# EXHIBIT A

SERVE THIS COPY

# COMMONWEALTH OF VIRGINIA



PRINCE WILLIAM CIRCUIT COURT
Civil Division
9311 LEE AVENUE ROOM 314
MANASSAS VA 20110

Summons

To: LIBERTY MUTAL INSURANCE CO
CORPORATION SERVICE COMPANY
REGISTERED AGENT
100 SHOCKOE SLIP, FL 2
RICHMOND VA 23219

Case No. 153CL26003866-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on,Tuesday, April 07, 2026

Clerk of Court: JACQUELINE C SMITH

by _____
(CLERK/DEPUTY CLERK )

Instructions:   CONTRACT ACTION COMPLAINT/EXHIBITS 1-15

Hearing Official:

Attorney's name:   BROWN, C THOMAS; ESQ
10621 JONES STREET, STE. 101
703-591-666
FAIRFAX VA 22030

VIRGINIA:

IN THE CIRCUIT COURT FOR PRINCE WILLIAM COUNTY

| | |
|---|---|
| ORO MASTER SUB 2, LLC<br>238 Potomac Ave<br>Quantico, VA 22134<br><br>        Plaintiff,<br><br>     v.<br><br>LIBERTY MUTUAL INSURANCE COMPANY,<br>175 Berkeley Street<br>Boston, MA 02116<br>Serve:  Corporation Service Company<br>        Registered Agent<br>        100 Shockoe Slip, Fl 2<br>        Richmond, VA 23219<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No.: _26-3866_<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

The Plaintiff, Oro Master Sub 2, LLC ("Plaintiff," "Oro," or "Insured"), by counsel, seeks entry of judgment against the Defendant, Liberty Mutual Insurance Company (the "Insurer," "Liberty Mutual," or "Defendant"), on the grounds set forth herein:

## THE PARTIES

1.  Oro Master, LLC is a Nevada Series Limited Liability Company.

2.  Oro Master Sub 2, LLC, is a sub-series entity of Oro Master, LLC. The membership and management structure is the same. Oro Master, LLC is the "main" entity that is renewed with the NV Secretary of State annually.

3.  The Plaintiff Oro Master Sub 2, LLC is a sub-series entity of Oro Master, LLC, a Nevada limited liability series LLC. Oro Master Sub 2, LLC is an independent sub-LLC under

1

Oro Master, LLC.  The members of Oro Master LLC are:  (1) Oro Assets Nevada Irrevocable Trust, dated May 20, 2013, in which Alan Golden is the Trustee; and (2) Alan Golden Living Trust, in which Alan Golden is the Trustee.

4.      Alan Golden is a citizen of the Commonwealth of Virginia.  The Plaintiff is therefore a citizen of Virginia.

5.      Upon information and belief, the Defendant Liberty Mutual Insurance Company is a Massachusetts corporation with its principal place of business located at 175 Berkeley St, Boston, MA, 02116.

6.      The citizenship of the Defendant is therefore Massachusetts.

7.      Upon information and belief, Defendant is registered to do business in Virginia and is, and was at all times relevant hereto, authorized to issue policies of insurance covering buildings and businesses, and related property and casualty insurance coverages, in the Commonwealth of Virginia.

<strong><u>FACTS MATERIAL TO ALL COUNTS</u></strong>

8.      All times material hereto, the Plaintiff has owned and/or had an insurable interest in the improved real property located at 238 Potomac Ave, Quantico, Virginia 22134 (the "Property" or "Insured Property"), including, but not limited to, the building(s) ("Building"), business and the business personal property ("BPP") located on said Property.

9.      The Plaintiff insured the Property, along with the BPP, by way of an insurance policy issued by Defendant to Plaintiff providing insurance coverage thereon and having the effective dates for the policy at issue November 16, 2024 to November 16, 2025, and the policy number BZS640984094 (the "Policy" or "Contract of Insurance").

2

10.    Upon information and belief, a true and accurate copy of the Policy is attached hereto as Exhibit 1.

11.    The Defendant alone drafted the Policy.

12.    At all times relevant hereto, the Policy was in full force and effect.

13.    At all times relevant hereto, all premiums on the Policy had been fully paid.

14.    The Policy constitutes a contract between the Plaintiff and the Insurer by which the Insurer agreed to accept certain risks and insure the Property, and by which the Plaintiff agreed to pay a premium.

15.    At all times relevant hereto, all of the premiums applicable to the Policy have been paid.

16.    The Policy contains a covenant by which the Defendant agreed to pay all losses in a timely manner and, in adjusting the loss, agreed to act in good faith, which the Insurer failed to do.

17.    At all times relevant hereto, the Insurer had a statutory duty to act in good faith as to the adjustment and handling of all insurance claims.

18.    The Plaintiff relied upon the Insurer's promises as set forth in the Policy and other representations made by the Insurer and its agent, when selecting the Insurer to provide insurance coverage on Plaintiff's Property, instead of insurance provided by other insurance carriers.

### Events Before the Loss

19.    The building included an Automatic Sprinkler System to protect the building from loss by fire.

20.    Before the loss, the Plaintiff had taken actions to protect the property from a water loss by that included, but were not limited to, the following:  (1) the insured had taken actions to

3

shut off the water supply and drain all water pipes in the building as to all domestic plumbing, but not to the sprinkler system; and (2) as to the Automatic Sprinkler System the sprinkler water supply was maintained and the Automatic Sprinkler System was maintained in working order providing "full protection" for the building; and (3) the Plaintiff had taken steps to maintain heat in the building.

21.    Prior to the loss, the water supply to the building had been shut off, and the water meter had been removed ensuing that there was no water supply to the building.

22.    The Plaintiff, understanding the need to maintain the Automatic Sprinkler System to provide "full protection", took steps to have the Automatic Sprinkler System connected directly to the city water supply, and at all times relevant hereto, while there was no water supply to the plumbing in the building, there was a water supply to the Automatic Sprinkler System.

23.    At all times hereto, the Automatic Sprinkler System was functional and the Plaintiff protected the system against freezing, which protections included, but were not limited to, the following:

a.  by providing gas heat to the building

b.  by setting the thermostats to 50-55 degrees;

c.  by supplying electricity to the building;

d.  by having the HVAC system maintained on a regular basis;

e.  by inspecting the building in the fall and winter, to, among other things, ensure that the building was being heated and that the Automatic Sprinkler system was protected against freezing;

4

f.   by leaving the doors open to all the rooms to ensure that the interior of the building was heated to above freezing to protect the Automatic Sprinkler System from freezing;

g.   By maintaining sufficient utilities to the building to operate the heating systems.

h.   By maintaining heat in the building from various furnaces located within the building;

i.   by having thermostats set at 50 degrees or above to protect the system against freezing;

j.   by taking actions to repair or restore any deficiencies in the heating system discovered upon inspection by the insured or by the HVAC company used to maintain the system.

All, among other things.

24.   In addition, the Plaintiff had taken steps to protect the Automatic Sprinkler System.

## The Inspection

25.   In or about November 2024, Dr. Golden visited the Property to inspect the same prior to the coming colder weather.

26.   At the time of that visit, Dr. Golden checked each of the furnaces and thermostats and confirmed that each was working and that heat was being supplied.

27.   At the time of the visit, Dr. Golden further ensured that all doors to each room were open so that heat could freely flow throughout the building and the rooms.

28. For the years before the January 23, 2025, Loss, the property had not sustained any instances of frozen sprinkler lines, with the protections being afforded by the Plaintiff being sufficient to protect the Automatic Sprinkler System.

29. On or about January 23, 2025, the Property sustained a loss that resulted in significant loss and damage to the Property and to the Plaintiff (the "Loss").

30. The Loss occurred when the sprinkler lines froze and burst at several places within the property.

31. Despite the Plaintiff's actions aforesaid in protecting the Automatic Sprinkler System, the sprinkler pipes froze and burst causing significant property damage.

32. The frozen sprinkler pipes burst which resulted in water being discharged from the broken sprinkler pipes into the building, causing significant damage.

33. At the time of the loss, the only pipes located in the building that had water supplied to them, or that had water in them at the time of the loss, were the sprinkler pipes since the water supply to all other pipes had been shut off and the pipes had been drained. As a result, the only pipes that ruptured and discharged water into the building at the time of the loss were the sprinkler pipes.

34. The Policy provides coverage for the Loss.

### Liberty Mutual's Bad Faith

35. Following the Loss, a claim was made with the Defendant insurer for the damage to the building from the burst pipes and ensuing water damage.

36. The insurer assigned Frank Schmidt, an employee of the Defendant, to investigate and adjust the loss.

6

37. Our onsite inspection was completed on or about January 28, 2025, by Frank Schmidt of Liberty Mutual Insurance, who met with the principal of the Plaintiff at the loss site.

38. At that inspection, the Plaintiff made clear that the water damage came from sprinkler pipes which burst and caused damage.

39. The insurer claims the sprinkler pipes leaked, however the loss was not due to leakage but was due to burst pipes.

40. The burst sprinkler pipes occurred despite the plaintiffs protection of the sprinkler pipes from freezing.

41. The Plaintiff had taken actions to ensure that heat was supplied to the building, the interior doors left open to ensure air flow, and the building and heating systems were inspected in November to ensure operability. In addition, the Plaintiff had taken other actions to protect the water pipes in the building, and water supply to those pipes had been drained and the water supply to those pipes was shut off.

42. The Plaintiff supplied the invoices from the plumber who responded to the loss and repaired the burst sprinkler lines.

43. The invoice from "My Plumbing Hearos" dated 1-24-25 demonstrates that there after the freezing temperatures in January there were several leaks that originated exclusively from burst sprinkler lines. Those lines were repaired, and Builders Fire Solutions, LLC was called to inspect and perform any sprinkler repairs necessary. That company replaced 3 sprinkler heads and pressurized the system.

44. Despite having this information, the Defendant's adjuster misrepresented the condition of the building to its engineer in an attempt to create false facts, which facts were untrue, to deny the claim.

7

45.    The Defendant then denied the claim based upon those false facts. The denial letter states as follows:

> Our onsite inspection was completed on or about January 28, 2025 by Frank Schmidt of Liberty Mutual Insurance. ... A summary of Mr. Bradley's findings are as follows in part: On or around January 23, 2025, two fire-protection water supply lines and two interior water lines failed, resulting in a water loss.

The above statement is false, as the loss was due to sprinkler pipes bursting and because there was no water supplied to the interior water lines, which had been drained.

46.    The Defendant sent its adjuster's report to an engineer for a bench review (he did not inspect the site but relied on what the Defendant had told him).

47.    That engineer recited the false facts told to him by the Defendant and the Defendant then sought to use the engineer's report to support its bad faith denial.

**Mitigation and Amount of Loss**

48.    Plaintiff mitigated its loss in reliance on the Insurer's covenant to act in good faith in adjusting the loss.

49.    In this regard, the Plaintiff incurred the following amounts in restoration of the water damage from the broken pipes:

    i.    Plumbing Heroes 1-24-2025 $2,678

    ii.    Sprinkler repairs $1,680

    iii.    Semper Dry invoices for water extraction, remediation, emergency services and the like in the amount of $224,378.07

50.    In addition to the repairs above, the building remains in a damaged state with the estimate cost to restore the building at $777,297.06. The amount of the loss, less a reasonable depreciation of 10% is $699,567 as the actual cash value to restore the building.

8

51.     The total loss as to the building is therefore $1,006,033.13 at replacement cost and $928,303.42 at actual cash value with a recoverable depreciation of $77,729.71.

52.     Despite the above, the Defendant, through its adjuster and employee Frank Schmidt, failed to adjust the loss in good faith, and failed to respond to inquiries as to the bad faith adjustment, including, but not limited to, those identified below.

53.     This claim was denied based upon Liberty Mutual's false claim and false representations that damage to the building occurred from 2 domestic water pipes, and ignoring the fact that the supply to the domestic water had been shut off and the pipes drained, and that the only water supply to the building was to the sprinkler pipes, which froze and resulted in the water damage claim.

54.     In its denial letter, a copy of which is attached hereto as Exhibit 1A, Liberty Mutual, through its adjuster, falsely stated that "On or around January 23, 2025, two fire-protection water supply lines and two interior water lines failed, resulting in a water loss" and further falsely stated that there were "facts as they are currently known" by the Defendant.

55.     The Defendant, however, knew that the factual recitation, and the denial based upon that wrongful factual recitation were false and were undertaken with the intention to have the Plaintiff and others rely upon the factual recitation.

56.     The Defendant knew that its representation that "two interior water lines failed, resulting in a water loss" was false since it was aware that the water supply had been turned off to the interior lines and that those lines had been drained.

57.     The Defendant's false representations were made as to an existing fact with the intention that the Plaintiff and others would rely upon those representations.

9

58.     The Plaintiff and the engineer who reviewed the claim in a bench review for the Defendant did rely upon those false representations, which false representations led to a wrongful denial of the claim.

59.     The Plaintiff relied to its detriment on the false statements made by the Defendant and incurred the costs and expenses of retaining a public adjuster and an attorney.

60.     Given the fact that no domestic water lines could leak since they were drained and had no supply, the Plaintiff through counsel sought to address the false statements made by the Defendant which over a series of communications, Liberty Mutual refused to respond to and refused to withdraw its denial.

61.     Liberty Mutuals continued refusal to address the factual predicate to its wrongful denial-which refusal remains to date.

62.     The Defendant denied the claim on or about April 3, 2025.  See Exhibit 1A.

63.     That denial was wrongful and was predicated on the false narrative created by the Defendant that 2 domestic water supply lines in the building burst.

64.     On many occasions, the Plaintiff requested a substantive response from the insurer addressing the false facts upon which its denial was predicated, including the following communications:

- May 1, 2025 letter from Goodman Gable Gould Company to Liberty Mutual which letter was substantively ignored.  See Exhibit 2.
- 8-19-25 letter to Becky Senn and Frank Schmidt who are employed by the Insurer either directly or indirectly.  See Exhibit 3.  That letter was ignored with an email response from Mr. Schmidt providing no substantive response but indicating that the case has been sent to Daniel Hunt.
- 8.20.25 Plaintiff's counsel sent an email sending the above letter to Mr. Daniel Hunt requesting a substantive response.  See Exhibit 4.
- 8.22.25 email from Hunt providing no substantive response but indicating only that "we maintain our coverage position….".  See Exhibit 5.

10

- 8.28.25 letter to Daniel Hunt again requesting a substantive response. See Exhibit 6 and 7.

- 9.3.25   An email to Daniel Hunt requesting a substantive response.  See Exhibits 8 and 9.

- 9.8.25 email from Daniel Hunt again failing to supply a substantive response, stating only that "our coverage position remains the same." See Exhibit 10.

- 9.8.25 letter to Daniel Hunt again asking for a substantive response.   See Exhibit 11.

- 9.24.25 letter to Liberty Mutual's counsel again asking for a substantive response, which was not supplied in response to that letter.  See Exhibit 12.

- 10.7.25 letter to Liberty Mutual's counsel again asking for a substantive response, which was not supplied in response to that letter.  See Exhibit 13.

- 10.28.25 letter to Liberty Mutual's counsel again asking for a substantive response, which was not supplied in response to that letter.  See Exhibit 14.

- 1-10-26 letter to Liberty Mutual's counsel again asking for a substantive response, which was not supplied in response to that letter.  See Exhibit 15.

65. In December, the Plaintiff, his retained expert, and his public adjuster met with the Insurer's representative and the Insurer's engineer, where it was demonstrated that the domestic water pipes prior to this loss had been drained and the supply shut off to the same.

66. Despite this, the Defendant again denied the claim and again relied in part on the false narrative which it knew not to be true as to the bursting of domestic water lines. See Exhibit 16.

67. Given Liberty Mutual's absolute failures above, and given the Defendants failure to provide any support for its denial based upon water discharge from interior pipes, and given the Defendants failure to respond to communications substantively and in a timely manner, and given the Defendants failure to provide periodic updates as required by code, and given the Defendants failure to adjust and pay this claim in good faith, it is clear that Liberty Mutual has acted in bad faith in connection with this claim and that this suit was therefore necessary.

11

68.     The Defendant's bad faith continues through today's date. Another demand was made on the insurer to (a) set the amount of the loss by demanding appraisal; and (b) still seeking an explanation for the Insurer's denial based upon domestic water pipes that could not have possibly been the cause of the loss.

69.     Liberty Mutual again refused to provide an explanation for its wrongful denial based upon false facts.

70.     Likewise, Liberty Mutual also refused to appraise the loss despite having an obligation to do so.

71.     All premiums have been paid by the Plaintiff to the Defendant for the insurance coverage.

72.     Conditions precedent to payment of this claim, if any, have either been met by the Plaintiff or waived by the Defendant.

## COUNT I
### *(Breach of Contract of Insurance)*

73.     Paragraphs 1-72 are incorporated herein.

74.     The Defendant and the Plaintiff entered into a Contract of Insurance for which Plaintiff has paid all premiums applicable hereto, and under which Defendant agreed to provide insurance coverage to the Plaintiff with regard to the Property.

75.     The insurance policy constitutes a contract by which the Plaintiff has paid premiums to the Defendant and the Defendant agreed to provide insurance coverage should a loss occur.

76.     A loss occurred but the Defendant has failed to meet its contractual obligation to pay the claim and failed to adjust the loss and treat the insured with good faith and fair dealing.

12

77.    Defendant is in breach of the Contract of Insurance for, among other things, its failure to pay the Claim in full, its failure to make prompt and full payment and its failure to act and otherwise adjust the loss in a timely manner and in good faith.

78.    The Insurer is further in breach of the Contract of Insurance for, the Defendants bad faith in failing and refusing to make full payment on the Insured's Claim, in failing and refusing to respond to communications in a timely and substantive fashion, in making misrepresentations and having its retained engineer also rely upon those misrepresentations, and for acting in bad faith in adjusting the Loss, which breaches have caused damage to Plaintiff.

79.    Plaintiff has been damaged as a result of Defendant's breaches of the Contract of Insurance in failing to adjust and pay the Claim in full and in failing to act in good faith as is set forth herein.

80.    Moreover, the Policy provides that the Insurer must initially pay or tender the "Actual Cash Value" of a covered Loss, which is calculated as being the full Replacement Cost that would be required to replace the damaged property, minus a discount for depreciation.

81.    The Plaintiff has been damaged in an amount not less than $1,250,000.00.

82.    The Insurer has an obligation to pay all amounts due under the insurance Policy, as determined by the appraisal, as a result of the Losses identified above, including the full replacement cost of damaged property.

WHEREFORE, the Plaintiff, moves this Honorable Court to enter judgment against the Defendant, Liberty Mutual Insurance Company, for compensatory damages in the amount of One Million Two Hundred and Fifty Thousand Dollars ($1,250,000), plus interest from the date of loss until the time of judgment at the legal rate and at the judgment rate thereafter until paid,, plus an

award of attorney's fees pursuant to Va. Code § 38.2-209, plus costs and such other relief as to

this Court may seem just and mete.

## COUNT II
*(Declaratory Judgment – Appraisal and as to the right of the Plaintiff to recover the
Replacement Cost of the loss)*

83.        Paragraphs 1-82 are incorporated herein.

84.        The Plaintiff has substantially complied with all contractual terms or those terms

have been waived, or the Insurer is estopped to rely thereon.

85.        The Policy contains an appraisal provision, which states in relevant part:

> *2. Appraisal*
> *If we and you disagree on the amount of loss,*
> *either may make written demand for an*
> *appraisal of the loss. In this event, each party*
> *will select a competent and impartial appraiser.*
> *The two appraisers will select an umpire. If*
> *they cannot agree, either may request that*
> *selection be made by a judge of a court having*
> *jurisdiction. The appraisers will state separately*
> *the amount of loss. If they fail to agree, they*
> *will submit their differences to the umpire. A*
> *decision agreed to by any two will be binding.*
> *Each party will:*
>
> *a. Pay its chosen appraiser; and*
>
> *b. Bear the other expenses of the appraisal*
>
> *and umpire equally. If there is an appraisal, we will still retain our*
> *right to deny the claim.*

See Exhibit. 1, Policy at bates page 56-57.

86.        The Policy included an implied contractual covenant that the Insurer would adjust

all Title 38.2 of the Code of Virginia applies to set the minimum standards for all insurance policies

and pursuant to Va. Code § 38.2-313 "All insurance contracts on or with respect to the ownership,

maintenance or use of property in this Commonwealth shall be deemed to have been made in and

14

shall be construed in accordance with the laws of this Commonwealth. Va. Code Ann. § 38.2-313

(Lexis Advance through 2025 Regular Session)

87.    Notably, Virginia Code § 38.2-2105 requires the Policy to contain the following

provision allowing for loss amounts to be established by appraisal:

> **Appraisal.** In case the insured and this Company shall fail to agree as to the actual cash value or the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within twenty days of such demand. The appraisers shall first select a competent and dis-interested umpire; and failing for fifteen days to agree upon such umpire, then, on request of the insured or this Company, such umpire shall be selected by a judge of a court of record in the state in which the property covered is located. The appraisers shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two when filed with this Company shall determine the amount of actual cash value and loss . . .

88.    To the extent that the policy language is less favorable to the Plaintiff than the code

required language, the code required language will control.

89.    Plaintiff has demanded that the amount of the loss and actual cash value be set by

appraisal, but the Defendant has refused to do so.

90.    The Insurer is in breach of Contract of Insurance, which breaches include, but are

not limited to, the failure to pay the claim and the failure to set the amount of loss and actual cash

value by appraisal.

91.    An actual controversy exists related to the Contract of Insurance and at this

juncture, the Plaintiff's rights cannot be adequately protected at law without a judgment

declaratory of its rights to obtain the full payment due under the Policy.

92.    The Insured is entitled to a declaratory judgment of his right to be paid the incurred

costs once incurred, after the insurer has fully paid the coverage set out in the appraisal award.

93.     Under the insurance policy and Title 38.2 of the Virginia Code, the Insurer has an obligation to initially pay the actual cash value, and upon replacement, restoration or repair, to pay for the difference between the actual cash value and the full replacement cost.

94.     Va. Code Ann. § 38.2-2119 provides that:

the policy shall permit the insured to assert a claim for the actual cash value of the property without prejudice to his right to thereafter assert a claim for the difference between the actual cash value and the full replacement cost unless a claim for full replacement cost has been previously resolved. Any claim for such difference must be made within six months of (i) the last date on which the insured received a payment for actual cash value or (ii) date of entry of a final order of a court of competent jurisdiction declaratory of the right of the insured to full replacement cost, whichever shall last occur.

95.     The Insurer has failed to properly value the personal property at replacement cost, and at actual cash value, and has set the amounts too low.

96.     The Insurer has failed to pay all amounts due for all items under the insurance Policy and under the appraisal award.

97.     Plaintiff is entitled to a judgment declaratory of its rights to obtain all such monies once all such repairs have been effected or items repaired or replaced including debris removal and code upgrades.

WHEREFORE, the Plaintiff, moves this Court to enter judgment against the Defendant, Liberty Mutual Insurance Company, for an order declaratory of Plaintiff's rights that the Insurer has an obligation to appraise the loss as to the amount of loss and actual cash value and that Plaintiff has a right to a judgment declaratory of its rights to recover the full replacement cost of the loss, and such other relief as to this Court may seem just and mete.

ORO MASTER SUB 2, LLC
By Counsel

16

C. Thomas Brown, Esquire
Va. State Bar No.: 23743
Erik B. Lawson, Esquire
Va. State Bar No.: 79656
SILVER & BROWN
10621 Jones Street, Suite 101
Fairfax, Virginia 22030
(703) 591-6666
(703) 591-5618 – Facsimile
*Counsel for Plaintiff*
tom@virginia-lawyers.net
erik@virginia-lawyers.net

## A TRIAL BY JURY IS DEMANDED

# EXHIBIT 1

# AFFIDAVIT

State of Indiana

County of Hamilton

NAME OF INSURED:    ORO MASTER SUB 2, LLC

POLICY NUMBER:    BZS 64098409

POLICY DATES:    11-16-2024 TO 11-16-2025

David Hager, archivist of

Ohio Security Insurance Company    and has compared the

attached copies of the insurance policy number listed above and its

endorsements with the original records of the policy of insurance and

endorsements contained in the Company's files and that the same is a

true and exact recital of all the provisions in the said original policy and

endorsements attached thereto.

David Alan Hager

David Hager
Policy Copy Archivist

March 25, 2025



**Liberty Mutual.**
INSURANCE

# Policyholder Information

| Named Insured & Mailing Address | Agent Mailing Address & Phone No. |
|---|---|
| ORO MASTER SUB 2, LLC<br>7814 STABLE WAY<br>POTOMAC, MD 20854-1791 | (410) 752-4008<br>R K TONGUE CO INC<br>4940 CAMPBELL BLVD STE 200<br>NOTTINGHAM, MD 21236-5911 |



Your Commercial Documents

## *Dear Policyholder:*

We know you work hard to build your business. We work together with your agent, **R K TONGUE CO INC    (410) 752-4008** to help protect the things you care about. Thank you for selecting us.

Enclosed are your insurance documents consisting of:

• Commercial Protector

To find your specific coverages, limits of liability, and premium, please refer to your Declarations page(s).

If you have any questions or changes that may affect your insurance needs, please contact your Agent  at (410) 752-4008

THIS IS NOT A BILL



**Reminders**

• Verify that all information is correct
• If you have any changes, please contact your Agent at (410) 752-4008
• In case of a claim, call your Agent or 1-844-325-2467

**You Need To Know**

• **NOTICE(S) TO POLICYHOLDER(S)**

The Important Notice(s) to Policyholder(s) provide a general explanation of changes in coverage to your policy. The Important Notice(s) to Policyholder(s) is not a part of your insurance policy and it does not alter policy provisions or conditions. Only the provisions of your policy determine the scope of your insurance protection. It is important that you read your policy carefully to determine your rights, duties and what is and is not covered.

**CONTINUED ON NEXT PAGE**

*To report a claim, call your Agent or 1-844-325-2467*

DS 70 20 01 21

**You Need To Know – continued**

| FORM NUMBER | TITLE |
|---|---|
| CNB 45 01 08 21 | Claims-Made Coverage Notice - Virginia |
| CNB 90 19 12 23 | Important Notice To Policyholder Changes and/or Clarifications In Coverage BP1504 - Exclusion - Access Or Disclosure Of Confidential Or Personal Material Or Information And BP1508 - Cyber Incident Liability Exclusion |
| CNI 90 11 07 18 | Reporting A Commercial Claim 24 Hours A Day |
| CNI 90 28 02 23 | Important Notice - Concealment, Misrepresentation or Fraud |
| CNI 90 33 04 24 | Important Notice To Policyholder Clarification/Change In Coverage Cyber Suite Coverage Endorsement |
| NP 10 84 11 22 | Important Notice To Policyholder Potential Changes And/Or Clarifications In Coverage Exclusion - PFC/PFAS |
| NP 70 53 02 24 | Virginia Notice Important Contact Information |
| NP 72 42 02 20 | Terrorism Insurance Premium Disclosure And Opportunity To Reject |
| NP 74 44 09 06 | U.S. Treasury Department's Office of Foreign Assets Control (OFAC) Advisory Notice to Policyholders |
| NP 88 10 09 10 | Virginia Changes (Employment Related Practices Liability Coverage |
| NP 90 09 09 21 | Important Policyholder Information Concerning Billing Practices - Virginia |
| NP 90 22 09 10 | Ordinance or Law Notice - Virginia |
| NP 91 62 05 12 | Virginia Earthquake Exclusion Advisory Notice to Policyholders |
| NP 98 20 01 15 | Jurisdictional Boiler And Pressure Vessel Inspections |
| SNI 04 01 06 24 | Liberty Mutual Group Privacy Notice |

This policy will be direct billed. You may choose to combine any number of policies on one bill with your billing account. Please contact your agent for more information.

*To report a claim, call your Agent or 1-844-325-2467*

**DS 70 20 01 21**

**CNB 45 01 08 21**

## CLAIMS-MADE COVERAGE NOTICE - VIRGINIA

### CYBER SUITE COVERAGE

You have purchased claims-made liability insurance. When this insurance terminates, we will send an offer with the available options for purchasing the supplemental extended reporting period. You may be entitled to receive information on claims under this policy. If you have any questions regarding your claims-made coverage or the importance of purchasing the supplemental extended reporting period, please contact us or your insurance agent.

**CNB 45 01 08 21**                                                                                                                        Page 1 of 1
© 2020, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

CNB 90 19 12 23

**IMPORTANT NOTICE TO POLICYHOLDER**
**CHANGES AND/OR CLARIFICATIONS IN COVERAGE**
**BP 15 04 – EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL MATERIAL OR**
**INFORMATION AND BP 15 08 – CYBER INCIDENT LIABILITY EXCLUSION**

Thank you for insuring your business with Liberty Mutual. We appreciate the trust and confidence you have placed in us. We take our responsibility to our customers seriously, and part of that responsibility is keeping you informed at all times.

**What you need to know**

**BP 15 04 – Exclusion – Access Or Disclosure Of Confidential Or Personal Material Or Information:**

1.  The following revisions have been made to clarify coverage:

    a.  Replaced damages with bodily injury and property damage;

    b.  The Electronic Data Exclusion provisions were deleted as this was restating the base form intent. As a result, the provisions addressing personal and advertising injury, bodily injury, and property damage were combined;

    c.  Biometric information was added to the types of material or information addressed in the exclusion; and

    d.  Material was added after confidential or personal to be consistent with the base form.

2.  The types of expenses addressed in the last paragraph of the exclusion are expressly extended to identity monitoring expenses, data restoration expenses and extortion expenses, which may result in a reduction of coverage.

**BP 18 03 – Cyber Incident Exclusion:**

This endorsement excludes bodily injury, property damage, or personal and advertising injury arising out of a cyber incident. While this endorsement is intended to clarify the coverage provided, the attachment of this exclusion may be considered a reduction in coverage from your existing policy or policies.

**Reviewing your coverage**

This notice provides information concerning the following endorsements, which may be attached to your renewal policy being issued by us. Please review your new or revised form and keep it with your policy.

| Expiring Form | Expiring Form Number | New Form | New Form Number |
|---|---|---|---|
| Exclusion – Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability – With Limited Bodily Injury Exception | BP 15 04 05 14 | Exclusion – Access Or Disclosure Of Confidential Or Personal Material Or Information | BP 15 04 12 23* |
| N/A | N/A | Cyber Incident Liability Exclusion | BP 18 03 12 23 |

* In CT & FL, this is a new form, not revised.

**We're here to help**

If you would like more information on this change or have any other questions about your policy, please contact the broker or agent shown on your Declarations Page.

**The above summary is for information purposes only and does not provide coverage. Your new Declarations Page, in conjunction with your policy and other applicable endorsements, provides complete details of your coverages. If this summary conflicts with the applicable policy language, the policy language prevails. Carefully read your policy, including all endorsements.**

CNI 90 11 07 18

# REPORTING A COMMERCIAL CLAIM 24 HOURS A DAY

**Liberty Mutual Insurance claims professionals across the United States are ready to resolve your claim quickly and fairly, so you and your team can focus on your business. Our claims teams are specialized, experienced and dedicated to a high standard of service.**

**We're Just a Call Away - One Phone Number to Report All Commercial Insurance Claims**

Reporting a new claim has never been easier. A Liberty Mutual customer service representative is available to you 24/7 at 1(844)325-2467 for reporting new property, auto, liability and workers' compensation claims. With contact centers strategically located throughout the country for continuity and accessibility, we're there when we're needed!

**Additional Resource for Workers' Compensation Customers**

In many states, employers are required by law to use state-specific workers compensation claims forms and posting notices. This type of information can be found in the Policyholders Toolkit section of our website along with other helpful resources such as:

- Direct links to state workers compensation websites where you can find state-specific claim forms
- Assistance finding local medical providers
- First Fill pharmacy forms - part of our managed care pharmacy program committed to helping injured workers recover and return to work

Our Policyholder Toolkit can be accessed at **www.libertymutualgroup.com/toolkit.**

For all claims inquiries please call us at 1(844)325-2467.

CNI 90 11 07 18                    © 2018 Liberty Mutual Insurance                    **Page 1 of 1**

CNI 90 28 02 23

## IMPORTANT NOTICE – CONCEALMENT, MISREPRESENTATION OR FRAUD

Thank you for insuring your business with Liberty Mutual. We appreciate the trust and confidence you have placed in us. We take our responsibility to our customers seriously, and part of that responsibility is keeping you informed at all times.

**What you need to know**

Your renewal policy includes an updated condition that permits us to void your policy and/or deny a claim at any point if you or any insured concealed or misrepresented a material fact or circumstance, made incorrect statements about any material fact, or engaged in fraud while applying for this policy or at any time during the policy period.

**Reviewing your coverage**

Please review your new endorsement and keep it with your policy.

**We're here to help**

If you would like more information on this change or have any other questions about your policy, please contact the broker or agent shown on your Declarations Page.

**The above summary is for information purposes only and does not provide coverage. Your new Declarations Page, in conjunction with your policy and other applicable endorsements, provides complete details of your coverages. If this summary conflicts with the applicable policy language, the policy language prevails. Carefully read your policy, including all endorsements.**

CNI 90 28 02 23                          © 2023 Liberty Mutual Insurance                          Page 1 of 1

CNI 90 33 04 24

## IMPORTANT NOTICE TO POLICYHOLDER
## CLARIFICATION/CHANGE IN COVERAGE
## CYBER SUITE COVERAGE ENDORSEMENT

Thank you for insuring your business with Liberty Mutual. We appreciate the trust and confidence you have placed in us. We take our responsibility to our customers seriously, and part of that responsibility is keeping you informed at all times.

**What you need to know**

There have been changes to the exclusions within the Cyber Suite Coverage form. You should review the updated form attached to your policy for specific coverage information.

**Reviewing your coverage**

Please review your updated form(s) and keep it with your policy.

**We're here to help**

If you would like more information on this change or have any other questions about your policy, please contact the broker or agent shown on your Declarations Page.

**The above summary is for information purposes only and does not provide coverage. Your new Declarations Page, in conjunction with your policy and other applicable endorsements, provides complete details of your coverages. If this summary conflicts with the applicable policy language, the policy language prevails. Carefully read your policy, including all endorsements.**

NP 10 84 11 22

**IMPORTANT NOTICE TO POLICYHOLDER**
**POTENTIAL CHANGES AND/OR CLARIFICATIONS IN COVERAGE**
**EXCLUSION – PFC/PFAS**

Dear Valued Policyholder,

Thank you for selecting us as your carrier for commercial insurance. We appreciate your business and the trust you place in us for your insurance needs.

Please read your policy, including all endorsements, and review your declarations page for complete coverage information. No coverage is provided by this notice, nor can it be construed to replace any provision of your policy. If there are discrepancies between your policy and this notice, the provisions of the policy shall prevail.

If you have any questions after reviewing this notice, please contact the broker or agent identified on your declarations page.

This notice does not form a part of your insurance contract. The notice is designed to alert you to a coverage change and/or clarification in your policy.

This notice provides information concerning the following endorsements, which may be attached to your renewal policy being issued by us.

**EXCLUSION – PFC/PFAS BP 90 99 03 22**
**EXCLUSION – PFC/PFAS CE 89 69 12 21**
**EXCLUSION – PFC/PFAS CG 93 74 03 22**
**EXCLUSION – PFC/PFAS CU 91 94 03 22**
**EXCLUSION – PFC/PFAS FL 88 45 03 22**

When Exclusion - PFC/PFAS endorsement is attached to your policy, coverage is excluded for liability arising out of perfluorinated compounds or per- and polyfluoroalkyl substances.

Thank you for your business.

NP 70 53 02 24

## VIRGINIA NOTICE

## IMPORTANT CONTACT INFORMATION

IMPORTANT INFORMATION REGARDING YOUR INSURANCE

In the event you need to contact someone about this insurance for any reason, please contact your agent. If no agent was involved in the sale of this insurance, or if you have additional questions, you may contact the insurance company issuing this insurance at the following address and telephone number:

Liberty Mutual Insurance
175 Berkeley Street
Boston, MA 02116
+1 (800) 344-0197

If you have been unable to contact or obtain satisfaction from the company or agent, you may contact the Virginia State Corporation Commission's Bureau of Insurance at:

Property and Casualty Division
State Corporation Commission
Bureau of Insurance
P.O. Box 1157
Richmond, VA 23218

In-state toll-free calls: 1-800-552-7945
Out-of-state calls: 804-371-9741

Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent, company or the Bureau of Insurance, have your policy number available.

ORO MASTER SUB 2, LLC

7814 STABLE WAY
⬤TOMAC, MD 20854-1791

(410) 752-4008
R K TONGUE CO INC

4940 CAMPBELL BLVD STE 200
NOTTINGHAM, MD 21236-5911

09/17/2024

BZS (25) 64 09 84 09
From 11/16/2024 To 11/16/2025

## TERRORISM INSURANCE PREMIUM DISCLOSURE AND
## OPPORTUNITY TO REJECT

**This notice contains important information about the Terrorism Risk Insurance Act and its effect on your policy. Please read it carefully.**

### THE TERRORISM RISK INSURANCE ACT

The Terrorism Risk Insurance Act, including all amendments ("TRIA" or the "Act"), establishes a program to spread the risk of catastrophic losses from certain acts of terrorism between insurers and the federal government. If an individual insurer's losses from "certified acts of terrorism" exceed a specified deductible amount, the government will generally reimburse the insurer for a percentage of losses (the "Federal Share") paid in excess of the deductible, but only if aggregate industry losses from such acts exceed the "Program Trigger". An insurer that has met its insurer deductible is not liable for any portion of losses in excess of $100 billion per year. Similarly, the federal government is not liable for any losses covered by the Act that exceed this amount. If aggregate insured losses exceed $100 billion, losses up to that amount may be pro-⬤ted, as determined by the Secretary of the Treasury.

Beginning in calendar year 2020, the Federal Share is 80% and the Program Trigger is $200,000,000.

### MANDATORY OFFER OF COVERAGE FOR "CERTIFIED ACTS OF TERRORISM" AND DISCLOSURE OF PREMIUM

TRIA requires insurers to make coverage available for any loss that occurs within the United States (or outside of the U.S. in the case of U.S. missions and certain air carriers and vessels), results from a "certified act of terrorism" AND that is otherwise covered under your policy.

A "certified act of terrorism" means:
Any act that is certified by the Secretary [of the Treasury], in consultation with the Secretary of Homeland Security, and the Attorney General of the United States

(i)   to be an act of terrorism;

(ii)  to be a violent act or an act that is dangerous to

(I)   human life;
(II)  property; or
(III) infrastructure;

(iii) to have resulted in damage within the United States, or outside of the United States in the case of

(I)   an air carrier (as defined in section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States); or

NP 72 42 02 20                        © 2020 Liberty Mutual Insurance                        Page 1 of 2

(II) the premises of a United States mission; and

(iv) to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

## REJECTING TERRORISM INSURANCE COVERAGE - WHAT YOU MUST DO

We have included in your policy coverage for losses resulting from "certified acts of terrorism" as defined above.

THE PREMIUM CHARGE FOR THIS COVERAGE APPEARS ON THE DECLARATIONS PAGE OF THE POLICY AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT. If we are providing you with a quote, the premium charge will also appear on your quote as a separate line item charge.

IF YOU CHOOSE TO REJECT THIS COVERAGE, PLEASE CHECK THE BOX BELOW, SIGN THE ACKNOWLEDGMENT, AND RETURN THIS FORM TO YOUR AGENT: **Please ensure any rejection is received within thirty (30) days of the effective date of your policy.**

Before making a decision to reject terrorism insurance, refer to the Disclaimer for Standard Fire Policy States located at the end of this Notice.

☐  I hereby reject this offer of coverage. I understand that by rejecting this offer, I will have no coverage for losses arising from "certified acts of terrorism" and my policy will be endorsed accordingly.

| Policyholder/Applicant's Signature | Print Name | Date Signed |
| --- | --- | --- |
| | | |

| Named Insured | Policy Number |
| --- | --- |
| ORO MASTER SUB 2, LLC | BZS (25) 64 09 84 09 |

Policy Effective/Expiration Date
From 11/16/2024 To 11/16/2025

**IF YOU REJECTED THIS COVERAGE, PLEASE RETURN THIS FORM TO YOUR AGENT.**

Note: Certain states (currently CA, GA, IA, IL, ME, MO, NY, NC, NJ, OR, RI, WA, WI and WV) mandate coverage for loss caused by fire following a "certified act of terrorism" in certain types of insurance policies. If you reject TRIA coverage in these states on those policies, you will not be charged any additional premium for that state mandated coverage.

**The summary of the Act and the coverage under your policy contained in this notice is necessarily general in nature. Your policy contains specific terms, definitions, exclusions and conditions. In case of any conflict, your policy language will control the resolution of all coverage questions. Please read your policy carefully.**

If you have any questions regarding this notice, please contact your agent.



NP 72 42 02 20    © 2020 Liberty Mutual Insurance    Page 2 of 2

NP 74 44 09 06

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

Please refer any questions you may have to your insurance agent.

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site - http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

© 2011 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

NP 74 44 09 06

**Page 1 of 1**

**NP 88 10 09 10**

## VIRGINIA  NOTICE

## CLAIMS-MADE  COVERAGE AND  THE AVAILABILITY  OF EXTENDED DISCOVERY PERIODS OR EXTENDED REPORTING  PERIODS

You have purchased  an insurance  policy that contains  claims-made  liability  coverage.  Please read this policy  carefully  to understand  your coverage.  There are certain circumstances  in which  you must be pro-vided the opportunity  to purchase  an extended  discovery  or reporting  period for reporting  claims.  These are explained  in your policy.  If you have any questions  regarding  the cost of an extended  discovery  or reporting period or the available  options  under the extended  discovery  or reporting  period, please contact us or your insurance  agent.

© 2011 Liberty Mutual Agency Corporation. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

NP 88 10 09 10    **Page 1 of 1**

NP 90 09 09 21

# IMPORTANT POLICYHOLDER INFORMATION
## CONCERNING BILLING PRACTICES – VIRGINIA

**Dear Valued Policyholder:** This insert provides you with important information about our policy billing practices that may affect you. Please review it carefully and contact your agent if you have any questions.

**Premium Notice:** We will mail you a policy Premium Notice separately. The Premium Notice will provide you with specifics regarding your agent, the account and policy billed, the billing company, payment plan, policy number, transaction dates, description of transactions, charges/credits, policy amount balance, minimum amount, and payment due date. This insert explains fees that may apply to and be shown on your Premium Notice.

**Available Premium Payment Plans:**

- **Annual Payment Plan:** When this plan applies, you have elected to pay the entire premium amount balance shown on your Premium Notice in full. No installment billing fee applies when the Annual Payment Plan applies.
- **Installment Payment Plan:** When this plan applies, you have elected to pay your policy premium in installments (e.g.: quarterly or monthly installments – Installment Payment Plans vary by state). As noted below, an installment fee may apply when the Installment Payment Plan applies.

The Premium Payment Plan that applies to your policy is shown on the top of your Premium Notice. Please contact your agent if you want to change your Payment Plan election.

**Installment Payment Plan Fee:** If you elected to pay your premiums in installments using the Installment Premium Payment Plan, an installment billing fee applies to each installment bill. The installment billing charge will not apply, however, if you pay the entire balance due when you receive the bill for the first installment. Because the amount of the installment charge varies from state to state, please consult your Premium Notice for the actual fee that applies.

**Dishonored Payment Fee:** Your financial institution may refuse to honor the premium payment withdrawal request you submit to us due to insufficient funds in your account or for some other reason. If that is the case, and your premium payment withdrawal request is returned to us dishonored, a payment return fee will apply. Because the amount of the return fee varies from state to state, please consult your Premium Notice for the actual fee that applies.

**Late Payment Fee:** If we do not receive the minimum amount due on or before the date or time the payment is due, as indicated on your Premium Notice, you will receive a policy cancellation notice effective at a future date that will also reflect a late payment fee charge. Issuance of the cancellation notice due to non-payment of a scheduled installment(s) may result in the billing and collection of all or part of any outstanding premiums due for the policy period. Late Payment Fees vary from state to state and are not applicable in some states.

**Special Note:** Please note that some states do not permit the charging of certain fees. Therefore, if your state does not allow the charging of an Installment Payment Plan, Dishonored Payment or Late Payment Fee, the disallowed fee will not be charged and will not be included on your Premium Notice.

**EFT-Automatic Withdrawals Payment Option:** When you select this option, you will not be sent any premium notices, and in most cases, will be charged installment fees. For more information on our EFT-Automatic Withdrawals program, refer to the attached EFT enrollment sheet.

**Schedule of Fees Type
of Fee** Installment

| | | **Fee Amount** |
|---|---|---|
| Payment Plan | EFT-Automatic Withdrawals Payment Options | $5.00 |
| | All Other Payment Options | $8.00 |
| Dishonored Payment | | $25.00 |
| Late Payment | | $25.00 |

Once again, please contact your agent if you have any questions about the above billing practice information.

**Thank you for selecting us to service your insurance needs.**

Page 2 of 2                    © 2021 Liberty Mutual Insurance                    **NP 90 09 09 21**

NP 90 22 09 10

## IMPORTANT NOTICE
## CONCERNING VIRGINIA CODE ANN. SECTION 38 2-2124
## BUILDING ORDINANCE OR LAW COVERAGE

To: Our Policyholders

Coverage can now be added to your policy for increased costs to repair or replace damaged property due to the application of ordinances or laws that regulate construction, repair or demolition.

This additional coverage provides protection when a building damaged by a covered cause of loss must be repaired or replaced in a more costly manner because the type of construction used, when the building was built, does not comply with current building codes. Coverage can also be provided when ordinances or laws require the demolition of the damaged building, including undamaged portions, prior to rebuilding in compliance with current building codes.

A. Description of Coverages Available:

   1. Coverage For Loss To The Undamaged Portion Of The Building - Covers loss in value of the undamaged portion of the building due to demolition pursuant to a building ordinance or law. This is not a separate limit of insurance. Building coverage is extended to include loss to the undamaged portion of the building.

   2. Demolition Cost Coverage - Covers the cost of demolishing and removing the debris of the undamaged portion of the building, if demolition is required by building ordinance or law. This coverage is not included in the Limit of Insurance applicable to the building.

   3. Increased Cost Of Construction - Covers the increased cost to repair, reconstruct or remodel damaged or undamaged parts of the building to comply with building ordinance or law, following damage to the building by a covered cause of loss. This coverage is not included in the Limit of Insurance applicable to the building.

B. There are two Coverages available:

   1. Ordinance or Law provides the coverages described in A. above, subject to an exclusion of all costs associated with the enforcement of an ordinance or law pertaining to pollution cleanup or assessment.

   2. Ordinance or Law Coverage - Virginia (Broad) Endorsement provides the coverages described in A. above, but does not exclude all costs associated with the enforcement of an ordinance or law pertaining to pollutant cleanup or assessment. It excludes testing for the existence, concentrat ion or effects of pollutants unless such testing is performed in the course of pollutant cleanup of the building and is required by the ordinance or law. Pollutant cleanup coverage includes cleanup of undamaged parts of a damaged building, if the ordinance or law so requires.

*This notice does not provide any coverage and should not be construed to replace any provision of your policy or endorsements. If there is any conflict between your policy or endorsements and this notice, the provisions of your policy and endorsements shall prevail.*

© 2012 Liberty Mutual Insurance. All rights reserved.
NP 90 22 09 10    Includes copyrighted material of Insurance Services Office, Inc., with its permission.    Page 1 of 1

NP 91 62 05 12

# VIRGINIA EARTHQUAKE EXCLUSION
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations Page for complete information on the coverages you are provided. If there is any conflict between the policy and this Advisory Notice to Policyholders, THE PROVISIONS OF YOUR POLICY PREVAIL.

## EARTHQUAKE EXCLUSION

Unless an endorsement providing earthquake coverage is attached to your policy, or earthquake coverage is shown on your Declarations Page, your policy does not protect you against losses from earthquakes. Earthquake coverage is excluded unless purchased by endorsement.

If you have questions regarding this notice or need information regarding the availability or purchase of earthquake insurance, please contact your insurance agent.

© 2012 Liberty Mutual Insurance
NP 91 62 05 12    Includes copyrighted material of Insurance Services Office, Inc., with its permission.    Page 1 of 1

NP 98 20 01 15

# JURISDICTIONAL BOILER AND PRESSURE VESSEL INSPECTIONS

Most jurisdictions (cities or states) are governed by laws and regulations that require owners of boilers and pressure vessels to have their equipment inspected on a routine basis. Jurisdictions require that equipment is installed and operated according to these regulations, and it is the equipment breakdown engineering inspector's responsibility to verify the equipment complies with all requirements.

Liberty Mutual Equipment Breakdown is a National Board Accredited Authorized Inspection Agency. This designation is recognized by authorities having jurisdictions in the U.S. & provinces of Canada and gives Liberty Mutual commissioned inspectors the ability to perform jurisdictionally required inspection on boilers and pressure vessels at insured locations. We have field inspectors strategically located throughout the U.S. to perform boiler and pressure vessel inspection for our customers and clients.

To request a Jurisdictional Inspection please:

- **Call the LMEB Hotline (877) 526-0020**

Or

- **Email your request to <u>LMEBInspections@Libertymutual.com</u>**

The assigned EB Risk Engineer will call to schedule within 24 - 48 hours. When requesting an inspection please include the following:

- Current Policy Number
- Location Address
- Contact Name
- Contact Phone Number and/or Email Address

**LIBERTY MUTUAL GROUP PRIVACY NOTICE**
Commercial Lines (excluding Workers' Compensation)
(Effective June 2024)

Liberty Mutual Group and its affiliates, subsidiaries, and partners (collectively "Liberty Mutual" or "we", "us" and "our") provide insurance to companies and other insurers. This Privacy Notice explains how we gather, use, and share your data. This Privacy Notice applies to you if you are a **Liberty Mutual commercial line insured or are a commercial line claimant**. It does not apply to covered employees or claimants under Workers' Compensation policies. If this notice does not apply to you, go to libertymutual.com/privacy to review the applicable Liberty Mutual privacy notice.

**What Data Does Liberty Mutual Gather?**

The types of personal data we gather and share depend on both the product and your relationship to us. For example, we may gather different data if you are a claimant reporting an injury than if you want a quote for commercial property insurance. The data we gather can include your Social Security Number, income, transaction data such as account balances and payment history, and data from consumer reports. It may also include data gathered in connection with our provision of insurance services, when you apply for such services, or resulting from other contacts with you. It may also include:

- **Identifiers**, including a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security Number, driver's license number, or other similar identifiers;
- **Personal information**, such as your name, signature, Social Security Number, physical characteristics or description, address, telephone number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, financial information, medical information, or health insurance information;
- **Protected classification characteristics**, including age, race, color, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, or veteran or military status;
- **Commercial information**, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consumer histories and tendencies;
- **Internet or other similar network activity**, including browsing history, search history, information on a consumer's interaction with a website, application, or advertisement;
- **Professional or employment related information**, including current or past job history or performance evaluations;
- **Inferences drawn from other personal information**, such as a profile reflecting a person's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes;
- **Risk data**, including data about your driving and/or accident history; this may include data from consumer reporting agencies, such as your motor vehicle records, and loss history information, health data, or criminal convictions;
- **Claims data**, including data about your previous and current claims, which may include data regarding your health, criminal convictions, third party reports, or other personal data; and
- **Sensitive Data** as defined under the California Privacy Rights Act when used to infer characteristics of an individual.

**How Do You Gather My Data?**

| We gather your personal data **directly from you**. For example, you provide us with data when you: | We also gather your personal data **from other people**. For example: |
|---|---|
| • ask about, buy insurance, or file a claim | • your insurance agent or broker |
| • pay your policy | • your employer, association, or business (if you are insured through them) |
| • visit our websites, call us, or visit our office | • our affiliates or other insurance companies about your transactions with them |
| | • consumer reporting agencies, Motor Vehicle Departments, and inspection services, to gather your credit history, driving record, claims history, or value and condition of your property |
| | • other public directories and sources |
| | • third parties, including other insurers, brokers and insurance support organizations who you have communicated with about your policy or claim, anti-fraud databases, sanctions lists, court judgments and other databases, government agencies, open electoral register, or in the event of a claim, third parties including other parties to the claim witnesses, experts, loss adjusters and claim handlers |
| | • other third parties who take out a policy with us and are required to provide your data such as when you are named as a beneficiary or where a family member has taken out a policy which requires your personal data |

Organizations that share data with us may keep it and disclose it to others as permitted by law.

**How Does Liberty Mutual Use My Data?**

Liberty Mutual uses your data to provide you with our products and services, and as otherwise provided in this Privacy Notice. We may use your data and the data of our former customers for our business and other compatible purposes. Our business purposes include, for example:

| Business Purpose | Data Categories | Do We Sell or Share Your Data as Defined by CPRA? |
|---|---|---|
| **Market, sell and provide insurance.** This includes, for example:<br>• calculating your premium;<br>• determining your eligibility for a quote;<br>• confirming your identity and servicing your policy; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data<br>• Sensitive Data | • No |

SNI 04 01 06 24                  © 2024 Liberty Mutual Insurance                  Page 2 of 6

| Business Purpose | Data Categories | Do We Sell or Share Your Data as Defined by CPRA? |
|---|---|---|
| **Manage your claim.** This includes, for example:<br>• managing your claim, if any;<br>• conducting claims investigations;<br>• conducting medical examinations;<br>• conducting inspections, appraisals;<br>• providing roadside assistance;<br>• providing rental car replacement or repairs; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data | • No |
| **Day to Day Business and Insurance Operations.** This includes, for example:<br>• creating, maintaining, customizing, and securing accounts;<br>• supporting day-to-day business and insurance related functions;<br>• doing internal research for technology and development;<br>• marketing, advertising and creating products and services;<br>• conducting audits related to a current contact with a consumer and other transactions;<br>• as described at or before the point of gathering personal data or with your authorization; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data | • No |
| **Security and Fraud Detection.** This includes, for example:<br>• detecting security issues;<br>• protecting against fraud or illegal activity, and to comply with regulatory and law enforcement authorities;<br>• managing risk and securing our systems, assets, infrastructure, and premises;<br>• help to ensure the safety and security of Liberty Mutual staff, assets, and resources, which may include physical and virtual access controls and access rights management;<br>• supervisory controls and other monitoring and reviews, as permitted by law; and emergency and business continuity management; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data | • No |

| Business Purpose | Data Categories | Do We Sell or Share Your Data as Defined by CPRA? |
|---|---|---|
| **Regulatory and Legal Requirements.** This includes for example:<br>• controls and access rights management;<br>• to evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of Liberty's Mutual's assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which personal data held by Liberty Mutual is among the assets transferred;<br>• exercising and defending our legal rights and positions;<br>• to meet Liberty Mutual contractual obligations;<br>• to respond to law enforcement requests as required by applicable law, court order, or governmental regulations;<br>• as otherwise permitted by law; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data | • No |
| **Improve Your Customer Experience and Our Products.** This includes, for example:<br>• improve your customer experience, our products, and service;<br>• to provide support, personalize, and develop our website, products, and services;<br>• create and offer new products and services; | • Identifiers<br>• Personal Information<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data | • No |
| **Analytics to identify, understand, and manage our risks and products.** This includes, for example:<br>• conducting analytics to better identify, understand, and manage risk and our products. | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information;<br>• Risk data<br>• Claims data<br>• Sensitive Data | • No |

| Business Purpose | Data Categories | Do We Sell or Share Your Data as Defined by CPRA? |
|---|---|---|
| **Customer service and technical support.** This includes, for example:<br>• answer questions and provide notifications;<br>• provide customer and technical support. | • Identifiers<br>• Personal Information<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data | • No |
| **Cross-Context Behavioral Advertising** | • Identifiers<br>• IP address<br>• Internet or other similar network activity | • We share this information with service providers such as search engines and social media platforms. |

Liberty Mutual will not collect additional categories of personal information or use the personal information we collected for materially unrelated, or incompatible purposes without updating our notice.

## How Does Liberty Mutual Share My Data?

Liberty Mutual does not sell your personal data as defined by California law.

Liberty Mutual shares your personal data as disclosed above. The California privacy law defines sharing as "communicating orally, in writing, or by electronic or other means, a consumers personal information, to a third party for cross-context behavioral advertising, whether or not for monetary or other valuable consideration". This occurs when you visit the Liberty Mutual website. Cookies or pixels are deployed that then allow us to show you targeted advertisements when you visit other websites or social media platforms.

This type of sharing is different from disclosing personal information to other entities to perform a service related to providing insurance or processing your claim. Liberty Mutual may disclose personal data with the following categories of affiliated and non-affiliated third parties:

- Liberty Mutual affiliates;
- Service Providers (such as auto repair facilities, towing companies, property inspectors, and independent adjusters);
- Insurance support organizations;
- Brokers and agents;
- Public entities (e.g. regulatory, quasi-regulatory, tax or other authorities, law enforcement agencies, courts, arbitrational bodies, and fraud prevention agencies);
- Consumer reporting agencies;
- Professional advisors including law firms, accountants, auditors, and tax advisors;
- Insurers, re-insurers, policy holders, and claimants;
- Group policyholders (for reporting claims data or an audit);
- A person, organization, affiliates or service providers conducting actuarial or research studies; and
- As permitted by law.

We may also disclose data with other companies that provide marketing services on our behalf or as part of a joint marketing agreement for products offered by Liberty Mutual. We will not disclose your personal data with others for their own marketing purposes.

We may also disclose data about our transactions (such as payment history) and experiences (such as claims made) with you to our affiliates.

Liberty Mutual may disclose the following categories of personal data to service providers for business purposes:
Identifiers                                Personal Data

SNI 04 01 06 24                      © 2024 Liberty Mutual Insurance                      Page 5 of 6

Protected Classification Characteristics
Internet or other similar network activity
Inferences drawn from personal data
Professional, employment, and education information

Commercial Information
Claims Data
Risk Data

## How Do We Keep Your Personal Data Safe?

We maintain physical, electronic, and procedural safeguards to protect your non-public personal information. These safeguards comply with applicable laws. Our employees and agents are authorized to access your data only for legitimate business purposes.

## How Long Does Liberty Mutual Retain Each Category of Personal Data?

We retain your information in accordance with our legal obligations, our records retention policies, or as otherwise permitted by law. For example, we may have a legal obligation to retain information relating to your policies or claims with us. We will delete your data once the legal obligation expires or after the period of time specified in our records retention policies. The period of retention is subject to our review and alteration.

## Children's Privacy

We do not direct our services to individuals under the age of 13 and we request that these individuals do not provide personal data through our services.

## What Rights Do I Have to Learn More About My Personal Data?

Individuals may request access to a copy of their personal information. We will honor requests for access after we have verified your identity. We will grant two requests per year after. A request may be made to us by contacting us as described below.

You may have additional rights if you are a resident of California. For information about our data practices in the last 12 months, including the types of personal data we have collected, from whom we gathered that data, and with whom we disclosed the data, please go to Lmi.co/caprivacynotices and click on the link for the California Privacy Policy (Consumers). As a California resident, you also have the right to opt-out of cross-context behavioral advertising. You can learn more about those rights at lmi.co/caprivacychoices. To learn more about these and other privacy rights you may have as a California resident, please see the California Privacy Policy (Consumers). If you cannot access the link, please contact us.

## Will Liberty Mutual Update This Privacy Notice?

We reserve the right to make changes to this notice at any time and for any reason. The updated version of this notice will be effective once it is posted online at https://www.libertymutual.com/. You are responsible for reviewing this notice to stay informed of any changes or updates.

## Who Do I Contact Regarding Privacy?

You can submit requests, seek additional information, or obtain a copy of our Privacy Notice in an alternative format by either:

**Calling**: 800-344-0197

**Email**: Privacy@libertymutual.com

**Online**: Libertymutualgroup.com/privacy-policy/data-request

**Postal Address**: Liberty Mutual Insurance Company
175 Berkeley St., 6th Floor
Boston, MA 02116
Attn: Privacy Office



**Liberty Mutual. INSURANCE**

**Coverage Is Provided In:**
Ohio Security Insurance Company

Policy Number:
**BZS (25) 64 09 84 09**

Policy Period:
**From 11/16/2024 To 11/16/2025**
*12:01 am Standard Time*
*at Insured Mailing Location*

# Common Policy Declarations

---

| **Named Insured & Mailing Address** | **Agent Mailing Address & Phone No.** |
|---|---|
| ORO MASTER SUB 2, LLC<br>7814 STABLE WAY<br>POTOMAC, MD 20854-1791 | (410) 752-4008<br>R K TONGUE CO INC<br>4940 CAMPBELL BLVD STE 200<br>NOTTINGHAM, MD 21236-5911 |

**Named Insured Is:** LIMITED LIABILITY COMPANY

**Named Insured Business Is:** DENTAL OFFICE

*In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.*

## SUMMARY OF COVERAGE PARTS AND CHARGES

These Declarations together with the Businessowners Coverage Form (and other applicable forms and endorsements, if any, issued to form a part of them) complete this policy.

| COVERAGE PART | CHARGES |
|---|---|
| **Commercial Protector** | $6,053.00 |

**Total Charges for all of the above coverage parts:** **$6,053.00**

**Certified Acts of Terrorism Coverage:** **$30.00** **(Included)**

*Note: This is not a bill*

## IMPORTANT MESSAGES

- Equipment Breakdown Enhancement Is Included - See Policy Forms and Endorsements summary

---

Issue Date        09/17/2024

Authorized Representative

*To report a claim, call your Agent or 1-844-325-2467*

DS 70 21 11 16



**Liberty Mutual.**
INSURANCE

**Coverage Is Provided In:**
Ohio Security Insurance Company

Policy Number:
**BZS (25) 64 09 84 09**

Policy Period:
**From 11/16/2024 To 11/16/2025**
*12:01 am Standard Time*
*at Insured Mailing Location*

## Common Policy Declarations

| Named Insured & Mailing Address | Agent Mailing Address & Phone No. |
|---|---|
| ORO MASTER SUB 2, LLC | (410) 752-4008<br>R K TONGUE CO INC |

### SUMMARY OF LOCATION(S) & PREMIUM(S)

0001   238 Potomac Ave, Quantico, VA 22134-3459                              *$5,698.00*

### POLICY FORMS AND ENDORSEMENTS

This section lists the Forms and Endorsements for your policy. Refer to these documents as needed for detailed information concerning your coverage.

| FORM NUMBER | TITLE |
|---|---|
| BP 00 03 07 13 | Businessowners Coverage Form |
| BP 01 32 03 20 | Virginia Changes |
| BP 04 17 01 10 | Employment - Related Practices Exclusion |
| BP 04 30 07 13 | Protective Safeguards |
| BP 04 39 07 02 | Abuse Or Molestation Exclusion |
| BP 05 23 01 15 | Cap On Losses From Certified Acts Of Terrorism |
| BP 05 65 01 15 | Conditional Exclusion of Terrorism Involving Nuclear, Biological or Chemical Terrorism (Relating to Disposition of Federal Terrorism Risk Insurance Act) |
| BP 05 77 01 06 | Fungi or Bacteria Exclusion (Liability) |
| BP 07 04 01 06 | Property Damage Liability Deductibles (Per Occurrence Basis) |
| BP 12 16 07 02 | Virginia - Effective Time Changes - Replacement of 12 Noon |
| BP 12 17 07 02 | Virginia Changes - Time Period |
| BP 14 86 07 13 | Communicable Disease Exclusion |
| BP 15 04 12 23 | Exclusion - Access Or Disclosure Of Confidential Or Personal Material Or Information |
| BP 18 03 12 23 | Cyber Incident Liability Exclusion |
| BP 79 19 09 16 | Businessowners Property Extension Endorsement |
| BP 79 74 07 13 | Amendment of Pollution Exclusion (Premises) |
| BP 80 56 07 13 | Medical Office Endorsement |
| BP 80 65 01 07 | Spoilage Coverage Endorsement |
| BP 81 15 03 11 | Exclusion - Asbestos |
| BP 82 37 08 15 | Equipment Breakdown Coverage Endorsement |
| BP 82 46 06 09 | Employment - Related Practices Liability Coverage |
| BP 82 85 09 16 | Virginia - Businessowners Liability Extension Endorsement |

*To report a claim, call your Agent or 1-844-325-2467*

**DS 70 21 11 16**



**Liberty Mutual.**
INSURANCE

**Coverage Is Provided In:**
Ohio Security Insurance Company

Policy Number:
**BZS (25) 64 09 84 09**

Policy Period:
**From 11/16/2024 To 11/16/2025**
*12:01 am Standard Time*
*at Insured Mailing Location*

# Common Policy Declarations

**Named Insured & Mailing Address**

ORO MASTER SUB 2, LLC

**Agent Mailing Address & Phone No.**

(410) 752-4008
R K TONGUE CO INC

## POLICY FORMS AND ENDORSEMENTS

This section lists the Forms and Endorsements for your policy. Refer to these documents as needed for detailed information concerning your coverage.

| FORM NUMBER | TITLE |
|---|---|
| BP 88 04 03 14 | Exclusion - Professional Services (Real Estate Agents, Insurance Agents, Travel Agents, Financial Services, Computer Software, Insurance Operations) |
| BP 88 16 09 20 | Business Income Changes - 24 Hour Time Period |
| BP 88 55 09 16 | Virginia Changes Amendment |
| BP 88 56 08 20 | Virginia Changes - Employment-Related Practices Liability |
| BP 88 77 07 13 | Identity Theft Administrative Services and Expense Coverage |
| BP 88 78 07 13 | Business Personal Property Limit - Automatic Increase |
| BP 89 38 07 19 | Non-Cumulation of Liability Limits (Same Occurrence) |
| BP 90 38 01 21 | Cyber Incident Exclusion |
| BP 90 41 04 24 | Cyber Suite Coverage Endorsement |
| BP 90 73 08 21 | Virginia Changes Amendatory Endorsement |
| BP 90 99 03 22 | Exclusion - PFC/PFAS |
| BP 91 00 10 22 | Exclusion - Biometric Information Privacy Claim |
| BP 91 08 09 23 | Amendment Of Concealment, Misrepresentation Or Fraud Condition |

In witness whereof, we have caused this policy to be signed by our authorized officers.

Damon Hart
Secretary

Hamid Mirza
President

**To report a claim, call your Agent or 1-844-325-2467**

DS 70 21 11 16


**Liberty Mutual.**
**INSURANCE**

**Coverage Is Provided In:**
Ohio Security Insurance Company

Policy Number:
**BZS (25) 64 09 84 09**

Policy Period:
**From 11/16/2024 To 11/16/2025**
*12:01 am Standard Time*
*at Insured Mailing Location*

## Commercial Protector
## Policy Declarations

| Named Insured & Mailing Address | Agent Mailing Address & Phone No. |
|---|---|
| ORO MASTER SUB 2, LLC | (410) 752-4008<br>R K TONGUE CO INC |

## SUMMARY OF LIMITS AND CHARGES

**Businessowners Liability Limits of Insurance**

| DESCRIPTION | LIMIT |
|---|---|
| Liability and Medical Expenses - Occurrence | 1,000,000 |
| Aggregate Limits of Insurance | |
|     Products-Completed Operations | 2,000,000 |
|     Other than Products-Completed Operations | 2,000,000 |
| Broadened Coverage For Damage To Premises Rented To You | 1,000,000 |
| Medical Expenses (Any One Person) | 15,000 |
| Property Damage Liability Deductible | 2,500 |

**Explanation of Charges**

| DESCRIPTION | PREMIUM |
|---|---|
| Businessowners Location(s) Total | $5,698.00 |
| Businessowners Other Coverage(s) Total | $325.00 |
| Certified Acts of Terrorism Coverage | $30.00 |

**Total Charges:**  **$6,053.00**
*Note: This is not a bill*

---

*To report a claim, call your Agent or 1-844-325-2467*

DS 70 22 01 08



**Liberty Mutual. INSURANCE**

| Coverage Is Provided In: | Policy Number: |
| --- | --- |
| Ohio Security Insurance Company | **BZS (25) 64 09 84 09** |

Policy Period:
**From 11/16/2024 To 11/16/2025**
*12:01 am Standard Time*
*at Insured Mailing Location*

## Commercial Protector
## Declarations Schedule

| Named Insured & Mailing Address | Agent Mailing Address & Phone No. |
| --- | --- |
| ORO MASTER SUB 2, LLC | (410) 752-4008<br>R K TONGUE CO INC |

## SUMMARY OF COVERAGES BY LOCATION

**0001   238 Potomac Ave**
**Quantico**
**Quantico, VA 22134-3459**

| Property Characteristics | Description: | |
| --- | --- | --- |
| | **Construction:** Joisted Masonry | |

| Building Coverage | **Occupancy:** Office: Dentists | |
| --- | --- | --- |
| | **DESCRIPTION** | |
| | Limit of Insurance - Replacement Cost | 2,139,274 |
| | **Covered Causes of Loss** | |
| | Special Form | |
| | Automatic Increase Building | 4% |
| | Deductible | $5,000 |
| | **Premium** | **$4,349.00** |

| Business Personal Property Coverage | **Occupancy:** Office: Dentists | |
| --- | --- | --- |
| | **DESCRIPTION** | |
| | Limit of Insurance | 337,239 |
| | **Covered Causes of Loss** | |
| | Special Form | |
| | Deductible | $5,000 |
| | Automatic Increase Business Personal Property | 2% |
| | **Premium** | **$1,349.00** |

| Spoilage | **DESCRIPTION** | |
| --- | --- | --- |
| | Limit of Insurance | 5,000 |
| | Deductible | $5,000 |
| | **Premium** | **Included** |

*To report a claim, call your Agent or 1-844-325-2467*

DS 70 23 01 08



**Liberty Mutual. INSURANCE**

**Coverage Is Provided In:**
Ohio Security Insurance Company

Policy Number:
**BZS (25) 64 09 84 09**

Policy Period:
**From 11/16/2024 To 11/16/2025**
*12:01 am Standard Time
at Insured Mailing Location*

## Commercial Protector Declarations Schedule

| Named Insured & Mailing Address | Agent Mailing Address & Phone No. |
|---|---|
| ORO MASTER SUB 2, LLC | (410) 752-4008<br>R K TONGUE CO INC |

## SUMMARY OF OTHER COVERAGES

### Employee Dishonesty Including Forgery and Alteration

| DESCRIPTION | |
|---|---|
| Limit of Insurance | 25,000 |
| Number of Employees | 1 |
| Deductible | $500 |
| **Premium** | **Included** |

### Employment Related Practices

| DESCRIPTION | |
|---|---|
| Aggregate Limit | 10,000 |
| Each Claim Limit | 10,000 |
| Number of Employees | 1 |
| Retroactive Date | 11/16/2021 |
| Deductible | $5,000 |
| Coinsurance | 0% |
| **Premium** | **$18.00** |

### Property Extension Endorsement

| DESCRIPTION | |
|---|---|
| See Endorsement | |
| **Premium** | **$11.00** |

### Cyber Suite

| DESCRIPTION | |
|---|---|
| Annual Aggregate Limit | 50,000 |
| Deductible Per Occurrence | $1,000 |
| **DATA COMPROMISE RESPONSE EXPENSES** | Included |
| DESCRIPTION | |
| Sublimit Per Occurrence | |
| Public Relations | 10,000 |
| Reputational Harm | 10,000 |
| **COMPUTER ATTACK** | Included |
| DESCRIPTION | |
| Sublimit Per Occurrence | |
| Public Relations | 10,000 |

---

***To report a claim, call your Agent or 1-844-325-2467***

DS 70 23 01 08



**Liberty Mutual.**
**INSURANCE**

**Coverage Is Provided In:**
Ohio Security Insurance Company

Policy Number:
**BZS (25) 64 09 84 09**

Policy Period:
**From 11/16/2024 To 11/16/2025**
*12:01 am Standard Time*
*at Insured Mailing Location*

## Commercial Protector
## Declarations Schedule

| Named Insured & Mailing Address | Agent Mailing Address & Phone No. |
|---|---|
| ORO MASTER SUB 2, LLC | (410) 752-4008<br>R K TONGUE CO INC |

## SUMMARY OF OTHER COVERAGES

| | | |
|---|---|---|
| **SUBLIMITED COVERAGES PER OCCURRENCE** | | Included |
| **DESCRIPTION** | | |
| Cyber Extortion | | 10,000 |
| **REWARD PAYMENTS** | | Included |
| **DESCRIPTION** | | |
| Sublimit Per Policy Period | | 25,000 |
| **PRIVACY INCIDENT LIABILITY** | | Included |
| **DESCRIPTION** | | |
| Privacy Incident Defense | | |
| Privacy Incident Liability | | |
| **NETWORK SECURITY LIABILITY** | | Included |
| **DESCRIPTION** | | |
| Network Security Defense | | |
| Network Security Liability | | |
| **ELECTRONIC MEDIA LIABILITY** | | Included |
| **DESCRIPTION** | | |
| Electronic Media Defense | | |
| Electronic Media Liability | | |
| | *Premium* | *$284.00* |

| Identity Recovery Coverage for Defined Individuals | **DESCRIPTION** | |
|---|---|---|
| | See Endorsement | |
| | *Premium* | *$12.00* |

| | |
|---|---|
| **Businessowners Location(s) Total** | $5,698.00 |
| **Businessowners Other Coverage(s) Total** | $325.00 |
| **Businessowners Schedule Total** | $6,023.00 |

*To report a claim, call your Agent or 1-844-325-2467*

DS 70 23 01 08

# BUSINESSOWNERS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Form, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

In Section II – Liability, the word "insured" means any person or organization qualifying as such under Paragraph **C.** Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Paragraph **H.** Property Definitions in Section I – Property and Paragraph **F.** Liability And Medical Expenses Definitions in Section II – Liability.

## SECTION I – PROPERTY

### A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

#### 1. Covered Property

Covered Property includes Buildings as described under Paragraph **a.** below, Business Personal Property as described under Paragraph **b.** below, or both, depending on whether a Limit Of Insurance is shown in the Declarations for that type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described under Paragraph **2.** Property Not Covered.

**a.** Buildings, meaning the buildings and structures at the premises described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

(a) Machinery; and

(b) Equipment;

(4) Your personal property in apartments, rooms or common areas furnished by you as landlord;

(5) Personal property owned by you that is used to maintain or service the buildings or structures or the premises, including:

(a) Fire extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings; and

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(6) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the buildings or structures;

(b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the buildings or structures.

**b.** Business Personal Property located in or on the buildings or structures at the described premises or in the open (or in a vehicle) within 100 feet of the buildings or structures or within 100 feet of the premises described in the Declarations, whichever distance is greater, including:

(1) Property you own that is used in your business;

(2) Property of others that is in your care, custody or control, except as otherwise provided in Loss Payment Property Loss Condition Paragraph **E.5.d.(3)(b)**;

(3) Tenant's improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you occupy but do not own; and

(b) You acquired or made at your expense but cannot legally remove;

(4) Leased personal property which you have a contractual responsibility to insure, unless otherwise provided for under Paragraph **1.b.(2)**; and

© Insurance Services Office, Inc., 2012

**(5)** Exterior building glass, if you are a tenant and no Limit Of Insurance is shown in the Declarations for Building property. The glass must be owned by you or in your care, custody or control.

**2. Property Not Covered**

Covered Property does not include:

**a.** Aircraft, automobiles, motortrucks and other vehicles subject to motor vehicle registration;

**b.** "Money" or "securities" except as provided in the:

**(1)** Money And Securities Optional Coverage; or

**(2)** Employee Dishonesty Optional Coverage;

**c.** Contraband, or property in the course of illegal transportation or trade;

**d.** Land (including land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetated roof);

**e.** Outdoor fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other than trees, shrubs or plants which are part of a vegetated roof), all except as provided in the:

**(1)** Outdoor Property Coverage Extension; or

**(2)** Outdoor Signs Optional Coverage;

**f.** Watercraft (including motors, equipment and accessories) while afloat;

**g.** Accounts, bills, food stamps, other evidences of debt, accounts receivable or "valuable papers and records"; except as otherwise provided in this policy;

**h.** "Computer(s)" which are permanently installed or designed to be permanently installed in any aircraft, watercraft, motortruck or other vehicle subject to motor vehicle registration. This paragraph does not apply to "computer(s)" while held as "stock";

**i.** "Electronic data", except as provided under Additional Coverages – Electronic Data. This Paragraph **i.** does not apply to your "stock" of prepackaged software or to "electronic data" which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system; or

**j.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings.

**3. Covered Causes Of Loss**

Direct physical loss unless the loss is excluded or limited under Section I – Property.

**4. Limitations**

**a.** We will not pay for loss of or damage to:

**(1)** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**(2)** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

**(3)** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. This limitation does not apply to the Optional Coverage for Money and Securities.

**(4)** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

**(5)** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

**(a)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

© Insurance Services Office, Inc., 2012

**(b)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

**(6)** Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

**(a)** Dampness or dryness of atmosphere or of soil supporting the vegetation;

**(b)** Changes in or extremes of temperature;

**(c)** Disease;

**(d)** Frost or hail; or

**(e)** Rain, snow, ice or sleet.

**b.** We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

**(1)** Animals, and then only if they are killed or their destruction is made necessary.

**(2)** Fragile articles such as glassware, statuary, marble, chinaware and porcelain, if broken. This restriction does not apply to:

**(a)** Glass that is part of the exterior or interior of a building or structure;

**(b)** Containers of property held for sale; or

**(c)** Photographic or scientific instrument lenses.

**c.** For loss or damage by theft, the following types of property are covered only up to the limits shown (unless a higher Limit Of Insurance is shown in the Declarations):

**(1)** $2,500 for furs, fur garments and garments trimmed with fur.

**(2)** $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

**(3)** $2,500 for patterns, dies, molds and forms.

**5. Additional Coverages**

**a. Debris Removal**

**(1)** Subject to Paragraphs **(2)**, **(3)** and **(4)**, we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

**(2)** Debris Removal does not apply to costs to:

**(a)** Remove debris of property of yours that is not insured under this policy, or property in your possession that is not Covered Property;

**(b)** Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

**(c)** Remove any property that is Property Not Covered, including property addressed under the Outdoor Property Coverage Extension;

**(d)** Remove property of others of a type that would not be Covered Property under this policy;

**(e)** Remove deposits of mud or earth from the grounds of the described premises;

**(f)** Extract "pollutants" from land or water; or

**(g)** Remove, restore or replace polluted land or water.

**(3)** Subject to the exceptions in Paragraph **(4)**, the following provisions apply:

**(a)** The most that we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

**(b)** Subject to Paragraph **(3)(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.

**(4)** We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

**(a)** The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

**(b)** The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if Paragraphs **(4)(a)** and/or **(4)(b)** apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.

**(5) Examples**

**Example 1**

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $ 500 |
| Amount of Loss | $ 50,000 |
| Amount of Loss Payable | $ 49,500 |
| | ($50,000 – $500) |
| Debris Removal Expense | $ 10,000 |
| Debris Removal Expense Payable | $ 10,000 |
| ($10,000 is 20% of $50,000) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore, the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3)**.

**Example 2**

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $ 500 |
| Amount of Loss | $ 80,000 |
| Amount of Loss Payable | $ 79,500 |
| | ($80,000 – $500) |
| Debris Removal Expense | $ 40,000 |
| Debris Removal Expense Payable | |
| Basic Amount | $ 10,500 |
| Additional Amount | $ 25,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under Paragraph **(4)**. Thus, the total payable for debris removal expense in this example is $35,500; $4,500 of the debris removal expense is not covered.

© Insurance Services Office, Inc., 2012

BP 00 03 07 13

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss of or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $2,500 for service at each premises described in the Declarations, unless a different limit is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

**d. Collapse**

The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse as described and limited in Paragraphs **d.(1)** through **d.(7)**.

**(1)** For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**(2)** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this policy or that contains Covered Property insured under this policy, if such collapse is caused by one or more of the following:

**(a)** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**(b)** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**(c)** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

**(d)** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

**(i)** A cause of loss listed in Paragraph **(2)(a)** or **(2)(b)**;

**(ii)** One or more of the "specified causes of loss";

**(iii)** Breakage of building glass;

**(iv)** Weight of people or personal property; or

**(v)** Weight of rain that collects on a roof.

**(3)** This Additional Coverage – Collapse does **not** apply to:

**(a)** A building or any part of a building that is in danger of falling down or caving in;

**(b)** A part of a building that is standing, even if it has separated from another part of the building; or

**(c)** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**(4)** With respect to the following property:

**(a)** Awnings;

**(b)** Gutters and downspouts;

**(c)** Yard fixtures;

**(d)** Outdoor swimming pools;

**(e)** Piers, wharves and docks;

**(f)** Beach or diving platforms or appurtenances;

**(g)** Retaining walls; and

**(h)** Walks, roadways and other paved surfaces;

**BP 00 03 07 13**          © Insurance Services Office, Inc., 2012          **Page 5 of 53**

if an abrupt collapse is caused by a cause of loss listed in Paragraphs **(2)(a)** through **(2)(d),** we will pay for loss or damage to that property only if such loss or damage is a direct result of the abrupt collapse of a building insured under this policy and the property is Covered Property under this policy.

(5) If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

  (a) The collapse of personal property was caused by a cause of loss listed in Paragraphs **(2)(a)** through **(2)(d)** of this Additional Coverage;

  (b) The personal property which collapses is inside a building; and

  (c) The property which collapses is not of a kind listed in Paragraph **(4),** regardless of whether that kind of property is considered to be personal property or real property.

  The coverage stated in this Paragraph **(5)** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

(6) This Additional Coverage – Collapse does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(7) This Additional Coverage – Collapse will not increase the Limits of Insurance provided in this policy.

(8) The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in Paragraphs **d.(1)** through **d.(7).**

e. **Water Damage, Other Liquids, Powder Or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

We will not pay the cost to repair any defect that caused the loss or damage, but we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

(1) Results in discharge of any substance from an automatic fire protection system; or

(2) Is directly caused by freezing.

f. **Business Income**

  (1) **Business Income**

    (a) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

    With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises mean:

      (i) The portion of the building which you rent, lease or occupy;

      (ii) The area within 100 feet of the building or within 100 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

      (iii) Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

**(b)** We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage. We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage, unless a greater number of days is shown in the Declarations.

**(c)** Business Income means the:

**(i)** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

**(ii)** Continuing normal operating expenses incurred, including payroll.

**(d)** Ordinary payroll expenses:

**(i)** Means payroll expenses for all your employees except:

   **i.** Officers;

   **ii.** Executives;

   **iii.** Department Managers;

   **iv.** Employees under contract; and

   **v.** Additional Exemptions shown in the Declarations as:

   - Job Classifications; or

   - Employees.

**(ii)** Include:

   **i.** Payroll;

   **ii.** Employee benefits, if directly related to payroll;

   **iii.** FICA payments you pay;

   **iv.** Union dues you pay; and

   **v.** Workers' compensation premiums.

**(2) Extended Business Income**

**(a)** If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

**(i)** Begins on the date property except finished stock is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(ii)** Ends on the earlier of:

   **i.** The date you could restore your "operations", with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred; or

   **ii.** 60 consecutive days after the date determined in Paragraph **(a)(i)** above, unless a greater number of consecutive days is shown in the Declarations.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

**(b)** Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(3)** With respect to the coverage provided in this Additional Coverage, suspension means:

**(a)** The partial slowdown or complete cessation of your business activities; or

**(b)** That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

**(4)** This Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

**g. Extra Expense**

(1) We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises mean:

(a) The portion of the building which you rent, lease or occupy;

(b) The area within 100 feet of the building or within 100 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

(c) Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

(2) Extra Expense means expense incurred:

(a) To avoid or minimize the suspension of business and to continue "operations":

(i) At the described premises; or

(ii) At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

(b) To minimize the suspension of business if you cannot continue "operations".

(c) To:

(i) Repair or replace any property; or

(ii) Research, replace or restore the lost information on damaged "valuable papers and records";

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage **f.** Business Income.

(3) With respect to the coverage provided in this Additional Coverage, suspension means:

(a) The partial slowdown or complete cessation of your business activities; or

(b) That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

(4) We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

**h. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay for each location under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

© Insurance Services Office, Inc., 2012   **BP 00 03 07 13**

**i. Civil Authority**

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for necessary Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

(1) Four consecutive weeks after the date of that action; or

(2) When your Civil Authority Coverage for Business Income ends;

whichever is later.

The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Civil Authority Additional Coverage. The Civil Authority Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

**j. Money Orders And "Counterfeit Money"**

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

(1) Money orders issued by any post office, express company or bank that are not paid upon presentation; or

(2) "Counterfeit money" that is acquired during the regular course of business.

The most we will pay for any loss under this Additional Coverage is $1,000.

**k. Forgery Or Alteration**

(1) We will pay for loss resulting directly from forgery or alteration of any check, draft, promissory note, bill of exchange or similar written promise of payment in "money" that you or your agent has issued, or that was issued by someone who impersonates you or your agent.

(2) If you are sued for refusing to pay the check, draft, promissory note, bill of exchange or similar written promise of payment in "money", on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur in that defense.

(3) For the purpose of this coverage, check includes a substitute check as defined in the Check Clearing for the 21st Century Act and will be treated the same as the original it replaced.

(4) The most we will pay for any loss, including legal expenses, under this Additional Coverage is $2,500, unless a higher Limit Of Insurance is shown in the Declarations.

**l. Increased Cost Of Construction**

(1) This Additional Coverage applies only to buildings insured on a replacement cost basis.

(2) In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in Paragraphs **(3)** through **(9)** of this Additional Coverage.

© Insurance Services Office, Inc., 2012

(3) The ordinance or law referred to in Paragraph **(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises and is in force at the time of loss.

(4) Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

(a) You were required to comply with before the loss, even when the building was undamaged; and

(b) You failed to comply with.

(5) Under this Additional Coverage, we will not pay for:

(a) The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot; or

(b) Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungi", wet rot or dry rot.

(6) The most we will pay under this Additional Coverage, for each described building insured under Section I – Property, is $10,000. If a damaged building(s) is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for each damaged building, is $10,000.

The amount payable under this Additional Coverage is additional insurance.

(7) With respect to this Additional Coverage:

(a) We will not pay for the Increased Cost of Construction:

(i) Until the property is actually repaired or replaced, at the same or another premises; and

(ii) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

(b) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the same premises.

(c) If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the new premises.

(8) This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion, to the extent that such exclusion would conflict with the provisions of this Additional Coverage.

(9) The costs addressed in the Loss Payment Property Loss Condition in Section I – Property do not include the increased cost attributable to enforcement of or compliance with an ordinance or law. The amount payable under this Additional Coverage, as stated in Paragraph **(6)** of this Additional Coverage, is not subject to such limitation.

m. **Business Income From Dependent Properties**

(1) We will pay for the actual loss of Business Income you sustain due to physical loss or damage at the premises of a dependent property or secondary dependent property caused by or resulting from any Covered Cause of Loss.

© Insurance Services Office, Inc., 2012

However, this Additional Coverage does not apply when the only loss at the premises of a dependent property or secondary dependent property is loss or damage to "electronic data", including destruction or corruption of "electronic data". If the dependent property or secondary dependent property sustains loss or damage to "electronic data" and other property, coverage under this Additional Coverage will not continue once the other property is repaired, rebuilt or replaced.

The most we will pay under this Additional Coverage is $5,000 unless a higher Limit Of Insurance is indicated in the Declarations.

(2) We will reduce the amount of your Business Income loss, other than Extra Expense, to the extent you can resume "operations", in whole or in part, by using any other available:

   (a) Source of materials; or

   (b) Outlet for your products.

(3) If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

(4) Dependent property means property owned by others whom you depend on to:

   (a) Deliver materials or services to you, or to others for your account. But services does not mean water supply services, wastewater removal services, communication supply services or power supply services;

   (b) Accept your products or services;

   (c) Manufacture your products for delivery to your customers under contract for sale; or

   (d) Attract customers to your business.

The dependent property must be located in the coverage territory of this policy.

(5) Secondary dependent property means an entity which is not owned or operated by a dependent property and which;

   (a) Delivers materials or services to a dependent property, which in turn are used by the dependent property in providing materials or services to you; or

   (b) Accepts materials or services from a dependent property, which in turn accepts your materials or services.

A road, bridge, tunnel, waterway, airfield, pipeline or any other similar area or structure is not a secondary dependent property.

Any property which delivers any of the following services is not a secondary dependent property with respect to such services:

   (i) Water supply services;

   (ii) Wastewater removal services;

   (iii) Communication supply services; or

   (iv) Power supply services.

The secondary dependent property must be located in the coverage territory of this policy.

(6) The coverage period for Business Income under this Additional Coverage:

   (a) Begins 72 hours after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the premises of the dependent property or secondary dependent property; and

   (b) Ends on the date when the property at the premises of the dependent property or secondary dependent property should be repaired, rebuilt or replaced with reasonable speed and similar quality.

(7) The Business Income coverage period, as stated in Paragraph (6), does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

   (a) Regulates the construction, use or repair, or requires the tearing down of any property; or

   (b) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not reduce the Business Income coverage period.

**(8)** The definition of Business Income contained in the Business Income Additional Coverage also applies to this Business Income From Dependent Properties Additional Coverage.

**n. Glass Expenses**

**(1)** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

**(2)** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

**o. Fire Extinguisher Systems Recharge Expense**

**(1)** We will pay:

**(a)** The cost of recharging or replacing, whichever is less, your fire extinguishers and fire extinguishing systems (including hydrostatic testing if needed) if they are discharged on or within 100 feet of the described premises; and

**(b)** For loss or damage to Covered Property if such loss or damage is the result of an accidental discharge of chemicals from a fire extinguisher or a fire extinguishing system.

**(2)** No coverage will apply if the fire extinguishing system is discharged during installation or testing.

**(3)** The most we will pay under this Additional Coverage is $5,000 in any one occurrence.

**p. Electronic Data**

**(1)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore "electronic data" which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that "electronic data" is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the "electronic data" was stored, with blank media of substantially identical type.

**(2)** The Covered Causes of Loss applicable to Business Personal Property include a computer virus, harmful code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you, or for you, to inspect, design, install, modify, maintain, repair or replace that system.

**(3)** The most we will pay under this Additional Coverage – Electronic Data for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved, is $10,000, unless a higher Limit Of Insurance is shown in the Declarations. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in, but not after, that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**(4)** This Additional Coverage does not apply to your "stock" of prepackaged software, or to "electronic data" which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

**q. Interruption Of Computer Operations**

**(1)** Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a suspension of "operations" caused by an interruption in computer operations due to destruction or corruption of "electronic data" due to a Covered Cause of Loss.

© Insurance Services Office, Inc., 2012

**(2)** With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

**(a)** Coverage under this Additional Coverage – Interruption Of Computer Operations is limited to the "specified causes of loss" and Collapse.

**(b)** If the Businessowners Coverage Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage.

**(c)** The Covered Causes of Loss include a computer virus, harmful code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you, or for you, to inspect, design, install, modify, maintain, repair or replace that system.

**(3)** The most we will pay under this Additional Coverage – Interruption Of Computer Operations for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved, is $10,000 unless a higher Limit Of Insurance is shown in the Declarations. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

**(4)** This Additional Coverage – Interruption Of Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in **(3)** above has not been exhausted.

**(5)** Coverage for Business Income does not apply when a suspension of "operations" is caused by destruction or corruption of "electronic data", or any loss or damage to "electronic data", except as provided under Paragraphs **(1)** through **(4)** of this Additional Coverage.

**(6)** Coverage for Extra Expense does not apply when action is taken to avoid or minimize a suspension of "operations" caused by destruction or corruption of "electronic data", or any loss or damage to "electronic data", except as provided under Paragraphs **(1)** through **(4)** of this Additional Coverage.

**(7)** This Additional Coverage does not apply when loss or damage to "electronic data" involves only "electronic data" which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

**r. Limited Coverage For "Fungi", Wet Rot Or Dry Rot**

**(1)** The coverage described in Paragraphs **r.(2)** and **r.(6)** only applies when the "fungi", wet rot or dry rot is the result of a "specified cause of loss" other than fire or lightning that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

**(2)** We will pay for loss or damage by "fungi", wet rot or dry rot. As used in this Limited Coverage, the term loss or damage means:

**(a)** Direct physical loss or damage to Covered Property caused by "fungi", wet rot or dry rot, including the cost of removal of the "fungi", wet rot or dry rot;

**(b)** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet rot or dry rot; and

**(c)** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet rot or dry rot is present.

**(3)** The coverage described under this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungi", wet rot or dry rot, we will not pay more than the total of $15,000 even if the "fungi", wet rot or dry rot continues to be present or active, or recurs, in a later policy period.

**(4)** The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungi", wet rot or dry rot, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungi", wet rot or dry rot, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungi", wet rot or dry rot causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

**(5)** The terms of this Limited Coverage do not increase or reduce the coverage provided under the Water Damage, Other Liquids, Powder Or Molten Material Damage or Collapse Additional Coverages.

**(6)** The following applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Business Income and/or Extra Expense Additional Coverage:

**(a)** If the loss which resulted in "fungi", wet rot or dry rot does not in itself necessitate a suspension of "operations", but such suspension is necessary due to loss or damage to property caused by "fungi", wet rot or dry rot, then our payment under the Business Income and/or Extra Expense Additional Coverages is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

**(b)** If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet rot or dry rot, but remediation of "fungi", wet rot or dry rot prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**6. Coverage Extensions**

In addition to the Limits of Insurance of Section I – Property, you may extend the insurance provided by this policy as provided below.

Except as otherwise provided, the following extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises:

**a. Newly Acquired Or Constructed Property**

**(1) Buildings**

If this policy covers Buildings, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at premises other than the one described, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Business Personal Property**

If this policy covers Business Personal Property, you may extend that insurance to apply to:

**(a)** Business Personal Property, including such property that you newly acquire, at any location you acquire; or

**(b)** Business Personal Property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

This Extension does not apply to personal property that you temporarily acquire in the course of installing or performing work on such property or your wholesale activities.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

**(3) Period Of Coverage**

With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as Covered Property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as Covered Property.

**b. Personal Property Off-premises**

You may extend the insurance provided by this policy to apply to your Covered Property, other than "money" and "securities", "valuable papers and records" or accounts receivable, while it is in the course of transit or at a premises you do not own, lease or operate. The most we will pay for loss or damage under this Extension is $10,000.

**c. Outdoor Property**

You may extend the insurance provided by this policy to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than signs attached to buildings), trees, shrubs and plants (other than trees, shrubs or plants which are part of a vegetated roof), including debris removal expense. Loss or damage must be caused by or result from any of the following causes of loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $2,500, unless a higher Limit Of Insurance for Outdoor Property is shown in the Declarations, but not more than $1,000 for any one tree, shrub or plant.

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.

**d. Personal Effects**

You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners or "members", your "managers" or your employees, including temporary or leased employees. This extension does not apply to:

**(1)** Tools or equipment used in your business; or

**(2)** Loss or damage by theft.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises.

**e. Valuable Papers And Records**

**(1)** You may extend the insurance that applies to Business Personal Property to apply to direct physical loss or damage to "valuable papers and records" that you own, or that are in your care, custody or control, caused by or resulting from a Covered Cause of Loss. This Coverage Extension includes the cost to research, replace or restore the lost information on "valuable papers and records" for which duplicates do not exist.

**(2)** This Coverage Extension does not apply to:

**(a)** Property held as samples or for delivery after sale; and

**(b)** Property in storage away from the premises shown in the Declarations.

**(3)** The most we will pay under this Coverage Extension for loss or damage to "valuable papers and records" in any one occurrence at the described premises is $10,000, unless a higher Limit Of Insurance for "valuable papers and records" is shown in the Declarations.

For "valuable papers and records" not at the described premises, the most we will pay is $5,000.

**(4)** Loss or damage to "valuable papers and records" will be valued at the cost of restoration or replacement of the lost or damaged information. To the extent that the contents of the "valuable papers and records" are not restored, the "valuable papers and records" will be valued at the cost of replacement with blank materials of substantially identical type.

**(5)** Paragraph **B.** Exclusions in Section **I** – Property does not apply to this Coverage Extension except for:

**(a)** Paragraph **B.1.c.,** Governmental Action;

**(b)** Paragraph **B.1.d.,** Nuclear Hazard;

**(c)** Paragraph **B.1.f.,** War And Military Action;

 © Insurance Services Office, Inc., 2012

(d) Paragraph **B.2.f.**, Dishonesty;

(e) Paragraph **B.2.g.**, False Pretense;

(f) Paragraph **B.2.m.(2)**, Errors Or Omissions; and

(g) Paragraph **B.3.**

**f. Accounts Receivable**

(1) You may extend the insurance that applies to Business Personal Property to apply to accounts receivable. We will pay:

(a) All amounts due from your customers that you are unable to collect;

(b) Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

(c) Collection expenses in excess of your normal collection expenses that are made necessary by loss or damage; and

(d) Other reasonable expenses that you incur to reestablish your records of accounts receivable;

that result from direct physical loss or damage by any Covered Cause of Loss to your records of accounts receivable.

(2) The most we will pay under this Coverage Extension for loss or damage in any one occurrence at the described premises is $10,000, unless a higher Limit of Insurance for accounts receivable is shown in the Declarations.

For accounts receivable not at the described premises, the most we will pay is $5,000.

(3) Paragraph **B.** Exclusions in Section I – Property does not apply to this Coverage Extension except for:

(a) Paragraph **B.1.c.**, Governmental Action;

(b) Paragraph **B.1.d.**, Nuclear Hazard;

(c) Paragraph **B.1.f.**, War And Military Action;

(d) Paragraph **B.2.f.**, Dishonesty;

(e) Paragraph **B.2.g.**, False Pretense;

(f) Paragraph **B.3.**; and

(g) Paragraph **B.6.**, Accounts Receivable Exclusion.

**g. Business Personal Property Temporarily In Portable Storage Units**

(1) You may extend the insurance that applies to Business Personal Property to apply to such property while temporarily stored in a portable storage unit (including a detached trailer) located within 100 feet of the buildings or structures described in the Declarations or within 100 feet of the described premises, whichever distance is greater.

(2) The limitation under Paragraph **A.4.a.(5)** also applies to property in a portable storage unit.

(3) Coverage under this Extension:

(a) Will end 90 days after the Business Personal Property has been placed in the storage unit;

(b) Does not apply if the storage unit itself has been in use at the described premises for more than 90 consecutive days, even if the Business Personal Property has been stored there for 90 or fewer days as of the time of loss or damage.

(4) Under this Extension, the most we will pay for the total of all loss or damage to Business Personal Property is $10,000 (unless a higher limit is indicated in the Declarations for such Extension) regardless of the number of storage units.

(5) This Extension does not apply to loss or damage otherwise covered under this Coverage Form or any endorsement to this Coverage Form, and does not apply to loss or damage to the storage unit itself.

**B. Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

**a. Ordinance Or Law**

(1) The enforcement of or compliance with any ordinance or law:

(a) Regulating the construction, use or repair of any property; or

**(b)** Requiring the tearing down of any property, including the cost of removing its debris.

**(2)** This exclusion, Ordinance Or Law, applies whether the loss results from:

**(a)** An ordinance or law that is enforced even if the property has not been damaged; or

**(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property or removal of its debris, following a physical loss to that property.

**b. Earth Movement**

**(1)** Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

**(2)** Landslide, including any earth sinking, rising or shifting related to such event;

**(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

**(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in Paragraphs **(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

**(5)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, building glass breakage or volcanic action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

**(a)** Airborne volcanic blast or airborne shock waves;

**(b)** Ash, dust or particulate matter; or

**(c)** Lava flow.

With respect to coverage for volcanic action as set forth in **5(a), (5)(b)** and **5(c),** all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to Covered Property.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5),** is caused by an act of nature or is otherwise caused.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

© Insurance Services Office, Inc., 2012

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

This exclusion does not apply to loss or damage to "computer(s)" and "electronic data".

f. **War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

g. **Water**

(1) Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

(2) Mudslide or mudflow;

(3) Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings; or

(5) Waterborne material carried or otherwise moved by any of the water referred to in Paragraph (1), (3) or (4), or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs (1) through (5), is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs (1) through (5), results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

h. **Certain Computer-related Losses**

(1) The failure, malfunction or inadequacy of:

(a) Any of the following, whether belonging to any insured or to others:

(i) "Computer" hardware, including microprocessors or other electronic data processing equipment as may be described elsewhere in this policy;

(ii) "Computer" application software or other "electronic data" as may be described elsewhere in this policy;

(iii) "Computer" operating systems and related software;

(iv) "Computer" networks;

(v) Microprocessors ("computer" chips) not part of any "computer" system; or

(vi) Any other computerized or electronic equipment or components; or

(b) Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph (a) above;

due to the inability to correctly recognize, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

**(2)** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **(1)** above.

However, if excluded loss or damage, as described in Paragraph **(1)** above, results in a "specified cause of loss" under Section I – Property, we will pay only for the loss or damage caused by such "specified cause of loss".

We will not pay for repair, replacement or modification of any items in Paragraph **(1)(a)** or **(1)(b)** to correct any deficiencies or change any features.

### i. "Fungi", Wet Rot Or Dry Rot

Presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot.

But if "fungi", wet rot or dry rot results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**(1)** When "fungi", wet rot or dry rot results from fire or lightning; or

**(2)** To the extent that coverage is provided in the Limited Coverage For "Fungi", Wet Rot Or Dry Rot Additional Coverage, with respect to loss or damage by a cause of loss other than fire or lightning.

### j. Virus Or Bacteria

**(1)** Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

**(2)** However, the exclusion in Paragraph **(1)** does not apply to loss or damage caused by or resulting from "fungi", wet rot or dry rot. Such loss or damage is addressed in Exclusion **i.**

**(3)** With respect to any loss or damage subject to the exclusion in Paragraph **(1)**, such exclusion supersedes any exclusion relating to "pollutants".

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

### a. Electrical Apparatus

Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(1)** Electrical current, including arcing;

**(2)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(3)** Pulse of electromagnetic energy; or

**(4)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by fire.

We will pay for loss or damage to "computer(s)" due to artificially generated electrical, magnetic or electromagnetic energy if such loss or damage is caused by or results from:

**(1)** An occurrence that took place within 100 feet of the described premises; or

**(2)** Interruption of electric power supply, power surge, blackout or brownout if the cause of such occurrence took place within 100 feet of the described premises.

### b. Consequential Losses

Delay, loss of use or loss of market.

### c. Smoke, Vapor, Gas

Smoke, vapor or gas from agricultural smudging or industrial operations.

© Insurance Services Office, Inc., 2012

**d. Steam Apparatus**

Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**e. Frozen Plumbing**

Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

**f. Dishonesty**

Dishonest or criminal acts (including theft) by you, anyone else with an interest in the property, or any of your or their partners, "members", officers, "managers", employees (including temporary or leased employees), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion:

(1) Applies whether or not an act occurs during your normal hours of operation;

(2) Does not apply to acts of destruction by your employees (including temporary or leased employees) or authorized representatives; but theft by your employees (including temporary or leased employees) or authorized representatives is not covered.

With respect to accounts receivable and "valuable papers and records", this exclusion does not apply to carriers for hire.

This exclusion does not apply to coverage that is provided under the Employee Dishonesty Optional Coverage.

**g. False Pretense**

Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**h. Exposed Property**

Rain, snow, ice or sleet to personal property in the open.

**i. Collapse**

(1) Collapse, including any of the following conditions of property or any part of the property:

(a) An abrupt falling down or caving in;

(b) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(c) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to Paragraph **i.(1)(a)** or **i.(1)(b)**.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

(2) This Exclusion **i.** does not apply:

(a) To the extent that coverage is provided under the Additional Coverage – Collapse; or

(b) To collapse caused by one or more of the following:

(i) The "specified causes of loss";

(ii) Breakage of building glass;

(iii) Weight of rain that collects on a roof; or

(iv) Weight of people or personal property.

**j. Pollution**

We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

© Insurance Services Office, Inc., 2012

**k. Neglect**

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**l. Other Types Of Loss**

**(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force.

This exclusion does not apply with respect to the breakdown of "computer(s)";

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in Paragraphs **(1)** through **(7)** above results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**m. Errors Or Omissions**

Errors or omissions in:

**(1)** Programming, processing or storing data, as described under "electronic data" or in any "computer" operations; or

**(2)** Processing or copying "valuable papers and records".

However, we will pay for direct physical loss or damage caused by resulting fire or explosion if these causes of loss would be covered by this Coverage Form.

**n. Installation, Testing, Repair**

Errors or deficiency in design, installation, testing, maintenance, modification or repair of your "computer" system including "electronic data".

However, we will pay for direct physical loss or damage caused by resulting fire or explosion if these causes of loss would be covered by this Coverage Form.

**o. Electrical Disturbance**

Electrical or magnetic injury, disturbance or erasure of "electronic data", except as provided for under the Additional Coverages of Section I – Property.

However, we will pay for direct loss or damage caused by lightning.

**p. Continuous Or Repeated Seepage Or Leakage Of Water**

Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**3.** We will not pay for loss or damage caused by or resulting from any of the following Paragraphs **a.** through **c.** But if an excluded cause of loss that is listed in Paragraphs **a.** through **c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a. Weather Conditions**

Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **B.1.** above to produce the loss or damage.

**b. Acts Or Decisions**

Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c. Negligent Work**

Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

© Insurance Services Office, Inc., 2012

**BP 00 03 07 13**

4. **Additional Exclusion**

The following applies only to the property specified in this Additional Exclusion:

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

5. **Business Income And Extra Expense Exclusions**

a. We will not pay for:

(1) Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

(b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage.

(2) Any other consequential loss.

b. With respect to this exclusion, suspension means:

(1) The partial slowdown or complete cessation of your business activities; and

(2) That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

6. **Accounts Receivable Exclusion**

The following additional exclusion applies to the Accounts Receivable Coverage Extension:

We will not pay for:

a. Loss or damage caused by or resulting from alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

b. Loss or damage caused by or resulting from bookkeeping, accounting or billing errors or omissions.

c. Any loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

C. **Limits Of Insurance**

1. The most we will pay for loss or damage in any one occurrence is the applicable Limits Of Insurance of Section I – Property shown in the Declarations.

2. The most we will pay for loss of or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

3. The amounts of insurance applicable to the Coverage Extensions and the following Additional Coverages apply in accordance with the terms of such coverages and are in addition to the Limits of Insurance of Section I – Property:

a. Fire Department Service Charge;

b. Pollutant Clean-up And Removal;

c. Increased Cost Of Construction;

d. Business Income From Dependent Properties;

e. Electronic Data; and

f. Interruption Of Computer Operations.

4. **Building Limit – Automatic Increase**

a. In accordance with Paragraph **C.4.b.,** the Limit of Insurance for Buildings will automatically increase by 8%, unless a different percentage of annual increase is shown in the Declarations.

b. The amount of increase is calculated as follows:

(1) Multiply the Building limit that applied on the most recent of the policy inception date, the policy anniversary date or any other policy change amending the Building limit by:

(a) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 7% is .07); or

(b) .08, if no percentage of annual increase is shown in the Declarations; and

(2) Multiply the number calculated in accordance with b.(1) by the number of days since the beginning of the current policy year, or the effective date of the most recent policy change amending the Building limit, divided by 365.

**Example**

If:

The applicable Building limit is $100,000. The annual percentage increase is 8%. The number of days since the beginning of the policy year (or last policy change) is 146.

The amount of increase is

$100,000 x .08 x 146 ÷ 365 = $3,200.

5. **Business Personal Property Limit – Seasonal Increase**

a. Subject to Paragraph **5.b.**, the Limit of Insurance for Business Personal Property is automatically increased by:

(1) The Business Personal Property – Seasonal Increase percentage shown in the Declarations; or

(2) 25% if no Business Personal Property – Seasonal Increase percentage is shown in the Declarations;

to provide for seasonal variances.

b. The increase described in Paragraph **5.a.** will apply only if the Limit Of Insurance shown for Business Personal Property in the Declarations is at least 100% of your average monthly values during the lesser of:

(1) The 12 months immediately preceding the date the loss or damage occurs; or

(2) The period of time you have been in business as of the date the loss or damage occurs.

**D. Deductibles**

1. We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance of Section I – Property.

2. Regardless of the amount of the Deductible, the most we will deduct from any loss or damage under all of the following Optional Coverages in any one occurrence is the Optional Coverage Deductible shown in the Declarations:

a. Money and Securities;

b. Employee Dishonesty;

c. Outdoor Signs; and

d. Forgery or Alteration.

But this Optional Coverage Deductible will not increase the Deductible shown in the Declarations. This Deductible will be used to satisfy the requirements of the Deductible in the Declarations.

3. No deductible applies to the following Additional Coverages:

a. Fire Department Service Charge;

b. Business Income;

c. Extra Expense;

d. Civil Authority; and

e. Fire Extinguisher Systems Recharge Expense.

**E. Property Loss Conditions**

1. **Abandonment**

There can be no abandonment of any property to us.

2. **Appraisal**

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

Page 24 of 53    © Insurance Services Office, Inc., 2012    BP 00 03 07 13

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

a. You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limits of Insurance of Section I – Property. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

(9) Resume all or part of your "operations" as quickly as possible.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

a. There has been full compliance with all of the terms of this insurance; and

b. The action is brought within two years after the date on which the direct physical loss or damage occurred.

**5. Loss Payment**

In the event of loss or damage covered by this policy:

a. At our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to Paragraph **d.(1)(e)** below.

b. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

c. We will not pay you more than your financial interest in the Covered Property.

d. Except as provided in Paragraphs **(2)** through **(7)** below, we will determine the value of Covered Property as follows:

(1) At replacement cost without deduction for depreciation, subject to the following:

(a) If, at the time of loss, the Limit of Insurance on the lost or damaged property is 80% or more of the full replacement cost of the property immediately before the loss, we will pay the cost to repair or replace, after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:

(i) The Limit of Insurance under Section I – Property that applies to the lost or damaged property;

BP 00 03 07 13                    © Insurance Services Office, Inc., 2012                    **Page 25 of 53**

**(ii)** The cost to replace, on the same premises, the lost or damaged property with other property:

**i.** Of comparable material and quality; and

**ii.** Used for the same purpose; or

**(iii)** The amount that you actually spend that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost is limited to the cost which would have been incurred had the building been built at the original premises.

**(b)** If, at the time of loss, the Limit of Insurance applicable to the lost or damaged property is less than 80% of the full replacement cost of the property immediately before the loss, we will pay the greater of the following amounts, but not more than the Limit of Insurance that applies to the property:

**(i)** The actual cash value of the lost or damaged property; or

**(ii)** A proportion of the cost to repair or replace the lost or damaged property, after application of the deductible and without deduction for depreciation. This proportion will equal the ratio of the applicable Limit of Insurance to 80% of the full replacement cost of the property.

**Example**

The full replacement cost of property which suffers a total loss is $100,000. The property is insured for $70,000. 80% of the full replacement cost of the property immediately before the loss is $80,000 ($100,000 x .80 = $80,000). A partial loss of $25,000 is sustained. The amount of recovery is determined as follows:

Amount of recovery

$70,000 ÷ $80,000 = .875

.875 x $25,000 = $21,875

**(c)** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

**(d)** We will not pay on a replacement cost basis for any loss or damage:

**(i)** Until the lost or damaged property is actually repaired or replaced; and

**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

However, if the cost to repair or replace the damaged building property is $2,500 or less, we will settle the loss according to the provisions of Paragraphs **d.(1)(a)** and **d.(1)(b)** above whether or not the actual repair or replacement is complete.

**(e)** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**(2)** If the Actual Cash Value – Buildings option applies, as shown in the Declarations, Paragraph **(1)** above does not apply to Buildings. Instead, we will determine the value of Buildings at actual cash value.

**(3)** The following property at actual cash value:

**(a)** Used or secondhand merchandise held in storage or for sale;

**(b)** Property of others. However, if an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance;

© Insurance Services Office, Inc., 2012

(c) Household contents, except personal property in apartments or rooms furnished by you as landlord;

(d) Manuscripts; and

(e) Works of art, antiques or rare articles, including etchings, pictures, statuary, marble, bronzes, porcelain and bric-a-brac.

(4) Glass at the cost of replacement with safety glazing material if required by law.

(5) Tenants' improvements and betterments at:

(a) Replacement cost if you make repairs promptly.

(b) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(i) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(ii) Divide the amount determined in (i) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(c) Nothing if others pay for repairs or replacement.

(6) Applicable only to the Optional Coverages:

(a) "Money" at its face value; and

(b) "Securities" at their value at the close of business on the day the loss is discovered.

(7) Applicable only to accounts receivable:

(a) If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage:

(i) We will determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

(ii) We will adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

(b) The following will be deducted from the total amount of accounts receivable, however that amount is established:

(i) The amount of the accounts for which there is no loss or damage;

(ii) The amount of the accounts that you are able to reestablish or collect;

(iii) An amount to allow for probable bad debts that you are normally unable to collect; and

(iv) All unearned interest and service charges.

e. Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

f. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

g. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, provided you have complied with all of the terms of this policy, and:

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

h. A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**6. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limits of Insurance of Section I – Property.

**7. Resumption Of Operations**

We will reduce the amount of your:

a. Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

b. Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**8. Vacancy**

a. **Description Of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs (a) and (b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

b. **Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

Page 28 of 53 © Insurance Services Office, Inc., 2012 BP 00 03 07 13

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in Paragraphs (1)(a) through (1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**F. Property General Conditions**

**1. Control Of Property**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Form at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**2. Mortgageholders**

a. The term "mortgageholder" includes trustee.

b. We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

c. The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

d. If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

(1) Pays any premium due under this policy at our request if you have failed to do so;

(2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

(3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this policy will then apply directly to the mortgageholder.

e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

(1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

(2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

f. If we cancel this policy, we will give written notice to the mortgageholder at least:

(1) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

g. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**3. No Benefit To Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**4. Policy Period, Coverage Territory**

Under Section I – Property:

a. We cover loss or damage commencing:

(1) During the policy period shown in the Declarations; and

(2) Within the coverage territory or, with respect to property in transit, while it is between points in the coverage territory.

b. The coverage territory is:

(1) The United States of America (including its territories and possessions);

(2) Puerto Rico; and

(3) Canada.

## G. Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages also apply. These coverages are subject to the terms and conditions applicable to property coverage in this policy, except as provided below:

### 1. Outdoor Signs

a. We will pay for direct physical loss of or damage to all outdoor signs at the described premises:

(1) Owned by you; or

(2) Owned by others but in your care, custody or control.

b. Paragraph A.3., Covered Causes Of Loss and Paragraph B., Exclusions in Section I – Property do not apply to this Optional Coverage, except for:

(1) Paragraph B.1.c., Governmental Action;

(2) Paragraph B.1.d., Nuclear Hazard; and

(3) Paragraph B.1.f., War And Military Action.

c. We will not pay for loss or damage caused by or resulting from:

(1) Wear and tear;

(2) Hidden or latent defect;

(3) Rust;

(4) Corrosion; or

(5) Mechanical breakdown.

d. The most we will pay for loss or damage in any one occurrence is the Limit Of Insurance for Outdoor Signs shown in the Declarations.

e. The provisions of this Optional Coverage supersede all other references to outdoor signs in this policy.

### 2. Money And Securities

a. We will pay for loss of "money" and "securities" used in your business while at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee (including a temporary or leased employee) having use and custody of the property, at the described premises, or in transit between any of these places, resulting directly from:

(1) Theft, meaning any act of stealing;

(2) Disappearance; or

(3) Destruction.

b. In addition to the Limitations and Exclusions applicable to Section I – Property, we will not pay for loss:

(1) Resulting from accounting or arithmetical errors or omissions;

(2) Due to the giving or surrendering of property in any exchange or purchase; or

(3) Of property contained in any "money"-operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

c. The most we will pay for loss in any one occurrence is:

(1) The limit shown in the Declarations for Inside the Premises for "money" and "securities" while:

(a) In or on the described premises; or

(b) Within a bank or savings institution; and

(2) The limit shown in the Declarations for Outside the Premises for "money" and "securities" while anywhere else.

d. All loss:

(1) Caused by one or more persons; or

(2) Involving a single act or series of related acts;

is considered one occurrence.

e. You must keep records of all "money" and "securities" so we can verify the amount of any loss or damage.

### 3. Employee Dishonesty

a. We will pay for direct loss of or damage to Business Personal Property and "money" and "securities" resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

(1) Cause you to sustain loss or damage; and also

(2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

(a) Any employee; or

(b) Any other person or organization.

**b.** We will not pay for loss or damage:

(1) Resulting from any dishonest or criminal act that you or any of your partners or "members" commit whether acting alone or in collusion with other persons.

(2) Resulting from any dishonest act committed by any of your employees (except as provided in Paragraph **a.**), "managers" or directors:

    (a) Whether acting alone or in collusion with other persons; or

    (b) While performing services for you or otherwise.

(3) The only proof of which as to its existence or amount is:

    (a) An inventory computation; or

    (b) A profit and loss computation.

(4) Caused by an employee if the employee had also committed theft or any other dishonest act prior to the effective date of this policy and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the employee, learned of that theft or dishonest act prior to the policy period shown in the Declarations.

**c.** The most we will pay for loss or damage in any one occurrence is the Limit Of Insurance for Employee Dishonesty shown in the Declarations.

**d.** All loss or damage:

(1) Caused by one or more persons; or

(2) Involving a single act or series of acts;

is considered one occurrence.

**e.** If any loss is covered:

(1) Partly by this insurance; and

(2) Partly by any prior cancelled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest;

the most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.

We will pay only for loss or damage you sustain through acts committed or events occurring during the policy period. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

**f.** This Optional Coverage is cancelled as to any employee immediately upon discovery by:

(1) You; or

(2) Any of your partners, "members", "managers", officers or directors not in collusion with the employee;

of any dishonest act committed by that employee before or after being hired by you.

**g.** We will pay only for covered loss or damage sustained during the policy period and discovered no later than one year from the end of the policy period.

**h.** If you (or any predecessor in interest) sustained loss or damage during the policy period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Optional Coverage, provided:

(1) This Optional Coverage became effective at the time of cancellation or termination of the prior insurance; and

(2) The loss or damage would have been covered by this Optional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred.

**i.** The insurance under Paragraph **h.** above is part of, not in addition to, the Limit of Insurance applying to this Optional Coverage and is limited to the lesser of the amount recoverable under:

(1) This Optional Coverage as of its effective date; or

(2) The prior insurance had it remained in effect.

**j.** With respect to the Employee Dishonesty Optional Coverage in Paragraph **G.3.**, employee means:

(1) Any natural person:

    (a) While in your service or for 30 days after termination of service;

    (b) Who you compensate directly by salary, wages or commissions; and

    (c) Who you have the right to direct and control while performing services for you;

**(2)** Any natural person who is furnished temporarily to you:

    **(a)** To substitute for a permanent employee, as defined in Paragraph **(1)** above, who is on leave; or

    **(b)** To meet seasonal or short-term workload conditions;

**(3)** Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **(2)** above;

**(4)** Any natural person who is a former employee, director, partner, member, manager, representative or trustee retained as a consultant while performing services for you; or

**(5)** Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside any building you occupy in conducting your business.

But employee does not mean:

**(1)** Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

**(2)** Any "manager", director or trustee except while performing acts coming within the usual duties of an employee.

**4. Equipment Breakdown Protection Coverage**

  **a.** We will pay for direct loss of or damage to Covered Property caused by or resulting from a mechanical breakdown or electrical failure to pressure, mechanical or electrical machinery and equipment.

    Mechanical breakdown or electrical failure to pressure, mechanical or electrical machinery and equipment does not mean any:

    **(1)** Malfunction including but not limited to adjustment, alignment, calibration, cleaning or modification;

    **(2)** Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

    **(3)** Damage to any vacuum tube, gas tube, or brush; or

    **(4)** The functioning of any safety or protective device.

  **b.** Paragraphs **A.4.a.(1)** and **A.4.a.(2),** Limitations, do not apply to this Optional Coverage.

  **c.** With respect to the coverage provided by this Optional Coverage, the following exclusions in Paragraph **B. Exclusions** do not apply:

    **(1)** Paragraph **B.2.a.,** Electrical Apparatus;

    **(2)** Paragraph **B.2.d.,** Steam Apparatus; and

    **(3)** Paragraph **B.2.l.(6),** Mechanical Breakdown.

  **d.** With respect to the coverage provided by this Optional Coverage, Paragraph **G.1.c.(5)** of the **Outdoor Signs Optional Coverage** does not apply.

  **e.** If a dollar deductible is shown in the Declarations for this Optional Coverage, we will first subtract the applicable deductible amount from any loss we would otherwise pay. We will then pay the amount of loss in excess of the applicable deductible up to the applicable limit for this coverage.

    If no optional deductible is chosen for this Optional Coverage, the Property Deductible shown in the Declarations applies.

  **f.** With respect to Additional Coverages **5.f.** Business Income and **5.g.** Extra Expense, if the 72-hour time period in the definition of "period of restoration" (hereinafter referred to as time deductible) is amended for this Optional Coverage as shown in the Declarations, we will not pay for any Business Income loss that occurs during the consecutive number of hours shown as the time deductible in the Declarations immediately following a mechanical breakdown or electrical failure. If a time deductible is shown in days, each day shall mean 24 consecutive hours.

    With respect to the coverage provided by this Optional Coverage, any time deductible shown in the Declarations for Equipment Breakdown Protection Coverage supersedes any time deductible otherwise applicable to the Business Income coverage provided by this policy.

  **g.** With respect to the coverage provided by this Optional Coverage, Paragraph **H. Property Definitions** is amended as follows:

    **1.** "Computer" means:

      **a.** Programmable electronic equipment that is used to store, retrieve and process data; and

b. Associated peripheral equipment that provides communication, including input and output functions such as printing and auxiliary functions such as data transmission.

"Computer" includes those used to operate production-type machinery or equipment.

h. Whenever any covered pressure, mechanical or electrical machinery and equipment is found to be in, or exposed to, a dangerous condition, any of our representatives may suspend coverage provided by this Optional Coverage for loss from a mechanical breakdown or electrical failure to that pressure, mechanical or electrical machinery and equipment.

However, coverage provided by this Optional Coverage may be reinstated for loss from a mechanical breakdown or electrical failure to that pressure, mechanical or electrical machinery and equipment if the reasons for the suspension are found by any of our representatives to no longer exist.

We may suspend or reinstate this Optional coverage by mailing or delivering a written notification regarding the suspension or reinstatement to:

(1) Your last known address; or

(2) The address where the pressure, mechanical or electrical machinery and equipment is located.

This notification will indicate the effective date of the suspension or reinstatement.

If the coverage provided by this Optional Coverage is not reinstated, you will get a pro rata refund of premium. But the suspension will be effective even if we have not yet made or offered a refund.

## H. Property Definitions

1. "Computer" means:

a. Programmable electronic equipment that is used to store, retrieve and process data; and

b. Associated peripheral equipment that provides communication, including input and output functions such as printing and auxiliary functions such as data transmission.

"Computer" does not include those used to operate production-type machinery or equipment.

2. "Counterfeit money" means an imitation of "money" that is intended to deceive and to be taken as genuine.

3. "Electronic data" means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a "computer" or device connected to it, which enable the "computer" or device to receive, process, store, retrieve or send data.

4. "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

5. "Manager" means a person serving in a directorial capacity for a limited liability company.

6. "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

7. "Money" means:

a. Currency, coins and bank notes in current use and having a face value; and

b. Traveler's checks, register checks and money orders held for sale to the public.

8. "Operations" means your business activities occurring at the described premises.

9. "Period of restoration":

a. Means the period of time that:

(1) Begins:

(a) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

(b) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

**(2)** Ends on the earlier of:

   **(a)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

   **(b)** The date when business is resumed at a new permanent location.

**b.** Does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

   **(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

   **(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**10.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**11.** "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or other property and includes:

**a.** Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

**b.** Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

**12.** "Specified causes of loss" means the following:

Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

**a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

   **(1)** The cost of filling sinkholes; or

   **(2)** Sinking or collapse of land into man-made underground cavities.

**b.** Falling objects does not include loss of or damage to:

   **(1)** Personal property in the open; or

   **(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**c.** Water damage means:

   **(1)** Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam; and

   **(2)** Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the described premises and is part of a municipal potable water supply system or municipal sanitary sewer system, if the breakage or cracking is caused by wear and tear.

But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

To the extent that accidental discharge or leakage of water falls within the criteria set forth in **c.(1)** or **c.(2)** of this definition of "specified causes of loss", such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the ground surface.

**13.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

© Insurance Services Office, Inc., 2012

14. "Valuable papers and records" means inscribed, printed or written:

a. Documents;

b. Manuscripts; and

c. Records;

including abstracts, books, deeds, drawings, films, maps or mortgages.

But "valuable papers and records" does not mean "money" or "securities".

## SECTION II – LIABILITY

## A. Coverages

### 1. Business Liability

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Paragraph **D. Liability And Medical Expenses Limits Of Insurance** in Section II – Liability; and

(2) Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements or medical expenses.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Paragraph **f. Coverage Extension – Supplementary Payments**.

b. This insurance applies:

(1) To "bodily injury" and "property damage" only if:

(a) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(b) The "bodily injury" or "property damage" occurs during the policy period; and

(c) Prior to the policy period, no insured listed under Paragraph **C.1. Who Is An Insured** and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known before the policy period.

(2) To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **C.1. Who Is An Insured** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **C.1. Who Is An Insured** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**f. Coverage Extension – Supplementary Payments**

(1) We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

(a) All expenses we incur.

(b) Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

(c) The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance. We do not have to furnish these bonds.

(d) All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

(e) All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

(f) Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

(g) All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the limit of liability.

(2) If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

(a) The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

(b) This insurance applies to such liability assumed by the insured;

(c) The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

(d) The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

(e) The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

(f) The indemnitee:

(i) Agrees in writing to:

i. Cooperate with us in the investigation, settlement or defense of the "suit";

ii. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

iii. Notify any other insurer whose coverage is available to the indemnitee; and

---

    © Insurance Services Office, Inc., 2012    BP 00 03 07 13

    **iv.** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(ii)** Provides us with written authorization to:

    **i.** Obtain records and other information related to the "suit"; and

    **ii.** Conduct and control the defense of the indemnitee in such "suit".

**(3)** So long as the conditions in Paragraph **(2)** are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **B.1.b.(2)** Exclusions in Section **II – Liability**, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the Limits of Insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**(a)** We have used up the applicable Limit of Insurance in the payment of judgments or settlements; or

**(b)** The conditions set forth above, or the terms of the agreement described in Paragraph **(2)(f)** above, are no longer met.

**2. Medical Expenses**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the Limits of Insurance of Section **II – Liability**. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**B. Exclusions**

**1. Applicable To Business Liability Coverage**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims allege negligence or other wrongdoing in:

(a) The supervision, hiring, employment, training or monitoring of others by an insured; or

(b) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1), (2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

d. **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

f. **Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

© Insurance Services Office, Inc., 2012

**BP 00 03 07 13**

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible;

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

    (a) Less than 51 feet long; and

    (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

    (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where it is licensed or principally garaged; or

    (b) The operation of any of the following machinery or equipment:

        (i) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

        (ii) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition or stunting activity.

**i. War**

"Bodily injury", "property damage" or "personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by government authority in hindering or defending against any of these.

**j. Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" caused by the rendering or failure to render any professional service. This includes but is not limited to:

(1) Legal, accounting or advertising services;

(2) Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;

(3) Supervisory, inspection or engineering services;

(4) Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;

(5) Any health or therapeutic service treatment, advice or instruction;

(6) Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;

© Insurance Services Office, Inc., 2012 **BP 00 03 07 13**

(7) Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

(8) Body piercing services; and

(9) Services in the practice of pharmacy.

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering or failure to render of any professional service.

k. **Damage To Property**

"Property damage" to:

(1) Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate Limit of Insurance applies to Damage To Premises Rented To You as described in Paragraph D. Liability And Medical Expenses Limits Of Insurance in Section II – Liability.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

l. **Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

m. **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

n. **Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

o. **Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**p. Personal And Advertising Injury**

"Personal and advertising injury":

**(1)** Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

**(2)** Arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity;

**(3)** Arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period;

**(4)** For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

**(5)** Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

**(6)** Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

**(7)** Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

**(8)** Committed by an insured whose business is:

**(a)** Advertising, broadcasting, publishing or telecasting;

**(b)** Designing or determining content of web sites for others; or

**(c)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under Paragraph **F.** Liability And Medical Expenses Definitions.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, by itself, is not considered the business of advertising, broadcasting, publishing or telecasting;

**(9)** Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time;

**(10)** With respect to any loss, cost or expense arising out of any:

**(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants";

**(11)** Arising out of an electronic chatroom or bulletin board the insured hosts, owns or over which the insured exercises control;

**(12)** Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan;

**(13)** Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags, or any other similar tactics to mislead another's potential customers.

**q. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

© Insurance Services Office, Inc., 2012

As used in this exclusion, electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**r. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**s. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c., d., e., f., g., h., i., k., l., m., n.** and **o.** in Section II – Liability do not apply to damage by fire to premises while rented to you, or temporarily occupied by you with permission of the owner. A separate Damage To Premises Rented To You Limit of Insurance applies to this coverage as described in Paragraph **D.** Liability And Medical Expenses Limits of Insurance in Section II – Liability.

**2. Applicable To Medical Expenses Coverage**

We will not pay expenses for "bodily injury":

**a.** To any insured, except "volunteer workers".

**b.** To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.** To a person injured on that part of premises you own or rent that the person normally occupies.

**d.** To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e.** To a person injured while practicing, instructing or participating in any physical exercises or games, sports or athletic contests.

**f.** Included within the "products-completed operations hazard".

**g.** Excluded under Business Liability Coverage.

**3. Applicable To Both Business Liability Coverage And Medical Expenses Coverage – Nuclear Energy Liability Exclusion**

This insurance does not apply:

**a.** Under Business Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

**(a)** Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

**(b)** The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**b.** Under Medical Expenses Coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**c.** Under Business Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of the "nuclear material"; if:

**(1)** The "nuclear material":

**(a)** Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

**(b)** Has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility"; but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**d.** As used in this exclusion:

**(1)** "By-product material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(2)** "Hazardous properties" include radioactive, toxic or explosive properties;

**(3)** "Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for:

**(i)** Separating the isotopes of uranium or plutonium;

**(ii)** Processing or utilizing "spent fuel"; or

**(iii)** Handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

**(4)** "Nuclear material" means "source material", "special nuclear material" or "by-product material";

**(5)** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**(6)** "Property damage" includes all forms of radioactive contamination of property;

**(7)** "Source material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(8)** "Special nuclear material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(9)** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

**(10)** "Waste" means any waste material:

**(a)** Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

**(b)** Resulting from the operation by any person or organization of any "nuclear facility" included under Paragraphs **(a)** and **(b)** of the definition of "nuclear facility".

## C. Who Is An Insured

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(a)** or **(b)**; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**D. Liability And Medical Expenses Limits Of Insurance**

**1.** The Limits of Insurance of Section II – Liability shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The most we will pay for the sum of all damages because of all:

**a.** "Bodily injury", "property damage" and medical expenses arising out of any one "occurrence"; and

**b.** "Personal and advertising injury" sustained by any one person or organization;

is the Liability and Medical Expenses limit shown in the Declarations. But the most we will pay for all medical expenses because of "bodily injury" sustained by any one person is the Medical Expenses limit shown in the Declarations.

**3.** The most we will pay under Business Liability Coverage for damages because of "property damage" to a premises while rented to you or in the case of fire while rented to you or temporarily occupied by you with permission of the owner is the applicable Damage To Premises Rented To You limit shown for that premises in the Declarations. For a premises temporarily occupied by you, the applicable limit will be the highest Damage To Premises Rented To You limit shown in the Declarations.

**4. Aggregate Limits**

The most we will pay for:

**a.** All "bodily injury" and "property damage" that is included in the "products-completed operations hazard" is twice the Liability and Medical Expenses limit.

**b.** All:

**(1)** "Bodily injury" and "property damage" except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard";

**(2)** Plus medical expenses;

**(3)** Plus all "personal and advertising injury" caused by offenses committed;

is twice the Liability and Medical Expenses limit.

Subject to Paragraph **a.** or **b.** above, whichever applies, the Damage To Premises Rented To You limit is the most we will pay for damages because of "property damage" to any one premises, while rented to you, or in the case of fire, while rented to you or temporarily occupied by you with permission of the owner.

The Limits of Insurance of Section II – Liability apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**E. Liability And Medical Expenses General Conditions**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this policy.

© Insurance Services Office, Inc., 2012

**BP 00 03 07 13**

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

    a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

        (1) How, when and where the "occurrence" or offense took place;

        (2) The names and addresses of any injured persons and witnesses; and

        (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

    b. If a claim is made or "suit" is brought against any insured, you must:

        (1) Immediately record the specifics of the claim or "suit" and the date received; and

        (2) Notify us as soon as practicable.

        You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

    c. You and any other involved insured must:

        (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

        (2) Authorize us to obtain records and other information;

        (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

        (4) Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

    d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

    No person or organization has a right under this policy:

    a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

    b. To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Separation Of Insureds**

    Except with respect to the Limits of Insurance of Section II – Liability, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

    a. As if each Named Insured were the only Named Insured; and

    b. Separately to each insured against whom claim is made or "suit" is brought.

F. **Liability And Medical Expenses Definitions**

    1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

        a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

        b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

    2. "Auto" means:

        a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

        b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where it is licensed or principally garaged.

        However, "auto" does not include "mobile equipment".

    3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

    4. "Coverage territory" means:

        a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in Paragraph **a.** above;

(2) The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits in the territory described in Paragraph **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

(1) The repair, replacement, adjustment or removal of "your product" or "your work"; or

(2) Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(2)** above and supervisory, inspection or engineering services.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

© Insurance Services Office, Inc., 2012

BP 00 03 07 13

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, on which are permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where they are licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law or motor vehicle registration law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at the job site has been put to its intended use by any other person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

The "bodily injury" or "property damage" must occur away from premises you own or rent, unless your business includes the selling, handling or distribution of "your product" for consumption on premises you own or rent.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

(2) The existence of tools, uninstalled equipment or abandoned or unused materials.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

## SECTION III – COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I – PROPERTY AND SECTION II – LIABILITY)

### A. Cancellation

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**a.** Five days before the effective date of cancellation if any one of the following conditions exists at any building that is Covered Property in this policy:

**(1)** The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

**(a)** Seasonal unoccupancy; or

**(b)** Buildings in the course of construction, renovation or addition.

Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

**(2)** After damage by a Covered Cause of Loss, permanent repairs to the building:

**(a)** Have not started; and

**(b)** Have not been contracted for;

within 30 days of initial payment of loss.

**(3)** The building has:

**(a)** An outstanding order to vacate;

**(b)** An outstanding demolition order; or

**(c)** Been declared unsafe by governmental authority.

**(4)** Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

**(5)** Failure to:

**(a)** Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

**(b)** Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

**b.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium.

**c.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceals or misrepresents a material fact concerning:

**1.** This policy;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this policy.

**D. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**E. Inspections And Surveys**

**1.** We have the right to:

**a.** Make inspections and surveys at any time;

**b.** Give you reports on the conditions we find; and

**c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

**a.** Are safe and healthful; or

**b.** Comply with laws, regulations, codes or standards.

**3.** Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**4.** Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**F. Insurance Under Two Or More Coverages**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**G. Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

**H. Other Insurance**

**1.** If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance of Section I – Property.

**2.** Business Liability Coverage is excess over:

**a.** Any other insurance that insures for direct physical loss or damage; or

**b.** Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured.

**3.** When this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**I. Premiums**

**1.** The first Named Insured shown in the Declarations:

**a.** Is responsible for the payment of all premiums; and

**b.** Will be the payee for any return premiums we pay.

**2.** The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

© Insurance Services Office, Inc., 2012    BP 00 03 07 13

3. With our consent, you may continue this policy in force by paying a continuation premium for each successive one-year period. The premium must be:

   a. Paid to us prior to the anniversary date; and

   b. Determined in accordance with Paragraph 2. above.

   Our forms then in effect will apply. If you do not pay the continuation premium, this policy will expire on the first anniversary date that we have not received the premium.

4. Undeclared exposures or change in your business operation, acquisition or use of locations may occur during the policy period that are not shown in the Declarations. If so, we may require an additional premium. That premium will be determined in accordance with our rates and rules then in effect.

**J. Premium Audit**

1. This policy is subject to audit if a premium designated as an advance premium is shown in the Declarations. We will compute the final premium due when we determine your actual exposures.

2. Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period, we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

3. The first Named Insured must keep records of the information we need for premium computation and send us copies at such times as we may request.

**K. Transfer Of Rights Of Recovery Against Others To Us**

1. Applicable to Businessowners Property Coverage:

   If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

   a. Prior to a loss to your Covered Property.

   b. After a loss to your Covered Property only if, at time of loss, that party is one of the following:

      (1) Someone insured by this insurance;

      (2) A business firm:

         (a) Owned or controlled by you; or

         (b) That owns or controls you; or

      (3) Your tenant.

   You may also accept the usual bills of lading or shipping receipts limiting the liability of carriers.

   This will not restrict your insurance.

2. Applicable to Businessowners Liability Coverage:

   If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. This condition does not apply to Medical Expenses Coverage.

**L. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.



BUSINESSOWNERS
BP 01 32 03 20

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# VIRGINIA CHANGES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**A. Section I – Property** is amended as follows:

1. The **Fire Department Service Charge** Additional Coverage is replaced by the following:

   **Fire Department Service Charge**

   a. When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $2,500 for service at each premises described in the Declarations, unless a different limit is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

   This Additional Coverage applies to your liability for fire department service charges:

   (1) Assumed by contract or agreement prior to loss; or

   (2) Required by local ordinance.

   b. If the fire department service charge is not covered under the terms of Paragraph **a.,** then the following applies:

   When a volunteer fire department is called to save or protect the Covered Property from a Covered Cause of Loss, we will pay the amount billed to you, up to $250, unless a different limit is shown in the Declarations for volunteer fire department service charges.

   This Additional Coverage applies to your liability for service charges billed to you by a volunteer fire department, provided that:

   (1) The volunteer fire department is not fully funded by real estate taxes or other property taxes; and

   (2) The service charge is not made in response to a call outside of the volunteer fire department's fire protection district, city or municipality pursuant to a contract.

   c. No deductible applies to this Additional Coverage.

2. Paragraph **E.2. Appraisal** Property Loss Condition is replaced by the following:

   **2. Appraisal**

   If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. You and we must notify the other of the appraiser selected within 20 days of the written demand for appraisal. The two appraisers will select an umpire. If the appraisers do not agree on the selection of an umpire within 15 days, the insured or the insurer may apply in writing, for the appointment of an umpire, to the judge of the circuit court of the county or city in which the damaged or destroyed property was located at the time of loss. The appraisers will state separately the value of the property and amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss. Any outcome of the appraisal will be binding on both parties. If you make a written demand for an appraisal of the loss, each party will:

   a. Pay its own appraiser; and

   b. Bear the other expenses of the appraisal and umpire equally.

   However, if we make written demand for an appraisal of the loss, we will reimburse you for the reasonable cost of your chosen appraiser and for your portion of the cost of the umpire.

   If there is an appraisal, we will still retain our right to deny the claim.

BP 01 32 03 20    © Insurance Services Office, Inc., 2019    **Page 1 of 6**

3. Paragraph **E.3. Duties In The Event Of Loss Or Damage** Property Loss Condition is amended as follows:

Paragraph **a.(1)** does not apply.

B. Paragraph **B.1.f.(1)(a)(i)** under Paragraph **B. Exclusions** of **Section II – Liability** is replaced by the following:

(i) "Bodily injury" or "property damage" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests.

C. **Section III – Common Policy Conditions** is amended as follows:

1. Paragraph **A. Cancellation** is replaced by the following:

A. **Cancellation**

1. The first Named Insured shown in the Declarations may cancel this Policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this Policy by mailing or delivering to the first Named Insured written notice of cancellation, stating the reason for cancellation, at least:

a. 15 days before the effective date of cancellation if we cancel for nonpayment of premium; or

b. 45 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver written notice to the first Named Insured's last mailing address known to us. If notice is mailed, it will be sent in accordance with Virginia Law.

4. Our notice will state the effective date of cancellation. The policy period will end on that date.

5. If this Policy is cancelled, we will send the first Named Insured any premium refund due. The cancellation will be effective even if we have not made or offered a refund. The following provisions govern calculation of return premium:

a. We will compute return premium pro rata and round to the next higher whole dollar when this Policy is cancelled:

(1) At our request;

(2) Because you no longer have a financial or insurable interest in the property or business operation that is the subject of insurance;

(3) And rewritten by us or a member of our company group; or

(4) After the first year, if it is a prepaid policy written for a term of more than one year.

b. When this Policy is cancelled at your request (except when Paragraph **a.(2), a.(3)** or **a.(4)** applies), we will return 90% of the pro rata unearned premium, rounded to the next higher whole dollar. However, when such cancellation takes place during the first year of a multiyear prepaid policy, we will return the full annual premium for the subsequent years. In addition, earned premium will not be less than our policywriting minimum premium.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

2. Paragraph **1.** of **H. Other Insurance** is replaced by the following:

1. If there is other insurance covering the same loss or damage, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Policy bears to the Limits of Insurance of all insurance covering on the same basis.

© Insurance Services Office, Inc., 2019

**BP 01 32 03 20**

3. Paragraph **I. Premiums** is amended as follows:

   a. The last subparagraph of Paragraph **3.** is replaced by the following:

      Our forms then in effect will be provided to you. If you do not pay the continuation premium, this Policy will expire on the first anniversary date that we have not received the premium.

   b. Paragraph **4.** is replaced by the following:

      4. Undeclared exposures or changes in your business operation, acquisition or use of locations may occur during the policy period that are not shown in the Declarations. If so, we may require an additional premium. That premium will be determined in accordance with the rates and rules in effect on the inception date or last anniversary date of the Policy.

4. The following paragraph is added:

   **M. Nonrenewal**

   1. If we elect not to renew this Policy, we will mail or deliver a notice of nonrenewal to the first Named Insured, shown in the Declarations, stating the reason for nonrenewal, at least:

      a. 15 days before the expiration date if the nonrenewal is due to nonpayment of premium; or

      b. 45 days before the expiration date if the nonrenewal is for any other reason.

   2. We will mail or deliver written notice of nonrenewal to the first Named Insured's last mailing address known to us. If notice is mailed, it will be sent in accordance with Virginia Law. If notice is mailed, proof of mailing will be sufficient proof of notice.

D. With respect to property to which replacement cost valuation applies, the following provision is added and supersedes any provision to the contrary:

   If replacement cost coverage applies, you may make an initial claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within six months of the later of the following dates:

   a. The last date on which you received a payment for actual cash value; or

   b. The date of entry of a final order of a court of competent jurisdiction declaring your right to full replacement cost.

   However, if the Actual Cash Value – Building option applies, as shown in the Declarations, Paragraph **D.** above does not apply to Building. Instead, we will determine the value of Buildings at actual cash value.

E. If Condominium Commercial Unit-owners Optional Coverages Endorsement **BP 17 03** is attached to this Policy, Paragraph **B.2.** of Endorsement **BP 17 03** does not apply.

**F.** The following changes apply only to Information Security Protection Endorsement **BP 15 07** if it is attached to this Policy:

Paragraph **N. Extended Reporting Periods** is replaced by the following:

**N. Extended Reporting Periods**

For the purposes of the coverage provided by this Endorsement under Insuring Agreements **d.** Security Breach Liability and **g.** Web Site Publishing Liability, the following are added to Paragraph **E. Liability And Medical Expenses General Conditions** of **Section II – Liability:**

**1. Basic Extended Reporting Period**

  **a.** A Basic Extended Reporting Period is automatically provided without additional charge if:

    **(1)** This Endorsement is cancelled or not renewed for any reason, except for nonpayment of premium, failure to comply with terms or conditions of the Policy or fraud; or

    **(2)** We renew or replace this Endorsement with insurance that:

      **(a)** Has a Retroactive Date later than the date shown in the Schedule of this Endorsement for either Insuring Agreement **d.** Security Breach Liability or **g.** Web Site Publishing Liability. However, the Basic Extended Reporting Period will only be provided for the insuring agreement for which our renewal or replacement endorsement has a Retroactive Date later than the date shown in the Schedule of this Endorsement; or

      **(b)** Does not apply to "wrongful acts" on a claims-made basis for either Insuring Agreement **d.** Security Breach Liability or **g.** Web Site Publishing Liability. However, the Basic Extended Reporting Period will only be provided for the insuring agreement for which our renewal or replacement endorsement does not apply to "wrongful acts" on a claims-made basis.

**b.** The Basic Extended Reporting Period starts with the end of the "policy period" and lasts for 30 days. A "claim" first made and reported by the insured during this 30-day period will be considered to have been received within the "policy period". However, the 30-day Basic Extended Reporting Period does not apply to "claims" that are covered under any subsequent insurance purchased by the insured, or that would be covered but for exhaustion of the Aggregate Limit of Insurance applicable to such "claims".

**c.** The Basic Extended Reporting Period does not extend the "policy period" or change the scope of coverage provided. It applies only to "claims" to which the following applies:

  **(1)** The "claim" is first made and reported to us during the Basic Extended Reporting Period; and

  **(2)** The "claim" arose out of either a "wrongful act" or the first of a series of "interrelated wrongful acts" which occurred on or after the Retroactive Date, if any, shown in the Schedule and before the end of the "policy period".

**2. Supplemental Extended Reporting Period**

  **a.** You will have the right to purchase a Supplemental Extended Reporting Period from us if:

    **(1)** This Endorsement is cancelled or not renewed; or

    **(2)** We renew or replace this Endorsement with insurance that:

      **(a)** Has a Retroactive Date later than the date shown in the Schedule of this Endorsement for either Insuring Agreement **d.** Security Breach Liability or **g.** Web Site Publishing Liability. However, the Supplemental Extended Reporting Period will only be provided for the insuring agreement for which our renewal or replacement endorsement has a Retroactive Date later than the date shown in the Schedule of this Endorsement; or

© Insurance Services Office, Inc., 2019

**(b)** Does not apply to "wrongful acts" on a claims-made basis for either Insuring Agreement **d.** Security Breach Liability or **g.** Web Site Publishing Liability. However, the Supplemental Extended Reporting Period will only be provided for the insuring agreement for which our renewal or replacement endorsement does not apply to "wrongful acts" on a claims-made basis.

**b.** The Supplemental Extended Reporting Period will not be available if:

**(1)** We cancel this Endorsement for nonpayment of premium, failure to comply with terms or conditions of the Policy or fraud; or

**(2)** You fail to pay any amounts owed us.

**c.** A Supplemental Extended Reporting Period, as specified in Paragraph **a.,** lasts one year and is available only for an additional premium.

**d.** The Supplemental Extended Reporting Period starts with the end of the Basic Extended Reporting Period set forth in Paragraph **1.** It does not extend the policy period or change the scope of the coverage provided. It applies only to "claims" to which the following applies:

**(1)** The "claim" is first made and reported to us during the Supplemental Extended Reporting Period; and

**(2)** The "claim" arose out of either a "wrongful act" or the first of a series of "interrelated wrongful acts" which occurred on or after the Retroactive Date, if any, shown in the Schedule and before the end of the "policy period".

**e.** You must give us a written request for the Supplemental Extended Reporting Period within 30 days after the end of the "policy period" or the effective date of cancellation, whichever comes first.

**f.** The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium in full along with any premium or deductible you owe us for coverage provided under this Endorsement within 30 days after the end of the "policy period" or the effective date of cancellation, whichever comes first. Once in effect, the Supplemental Extended Reporting Period may not be cancelled by us, except for fraud. The premium for the Supplemental Extended Reporting Period will be deemed to be fully earned as of the date it is purchased.

**g.** We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

**(1)** The exposures insured;

**(2)** Previous types and amounts of insurance;

**(3)** Limit of Insurance available under this Endorsement for future payment of damages; and

**(4)** Other related factors.

The additional premium may not exceed 100% of the annual premium for this Endorsement.

**3. Basic And Supplemental Extended Reporting Period Limits**

**a. Basic Extended Reporting Period Limit**

There is no separate or additional Aggregate Limit of Insurance for the Basic Extended Reporting Period. The Limit of Insurance available during the Basic Extended Reporting Period shall be the remaining amount, if any, of the Information Security Protection Aggregate Limit of Insurance available at the end of the "policy period".

 © Insurance Services Office, Inc., 2019

**b. Supplemental Extended Reporting Period Limit**

There is no separate or additional Aggregate Limit of Insurance for the Supplemental Extended Reporting Period. The Limit of Insurance available during the Supplemental Extended Reporting Period, if purchased, shall be the remaining amount, if any, of the Information Security Protection Aggregate Limit of Insurance available at the end of the Basic Extended Reporting Period.

© Insurance Services Office, Inc., 2019

BUSINESSOWNERS
BP 04 17 01 10

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following exclusion is added to Paragraph **B.1. Exclusions – Applicable To Business Liability Coverage** in **Section II – Liability:**

This insurance does not apply to "bodily injury" or "personal and advertising injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" or "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraph **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

(1) Whether the injury-causing event described in Paragraph **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

(2) Whether the insured may be liable as an employer or in any other capacity; and

(3) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

BP 04 17 01 10                  © Insurance Services Office, Inc., 2009                  **Page 1 of 1**     ☐

POLICY NUMBER:

BUSINESSOWNERS
BP 04 30 07 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

## SCHEDULE

| Premises Number | Building Number | Protective Safeguards Symbols Applicable |
|---|---|---|
| 238 Potomac Ave Quantico Quantico VA 22134-3459 | | P-1 |

**Describe Any "P-9":**

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** The following is added to the **Property General Conditions in Section I - Property:**

**Protective Safeguards**

1. As a condition of this insurance you are required to maintain the protectivce devices or services listed in the Schedule above.

2. The protective safeguards to which this endorsement applies are identified by the following symbols:

   a. **"P-1" Automatic Sprinkler System,** including related supervisory services.

   Automatic Sprinkler System means:

   (1) Any automatic fire protective or extinguishing system, including connected:

   (a) Sprinklers and discharge nozzles;

   (b) Ducts, pipes, valves and fittings;

   (c) Tanks, their component parts and supports; and

   (d) Pumps and private fire protection mains.

   (2) When supplied from an automatic fire protective system:

   (a) Non-automatic fire protective systems; and

   (b) Hydrants, standpipes and outlets.

   b. **"P-2" Automatic Fire Alarm,** protecting the entire building, that is:

   (1) Connected to a central station; or

   (2) Reporting to a public or private fire alarm station.

BP 04 30 07 13                    © Insurance Services Office, Inc., 2012                    **Page 1 of 2**

c. **"P-3" Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

d. **"P-4" Service Contract,** with a privately owned fire department providing fire protection service to the described premises.

e. **"P-5" Automatic Commercial Cooking Exhaust And Extinguishing System,** installed on cooking appliances and having the following components:

   (1) Hood;

   (2) Grease removal device;

   (3) Duct system; and

   (4) Wet chemical fire extinguishing equipment.

f. **"P-9"** the protective system described in the Schedule.

B. The following is added to Paragraph **B. Exclusions in Section I - Property:**

We will not pay for loss or damages caused by or resulting from fire if, prior to the fire, you:

1. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System or Automatic Commercial Cooking Exhaust And Extinguishing System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

**BUSINESSOWNERS**
**BP 04 39 07 02**



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ABUSE OR MOLESTATION EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following applies to Section **II** – Liability and supersedes any provision to the contrary:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

**(a)** The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or

**(b)** The negligent:

    **(i)** Employment;

    **(ii)** Investigation;

    **(iii)** Supervision;

    **(iv)** Reporting to the proper authorities, or failure to so report; or

    **(v)** Retention;

    of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by **(a)** above.

BUSINESSOWNERS
BP 05 23 01 15



**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to the Businessowners Policy and apply to Property and Liability Coverages:

## A. CAP ON CERTIFIED TERRORISM LOSSES

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

B. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for loss or injury or damage that is otherwise excluded under this Policy.

POLICY NUMBER:                                                        **BUSINESSOWNERS**
                                                                     **BP 05 65 01 15**

● THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CONDITIONAL EXCLUSION OF TERRORISM INVOLVING NUCLEAR, BIOLOGICAL OR CHEMICAL TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

### SCHEDULE

| |
|---|
| The **Exception Covering Certain Fire Losses** (Paragraph **B.2.**) applies to property located in the following state(s): |
| California, Georgia, Iowa, Illinois, Maine, Missouri, North Carolina, New Jersey, New York, Oregon, Rhode Island, Washington, Wisconsin, and West Virginia |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section I – Property** and **Section II – Liability** are amended as follows:

   **1. Applicability Of The Provisions Of This Endorsement**

   a. The provisions of this endorsement become applicable commencing on the date when any one or more of the following first occurs. But if your policy (meaning the policy period in which this endorsement applies) begins after such date, then the provisions of this endorsement become applicable on the date your policy begins.

   (1) The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under this Coverage Form; or

   (2) A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available to you and with revisions that:

   (a) Increase our statutory percentage deductible under the Program for terrorism losses. (That deductible determines the amount of all certified terrorism losses we must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses.); or

   (b) Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or

BP 05 65 01 15                      © Insurance Services Office, Inc., 2015                      **Page 1 of 3**

(c) Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.

b. If the provisions of this endorsement become applicable, such provisions:

(1) Supersede any terrorism endorsement already endorsed to this policy that addresses "certified acts of terrorism" and/or "other acts of terrorism", but only with respect to loss or injury or damage from an incident(s) of terrorism (however defined) that occurs on or after the date when the provisions of this endorsement become applicable; and

(2) Remain applicable unless we notify you of changes in these provisions, in response to federal law.

c. If the provisions of this endorsement do NOT become applicable, any terrorism endorsement already endorsed to this policy, that addresses "certified acts of terrorism" and/or "other acts of terrorism", will continue in effect unless we notify you of changes to that endorsement in response to federal law.

2. The following definition is added and applies under this endorsement wherever the term terrorism is enclosed in quotation marks.

"Terrorism" means activities against persons, organizations or property of any nature:

a. That involve the following or preparation for the following:

(1) Use or threat of force or violence; or

(2) Commission or threat of a dangerous act; or

(3) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

b. When one or both of the following applies:

(1) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

(2) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

B. Section I – Property is amended as follows:

1. The following exclusion is added:

EXCLUSION OF TERRORISM

We will not pay for loss or damage caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

a. The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

b. Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

c. The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

d. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials.

2. **Exception Covering Certain Fire Losses**

The following exception to the Exclusion Of Terrorism applies only if indicated and as indicated in the Schedule of this endorsement.

If "terrorism" results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverages or endorsements that apply to those coverages.

© Insurance Services Office, Inc., 2015                    BP 05 65 01 15

**3. Application Of Other Exclusions**

When the Exclusion Of Terrorism applies in accordance with the terms of Paragraph **1.a.** or **1.b.,** such exclusion applies without regard to the Nuclear Hazard Exclusion in this Coverage Form.

**C. Section II – Liability** is amended as follows:

**1.** The following definition is added and applies under this endorsement wherever the phrase any injury or damage is enclosed in quotation marks:

"Any injury or damage" means any injury or damage covered under this Coverage Form or any applicable endorsement, and includes but is not limited to "bodily injury", "property damage" or "personal and advertising injury" as may be defined under this Coverage Form.

**2.** The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for "any injury or damage" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". "Any injury or damage" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

**a.** The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

**b.** Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

**c.** The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**d.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials.

**D.** The following provision is added to **Section I – Property** and **Section II – Liability:**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for loss or injury or damage that is otherwise excluded under this Policy.

**BP 05 65 01 15**           © Insurance Services Office, Inc., 2015           **Page 3 of 3**



**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION (LIABILITY)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to **Section II – Liability:**

A. The following exclusion is added to Paragraph **B.1., Exclusions – Applicable To Business Liability Coverage:**

  **t. Fungi Or Bacteria**

   **(1)** "Bodily injury", "property damage" or "personal and advertising injury" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

   **(2)** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

   This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

B. The following definition is added Paragraph **F. Liability And Medical Expenses Definitions:**

   **1.** "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi.

POLICY NUMBER:

**BUSINESSOWNERS**
**BP 07 04 01 06**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BUSINESS LIABILITY COVERAGE – PROPERTY DAMAGE LIABILITY DEDUCTIBLE (PER OCCURRENCE BASIS)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**SCHEDULE**

| |
|---|
| **Amount Of Per Occurrence Deductible:** $ |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** Our obligation under Paragraph **A. Coverages** in **Section II – Liability** to pay damages on your behalf because of "property damage" applies only to the amount of damages in excess of the deductible amount shown in the Schedule.

**B.** The deductible amount shown in the Schedule applies to the total of all damages because of "property damage" as the result of any one "occurrence", regardless of the number of persons or organizations who sustain "property damage" because of that "occurrence".

**C.** The terms of this insurance, including those with respect to:

**1.** Our right and duty to defend the insured against any "suits" seeking those damages; and

**2.** Your duties in the event of an "occurrence", claim, or "suit";

apply irrespective of the application of the deductible amount.

**D.** We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**BP 07 04 01 06**                    © ISO Properties, Inc., 2004                    **Page 1 of 1**    ☐

BUSINESSOWNERS
BP 12 16 07 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# VIRGINIA EFFECTIVE TIME CHANGES – REPLACEMENT OF 12 NOON

This endorsement modifies the BUSINESSOWNERS COVERAGE FORM.

To the extent that coverage in this policy replaces coverage in other policies terminating noon standard time on the inception date of this policy, coverage under this policy shall not become effective until such other coverage has terminated.

**BUSINESSOWNERS**
**BP 12 17 07 02**



**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# VIRGINIA CHANGES – POLICY PERIOD

Coverage under this policy begins at 12:01 A.M. (Standard Time) at the mailing address shown in the Declarations. However, to the extent that this policy replaces coverage in other policies terminating at 12:01 A.M. (Standard Time) on the inception date of this policy at the location of the property involved, coverage under this policy, at each location, becomes effective when such other coverage terminates.

 © ISO Properties, Inc.,  2001

BUSINESSOWNERS
BP 14 86 07 13



**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COMMUNICABLE DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following exclusion is added to Paragraph **B. Exclusions** in **Section II – Liability:**

**Communicable Disease**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

a. Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

b. Testing for a communicable disease;

c. Failure to prevent the spread of the disease; or

d. Failure to report the disease to authorities.

BUSINESSOWNERS
BP 15 04 12 23

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL MATERIAL OR INFORMATION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following is added to Paragraph **1. Applicable To Business Liability Coverage** of **B. Exclusions** under **Section II – Liability:**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Material Or Information**

"Bodily Injury", "property damage" or "personal and advertising injury", arising out of any access to or disclosure of any person's or organization's confidential or personal material or information, including:

**a.** Patents, trade secrets, processing methods, customer lists;

**b.** Financial information, credit card information;

**c.** Health information, biometric information; or

**d.** Any other type of nonpublic material or information.

This exclusion applies even if damages are claimed for notification costs, credit or identity monitoring expenses, forensic expenses, public relations expenses, data restoration expenses, extortion expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal material or information.

BP 15 04 12 23                    © Insurance Services Office, Inc., 2023                    **Page 1 of 1**

BUSINESSOWNERS
BP 18 03 12 23

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CYBER INCIDENT LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**Section II – Liability** is amended as follows:

A. The following exclusion is added to Paragraph **1. Applicable To Business Liability Coverage** under **B. Exclusions:**

This insurance does not apply to:

**Cyber Incident**

"Bodily injury", "property damage", or "personal and advertising injury" arising out of a "cyber incident".

This exclusion applies even if damages are claimed for notification costs, credit or identity monitoring expenses, forensic expenses, public relations expenses, data restoration expenses, extortion expenses or any other similar cost or expense incurred by you or others arising out of a "cyber incident".

B. For the purposes of this endorsement, the following is added to Paragraph **F. Liability And Medical Expenses Definitions:**

"Cyber incident" means any:

1. Unauthorized access to or use of any computer system.

2. Malicious code, virus or any other harmful code that is directed at, enacted upon or introduced into any computer system and is designed to access, alter, corrupt, damage, delete, destroy, disrupt, encrypt, exploit, use or prevent or restrict access to or the use of any part of any computer system or otherwise disrupt its normal functioning or operation.

3. Denial of service attack which disrupts, prevents or restricts access to or use of any computer system, or otherwise disrupts its normal functioning or operation.

BP 18 03 12 23 © Insurance Services Office, Inc., 2023 **Page 1 of 1**

BUSINESSOWNERS
BP 79 19 09 16

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# BUSINESSOWNERS PROPERTY EXTENSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

Below is a summarization of the coverages provided by this endorsement. No coverages are given by this summary. Actual coverage descriptions are within this endorsement.

| SECTION | SUBJECT | LIMITS OF INSURANCE OR CHANGE IN CONDITION |
|---|---|---|
| A. | Business Personal Property | Legal Liability requirement deleted<br>Extended to 1,000 feet of premises |
| | Undamaged Tenants Improvements<br>And Betterments | Covered as Business Personal Property<br>Loss Payment Valuation |
| | Leased Building Property | $ 5,000 |
| B. | Property Not Covered | Stained Glass |
| C. | Limitations<br>Fragile Articles Limitation | $ 5,000 All Covered Causes of Loss |
| D. | Additional Coverages broadened:<br>Preservation Of Property<br>Fire Department Service Charge<br>Business Income - Ordinary Payroll Expense<br>Business Income - Newly Acquired Locations | 60 days<br>$ 15,000<br><br>$ 250,000 at each Newly Acquired Premises / 60 days |
| | Money Orders And Counterfeit Money<br>Forgery Or Alteration<br>Increased Cost Of Construction<br>Business Income From Dependent Property | $ 10,000<br>Same as Employee Dishonesty limit<br><br>$ 50,000 or 30 days Actual Loss Sustained |
| | Glass Expenses<br>Fire Extinguisher Systems Recharge Expense<br>Electronic Data | $ 15,000<br>$ 25,000 |
| E. | Additional Coverages added:<br>Computer Equipment<br>Employee Dishonesty<br>Employee Tools<br>Money And Securities | $ 25,000<br>$ 25,000<br>$ 25,000<br>$ 10,000 on premises / $5,000 off-premises |
| | Off-premises Power Failure<br>Ordinance Or Law | $ 25,000 / 24 hours<br>Included - Coverage 1 - Loss to the Undamaged Property<br>$ 150,000<br>Coverage 2 - Demolition Cost Coverage<br>Coverage 3 - Increased Cost of Construction Coverage |
| | Outdoor Signs<br>Reward | $ 25,000<br>$ 10,000 |

© 2016 Liberty Mutual Insurance
BP 79 19 09 16    Includes copyrighted material of Insurance Services Office Inc., with its permission.    Page 1 of 18

Page 106 of 198

**F.    Coverage Extensions broadened:**

Newly Acquired Or Constructed
Property

|  |  |
|---|---|
| Building | $1,000,000 up to 180 days |
| Business Personal Property | $ 500,000 up to 180 days |
| Personal Property Off-premises | $ 25,000 |
| Outdoor Property | All Covered Causes Of Loss |
| Fences, retaining walls, radio and | $ 25,000 aggregate |
| television antennas, trees and shrubs | $ 1,000 each tree, shrub or plant |
| Personal Effects | $ 15,000 |
| Valuable Papers And Records | $ 25,000 on premises / $10,000 off-premises |
| Accounts Receivable | $ 35,000 on premises / $5,000 off-premises |

**G.    Coverage Extensions added:**

|  |  |
|---|---|
| Cellular Phones - Coverage | $ 1,000 |
| Fine Arts | $ 10,000 |
| Lock Replacement | Actual Loss Sustained |
| Loss Adjustment Expenses | $ 5,000 |
| Water Back-up And Sump Overflow | $ 25,000 |

**H.    Limits Of Insurance**

Coverages in addition to Limits of Insurance

| Business Personal Property Limit - Seasonal Increase | 33% |
|---|---|

**I.    Deductible**

No more than $500 deductible
No deductible

| Deductible - Cellular Phones | $ 50 |
|---|---|

**J.    Property Loss Conditions**

Amendment Loss Payment Provision

| Brand And Labels | Included in Business Personal Property Limit |
|---|---|
| Consequential Loss To Stock | Included in Business Personal Property Limit |

**K.    Property Definitions**

Period of Restoration
Fine Arts

© 2016 Liberty Mutual Insurance

**Section I - Property** is amended as follows:

A.  Paragraph **A.1.b. Business Personal Property** is replaced by the following:

    **b.**  Business Personal Property located in or on the buildings at the described premises or in the open (or in a vehicle) within 1,000 feet of the described premises, including:

        **(1)**  Property you own that is used in your business;

        **(2)**  Property of others that is in your care, custody or control, plus the cost of labor, materials or services furnished or arranged by you on personal property of others;

            Property of others coverage does not apply to Employee Tools except as provided under Section **E.** of this endorsement.

        **(3)**  Tenants improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

            **(a)**  Made a part of the building or structure you occupy but do not own; and

            **(b)**  You acquire or made at your expense but cannot legally remove;

        **(4)**  Leased personal property which you have a contractual responsibility to insure, unless otherwise provided for under Paragraph **1.b.(2)** ; and

        **(5)**  Exterior building glass, if you are a tenant and no Limit of Insurance is shown in the Declarations for Building property. The glass must be owned by you or in your care, custody or control.

        **(6)**  Undamaged tenants improvements and betterments.

            **(a)**  Improvements and betterments coverage includes the portion of improvements and betterments not damaged in a covered loss.

            **(b)**  We will pay for the portion of undamaged tenants improvements and betterments only if a minimum of six months is required to repair or rebuild the building for your occupancy, and only when your lease is cancelled:

                **(i)**  By the lessor;

                **(ii)**  By a valid condition of your lease; and

                **(iii)**  Due to direct physical loss or damage by a Covered Cause of Loss to property at the premises stated in the Declarations.

        **(7)**  Leased Building Property, including but not limited to, building or doors, at a premises where you are a tenant and are liable for such damage, unless coverage is otherwise provided for above in Paragraph **A.1.a. Covered Property - Buildings.** The most we will pay for loss or damage by a Covered Cause of Loss under this provision as respects leased Building Property is $5,000 in any one occurrence. This provision does not apply to exterior glass and semi-exterior glass (glass which is on the exterior of the insured premises, but which is interior to an enclosed structure, i.e., an enclosed shopping mall), including all lettering and ornamentation.

B.  The following is added to Section **A.2. Property Not Covered:**

    Stained Glass except as provided under Paragraph **G.2. Fine Arts** of this endorsement.

C.  Paragraph **A.4.b.(2) Limitations - Fragile articles** is replaced by the following:

    **(2)**  We will not pay more than $5,000 for loss or damage to fragile articles such as glassware, statuary, marbles, chinaware and porcelain, if broken, unless caused by a Covered Cause of Loss or building glass breakage. This restriction does not apply to:

        **(a)**  Glass that is part of the exterior or interior of a building or structure;

        **(b)**  Containers of property while held for sale;

        **(c)**  Photographic or scientific instrument lenses; or

        **(d)**  Fine Arts Coverage Extension.

D.  Section **A.5. Additional Coverages** is modified as follows:

    **1.**  The 30 day limit shown in Paragraph **A.5.b.(2) Preservation of Property** is replaced by a 60 day limit.

    **2.**  The $2,500 limit shown in Paragraph **A.5.c. Fire Department Service Charge** is replaced by a $15,000 limit.

    **3.**  The 60 day limitation for ordinary payroll expense shown in Paragraph **A.5.f.(1)(b) Business Income** does not apply.

© 2016 Liberty Mutual Insurance

BP 79 19 09 16      Includes copyrighted material of Insurance Services Office Inc., with its permission.      **Page 3 of 18**

4.  The following  is added to Paragraph  **A.5.f. Business Income:**

    **(5) Newly Acquired Locations**

    **(a)** If this policy  includes  Business  Income  Coverage,  you may extend  your  Business  Income Coverage  to apply  to property  at a location  you acquire  other than at fairs or exhibitions .

    **(b)** The most  we will  pay for loss or damage  under  this Extension  is $250,000 at each location in any one occurrence.

    **(c)** Insurance  under  this Extension  for each newly  acquired  location  will  end when  any of the following  first occurs:

    **(i)**   This policy  expires;

    **(ii)**  60 days expire  after you acquire  or begin  to construct  the property;

    **(iii)** You report  values  to us; or

    **(iv)** The property  is more specifically  insured.

5.  The $1,000 limit  shown  in Paragraph  **A.5.j. Money Orders And "Counterfeit Money"** is replaced  by a $10,000 limit.

6.  Paragraph  **A.5.k.(4) Forgery Or Alteration** is replaced  by the following:

    **(4)** The most  we will  pay for any loss, including  legal  expenses,  under  this Additional  Coverage  is the greater  of $25,000 or an amount  equal  to the Limit  of Insurance  for Employee  Dishonesty shown  in the Declarations.

7.  Paragraph  **A.5.l. Increased Cost Of Construction** does  not apply.  Refer  to Paragraph  **E.6. - Ordinance Or Law Coverage** of this endorsement.

8.  Paragraph  **A.5.m. Business Income From Dependent Properties** is replaced  by the following:

    **(1)** We will  pay for the actual  loss of Business  Income  you sustain  due to physical  loss or damage at the premises  of a dependent  property  or secondary  dependent  property  caused  by or resulting  from  any Covered  Cause of Loss.

    However,  this Additional  Coverage  does not apply  when  the only  loss to dependent  property  or secondary  dependent  property · is loss or damage  to "electronic  data",  including  destruction  or corruption  of "electronic  data". If the dependent  property  or secondary  dependent  property sustains  loss or damage  to "electronic  data" · and other  property,  coverage  under  this Additional  Coverage  will  not continue  once the other  property  is repaired,  rebuilt  or replaced.

    The most  we will  pay under  this Additional  Coverage  is the lesser of:

    **(a)** $50,000; or

    **(b)** 30 days actual  loss sustained  after direct  loss or damage  to the property.

    **(2)** We will  reduce  the amount  of your  Business  Income  loss, other  than Extra  Expense,  to the extent  you can resume  "operation"  in whole  or in part, by using  any other  available:

    **(a)** Source  of materials;  or

    **(b)** Outlet  for your products.

    **(3)** If you do not resume  "operations",  or do not resume  "operations"  as quickly  as possible,  we will  pay based  on the length  of time  it would  have taken  to resume  "operations"  as quickly  as possible.

    **(4)** Dependent  property  means  property  owned  by others  whom  you depend  on to:

    **(a)** Deliver  materials  or services  to you, or to others  for your  account.  But services  does not mean  water  supply  services,  wastewater  removal  services,  communication  supply  services,  or power  supply  services;

    **(b)** Accept  your products  or services;

    **(c)** Manufacture  your products  for delivery  to your customers  under  contract  for sale; or

    **(d)** Attract  customers  to your business.

    The dependent  property  must be located  in the coverage  territory  of this policy.

    **(5)** Secondary  dependent  property  means  an entity  which  is not owned  or operated  by a dependent  property  and which;

    **(a)** Delivers  materials  or services  to a dependent  property,  which  in turn  are used  by the dependent  property  in providing  materials  or services  to you; or

© 2016 Liberty Mutual Insurance

**BP 79 19 09 16**    Includes copyrighted material of Insurance Services Office Inc., with its permission.    **Page 4 of 18**

Page 109 of 198

**(b)** Accepts materials or services from a dependent property, which in turn accepts your materials or services.

A road, bridge, tunnel, waterway, airfield, pipeline or any other similar area or structure is not a secondary dependent property

Any property which delivers any of the following services is not a secondary dependent property with respect to such services:

    **(i)** Water supply services;

    **(ii)** Wastewater removal services;

    **(iii)** Communication supply services; or

    **(iv)** Power supply services.

The secondary dependent property must be located in the coverage territory of this policy.

**(6)** The coverage period for Business Income under this Additional Coverage:

    **(a)** Begins 72 hours after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the premises of the dependent property or secondary dependent property; and

    **(b)** Ends on the date when the property at the premises of the dependent property or secondary dependent property should be repaired, rebuilt or replaced with reasonable speed and similar quality.

**(7)** The Business Income coverage period as stated in Paragraph **(5),** does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

    **(a)** Regulates the construction, use or repair, or requires the tearing down of any property; or

    **(b)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of " pollutants".

The expiration date of this policy will not reduce the Business Income coverage period.

**(8)** The definition of Business Income contained in the Business Income Additional Coverage also applies to this Business Income from Dependent Properties Additional Coverage.

**9.** Paragraph **A.5.n. Glass Expenses** is replaced by the following:

We will pay for direct physical loss of or damage to glass, including lettering or ornamentation, which is part of or contained in a covered building or structure at the described premises. The glass must be owned by you, or owned by others but in your care, custody or control. We will also pay for necessary:

**(1)** Expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed;

**(2)** Repair or replacement of encasing frames; and

**(3)** Expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

**10.** Paragraph **A.5.o. Fire Extinguisher Systems Recharge Expense** is replaced by the following:

**(1)** We will pay:

    **(a)** The cost of recharging or replacing, whichever is less, your fire extinguishers and fire extinguishing systems (including hydrostatic testing if needed) if they are discharged on or within 1,000 feet of the described premises; and

    **(b)** For loss or damage to Covered Property if such loss or damage is the result of an accidental discharge of chemicals from a fire extinguisher or a fire extinguishing system.

**(2)** No coverage will apply if the fire extinguishing system is discharged during installation or testing.

**(3)** The most we will pay under this Additional Coverage is $15,000 in any one occurrence.

**11.** The $10,000 limit shown in Paragraph **A.5.p.(3) Electronic Data** is replaced by a $25,000 limit.

**E.** The following is added to Section **A.5 Additional Coverages:**

**1. Computer Equipment**

    **a.** We will pay for direct loss of or damage to Computer Equipment resulting from direct physical loss or damage by a Covered Cause of Loss at the premises described in the Declarations.

b. The most we will pay for loss under this Additional Coverage is $25,000 in any one occurrence. Our payment will only be for the account of the owner of the computer equipment.

**2. Employee Dishonesty**

a. We will pay for direct loss of or damage to Business Personal Property and "money" and "securities" resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

 (1) Cause you to sustain loss or damage; and also

 (2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for;

  (a) Any employee; or

  (b) Any other person or organization.

b. We will not pay for loss or damage:

 (1) Resulting from any dishonest or criminal act that you or any of your partners or "members" commit whether acting alone or in collusion with other persons.

 (2) Resulting from any dishonest act committed by any of your employees (except as provided in Paragraph **a.**), "managers" or directors:

  (a) Whether acting alone or in collusion with other persons; or

  (b) While performing services for you or otherwise.

 (3) The only proof of which as to its existence or amount is:

  (a) An inventory computation; or

  (b) A profit and loss computation.

 (4) Caused by an employee if the employee had also committed theft or any other dishonest act prior to the effective date of this policy and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the employee, learned of that theft or dishonest act prior to the policy period shown in the Declarations.

c. The most we will pay for loss or damage in any one occurrence is:

 (1) $25,000; or

 (2) The Limit of Insurance for Employee Dishonesty shown in the Declarations;

 whichever is greater.

d. All loss or damage:

 (1) Caused by one or more persons; or

 (2) Involving a single or series of related acts;

 is considered one occurrence.

e. If any loss is covered:

 (1) Partly by this insurance; and

 (2) Partly by any prior cancelled or terminated insurance that we or any affiliate has issued to you or any predecessor in interest;

 the most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.

 We will pay only for loss or damage you sustain through acts committed or events occurring during the policy period. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

f. This Additional Coverage is cancelled as to any employee immediately upon discovery by:

 (1) You; or

 (2) Any of your partners, "members", "managers", officers or directors not in collusion with the employee;

 of any dishonest act committed by that employee before or after being hired by you.

g. We will pay only for covered loss or damage sustained during the policy period and discovered no later than one year from the end of the policy period.

© 2016 Liberty Mutual Insurance

**BP 79 19 09 16**  Includes copyrighted material of Insurance Services Office Inc., with its permission.  **Page 6 of 18**

**h.** If you (or any predecessor in interest) sustained loss or damage during the policy period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Additional Coverage, provided:

**(1)** This Additional Coverage became effective at the time of cancellation or termination of the prior insurance; and

**(2)** The loss or damage would have been covered by this Additional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred.

**i.** The insurance under Paragraph **h.** above is part of, not in addition to, the Limit of Insurance applying to this Additional Coverage and is limited to the lesser of the amount recoverable under:

**(1)** This Additional Coverage as of its effective date; or

**(2)** The prior insurance had it remained in effect.

**j.** With respect to the Employee Dishonesty Additional Coverage Paragraph **E.2.** of this endorsement, employee means:

**(1)** Any natural person:

**(a)** While in your service or for 30 days after termination of service;

**(b)** Who you compensate directly by salary, wages or commissions; and

**(c)** Who you have the right to direct and control while performing services for you;

**(2)** Any natural person who is furnished temporarily to you:

**(a)** To substitute for a permanent employee as defined in Paragraph **(1)** above, who is on leave; or

**(b)** To meet seasonal or short-term workload conditions;

**(3)** Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **(2)** above;

**(4)** Any natural person who is a former employee, director, partner, "member", "manager", representative or trustee retained as a consultant while performing services for you; or

**(5)** Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside any building you occupy in conducting your business.

But employee does not mean;

**(1)** Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

**(2)** Any "manager", director or trustee except while performing acts coming within the usual duties of an employee.

**k.** This Additional Coverage replaces Paragraph **G.3. Optional Coverages - Employee Dishonesty.**

**l.** Paragraph **B.2.f. Exclusions - Dishonesty** does not apply to coverage for employees as provided by this Additional Coverage.

**m. Theft Of Clients' Property Coverage**

**(1)** We will also pay for loss of or damage to "money", "securities" and "other property" which was located at your clients' premises, and your client owned, leased, or held for others at the time of loss or damage, resulting directly from theft committed by any of your employees, acting alone or in collusion with other persons.

However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization, including your client. Any claim for loss that is covered under this coverage must be presented by you.

**(2)** The most we will pay for covered loss or damage under this Additional Coverage is $5,000, unless a higher Theft of Clients' Property Coverage Limit of Insurance is shown in the Declarations.

**(3)** We will not pay for any covered loss or damage until the amount of covered loss or damage exceeds $250 in any one occurrence. We will then pay the amount of covered loss or damage in excess of this deductible amount up to the applicable Limit of Insurance. No other deductible applies to this Theft of Clients' Property Coverage.

© 2016 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office Inc., with its permission.

(4) As used in the Theft Of Clients' Property Coverage, "other property" means any tangible property other than "money" and "securities " that has intrinsic value, but does not include any property described under subparagraphs **a., c., d., f., h.** and **i.** of Section **A.2. Property Not Covered.**

3. **Employee Tools**

We will pay for loss of or damage to tools owned by your employees located on the described premises or in transit resulting from a Covered Caused of Loss.

The most we will pay for loss under this Additional Coverage is $25,000 or the Limit of Insurance shown in the Declarations in any one occurrence. Our payment will only be for the account of the owner of the tools.

4. **Money And Securities**

   a. We will pay for loss of "money" and "securities" used in your business while at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee (including a temporary or leased employee) having use and custody of the property, at the described premises, or in transit between any of these places, resulting directly from:

      (1) Theft, meaning any act of stealing;

      (2) Disappearance; or

      (3) Destruction.

   b. In addition to the limitations and exclusions applicable to **Section I - Property**, we will not pay for loss:

      (1) Resulting from accounting or arithmetical errors or omissions;

      (2) Due to the giving or surrendering of property in any exchange or purchase; or

      (3) Of property contained in any "money" operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

   c. The most we will pay for loss in any one occurrence is:

      (1) $10,000 for Inside the Premises for "money" and "securities" while:

         (a) In or on the described premises; or

         (b) Within a bank or savings institution; and

      (2) $5,000 for Outside the Premises for "money" and "securities" while anywhere else; or

      (3) The Limit of Insurance for Money And Securities shown in the Declarations;

      whichever is greater.

   d. All loss:

      (1) Caused by one or more persons; or

      (2) Involving a single act or series of related acts;

      is considered one occurrence.

   e. You must keep records of all "money" and "securities" so we can verify the amount of any loss or damage.

   f. This Additional Coverage replaces Paragraph **G.2. Optional Coverages - Money And Securities.**

5. **Off-premises Power Failure**

We will pay up to $25,000 for loss of Business Income and Extra Expense caused by the failure of power or other utility service supplied to the described premises if the failure occurs away from the described premises.

The failure of power or other utility service must result from direct physical loss or damage by a Covered Cause of Loss.

We will only pay for loss you sustain after the first 24 hours following the direct physical loss to the off-premises property.

6. **Ordinance Or Law Coverage**

   a. The following Additional Coverages apply only to covered buildings written on a replacement cost basis.

   b. **Application Of Coverage(s)**

      The Additional Coverage for Ordinance Or Law provided by this endorsement applies only if both **6.b.(1)** and **6.b.(2)** are satisfied and are then subject to the qualifications set forth in **6.b.(3).**

**(1)** The ordinance or law:

**(a)** Regulates the demolition, construction or repair of buildings or tenants improvements and betterments, or establishes zoning or land use requirements at the described premises; and

**(b)** Is in force at the time of loss.

But coverage applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered.

**(2)** The building or tenants improvements and betterments sustain direct physical damage:

**(a)** That is covered under this policy and as a result of such damage, you are required to comply with the ordinance or law; or

**(b)** That is covered under this policy and direct physical damage that is not covered under this policy, and as a result of the building or tenants improvements and betterments damage in its entirety, you are required to comply with the ordinance or law.

**(c)** But if the damage is not covered under this policy, and such damage is the subject of the ordinance or law, then there is no coverage under this endorsement even if the building or tenants improvements and betterments has also sustained covered direct physical damage.

**(3)** In the situation described in **6.b.(2)(b)** above, we will not pay the full amount of loss otherwise payable under the terms of Coverages **1, 2** and/or **3** of this endorsement. Instead, we will pay a proportion of such loss, meaning the proportion that the covered direct physical damage bears to the total direct physical damage.

However, if the covered direct physical damage alone would have resulted in a requirement to comply with the ordinance or law, then we will pay the full amount of loss otherwise payable under terms of Coverages **1, 2** and/or **3.**

**c.** We will not pay under Coverages **1, 2** or **3** for:

**(1)** Enforcement of or compliance with any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread of any activity of "fungi", wet rot or dry rot; or

**(2)** The costs associated with the enforcement of or compliance with any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungi", wet rot or dry rot.

**d.** **Coverage**

**(1)** **Coverage 1 - Coverage For Loss To The Undamaged Portion Of The Building or Tenants Improvements And Betterments**

With respect to the building or tenants improvements and betterments that has sustained covered direct physical damage, we will pay under Coverage **1** for the loss in value of the undamaged portion of the building or tenants improvements and betterments as a consequence of a requirement to comply with an ordinance or law that requires demolition of undamaged parts of the same building or tenants improvements and betterments. Coverage **1** is included within the Limit of Insurance shown in the Declarations as applicable to the covered building. Coverage **1** does not increase the Limit of Insurance.

**(2)** **Coverage 2 - Demolition Cost Coverage**

With respect to the building that has sustained covered direct physical damage, we will pay the cost to demolish and clear the site of undamaged parts of the same building, as a consequence of a requirement to comply with an ordinance or law that requires demolition of such undamaged property.

Paragraph **E.5.d. Loss Payment - Property Loss Condition** does not apply to **Demolition Cost Coverage.**

**(3)** **Coverage 3 - Increased Cost Of Construction Coverage**

With respect to the building that has sustained covered direct physical damage, we will pay the increased cost to:

**(a)** Repair or reconstruct damaged portions of that building; and/or

© 2016 Liberty Mutual Insurance

**(b)** Reconstruct or remodel undamaged portions of that building, whether or not demolition is required;

when the increased cost is a consequence of a requirement to comply with the minimum standards of the ordinance or law.

However:

**(a)** This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

**(b)** We will not pay the increased cost of construction if the building is not repaired, reconstructed or remodeled.

Paragraph **E.5.d. Loss Payment** Property Loss Condition does not apply to the **Increased Cost Of Construction Coverage.**

e.  **Loss Payment**

**(1)** Loss payment Provisions **e.(2)** and **e.(3)** below, are subject to the apportionment procedure set forth in Paragraph **6.b.(3)** above.

**(2)** When there is a loss in value of an undamaged portion of a building or tenants improvements and betterments to which Coverage **1** applies, the loss payment for that building or tenants improvements and betterments, including damaged and undamaged portions, will be determined as follows:

**(a)** If the property is repaired or replaced on the same or another premises, we will not pay more than the lesser of:

**(i)** The amount you actually spend to repair, rebuild or reconstruct the building or tenants improvements and betterments, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

**(ii)** The Limit of Insurance shown in the Declarations as applicable to the covered building.

**(b)** If the property is not repaired or replaced, we will not pay more than the lesser of:

**(i)** The actual cash value of the building at the time of loss; or

**(ii)** The Limit of Insurance shown in the Declarations as applicable to the covered building.

**(iii)** If the tenants improvements and betterments are not repaired or replaced, we will pay based on a proportion of your original cost of the tenants improvements and betterments. We will determine the proportionate value as follows:

**i.** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**ii.** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in the procedure.

**(3)** For Coverage **2** - Demolition Cost Coverage and Coverage **3** - Increased Cost Of Construction Coverage, the most we will pay at each described premises for the total of all covered losses is:

**(a)** $150,000; or

**(b)** The Limit of Insurance for Demolition Cost Coverage and Increased Cost Of Construction Coverage shown in the Declarations;

whichever is greater.

The Limit of Insurance for Demolition Cost Coverage and Increased Cost Of Construction Coverage described in Paragraph **e.(3)** above, is subject to the following additional loss payment provisions:

**(a)** For Demolition Cost, we will not pay more than the amount you actually spend to demolish and clear the site of the described premises.

© 2016 Liberty Mutual Insurance

    **(b)** With respect to the Increased Cost Of Construction:

        **(i)** We will not pay for the increased cost of construction:

            **i.** Until the property is actually repaired or replaced, at the same or another premises; and

            **ii.** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

        **(ii)** If the building or tenants improvements and betterments are repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost Of Construction is the lesser of:

            **i.** The increased cost of construction at the same premises; or

            **ii.** The applicable Demolition Cost and Increased Cost of Construction Limit of Insurance described in Paragraph **e.(3)** above.

        **(iii)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost Of Construction is the lesser of:

            **i.** The increased cost of construction at the new premises; or

            **ii.** The applicable Demolition Cost and Increased Cost Of Construction Limit of Insurance described in Paragraph **e.(3)** above.

**f.** The terms of this Additional Coverage apply separately to each building to which this endorsement applies.

**g.** Under this endorsement, we will not pay for loss due to any ordinance or law that:

    **(1)** You were required to comply with before the loss, even if the building was undamaged; and

    **(2)** You failed to comply with.

**h.** Example of Proportionate Loss Payment for Ordinance Or Law Coverage Losses (procedure as set forth in Paragraph **6.b.(3)** above).

Assume:

- Wind is a Covered Cause of Loss. Flood is an excluded Cause of Loss;
- The building has a value of $200,000;
- Total direct physical damage to building: $100,000;
- The ordinance or law in this jurisdiction is enforced when building damage equals or exceeds 50% of the building's value;
- Portion of direct physical damage that is covered (caused by wind): $30,000;
- Portion of direct physical damage that is not covered (caused by flood): $70,000; and
- Loss under Ordinance Or Law Coverage **3** of this endorsement: $60,000.

Step **1**: Determine the proportion that the covered direct physical damage bears to the total direct physical damage.

$30,000 divided by $100,000 = .30

Step **2**: Apply that proportion to the Ordinance Or Law loss.

$60,000 x .30 = $18,000

In this example, the most we will pay under this endorsement for Coverage **3** loss is $18,000, subject to the applicable Limit of Insurance and any other applicable provisions.

**NOTE:** The same procedure applies to losses under Coverage **1** and **2** of this endorsement.

**7.** **Outdoor Signs**

    **a.** We will pay for direct physical loss of or damage to all outdoor signs at the described premises:

        **(1)** Owned by you; or

        **(2)** Owned by others but in your care, custody or control.

    **b.** Section **A.3. Covered Causes of Loss** and Section **B. Exclusions** do not apply to this Additional Coverage, except for:

        **(1)** Paragraph **B.1.c. Governmental Action;**

© 2016 Liberty Mutual Insurance

      **(2)** Paragraph **B.1.d. Nuclear Hazard;** and

      **(3)** Paragraph **B.1.f. War And Military Action.**

  **c.** We will not pay for loss or damage caused by or resulting from:

      **(1)** Wear and tear;

      **(2)** Hidden or latent defect;

      **(3)** Rust;

      **(4)** Corrosion; or

      **(5)** Mechanical breakdown.

  **d.** The most we will pay for loss or damage in any one occurrence is:

      **(1)** $25,000; or

      **(2)** The Limit of Insurance for Outdoor Signs shown in the Declarations;

      whichever is greater.

  **e.** This Additional Coverage replaces Paragraph **G.1. Optional Coverages - Outdoor Signs.**

  **f.** Paragraph **C.2. Limits Of Insurance** does not apply to this Additional Coverage.

**8. Reward**

We will pay up to $10,000 as a reward for information which leads to a conviction in connection with a fire loss or theft loss covered under this policy. Regardless of the number of persons involved in providing information, the limit of our liability under this Additional Coverage shall not be increased.

**F.** Section **A.6. Coverage Extensions** is modified as follows:

**1.** Paragraph **A.6.a Newly Acquired Or Constructed Property** is replaced by the following:

  **(1) Buildings**

    If this policy covers Buildings, you may extend that insurance to apply to:

    **(a)** Your new buildings while being built on the described premises; and

    **(b)** Buildings you acquire at premises other than the one described, intended for:

      **(i)** Similar use as the building described in the Declarations; or

      **(ii)** Use as a warehouse.

    The most we will pay for loss or damage under this Extension is $1,000,000 at each building.

  **(2) Business Personal Property**

    If this policy covers Business Personal Property, you may extend that insurance to apply to:

    **(a)** Business Personal Property, including such property that you newly acquire, at any location you acquire;

    **(b)** Business Personal Property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations; or

    **(c)** Business Personal Property that you newly acquire, located at the described premises.

    This Extension does not apply to personal property that you temporarily acquire in the course of installing or performing work on such property or your wholesale activities.

    The most we will pay for loss or damage under this Extension is $500,000 at each building.

  **(3) Period Of Coverage**

    With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:

    **(a)** This policy expires;

    **(b)** 180 days expire after you acquire the property or begin construction of that part of the building that would qualify as Covered Property; or

    **(c)** You report values to us.

    We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as Covered Property.

© 2016 Liberty Mutual Insurance

2. Paragraph **A.6.b. Personal Property Off-premises** is replaced by the following:

You may extend the insurance provided by this policy to apply to your Covered Property, other than "money" and "securities", "valuable papers and records" or accounts receivable, while it is in the course of transit or at a premises you do not own, lease or operate. The most we will pay for loss or damage under this Extension is $25,000.

The above Limit does not include Employee Tools. Refer to Paragraph **E.3. Additional Coverages - Employee Tools** of this endorsement for specific coverage.

3. Paragraph **A.6.c. Outdoor Property** is replaced by the following:

You may extend the insurance provided by this policy to apply to your outdoor fences and retaining walls; radio or television antennas (including satellite dishes), including their lead-in wiring, masts, or towers; trees, shrubs and plants, including debris removal expense, caused by or resulting from a Covered Cause of Loss.

The most we will pay for loss or damage under this Extension is $25,000 but not more than $1,000 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

4. Paragraph **A.6.d. Personal Effects** is replaced by the following:

You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners or "members", your "managers" or your employees, including temporary or leased employees. This extension does not apply to:

(1) Tools or equipment used in your business except as provided by Paragraph **E.3. Additional Coverages - Employee Tools** of this endorsement; or

(2) Loss or damage by theft.

The most we will pay for loss or damage under this Extension is $15,000 at each described premises.

5. Paragraph **A.6.e.(3) Valuable Papers And Records** is replaced by the following:

(3) The most we will pay under this Coverage Extension for loss or damage to "valuable papers and records" in any one occurrence at the described premises is $25,000, unless a higher Limit of Insurance is shown in the Declarations.

For "valuable papers and records" not at the described premises, the most we will pay is the lesser of 25% of the Valuable Papers And Records Limit of Insurance described above, or $10,000.

6. Paragraph **A.6.f.(2) Accounts Receivable** is replaced by the following:

(2) The most we will pay under this Coverage Extension for loss or damage in any one occurrence at the described premises is $35,000, unless a higher Limit of Insurance for Accounts Receivable is shown in the Declarations.

For accounts receivable not at the described premises, the most we will pay is $5,000.

G. The following are added to Section **A.6. Coverage Extensions:**

1. **Cellular Phones And Personal Digital Assistant (PDA)**

a. The most we will pay for loss or damage to Cellular Phones, PDA's and similar hand-held wireless communication devices is $1,000.

b. A $50 per occurrence deductible applies to this Coverage Extension. This deductible does not increase the amount of the deductible shown in the Declarations and will be used to satisfy the requirements of the deductible shown in the Declarations.

2. **Fine Arts**

You may extend the insurance which applies to Your Business Personal Property to apply to "fine arts" that are:

a. Property you own that is used in your business; or

b. Property of others that is in your care, custody or control.

The most we will pay for loss or damage under this Coverage Extension is $10,000 at each described premises; or the Limit of Insurance for Fine Arts shown in the Declarations; whichever is greater.

In the event of loss or damage to property covered under this Extension, we will pay the market value of the property at the time of loss or damage.

Section **B. Exclusions** does not apply to this Coverage Extension except for:

a.  Paragraph **B.1.c. Governmental Action;**

b.  Paragraph **B.1.d. Nuclear Hazard;**

c.  Paragraph **B.1.f. War And Military Action;**

d.  Paragraph **B.2.f. Dishonesty;**

e.  Paragraph **B.2.g. False Pretense;** and

f.  Paragraph **B.2.k. Neglect.**

3.  **Lock Replacement**

You may extend the insurance provided by this policy to apply to the cost to repair or replace the door locks or tumblers of your described premises due to theft of your door keys.

4.  **Loss Adjustment Expenses**

You may extend the insurance provided by this policy to apply to your expenses for preparation of loss data, including inventories and appraisals, in connection with any claim covered under this policy. This Coverage Extension will not pay for expenses incurred insuring the services of a public adjuster.

The most we will pay under this Coverage Extension is $5,000.

5.  **Water Back-up And Sump Overflow**

a.  You may extend the insurance provided by this policy to apply to direct physical loss or damage to your covered property caused by or resulting from:

(1) Water or waterborne material which backs up into a building or structure through sewers or drains contained within a building which are directly connected to a sanitary sewer or septic system; or

(2) Water or waterborne material which enters into or overflows from a sump, sump pump or related equipment, provided that it is located in a building and designed to remove subsurface water which is drained from the foundation area, even if the overflow or discharge results from mechanical breakdown of a sump pump or its related equipment.

However, with respect to Paragraph **(2)** above, we will not pay the cost of repairing or replacing a sump pump or its related equipment in the event of mechanical breakdown.

b.  The coverage described in Paragraph **a.** above does not apply to loss or damage resulting from an insured's failure to:

(1) Keep a sump pump or its related equipment in proper working condition; or

(2) Perform the routine maintenance or repair necessary to keep a sewer or drain free from obstructions.

c.  The most we will pay for the coverage provided under the Water Back-up And Sump Overflow Coverage Extension is $25,000 per location.

d.  We will not, however, pay for any loss or damage that results from water or other materials that back up, overflow, or are discharged from a sewer, drain, sump, sump pump or related equipment when it is caused directly or indirectly by any flood, whether the flood is caused by an act of nature or is otherwise caused. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

H.  Section **C. Limits Of Insurance** is modified as follows:

1.  Paragraph **C.3.** is replaced by the following:

3.  Unless otherwise stated, the amounts of insurance applicable to the Coverage Extensions, and the following Additional Coverages listed below, are in addition to the Limits of Insurance:

a.  Computer Equipment;

b.  Employee Dishonesty;

c.  Employee Tools;

d.  Fire Department Service Charge;

e.  Fire Extinguisher Systems Recharge Expense;

f.  Forgery Or Alteration;

g.  Money And Securities;

© 2016 Liberty Mutual Insurance

      h.   Money Orders And "Counterfeit Money";

      i.   Off-premises Power Failure;

      j.   Ordinance Or Law Coverage;

      k.   Pollutant Clean Up And Removal; and

      l.   Reward.

**2.** Paragraph **C.5.a. Business Personal Property Limit - Seasonal Increase** is replaced by the following:

    **a.**  The Limit of Insurance for Business Personal Property will automatically increase by 33% to provide for seasonal variations.

**I.** Paragraphs **D.2. and D.3. Deductibles** are replaced by the following:

**2.** Regardless of the amount of the Deductible, the most we will deduct from any loss or damage is $500 in any one occurrence under the following Additional Coverages:

    **a.**  Employee Dishonesty;

    **b.**  Forgery Or Alteration;

    **c.**  Money Orders And "Counterfeit Money";

    **d.**  Money And Securities; or

    **e.**  Outdoor Signs.

But this $500 deductible will not increase the deductible shown in the Declarations. This deductible will be used to satisfy the requirements of the deductible in the Declarations.

**3.** No deductible applies to the following:

    **a.**  Additional Coverages:

        **(1)** Business Income;

        **(2)** Civil Authority;

        **(3)** Extra Expense;

        **(4)** Fire Department Service Charge;

        **(5)** Fire Extinguisher Systems Recharge Expense;

        **(6)** Off-premises Power Failure;

        **(7)** Reward; or

    **b.**  Coverage Extensions:

        **(1)** Lock Replacement; or

        **(2)** Loss Adjustment Expenses.

    **c.**  A $50 per occurrence deductible applies to Cellular Phone Coverage, but this $50 per occurrence deductible will not increase the deductible shown in the Declarations. This deductible will be used to satisfy the requirements of the deductible in the Declarations.

**J.** Section **E. Property Loss Conditions** is modified as follows:

**1.** Paragraph **E.5. Loss Payment** is replaced by the following:

In the event of loss or damage covered by this policy:

    **a.**  At our option, we will either:

        **(1)** Pay the value of lost or damaged property;

        **(2)** Pay the cost of repairing or replacing the lost or damaged property;

        **(3)** Take all or any part of the property at an agreed or appraised value; or

        **(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to Paragraph **d.(1)(a)** below.

    **b.**  We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

    **c.**  We will not pay you more than your financial interest in the Covered Property.

    **d.**  Except as provided in Paragraphs **(2)** through **(8)** below, we will determine the value of Covered Property as follows:

        **(1)** At replacement cost without deduction for depreciation, subject to the following:

            **(a)** We will not pay more for loss or damage on a replacement cost basis than the least of:

© 2016 Liberty Mutual Insurance

**BP 79 19 09 16**    Includes copyrighted material of Insurance Services Office Inc., with its permission.    **Page 15 of 18**

(i) The Limit of Insurance under **Section I - Property** that applies to the lost or damaged property;

(ii) The cost to replace, on the same premises, the lost or damaged property with other property:

    **i.** Of comparable material and quality; and

    **ii.** Used for the same purpose; or

(iii) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost is limited to the cost which would have been incurred had the building been built at the original premises.

**(b)** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

**(c)** We will not pay on a replacement cost basis for any loss or damage:

(i) Until the lost or damaged property is actually repaired or replaced; and

(ii) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

However, if the cost to repair or replace the damaged building property is $2,500 or less, we will settle the loss according to the provisions of Paragraph **d.(1)(a)** whether or not the actual repair or replacement is complete.

**(d)** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**(2)** If the Actual Cash Value - Buildings option applies, as shown in the Declarations, Paragraph **(1)** above does not apply to Buildings. Instead, we will determine the value of Buildings at actual cash value.

**(3)** The following property at actual cash value:

**(a)** Used or second-hand merchandise held in storage or for sale;

**(b)** Household contents, except personal property in apartments or rooms furnished by you as landlord; or

**(c)** Manuscripts.

**(4)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac at market value at the time of loss.

**(5)** Glass at the cost of replacement with safety glazing material if required by law.

**(6)** Tenants improvements and betterments and/or undamaged tenants improvements and betterments at:

**(a)** The cost to repair or replace on the same or another site if you make repairs promptly;

**(b)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(i) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(ii) Divide the amount determined in **(i)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(c)** Nothing if others pay for repairs or replacement.

**(7)** Applicable only to coverage for Money And Securities:

**(a)** "Money" at its face value; and

**(b)** "Securities" at their value at the close of business on the day the loss is discovered.

© 2016 Liberty Mutual Insurance

(8) Applicable only to Accounts Receivable:

    (a) If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage:

        (i) We will determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

        (ii) We will adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

    (b) The following will be deducted from the total amount of accounts receivable, however that amount is established:

        (i) The amount of the accounts for which there is no loss or damage;

        (ii) The amount of the accounts that you are able to re-establish or collect;

        (iii) An amount to allow for probably bad debts that you are normally unable to collect; and

        (iv) All unearned interest and service charges.

**e.** Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, provided you have complied with all the terms of this policy, and:

    (1) We have reached agreement with you on the amount of loss; or

    (2) An appraisal award has been made.

**2.** The following are added to Paragraph **E.5. Loss Payment:**

**a. Brands And Labels**

If branded or labeled merchandise that is Covered Property is damaged by a Covered Cause of Loss, and we take all or part of the property at an agreed or appraised value, you may extend the insurance that applies to Business Personal Property to pay expenses you incur to:

    (1) Stamp salvage on the merchandise or its containers, if the stamp will not physically damage the merchandise; or

    (2) Remove the brands and labels, if doing so will not physically damage the merchandis e or its containers to comply with the law.

Payment of these expenses is included within the applicable Limit of Insurance.

**b. Consequential Loss To Stock**

If a Covered Cause of Loss occurs to covered "stock", we will pay any reduction in value of the remaining undamaged parts of covered "stock".

Payment for any reduced value in "stock" is included within the applicable Limit of Insurance.

**K.** Section **H. Property Definitions** is modified as follows:

**1.** Paragraph **H.9.** "Period of restoration" is replaced by the following:

**a.** Means the period of time that:

    (1) Begins:

        (a) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

        (b) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

    caused by or resulting from any Covered Cause of Loss at the described premises; and

© 2016 Liberty Mutual Insurance

    **(2)** Ends on the earlier of:

        **(a)** The date when your business activities at the described premises return to the level that existed immediately before the loss; but in no event for more than 30 days after the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

        **(b)** The date when business is resumed at a new permanent location.

  **b.** Does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

    **(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

    **(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

    The expiration date of this policy will not cut short the "period of restoration".

**2.** With respect to this endorsement, the following is added to Section **H. Property Definitions:**

"Fine Arts" means paintings, etchings, pictures, tapestries, art or stained glass windows, valuable rugs, statuary, marbles, bronzes, antique furniture, rare books, antique silver, manuscripts, porcelains, rare glass, bric-a-brac, sports memorabilia and any other similar property of rarity, historic value or artistic merit.

© 2016 Liberty Mutual Insurance

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF POLLUTION EXCLUSION
# (PREMISES)

This endorsement modifies insurance provided under the following.

BUSINESSOWNERS COVERAGE FORM

**1.** The following exception is added to Exclusion B.1.f. Pollution in Section II - Liability:

Subparagraph (a) of Paragraph (1) does not apply to "I bodily injury" or to "property damage" to tangible property arising out of the actual discharge, dispersal, seepage, migration, release or escape of "pollutants" if the actual discharge, dispersal, seepage, migration, release or escape:

**(a)** begins on a clearly identifiable specific day during the policy period and ends in its entirety not later than seventy-two (72) hours thereafter;

**(b)** is discovered and reported to us within fifteen (15) days of the specific day it begins;

**(c)** is neither expected nor intended from the standpoint of any insured;

**(d)** is unrelated to any previous discharge, dispersal, seepage, migration, release or escape; and

**(e)** does not originate at or from a storage tank or other container, duct or piping which is below the surface of the ground or water or which at any time has been buried under the surface of the ground or water and then is subsequently exposed by erosion, excavation or any other means.

Tangible property, as used in this endorsement, does not include land or water, which is below ground level or not.

Coverage provided hereunder does not apply to any discharge, dispersal, seepage, migration, release or escape that is merely threatened or alleged rather than shown to have actually occurred.

© 2013 Liberty Mutual Insurance. All rights reserved.

**BP 79 74 07 13**        Includes copyrighted material of Insurance Services Office, Inc., with its permission.        **Page 1 of 1**

BUSINESSOWNERS
BP 80 56 07 13

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# MEDICAL OFFICE ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY

This summarizes the various coverages provided by this endorsement; NO COVERAGES ARE GIVEN BY THIS SUMMARY. Actual coverage descriptions are within the form.

| SUBJECT | LIMITS OF INSURANCE OR CHANGE IN CONDITION | SECTION |
|---|---|---|
| **Section I - Property of the BUSINESSOWNERS COVERAGE FORM** | | |
| MEDICAL PROFESSIONAL EQUIPMENT - EXCLUSIONS | See endorsement | I.A.2. |
| MEDICAL PROFESSIONAL EQUIPMENT - OFF PREMISES | Subject to Business Personal Property Limit - wherever located within the coverage territory | I.A.1. |
| SPOILAGE COVERAGE | $ 10,000 | I.B. |
| **Section II - Liability of the BUSINESSOWNERS COVERAGE FORM** | | |
| MEDICAL WASTE LEGAL EXPENSE REIMBURSEMENT COVERAGE | $ 50,000 | II.A. |

© 2013 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

BP 80 56 07 13    Page 1 of 4

I.  Section I - Property of the **BUSINESSOWNERS COVERAGE FORM** is amended as follows:

**A.  MEDICAL PROFESSIONAL EQUIPMENT**

1.  Off Premises Coverage

   a.  Paragraph **1.b., Business Personal Property** of Part **A., Coverage** is extended to include coverage to the following described property WHEREVER LOCATED within the policy coverage territory:

   (1)  Your medical, surgical and dental equipment, instruments, tools, materials, supplies and books usual to the medical, surgical or dental profession; and

   (2)  At your option, similar property of others in your care, custody and control, used by you in your profession.

2.  Exclusions

   Part **B., Exclusions** is hereby amended by the deletion of the following exclusions as respects Business Personal Property:

   **1.b.**    Earth Movement;

   **1.g.**    Water;

   **2.a.**    Electrical Apparatus;

   **2.c.**    Smoke, Vapor, Gas;

   **2.d.**    Steam Apparatus;

   **2.e.**    Frozen Plumbing; and

   **2.h.**    Exposed Property.

**B.  SPOILAGE COVERAGE**

   The following is added to Paragraph **A.5., Additional Coverages:**

1.  Paragraph **A. 1., Covered Property** is amended as follows:

   Covered Property also includes "perishable stock" at the described premises, if the "perishable stock" is:

   a.  Owned by you and used in your business; or

   b.  Owned by others and in your care, custody or control.

2.  Paragraph **A. 2., Property Not Covered** is amended by addition of **j.** as follows:

   j.  Property located:

   (1)  On buildings;

   (2)  In the open; or

   (3)  In vehicles.

3.  Paragraph **A. 3., Covered Causes Of Loss** is replaced by the following:

   Subject to the **Exclusions** described in item **E.5.** of this endorsement, Covered Causes of Loss means the following:

   a.  Breakdown or Contamination, meaning:

   (1)  Change in temperature or humidity resulting from mechanical breakdown or mechanical failure of refrigerating, cooling or humidity control apparatus or equipment, only while such apparatus or equipment is at the described premises; or

   (2)  Contamination by a refrigerant, only while the refrigerating apparatus or equipment is at a described premises. Mechanical breakdown and mechanical failure do not mean power interruption, regardless of how or where the interruption is caused and whether or not the interruption is complete or partial.

© 2013 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**BP 80 56 07 13**    **Page 2 of 4**

b.  Power Outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off the described premises, due to conditions beyond your control.

We will pay for loss or damage only when the Breakdown, Contamination or Power Outage results from fire; lightning; windstorm or hail; explosion; smoke; aircraft or vehicles; riot or civil commotion; vandalism; sprinkler leakage; falling objects; weight of snow, ice or sleet; freezing; or collapse.

4.  Paragraph **A. 6., Coverage Extensions** does not apply to Spoilage Coverage.

5.  Part **B., Exclusions** is amended as follows:

Paragraph **1.** - only the following apply to this Spoilage Coverage:

b.  Earth Movement;

c.  Governmental Action;

d.  Nuclear Hazard;

f.  War And Military Action; and

g.  Water.

Exclusion **2. I. (7)** is replaced by the following:

(7)  The following causes of loss to Personal Property:

(a)  Dampness or dryness of atmosphere; and

(b)  Marring or scratching.

6.  Paragraph **E.5., Property Loss Conditions, Loss Payment, d.** is replaced by the following:

d.  We will determine the value of Covered Property you have purchased as follows:

(1)  For "perishable stock" you have sold but not delivered, at the selling price less discounts and expenses you otherwise would have had;

(2)  For other "perishable stock", at actual cash value.

7.  Part **G., Optional Coverages** does not apply to Spoilage Coverage.

8.  Part **H., Property Definitions** is amended by the addition of the following:

"Perishable Stock" means property:

a.  Maintained under controlled temperature or humidity conditions for preservation; and

b.  Susceptible to loss or damage if the controlled temperature for humidity conditions change.

9.  Limits of insurance.

The most we will pay for direct physical loss or damage to "perishable stock" caused by the Covered Cause(s) of Loss of this Spoilage Coverage in any one occurrence is $10,000.

II.  Section II - Liability of the **BUSINESSOWNERS COVERAGE FORM** is amended to include Medical Waste Legal Expense Reimbursement Coverage as follows:

A.  Medical Waste Legal Expense Reimbursement Coverage

We will reimburse you for the necessary "legal expenses" incurred by you resulting from your being a defendant or co-defendant in a "civil suit" alleging violation of a law or regulation governing disposal of medical waste.

Such "civil suit" must be brought after the effective date of this policy.

We have neither the right nor the duty to defend any claim arising from a defined "incident."

This coverage does not apply to any "civil suit" for any "incident" that happened prior to the effective date of this policy, nor to any "incident" which we are obligated to defend under the policy form to which this endorsement is attached.

© 2013 Liberty Mutual Insurance. All rights reserved.

**B.** Limits of Liability

    **1.** Per "Civil Suit": $50,000

    The Limit of Liability stated above as per "Civil Suit" is the Limit of Liability for all "legal expenses" arising out of, or in connection with, the same or related "civil suit."

    **2.** Annual Aggregate: $50,000

    Subject to provision **1.** above, the total Limit of Liability for all "legal expenses" shall not exceed the Limit of Liability stated as annual aggregate.

    This limit applies regardless of the number of "civil suits" filed against you during each annual policy period.

    The limits applicable to per "civil suit" and annual aggregate apply collectively for the entity named as the Named Insured, including such other entities who qualify for coverage under the definition of you.

    All "civil suits" whenever filed, including any and all appeals, shall be considered first filed during the policy period in which the earliest "civil suit" arising out of the same or related "incident" was filed, and all such "civil suits" shall be subject too the same Limit of Liability.

**C.** Additional Definitions

    **1.** "Civil Suit" includes administrative proceedings brought by the Federal or State Environmental Protection Agency as well as law suits brought in civil court.

    **2.** "Incident" means the actual or alleged improper disposing of any medical waste material that results in a "civil suit" being filed against you.

    **3.** "Legal Expenses" means fees charged by the legal counsel you select and all other fees, costs and expenses, other than loss of income, which result from the investigation, defense and appeal of a "civil suit."

**D.** Our Duties

You shall give us, or any of our authorized representatives, notice as soon as practicable after you receive notice of the "civil suit" covered by this policy. Such notice shall contain details sufficient to identify you and all reasonable obtainable information regarding the time, place and circumstanc es of the "civil suit" and shall identify the court and all parties to the action before the court.

© 2013 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**BP 80 56 07 13**       **Page 4 of 4**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SPOILAGE COVERAGE ENDORSEMENT

**\* Schedule**

| Premises No. | Bldg. No. | Limit of Insurance |
|---|---|---|
| | | |

\* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A.** The following is added to paragraph A.5., Additional Coverages of Section I - Property of the Businessowners Coverage Form:

   **s.** Spoilage Coverage

   We will pay for direct physical loss or damage caused by spoilage to "perishable stock", at the described premises, if the spoilage is caused by one of the following:

   **(1)** Breakdown or contamination, meaning:

   **(a)** Change in temperature or humidity resulting from mechanical breakdown or mechanical failure of refrigerating, cooling or humidity control apparatus or equipment, only while such apparatus or equipment is at the described premises; or

   **(b)** Contamination by a refrigerant, only while the refrigerating apparatus or equipment is at a described premises.

   Mechanical breakdown and mechanical failure do not mean power interruption, regardless of how or where the interruption is caused and whether or not the interruption is complete or partial.

   **(2)** Power Outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power either on or off the described premises, due to conditions beyond your control.

**B.** The following is added to Paragraph A.2. Property Not Covered in Section I - Property of the Businessowners Coverage Form:

   **j.** Property located:

   **(1)** On buildings;

   **(2)** In the open; or

   **(3)** In vehicles.

**C.** Of the Exclusions contained in Paragraph B. in Section I - Property of the Businessowners Coverage Form, only the following apply to Spoilage Coverage:

   **(1)** Paragraph B.1.b., Earth Movement;

   **(2)** Paragraph B.1.c., Governmental Action;

   **(3)** Paragraph B.1.d., Nuclear Hazard;

   **(4)** Paragraph B.1.f., War and Military Action; and

   **(5)** Paragraph B.1.g., Water.

**D.** In the event of loss or damage covered by this Additional Coverage we will determine the value of "perishable stock" as follows:

   **(1)** For "perishable stock" you have sold but not delivered, at the selling price less discounts and expenses you otherwise would have had;

   **(2)** For other "perishable stock", at actual cash value.

Includes copyrighted material of Insurance Services Office, with its permission.
© ISO Properties, Inc., 2004

**E.** The most we will pay for covered direct physical loss or damage under this Additional Coverage in any one occurrence is:

    **(1)** $10,000; or

    **(2)** the Limit of Insurance shown in the Declarations or Schedule above: whichever is greater.

**F.** Coverage provided by this Additional Coverage is excess over any other insurance provided by this Policy covering the same loss or damage.

**G.** "Perishable stock", as used in this Additional Coverage, means property owned by you and used in your business or owned by others and in your care, custody or control that is:

    **(1)** Maintained under controlled temperature or humidity conditions for preservation; and

    **(2)** Susceptible to loss or damage if the controlled temperature or humidity conditions change.

Includes copyrighted material of Insurance Services Office, with its permission.
© ISO Properties, Inc., 2004

BP 80 65 01 07

**Page 2 of 2**

**BUSINESSOWNERS**
**BP 81 15 03 11**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ASBESTOS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

Section II - Liability is amended as follows:

This insurance does not apply to:

"Bodily injury", "property damage", or "personal and advertising injury" arising out of or related in any way to asbestos or asbestos-containing materials.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

BP 81 15 03 11                              ©ISO Properties, Inc., 2004                              Page 1 of 1

Page 131 of 198

**BUSINESSOWNERS**
**BP 82 37 08 15**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EQUIPMENT  BREAKDOWN  COVERAGE  ENDORSEMENT

This endorsement  modifies  insurance  provided  under  the following:

BUSINESSOWNERS  COVERAGE FORM

**Section I - Property** is amended  as follows:

A.  The following  is added to Paragraph  **A.5 Additional  Coverages:**

**Equipment  Breakdown  Additional  Coverages**

1.  We will  pay  for direct  physical  damage to Covered  Property  that is a direct  result of an "accident"  to "covered  equipment".

2.  The most we will  pay for loss, damage or expense  under  this endorsement  arising  from  any "one accident"  is the applicable  Limit of Insurance  in the Declarations.  Coverage  provided  under  this endorsement  does not increase  and is not in addition  to any other Limit  of Insurance.

3.  The following  coverages  also apply  to the direct  result of an "accident".  These coverages  do not provide additional  limits of insurance.

a.  **Expediting  Expenses**

With  respect  to your damaged  Covered  Property,  we will  pay the reasonable  extra cost to:

(1)  Make temporary  repairs;  and

(2)  Expedite  permanent  repairs  or replacement.

Reasonable  extra cost  shall  mean  the extra  cost of temporary  repair  and of expediting  the repair of such damaged  equipment  of the insured,  including  overtime  and the extra cost of express or other rapid  means of transportation.

b.  **Hazardous  Substances**

We will  pay for the additional  cost to repair  or replace Covered  Property  because  of contamination by a "hazardous  substance".  This includes  the additional  expense  to clean up or dispose of such property.

This does not include  contamination  of "perishable  goods"  by a refrigerant,  including  ammonia, which  is addressed  in **2.d** below.  As used in this coverage,  additional  costs mean those beyond  what  would  have  been  payable  under  this  Equipment  Breakdown  Coverage  had no "hazardous  substance"  been involved.

The most  we will  pay for under  this coverage,  including  actual  loss of Business  Income you sustain and necessary  Extra Expense you incur is $50,000.

c.  **Spoilage**

We will  pay for physical  damage to "perishable  goods"  due to spoilage. The spoilage  damage must be due to the lack of or excess of power,  light,  heat, steam or refrigeration  caused by an "accident"  to "covered  equipment"  covered  by this policy.

We will  also  pay any necessary  expense  you incur  to reduce  the amount  of loss under  this coverage. We will  pay such expenses  to the extent  that they do not exceed  the amount  of loss that otherwise  would  have  been payable  under  this coverage.

Loss payment  will  be in accordance  with Loss Payment  provisions  of the Property  Loss Conditions of the policy. However,  if you are unable  to replace "perishable  goods"  before the anticipated sale date of such goods had no loss occurred,  the amount  of our payment  will  be determined  on the basis of the sale price of "perishable  goods"  at the time of the "accident" less discounts  and expenses you would  normally  incur.

© 2015 Liberty Mutual Insurance

BP 82 37 08 15        Includes copyrighted material of Insurance Services Office, Inc., with its permission.        **Page 1 of 4**

The most we will pay for loss, damage or expense under this coverage is $50,000.

**d.  Ammonia Contamination**

The physical damage to Covered Property due to the contamination from the release of ammonia, including any salvage expense.

The most we will pay for loss or damage under this coverage is $50,000.

**f.  Data Restoration**

We will pay for your reasonable and necessary cost to research, replace and restore lost "electronic data".

The most we will pay for loss or expense under this coverage, including the actual loss of Business Income you sustain and necessary Extra Expense you incur is $50,000.

**g.  Service Interruption**

**(1)** Insurance provided for Business Income, Extra Expense and Spoilage is extended to apply to your loss, damage or expense caused by an "accident" to equipment that is owned, managed, or controlled by your landlord or landlord's utility, or utility or other supplier with whom you have a contract, that directly supplies you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, internet access, telecommunications services, wide area networks or data transmission to the premises as described in the Declarations. The equipment must meet the definition of "covered equipment" except that it is not Covered Property.

**(2)** Service Interruption coverage will not apply unless the loss of or disruption of service exceeds 24 hours immediately following the "accident".

**(3)** The most we will pay for loss, damage or expense under this coverage is the limit that applies to Business Income, Extra Expense or Spoilage.

**B.** The following is added to Paragraph **B. Exclusions:**

**Equipment Breakdown Exclusions**

All exclusions in the Businessowners Coverage Form apply except as modified below and to the extent that coverage is specifically provided by this Equipment Breakdown Additional Coverage.

**1.** The exclusions are modified as follows:

**a.** The following is added to **B.1.g.(1) Water Exclusion:**

However, if electrical "covered equipment" requires drying out because of Water as described in **B.1.g.(1)** above, we will pay for the direct expenses of such drying out subject to the applicable Limit of Insurance and Deductible for Building or Business Personal Property, whichever applies.

**b.** As respects to this endorsement only, the next to the last Paragraph of **B.1.h. Certain Computer-related Losses** Exclusion is deleted and replaced with the following:

However, if excluded loss or damage, as described in Paragraph **(1)** above results in an "accident", we will pay only for the loss, damage or expense caused by such "accident".

**c.** As respects to this endorsement only, the last paragraph of **B.2.l Other Types of Loss** Exclusion is deleted and replaced with the following:

But if an excluded cause of loss that is listed in Paragraphs **2.l.(1)** through **(7)** results in an "accident", we will pay for the loss, damage or expense caused by that "accident".

**d.** The following is added to **B.2.m. Errors Or Omissions** and **B.2.n Installati on, Testing, Repair** Exclusions:

We will also pay for direct physical loss or damage caused by an "accident".

© 2015 Liberty Mutual Insurance

BP 82 37 08 15          Includes copyrighted material of Insurance Services Office, Inc., with its permission.          **Page 2 of 4**

2. We will not pay under this endorsement for loss, damage or expense caused by or resulting from:

    a. Any defect, programming error, programming limitation, computer virus, malicious code, loss of data, loss of access, loss of use, loss of functionality or other condition within or involving "electronic data" of any kind. But if an "accident" results, we will pay for the resulting loss, damage or expense; or

    b. Any of the following tests: a hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment.

3. With respects to Service Interruption coverage, we will also not pay for an "accident" caused by or resulting from: fire; lightning; windstorm or hail; explosion (except as specifically provided in **D.1.c.** below); smoke; aircraft or "vehicles"; riot or civil commotion; vandalism; sprinkler leakage; falling objects; weight of snow, ice or sleet; freezing; collapse; flood or earth movement.

4. With respect to Business Income, Extra Expense and Service Interruption coverages, we will also not pay for:

    a. Loss caused by your failure to use due diligence and dispatch and all reasonable means to resume business; or

    Any increase in loss resulting from an agreement between you and your customer or supplier, including contract penalties.

5. We will not pay under this endorsement for any loss or damage to animals.

C. The following are added to Paragraph **F. Property General Conditions:**

1. **Suspension**

Whenever "covered equipment" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an "accident" to that "covered equipment". This can be done by mailing or delivering a written notice of suspension to:

    **(a)** Your last known address; or

    **(b)** The address where the "covered equipment" is located.

Once suspended in this way, your insurance can be reinstated only by and endorsement for that "covered equipment". If we suspend your insurance, you will get a pro rata refund for that "covered equipment" for the period of suspension. But the suspension will be effective even if we have not yet made or offered a refund.

2. **Jurisdictional Inspections**

If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

3. **Environmental, Safety and Efficiency Improvements**

If "covered equipment" requires replacement due to an "accident", we will pay your additional cost to replace with equipment that is better for the environment, safer or more efficient than the equipment being replaced.

However, we will not pay more than 125% of what the cost would have been to repair or replace with like kind and quality. This condition does not increase any of the applicable limits. This condition does not apply to any property to which Actual Cash Value applies.

D. The following are added to Paragraph **H. Property Definitions:**

1. "Accident" means a fortuitous event that causes direct physical damage to "covered equipment" that requires repair or replacement. The event must be one of the following:

    a. Mechanical breakdown, including rupture or bursting caused by centrifugal force;

    b. Artificially generated electrical current, including electric arcing that damages electrical devices, appliances or wires;

    c. Explosion of steam boilers, steam pipes, steam engines, or steam turbines owned or leased by you, or operated under your control;

© 2015 Liberty Mutual Insurance

BP 82 37 08 15    Includes copyrighted material of Insurance Services Office, Inc., with its permission.    **Page 3 of 4**

   **d.** Loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any event inside such equipment, unless otherwise excluded; or

   **e.** Loss or damage to hot water boilers or other water heating equipment caused by or resulting from any event inside such boilers or equipment, unless otherwise excluded.

An "accident" does not include the functioning of any safety or protective device, or any other condition, which can be corrected by resetting, tightening, adjusting, cleaning, or the performance of maintenance.

**2.** "Covered equipment"

   **a.** "Covered equipment" means Covered Property:

      **(1)** That generates, transmits or utilizes energy, including electronic communications and data processing equipment; or

      **(2)** Which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

   **b.** None of the following is "covered equipment":

      **(1)** Structure, foundation, cabinet, compartment or air supported structure or building;

      **(2)** Insulating or refractory material;

      **(3)** Sewer piping, buried vessels or piping, or piping forming a part of a sprinkler system;

      **(4)** Water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;

      **(5)** "Vehicle" or any equipment mounted on a "vehicle";

      **(6)** Satellite, spacecraft or any equipment mounted on a satellite or spacecraft;

      **(7)** Dragline, excavation or construction equipment; or

      **(8)** Equipment manufactured by you for sale.

**3.** "Hazardous substance" means any substance that has been declared to be hazardous to health by any governmental agency.

**4.** "One accident" means, if an initial "accident" causes other "accidents", all will be considered "one accident". All "accidents" that are the result of the same event will be considered "one accident".

**5.** "Perishable goods" means personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change.

**6.** "Vehicle" means, as respects this endorsement only, any machine or apparatus that is used for transportation or moves under its own power. "Vehicle" includes, but is not limited to: car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester.

However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external power source will not be considered a "vehicle".

© 2015 Liberty Mutual Insurance
**BP 82 37 08 15**   Includes copyrighted material of Insurance Services Office, Inc., with its permission.   **Page 4 of 4**

Page 135 of 198

BUSINESSOWNERS
BP 82 46 06 09

## EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE

**THIS ENDORSEMENT PROVIDES CLAIMS-MADE AND REPORTED COVERAGE. DEFENSE COSTS APPLY AGAINST THE LIMITS OF INSURANCE AND ARE SUBJECT TO THE DEDUCTIBLE.**

**PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.**

THERE IS A SEPARATE COINSURANCE PROVISION APPLICABLE TO ALL PAYMENTS FOR "DAMAGES".

PLEASE READ THIS POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES, COVERAGE AND RESTRICTIONS.

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

### SCHEDULE

| | |
|---|---|
| **Employment-Related Practices Liability Annual Aggregate Limit Of Insurance** | $ |
| **Deductible Amount** | $ |
| **Retroactive Date** | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

A. **Section II. Liability** is amended as follows:

1.  For the purposes of the coverage provided by this endorsement, the following is added to Paragraph **A. Coverages:**

    **Coverage - Employment-Related Practices Liability**

    a.  **Insuring Agreement**

        (1) We will pay on behalf of the insured for "damages" in excess of the Deductible arising out of any "employment-related practices" to which this insurance applies. We have no obligation under this insurance to make payments or perform acts or services except as provided for in this paragraph and in Item **B.** below.

        (2) This insurance applies to such "damages" only if:

            (a) The "damages" result from "claims" made by "employees", "leased workers", "temporary workers", former "employees" or applicants for employment by you;

            (b) The "employment-related practices" take place in the "coverage territory";

            (c) Such "employment-related practices" occurred after the Retroactive Date, if any, shown in the Declarations and before the end of the "policy period"; and

            (d) A "claim" is both:

                (i) First made against any insured, in accordance with paragraph **3.** below, during the "policy period" or any Extended Reporting Period we provide under **SECTION VII -EXTENDED REPORTING PERIODS;** and

                (ii) Reported to us either:

                    i.  During the "policy period" or within thirty (30) days thereafter; or

                    ii. With respect to any "claim" first made during any Extended Reporting Period we provide under **SECTION VII -EXTENDED REPORTING PERIODS,** during such Extended Reporting Period.

(3) A "claim" will be deemed to have been made at the earlier of the following times:

    (a) When notice of such "claim" is received and recorded by you or by us, whichever comes first; or

    (b) When we make settlement in accordance with paragraph **B.3.** below.

(4) All "claims" for "damages" based on or arising out of:

    (a) One "employment-related practice", or

    (b) "Interrelated" "employment-related practices"

by one or more insureds shall be deemed to be one "claim" and to have been made at the time the first of those "claims" is made against any insured.

Each payment we make for "damages" or "defense expense" reduces the amount of insurance available, as provided under **SECTION III - LIMITS OF INSURANCE.** Each payment we make for "damages" under this insurance is further subject to your coinsurance participation, as specifically described in **SECTION V - COINSURANCE FOR PAYMENT OF "DAMAGES".**

**b. Exclusions**

This insurance does not apply to "claims" arising directly or indirectly form any:

**(1) Prior "Employment-Related Practices", Facts Or Circumstances**

    (a) "Employment-related practices" which were the subject of any demand, suit or other proceeding which was initiated against any insured; or

    (b) Facts, incidents and circumstances which would cause a reasonable person to believe a "claim" would be made and which were known to any insured,

prior to the effective date of the earlier of:

    (a) The first Employment-Related Practices Liability Endorsement that we issued to you of which this policy was an uninterrupted renewal of this type of coverage, or

    (b) This Employment-Related Practices Liability Endorsement.

**(2) Contractual Liability**

    (a) Breach of any express contract of employment or any express obligation to make payments in the event of termination of employment; or

    (b) Obligation to pay "damages" by reason of the assumption of liability in any contract or agreement. This exclusion does not apply to liability for "damages" that the insured would have in the absence of the contract or agreement.

**(3) Statutory Obligations**

Of the following laws:

    (a) Any workers compensation, disability benefits or unemployment compensation law, or any similar law, provided however, this exclusion shall not apply to any "claim" based upon, arising from, or in consequence of any actual or alleged retaliatory treatment of the claimant by the insured on account of the claimant's exercise of rights pursuant to any such law; or

    (b) The Fair Labor Standards Act, or any state or common law wage or hour law, including, but not limited to laws governing minimum wages, hours worked, overtime compensation, and including any recordkeeping and reporting related thereto. This exclusion includes actions or claims brought by or on behalf of individuals or agencies seeking wages, fines, penalties, taxes, disgorgement, or other affirmative relief or compensation, but does not include claims based on the Equal Pay Act, or retaliation; or

    (c) The National Labor Relations Act of 1938, the Worker Adjustment and Retraining Notification Act (Public Law 100-37991988), the Consolidated Omnibus Budget Reconciliation Act of 1985, or the Occupational Safety and Health Act.

© 2009 Liberty Mutual Insurance Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

BP 82 46 06 09

**Page 2 of 13**

This exclusion also applies to any rules or regulations promulgated under any of the foregoing and amendments thereto or any similar provisions of any federal, state or local law, and to that part of any "damages" awarded for the cost or replacement of any insurance benefits due or alleged to be due to any current or former "employee".

**(4) Employees' Retirement Income Security Act And Administration Of Employee Benefit Plans**

**(a)** Responsibilities, obligations or duties imposed under the Employees' Retirement Income Security Act of 1974, Public Law 93-406, (E.R.I.S.A.) as now or hereafter amended, or any similar state or other governmental law. This includes fiduciary liability and any other liability under any such laws.

**(b)** Administration of employee benefits plans whether or not liability arises out of E.R.I.S.A.

**(5) Publication Of Material With Knowledge Of Falsity Or Prior To Retroactive Date**

Oral or written publication of material, if such material:

**(a)** Was published by or at the direction of the insured with knowledge of the material's falsity; or

**(b)** Was first published before the Retroactive Date, if any, shown in the Declarations.

**(6) Dishonest, Criminal Or Fraudulent Acts, Or Failure To Comply With Law**

**(a)** Dishonest, criminal or fraudulent acts of the insured; or

**(b)** The willful failure by the insured or with the insured's consent to comply with any law or any governmental or administrative order or regulation relating to "employment-related practices". Willful, as used in this exclusion, means acting with intentional or reckless disregard for such employment related laws, orders or regulations.

The enforcement of this exclusion against any insured under this policy shall not be imputed to any other insured.

**(7) Bodily Injury**

"Bodily injury".

**(8) Bankruptcy Or Acquisition By Another Entity**

"Employment-related practices" which occur when or after:

**(a)** You file for or are placed in any bankruptcy, receivership, liquidation or reorganiza tion proceeding; or

**(b)** Any other business entity acquires an ownership interest in you which is greater than fifty percent.

**(9) Americans With Disabilities Act - Costs Of Accommodations**

Costs of complying with physical modifications to your premises or any changes to your usual business operations as mandated by the Americans with Disabilities Act of 1990 including any amendment thereto, or any similar federal, state or local law.

**(10) Strikes, Lockouts And Other Similar Actions**

Lockout, strike, picket line, related worker replacement(s) or other similar actions resulting from labor disputes or labor negotiations.

**(11) War**

**(a)** War, including undeclared or civil war; or

**(b)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

© 2009 Liberty Mutual Insurance Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

BP 82 46 06 09                                                                **Page 3 of 13**

**(c)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**c. Defense Of Claims, Administrative Hearings And Settlement Authority**

**(1)** We have the right and duty to defend the insured against "claims" seeking "damages" to which this insurance applies and to pay for related "defense expense". However, we have no duty to:

**(a)** Defend the insured against "claims" seeking "damages", or

**(b)** Pay for related "defense expense",

when this insurance does not apply.

**(2)** Our right and duty to defend the insured against "claims" end when we have used up the amount of insurance available, as provided under **SECTION III - LIMITS OF INSURANCE.** This applies both to "claims" pending at that time and those filed thereafter.

**(3)** We may:

**(a)** At our sole discretion, investigate any "employment- related practice" that may result in damages"; and

**(b)** Settle any "claim" which may result, provided:

**(i)** We have your written consent to settle; and

**(ii)** The settlement is within the applicable Limit of Insurance available.

Our liability will be limited as described below if:

**(a)** You refuse to consent to any settlement we recommend, and

**(b)** Such recommended settlement is also acceptable to the claimant.

When this happens, our liability under this Endorsement for such "claim" shall not exceed the amount we would have paid for "damages" and "defense expense" if you had con- sented at the time of our recommendation. You shall thereafter negotiate and defend that "claim" at your own cost and without our involvement.

**(4) (a)** When we control defense of a "claim", we will pay associated "defense expense" and choose a counsel of our choice from the panel of attorneys we have selected to deal with "employment-related practices" "claims". If you give us a specific written re- quest at the time a claim" is first made:

**(i)** You may select one of our panel of employment law attorneys; or

**(ii)** You may ask us to consider the approval of a defense attorney of your choice who is not on our panel.

We will use the panel attorney you selected in **(i)** above, or consider your request in **(ii)** above, when we deem it appropriate to engage counsel for such "claim".

**(b)** If by mutual agreement or court order the insured assumes control of such defense before the applicable Limit of Insurance is used up, we will reimburse the insured for reasonable "defense expense", subject to item **c.** immediately below. You and any involved insured must continue to comply with **SECTION VI - CONDITIONS, B. Duties In Event Of "Employment-Related Practices" And "Claims".** Additionally, you or such insured must direct defense counsel to:

**(i)** Furnish us with additional information we request to evaluate the "employment- related practices" or "claims"; and

**(ii)** Cooperate with any counsel we may select to monitor or associate in the defense of the "employment-related practices" or "claim".

© 2009 Liberty Mutual Insurance Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

**BP 82 46 06 09**

**Page 4 of 13**

(c) If we defend the insured under a reservation of rights, counsel will be required to maintain records pertinent to the insured's "defense expenses". These records will be used to determine the allocation of any "defense expenses" for which you or any insured may be solely responsible, including defense of an allegation not covered by this insurance.

(d) We will notify you in writing when the applicable limit of insurance has actually been used up by the payment of judgment, settlements or "defense expense". We will also initiate and cooperate in the transfer of defense of any "claim" to an appropriate insured for which the duty to defend has ended by reason of **SECTION B.2.** above.

In any case, however, we only pay amounts in excess of the Deductible and such payments will reduce the Limit of Insurance available, as provided under **SECTION III - LIMITS OF INSURANCE.**

2. For the purposes of the coverage provided by this endorsement:

a. Paragraph **f. Coverage Extension . Supplementary Payments** does not apply.

3. For the purposes of the coverage provided by this endorsement, Paragraph **C. Who Is An Insured** is replaced by the following:

a. If you are designated in the Declarations as:

(1) An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

(2) A partnership or joint venture, you are an insured. Your current or former members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

(3) A limited liability company, you are an insured. Your current or former members are also insureds, but only with respect to the conduct of your business. Your current or former managers are insureds, but only with respect to their duties as your managers.

(4) An organization other than a partnership, joint venture or limited liability company, you are an insured. Your current or former directors are insureds, but only with respect to their duties as your directors.

b. Each of the following is also an insured:

(1) Your current or former "employees" but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

(2) Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

c. Any heirs, executors, administrators, assignees or legal representatives of any individual insured described in provisions **1.** and **2.** of paragraphs **A.** and **B.** above, in the event of the death, bankruptcy or incapacity of such insured, shall be insureds, but only to the extent this insurance would have been available to such insured but for their death, bankruptcy or incapacity .

d. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

(1) You must provide us notice of such acquisition or formation within 30 days of the effective date of your acquisition or formation;

(2) Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the "policy period", whichever is earlier;

(3) Coverage does not apply to any "employment-related practices" that occurred before you acquired or formed the organization; and

(4) You must pay us any additional premium due as a condition precedent to the enforceability of this additional extension of coverage.

© 2009 Liberty Mutual Insurance Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

BP 82 46 06 09

This part **D.** does not apply to any organization after it is shown in the Declarations or added to this policy by endorsement.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

4.  For the purposes of the coverage provided by this endorsement, Paragraph **D. Liability And Medical Expenses Limits Of Insurance** is replaced by the following:

    a.  **Limits of Insurance**

        (1) The Limits of Insurance shown in the Declarations for this Endorsement and the rules below fix the most we will pay regardless of the number of:

            (a) Insureds;

            (b) "Claims" made; or

            (c) Persons or organizations making "claims".

        (2) The amount of insurance stated as Aggregate Limit is the most we will pay for the sum of

            (a) All "damages" for all "claims" arising out of any actual or alleged "employment-related practices" covered by this insurance; and

            (b) All "defense expense" for all "claims" seeking "damages" payable under paragraph **B.1.** above.

            Each payment we make for such "damages" or "defense expenses" reduces the Aggregate Limit by the amount of the payment. This reduced limit will then be the amount of insurance available for further "damages" and "defense expenses" under this Endorsement.

        (3) Subject to **B.** above, the amount of insurance stated as the Each "Claim" Limit is the most we will pay in excess of the Deductible as further described in **SECTION IV - DEDUCTIBLE** for the sum of :

            (a) All " damages" for injury arising from "employment- related practices" covered by this insurance arising out of one "claim" whether such "claim" is brought by one or more claimants; and

            (b) All "defense expense" associated with that specific "claim" in item **C.1.** immediately preceding.

        (4) In addition to the payments for "damages" and "defense expense" in paragraphs **B.** and **C.** above, we will also pay all interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the amount available for the judgment under the provisions of paragraphs **B.** and **C.** above.

        These Limits of Insurance apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period", unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

5.  **Deductible**

    a.  A deductible applies to all "damages" for injury arising from "employment-related practices" and any "defense expense" however caused.

    b.  Our obligation under this Employment-Related Practices Liability Insurance to pay "damages" and "defense expense" on behalf of any insured applies only to the sum of the amount of "damages" and "defense expense" for each "claim" which are in excess of the deductible amount stated in Declarations.

c.  Your obligation is to pay that deductible which is applicable to each "claim" made against this insurance. That deductible applies to the sum of all "damages" because of injury arising from "employment-related practices" paid for each "claim" and applicable "defense expense" associated therewith. If there should be no "damages" paid for a "claim", you are still obligated to pay the applicable deductible for any "defense expense" incurred by us in connection with that "claim".

d.  The terms of this insurance apply irrespective of the application of the deductible, including those with respect to:

(1)  Our right and duty to defend any "claims" seeking those "damages"; and

(2)  Your duties in the event of a "claim".

e.  We may pay any part or all of the deductible to effect settlement of any "claim" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible as we may have paid for "damages" or "defense expense".

f.  The application of the deductible does not erode the Limits of Insurance provided.

6.  **Coinsurance For Payment Of "Damages"**

a.  With respect to any "claim" for which we pay "damages" under this insurance, you will be responsible for your share of such "damages", in excess of the applicable deductible, at the percentage shown in the Declarations as coinsurance participation. We will be responsible for the remaining percentage of "damages" payable under this Endorsement subject to the applicable Limits of Insurance.

b.  Your coinsurance participation is limited as shown in the declarations to a maximum amount per "claim".

c.  Subject to the provisions of this section we may make payments for "damages" and then request you to pay us your percentage share. You agree to reimburse us for your share. By making such payments for "damages", we do not waive our right to recover your share of such payment(s).

d.  The application of this coinsurance provision does not erode the Limits of Insurance provided.

7.  **Conditions**

We have no duty to provide insurance under this Endorsement unless you and any involved insured have fully complied with Conditions contained in this Endorsement.

a.  For the purposes of the coverage provided by this endorsement, Paragraph **E. Liability And Medical Expenses General Conditions** is replaced by the following:

(1)  **Bankruptcy**

Subject to exclusion **8.**, the bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Endorsement.

(2)  **Duties in Event of "Employment-Related Practices" or "Claims"**

(a)  You must see to it that we are notified as soon as practicable of any specific "employment-related practices" which you believe may result in an actual "claim". Your belief must be reasonably certain as the result of specific allegations made by a potential claimant or such potential claimant's representative, or as the result of specifically identifiable injury sustained by a potential claimant. To the extent possible, notice should include:

(i)  How, when and where such "employment-related practices" took place;

(ii)  The names and addresses of any potential claimants and witnesses; and

(iii)  The nature of any injury arising out of such "employment-related practices".

© 2009 Liberty Mutual Insurance Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

Notice of such "employment-related   practices" is not notice of a "claim", but preserves any insured's rights to future coverage for subsequent "claims" arising out of such "employment-related   practices" as described in the Basic Extended Reporting Period of **SECTION VII - EXTENDED REPORTING PERIODS.**

**(b)** If a "claim" is received by any insured:

**(i)** You must immediately record the specifics of the "claim" and the date received;

**(ii)** You and any other involved insured must see to it that we receive written notice of the "claim", as soon as practicable, but in any event we must receive notice either:

**i.** During the "policy period" or within thirty (30) days thereafter; or

**ii.** With respect to any "claim" first made during any Extended Reporting Period we provide under **SECTION VII - EXTENDED REPORTING PERIODS,** during such Extended Reporting Period,

as a condition precedent for coverage under this insurance. Such notice must provide us with the same information as is required in item **1.** immediately preceding; and

**(iii)** You and any other involved insured must:

**i.** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim";

**ii.** Authorize us to obtain records and other information;

**iii.** Cooperate with us in the investigation, settlement or defense of the "claim"; and

**iv.** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**(c)** No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

**(3) Legal Action Against Us**

No person or organization has a right under this Endorsement:

**(a)** To join us as a party or otherwise bring us into a "claim" seeking "damages" from any insured; or

**(b)** To sue us on this Endorsement unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for "damages" that are not payable under the terms of this Endorsement or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representati ve.

**(4) Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Endorsement to the first Named Insured, this insurance applies:

**(a)** As if each Named Insured were the only Named Insured; and

**(b)** Separately to each insured against whom "claim" is made.

© 2009 Liberty Mutual Insurance Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

BP 82 46 06 09

**Page 8 of 13**

b. For the purposes of the coverage provided by this endorsement, Paragraph **E. Liability And Medical Expenses General Conditions** the following is added:

**(1) Representations**

By accepting this policy, you agree:

**(a)** The statements in the Declarations are accurate and complete;

**(b)** Those statements are based upon representations you made to us; and

**(c)** We have issued this policy, in reliance upon your representations.

**(2) Payment of Deductibles and Coinsurance Amounts**

The first Named Insured shown in the Declarations is responsible for the payment of all deductible and coinsurance participation amounts.

**(3) When We Do Not Renew**

If we decide not to renew this insurance, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days the expiration date. If notice is mailed, proof of mailing will be sufficient proof of notice.

Any State amendatory endorsement changing Nonrenewal Conditions for any part of this policy to which this Endorsement forms a part, shall also apply to this Endorsement.

c. For the purposes of the coverage provided by this endorsement, Paragraph **H., Other Insurance,** of the **Common Policy Conditions** is replaced by the following:

**H. Other Insurance**

If other valid and collectible insurance is available to the insured for "damages" or "defense expense" we cover under this Endorsement, our obligations are limited as follows:

**1.** As this insurance is primary insurance, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **2.** below.

**2.** If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

d. **Common Policy Conditions**

The following additional conditions apply with respect to this Endorsement:

a. The Common Policy Conditions contained in form **BP 00 03;** and

b. Any applicable State amendments thereto.

8. **Extended Reporting Periods**

a. We will provide Extended Reporting Periods, as described below, if:

**(1)** This insurance is cancelled or not renewed; or

**(2)** We renew or replace this Endorsement with insurance that:

**(a)** Has a Retroactive Date later than the date shown in the Declarations of this Endorsement; or

**(b)** Does not apply on a claims-made basis.

© 2009 Liberty Mutual Insurance Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

b.  Extended Reporting Periods do not extend the "policy period" or change the scope of coverage provided. They apply only to "claims" as the result of "employment-related practices" which occurred after the Retroactive Date, if any, shown in the Declarations and before the end of the "policy period". Once in effect, Extended Reporting Periods may not be cancelled.

c.  Extended Reporting Periods do not reinstate or increase the Limits of Insurance.

d.  A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the "policy period" and lasts for:

   (1) Five years with respect to "claims" arising out of "employment-related practices" which had been properly reported to us during the "policy period" in accordance with provision **1.** of paragraph **B. Duties in Event of "Employment-Related Practices" or "Claims",** under **SECTION VI - CONDITIONS;** and

   (2) Sixty days with respect to "claims" arising from "employment-related practices" not previously reported to us.

   The Basic Extended Reporting Period does not apply to "claims" that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such claims.

e.  A Supplemental Extended Reporting Period of twelve (12) months duration is available, but only by an endorsement and for an extra charge. This supplemental period starts when the Basic Extended Reporting Period, set forth in paragraph **D.2.** above, ends. You must give us a written request for the endorsement within 30 days after the end of the "policy period". The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium when due. We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

   (1) The exposures insured;

   (2) Previous types and amounts of insurance;

   (3) Limits of Insurance available under this Endorsement for future payment of "damages" or "defense expense"; and

   (4) Other related factors.

   The additional premium will not exceed 200% of the annual premium for this Endorsement.

f.  The Supplemental Extended Reporting Period endorsement we issue shall set forth the terms, not inconsistent with this Section, applicable to the Supplemental Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Supplemental Extended Reporting Period begins.

9.  **Liability and Medical Expense Definitions**

a.  For the purposes of the coverage provided by this endorsement, Paragraphs **F.3., F.4., F.5., F.10.,** and **F.19.,** of the **Liability and Medical Expense Definitions** are replaced by the following:

   3.  "Bodily injury" means physical injury to the body, sickness or disease sustained by a person as the result of direct physical injury to the body, including death resulting from any of these at any time. "Bodily injury" does not include mental anguish that results from an "employment-related practice".

   4.  "Coverage territory" means:

      a.  The United States of America (including its territories and possessions) and Puerto Rico; or

      b.  Anywhere in the world with respect to the activities of a person whose place of employment is in the territory described in **1.** above, while he or she is away for a short time on your business;

© 2009 Liberty Mutual Insurance Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

BP 82 46 06 09

provided that the insured's responsibility to pay "damages" is determined in a suit (or in any other type of civil proceeding as described under the definition of "claim") on the merits in, and under the substantive law of, the United States of America (including its territories and possessions) or Puerto Rico.

5.  "Employee" means a person

(1) Employed by you for wages or salary, or

(2) Who is a current or former member of your board of directors.

But "employee" does not include any independent contractor, any employees of any independent contractor while acting within the scope of their employment, any "leased worker" or any "temporary worker".

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

b.  For the purposes of the coverage provided by this endorsement, Paragraph **F. Liability and Medical Expense Definitions,** the following is added.

1.  "Claim" means written or oral notice presented by:

(a) Any "employee", "leased worker", "temporary worker", former "employee" or applicant for employment by you; or

(b) The EEOC or any other Federal, state or local administrative or regulatory agency on behalf of such person in item **1.** immediately preceding,

alleging that the insured is responsible for "damages" as a result of injury arising out of any "employment-related practices".

"Claim" includes any civil proceeding in which either "damages" are alleged or fact finding will take place, when either is the actual or alleged result of any "employment-related practice" to which this insurance applies. This includes:

(a) An arbitration proceeding in which such "damages" are claimed and to which the insured submits with our consent;

(b) Any other alternative dispute resolution proceeding in which such "damages" are claimed and to which the insured submits with our consent; or

(c) Any administrative proceedings established under applicable federal, state or local laws as may be applicable to "employment-related practices" covered under this insurance.

2.  "Damages" means monetary amounts to which this insurance applies and which the insured is legally obligated to pay as judgments or awards, or as settlements to which we have agreed in writing.

"Damages" include:

(a) "Pre-judgment interest" awarded against the insured on that part of the judgment we pay,

(b) To the extent allowed by law, any portion of a judgment or award that represents a multiple of the compensatory amounts or punitive or exemplary damages, and

(c) "Legal fees" unless the "claim" is seeking solely equitable relief, injunctive relief, declarative relief or any other relief or recovery other than money.

"Damages" do not include:

(a) Civil, criminal, administrative or other fines or penalties;

© 2009 Liberty Mutual Insurance Company. All rights reserved.

**(b)** Equitable relief, injunctive relief, declarative relief or any other relief or recovery other than money;

**(c)** "Legal fees" when solely 'equitable relief, injunctive relief, declarative relief or any other relief or recovery other than money is sought; or

**(d)** judgments or awards because of acts deemed uninsurable by law.

3. "Defense expense" means payments allocated to a specific "claim" for its investigation, settlement, or defense, including:

**(a)** Attorney fees and all other litigation expenses.

**(b)** The cost of bonds to appeal a judgment or award in any "claim" we defend. We do not have to furnish these bonds.

**(c)** The cost of bonds to release attachments, but only for bond amounts within the available limits of insurance. We do not have to furnish these bonds.

**(d)** Reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of any "claim", including actual loss of earnings up to $250 a day because of time off from work.

**(e)** Costs taxed against the insured in the "claim".

"Defense expense" does not include:

**(a)** Salaries and expenses of our employees or your "employees", other than:

**(1)** That portion of our employed attorneys' fees, salaries and expenses allocated to a specific "claim" for the defense of the insured; and

**(2)** The expenses described in **4.** above; and

**(b)** Interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the amount available for the judgment under the provisions of **LIMITS OF INSURANCE.**

4. "Employment-related practices" means any of the following actual or alleged practices which are directed against any of your "employees", "leased workers", "temporary workers", former "employees" or any applicant for employment by you, and for which remedy is sought under any federal, state or local statutory or common civil employment law:

**(a)** Wrongful refusal to employ a qualified applicant for employment;

**(b)** Wrongful failure to promote, or wrongful deprivation of career opportunity;

**(c)** Wrongful demotion, negligent evaluation, negligent reassignment or wrongful discipline;

**(d)** Wrongful termination of employment, including retaliatory or constructive discharge;.

**(e)** Employment related misrepresentation;

**(f)** Harassment, coercion, discrimination or humiliation as a consequence of race, color, creed, national origin, marital status, medical condition, gender, age, physical appearance, physical and/or mental impairments, pregnancy, sexual orientation or sexual preference or any other protected class or characteristic established by any applicable federal, state, or local statute; or

**(g)** Oral or written publication of material that slanders, defames or libels or violates or invades a right of privacy.

5. "Interrelated" means:

**(a)** Having as a common nexus any fact, circumstance, situation, event, transaction or cause; or

**(b)** A series of related facts, circumstances, situations, events, transactions or causes.

© 2009 Liberty Mutual Insurance Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

BP 82 46 06 09    **Page 12 of 13**

6. "Legal fees" means attorneys fees, or expenses that the insured is legally obligated to pay as a result of an adverse judgment. "Legal fees" does not include cost of compliance with any equitable relief, injunctive relief, declarative relief or any other relief or recovery other than money.

7. "Policy period" means the period stated in the Declarations of the policy of which this Endorsement forms a part including an extension after issuance of the policy for an additional period of less than 12 months. However:

    (a) If this Endorsement is issued to be effective subsequent to the effective date of such policy, the "policy period" for the Endorsement will start with the effective date of the Endorsement; and

    (b) If this Endorsement is cancelled prior to the expiration date of such policy, the "policy period" for this Endorsement will end with the cancellation date of the Endorsement.

8. "Pre-judgment interest" means interest added to a settlement, verdict, award or judgment based on the amount of time prior to the settlement, verdict, award or judgment, whether or not made part of the settlement, verdict, award or judgment.

© 2009 Liberty Mutual Insurance Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**VIRGINIA - BUSINESSOWNERS LIABILITY EXTENSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

Below is a summarization of the coverages provided by this endorsement. No coverages are given by this summary. Actual coverage descriptions are within this endorsement.

| SECTION | SUBJECT |
|---|---|
| A. | Supplementary Payments<br>Bail Bonds<br>Loss Of Earnings |
| B. | Broadened Coverage For Damage To Premises Rented To You |
| C. | Incidental Medical Malpractice Injury |
| D. | Mobile Equipment |
| E. | Blanket Additional Insured (Owners, Contractors Or Lessors) |
| F. | Newly Formed Or Acquired Organizations |
| G. | Aggregate Limits |
| H. | Duties In The Event Of Occurrence, Offense, Claim Or Suit |
| I. | Liability And Medical Expenses Definitions<br>Bodily Injury<br>Insured Contract<br>Personal And Advertising Injury |

**Section II – Liability** is amended as follows:

**A. Supplementary Payments**

Section **A.1. Business Liability** is modified as follows:

1. The $250 limit shown in Paragraph **A.1.f.(1)(b) Coverage Extension – Supplementary Payments** for the cost of bail bonds is replaced by a $3,000 limit.

2. The $250 limit shown in Paragraph **A.1.f.(1)(d) Coverage Extension – Supplementary Payments** for reasonable expenses and loss of earnings is replaced by a $500 limit.

**B. Broadened Coverage For Damage To Premises Rented To You**

1. The last paragraph of Section **B.1. Exclusions – Applicable To Business Liability Coverage** is replaced by the following:

   With respect to the premises which are rented to you or temporarily occupied by you with the permission of the owner, Exclusions **c., d., e., g., h., k., l., m., n.** and **o.** do not apply to "property damage".

2. Paragraph **D.2. Liability And Medical Expenses Limits Of Insurance** is replaced by the following:

   The most we will pay under this endorsement for the sum of all damages because of all "property damage" to premises while rented to you or temporarily occupied by you with the permission of the owner is the Limit of Insurance shown in the Declarations.

3. Paragraph **D.3. Liability And Medical Expenses Limits Of Insurance** does not apply.

**C. Incidental Medical Malpractice Injury**

1. Paragraph **(4)** under Paragraph **B.1.j. Exclusions – Applicable To Business Liability Coverage – Professional Services** does not apply to "Incidental Medical Malpractice Injury" coverage.

2. With respect to this endorsement, the following is added to Section **F. Liability And Medical Expenses Definitions**:

   a. "Incidental Medical Malpractice Injury" means bodily injury arising out of the rendering of or failure to render, during the policy period, the following services:

      (1) Medical, surgical, dental, x-ray or nursing service or treatment or the furnishing of food or beverages in connection therewith; or

      (2) The furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

   b. This coverage does not apply to:

      (1) Expenses incurred by the insured for first-aid to others at the time of an accident and the Duties in the Event of Occurrence, Offense, Claim or Suit Condition is amended accordingly.

      (2) Any insured engaged in the business or occupation of providing any of the services described under **a.** above.

      (3) Injury caused by any indemnitee if such indemnitee is engaged in the business or occupation of providing any of the services described under **a.** above.

**D. Mobile Equipment**

Section **C. Who Is An Insured** is amended to include any person driving "mobile equipment" with your permission.

**E. Blanket Additional Insured (Owners, Contractors Or Lessors)**

1. Section **C. Who Is An Insured** is amended to include as an insured any person or organization whom you are required to name as an additional insured on this policy under a written contract or written agreement. The written contract or agreement must be:

   a. Currently in effect or becoming effective during the term of this policy; and

   b. Executed prior to the "bodily injury", "property damage", or "personal and advertising injury".

2. The insurance afforded to the additional insured is limited as follows:

   a. The person or organization is only an additional insured with respect to liability arising out of:

      (1) Real property, as described in a written contract or written agreement, you own, rent, lease, maintain or occupy; and

      (2) Caused in whole or in part by your ongoing operations performed for that insured.

   b. The Limit of Insurance applicable to the additional insured are those specified in the written contract or written agreement or the limits available under this policy, as stated in the Declarations, whichever are less. These limits are inclusive of and not in addition to the Limit of Insurance available under this policy.

   c. The insurance afforded to the additional insured does not apply to:

      (1) Liability arising out of the sole negligence of the additional insured;

      (2) "Bodily injury", "property damage", "personal and advertising injury", or defense coverage under the Supplementary Payments section of the policy arising out of an architect's, engineer's or surveyor's rendering of or failure to render any professional services including:

         (a) The preparing or approving of maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

         (b) Supervisory, inspection, architectural or engineering activities.

      (3) Any "occurrence" that takes place after you cease to be a tenant in the premises described in the Declarations; or

      (4) Structural alterations, new construction or demolition operations performed by or for the person or organization designated in the Declarations.

3. Any coverage provided hereunder shall be excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis unless a contract specifically requires that this insurance be primary or you request that it apply on a primary basis.

## F. Newly Formed Or Acquired Organizations

The following is added to Section **C. Who Is An Insured**:

Any business entity acquired by you or incorporated or organized by you under the laws of any individual state of the United States of America over which you maintain majority ownership interest exceeding fifty percent. Such acquired or newly formed organization will qualify as an insured if there is no similar insurance available to that entity. However:

1. Coverage under this provision is afforded only until the 180th day after the entity was acquired or incorporated or organized by you or the end of the policy period, whichever is earlier;

2. Section **A.1. Business Liability** does not apply to:

   a. "Bodily injury" or "property damage" that occurred before the entity was acquired or incorporated or organized by you; and

   b. "Personal and advertising injury" arising out of an offense committed before the entity was acquired or incorporated or organized by you.

3. Records and descriptions of operations must be maintained by the first Named Insured.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**G.  Aggregate Limits**

The following is added to Paragraph **D.4. Aggregate Limits** Liability And Medical Expenses Limits of Insurance:

1.  The Aggregate Limits apply separately to each of the "locations" owned by or rented to you or temporarily occupied by you with the permission of the owner.

2.  The Aggregate Limits also apply separately to each of your projects away from premises owned by or rented to you.

For the purpose of this endorsement only, "location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

**H.  Duties In The Event Of Occurrence, Offense, Claim Or Suit**

1.  Paragraph **E.2.a. Duties In The Event Of Occurrence, Offense, Claim Or Suit** Liability And Medical Expenses General Condition applies only when the "occurrence" is known to any insured listed in Paragraph **C.1. Who Is An Insured** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim.

2.  Paragraph **E.2.b. Duties In The Event Of Occurrence, Offense, Claim Or Suit** Liability And Medical Expenses General Conditions will not be considered breached unless the breach occurs after such claim or "suit" is known to any insured listed under Paragraph **C.1. Who Is An Insured** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim.

**I.  Section F. Liability And Medical Expenses Definitions** is modified as follows:

1.  Paragraph **F.3.** is replaced by the following:

3.  "Bodily Injury" means bodily injury, sickness, disease, or incidental medical malpractice injury sustained by a person, and includes mental anguish resulting from any of these; and including death resulting from any of these at any time.

2.  Paragraph **F.9.** is replaced by the following:

9.  "Insured contract" means:

a.  A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b.  A sidetrack agreement;

c.  Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d.  An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e.  An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**3.** Paragraph **F.14.b. Personal And Advertising Injury** is replaced by the following:

**b.** Malicious prosecution or abuse of process;

**BUSINESSOWNERS**
**BP 88 04 03 14**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - PROFESSIONAL SERVICES (REAL ESTATE AGENTS, INSURANCE AGENTS, TRAVEL AGENTS, FINANCIAL SERVICES, COMPUTER SOFTWARE, INSURANCE OPERATIONS)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

Exclusion **B.1.j. Professional Services** in **Section II, Liability,** the following is added:

**j.  Professional Services:**

   **(10)** Services while you are acting in a fiduciary or representative capacity including but not limited to Real Estate Agents, Insurance Agents and Travel Agents.

   **(11)** Financial services including but not limited to:

   **(a)** Planning, administering or advising on investments, pensions, annuities or individual retirement plan, fund or account;

   **(b)** The issuance or withdrawal of stocks, bonds or other securities;

   **(c)** The trading of securities or commodities;

   **(d)** Maintaining of financial accounts or records;

   **(e)** Tax planning, tax advising or the preparation of tax returns.

   **(12)** Services in connection with the selling, licensing, franchising or furnishing of your computer software including electronic data processing programs, designs, specifications, manuals and instructions.

   **(13)** Services arising from insurance or related operations:

   **(a)** with respect to any contract or treaty of insurance, reinsurance, suretyship, annuity endowment or employee benefit plan, including applications, receipts or binders:

   **(i)** any obligation assumed by any Insured; or

   **(ii)** the failure to discharge, or the improper discharge of, any obligation or duty, contractual or otherwise;

   **(b)** due to membership in or contribution to any plan, pool, association, insolvency or guarantee fund or any similar fund, organization or association, whether voluntary or involuntary;

   **(c)** due to the rendering or failure to render professional services in

   **(i)** advising, inspecting, reporting, or making recommendations in the Insured's capacity as an insurance company, consultant, broker, agent or representative thereof;

   **(ii)** effecting insurance, reinsurance or suretyship coverages;

   **(iii)** investigating, defending or settling any claim under any contract of insurance, self-insurance, reinsurance or suretyship;

   **(iv)** auditing of accounts or records of others;

   **(v)** conducting an investment, loan or real estate department or operation;

   **(vi)** acting in any capacity as a fiduciary or trustee for mutual funds, pension or welfare funds or other similar activities; or

   **(vii)** performing any claim, investigative, adjustment, engineering or inspection service for a fee.

© 2014 Liberty Mutual Insurance. All rights reserved.

BP 88 04 03 14    Includes copyrighted material of Insurance Services Office, Inc., with its permission.    Page 1 of 1

Page 154 of 198

BUSINESSOWNERS
BP 88 16 09 20



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BUSINESS INCOME CHANGES – 24 HOUR TIME PERIOD

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**Section I – Property** is amended as follows:

A.  The second Paragraph under Paragraph **A.5.i. Civil Authority** is deleted and replaced by the following:

   **i.  Civil Authority**

   Civil Authority Coverage for Business Income will begin after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

B.  Paragraph **A.5.m.(6)(a) Business Income From Dependent Properties** is deleted and replaced by the following:

   **(a)**  Begins 24 hours after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the  premises of the dependent property or secondary dependent property; and

C.  Paragraph **H.9.a.(1)(a)** of the "Period of Restoration" definition is deleted and replaced by the following:

   **(a)**  24 hours after the time of direct physical loss or damage for Business Income Coverage; or

 © 2020 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, with its permission **Page 1 of 1**

**BUSINESSOWNERS
BP 88 55 09 16**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# VIRGINIA CHANGES AMENDMENT

This endorsement modifies insurance provided under the following:

> BUSINESSOWNERS COVERAGE FORM - BP 00 03
> BUSINESSOWNERS PROPERTY ENDORSEMENT - BP 88 19
> BUSINESSOWNERS PROPERTY EXTENSION ENDORSEMENT - BP 79 19
> BUSINESSOWNERS PROPERTY PLUS EXTENSION ENDORSEMENT - BP 82 42
> CONDOMINIMUM ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE - BP 80 05
> VIRGINIA CHANGES - BP 01 32

A. The $2,500 limit shown in the first paragraph of the **Fire Department Service Charge** as amended by Virginia Changes form BP 01 32 and Paragraph **D.2.** of the "Property Extension Endorsement" is replaced by a $15,000 limit.

B. Paragraph **J.1.d.(1)(b) Loss Payment** of the "Property Extension Endorsement" is replaced by the following:

> **(b)** You may make an initial claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within six months of the later of the following dates:
>
> **(i)** The last date on which you received a payment for actual cash value; or
>
> **(ii)** The date of entry of a final order of a court of competent jurisdiction declaring your right to full replacement cost.

C. When Condominium Association Directors and Officers Liability Coverage form BP 80 05 is attached, Paragraph **A.1.f.(1)(g)** of **Section II - Liability, Coverage Extension - Supplementary Payments** of the Businessowners Coverage Form does not apply.

D. With respect to this endorsement, the following is added to Section **H. Property Definitions:**

"Property Extension Endorsement" means Businessowners Property Endorsement, Businessowners Property Extension Endorsement or Businessowners Property Plus Extension Endorsement.

© 2016 Liberty Mutual Insurance
**BP 88 55 09 16**    Includes copyrighted material of Insurance Services Office, Inc., with its permission.    **Page 1 of 1**

BUSINESSOWNERS
BP 88 56 08 20



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# VIRGINIA CHANGES – EMPLOYMENT-RELATED PRACTICES LIABILITY

This endorsement modifies insurance provided under the following:

EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE

Section **A.8. Extended Reporting Periods** is amended as follows:

**A.** The following is added to Paragraph **a.**:

**(3)** Previously existing coverage is newly excluded.

**B.** Paragraphs **b.**, **c.**, **d.** and **e.** are replaced by the following:

**b.** Extended Reporting Periods do not extend the "policy period" or change the scope of coverage provided. They apply only to "claims" as the result of "employment-related practices" which occurred after the Retroactive Date, if any, shown in the Declarations and before the end of the "policy period". Once in effect, Extended Reporting Periods may not be cancelled by us, except for fraud.

**c.** The Basic Extended reporting period does not reinstate or increase the Limits of Insurance. The Supplemental Extended Reporting Period reinstates the Limit of Insurance to the same limit which was specified for the coverage prior to the termination of coverage.

**d.** A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the termination of coverage and lasts for:

**(1)** Sixty days with respect to "claims" arising out of "employment-related practices" which had been properly reported to us during the "policy period" in accordance with provision **1.** of Paragraph **B. Duties in Event of "Employment-Related Practices" or "Claims"**, under **SECTION VI - CONDITIONS**; and

**(2)** Sixty days with respect to "claims" arising from "employment-related practices" not previously reported to us.

The Basic Extended Reporting Period does not apply to "claims" that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such claims.

**e.** A Supplemental Extended Reporting Period of twenty four (24) months duration is available, but only by an endorsement and for an extra charge. This supplemental period replaces the Basic Extended Reporting Period, set forth in Paragraph **D.2.** above, and starts with the termination of coverage. You must give us a written request for the endorsement within 30 days after the termination of coverage. The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium when due. We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

**(1)** The exposures insured;

**(2)** Previous types and amounts of insurance;

**(3)** Limits of Insurance available under this Endorsement for future payment of "damages" or "defense expense"; and

 © 2020 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(4)** Other related factors.

The additional premium will not exceed 200% of the annual premium for this Endorsement.

BUSINESSOWNERS
BP 88 77 07 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# IDENTITY THEFT ADMINISTRATIVE SERVICES AND EXPENSE COVERAGE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following is added to **A. 5. Additional Coverages in Section I - Property:**

## IDENTITY THEFT ADMINISTRATIVE SERVICES AND EXPENSE COVERAGE

We will provide "Identity Theft Administrative Services" and will reimburse up to $25,000 for "Identity Theft Expenses" incurred by an "identity theft insured" as a direct result of any one "identity theft" in the "coverage territory" if all of the following requirements are met:

1. The personal identity of an "identity theft insured" under this policy was the subject of an "identity theft";

2. Such "identity theft" is first discovered by the "identity theft insured" during the policy period for which this Identity Theft Expense Coverage is applicable;

3. Such "identity theft" is reported to us as soon as practicable but in no event later than 60 days after it is first discovered by the "identity theft insured"; and

4. The "identity theft insured" reports the "identity theft" in writing to the appropriate law enforcement agency.

Any act or series of acts committed by one or more persons, or in which such person or persons are aiding or abetting others, against an "identity theft insured" is considered to be one "identity theft", even if a series of acts continues into a subsequent policy period.

## LIMITS

Regardless of the number of claims or "identity theft insureds", the most we will pay in the aggregate for all "Identity Theft Expenses" resulting from "identity theft" discovered during the policy period is $25,000.

1. The $25,000 Identity Theft Expense Limit shall be reduced by the amount of any payment made by us under the terms of this insurance. If the Identity Theft Expense Limit of Insurance is exhausted, we will have no further liability to pay for loss which may be discovered during the remainder of the policy period.

2. Any recovery made by us after settlement of a loss covered by this insurance shall not be used to increase or reinstate the Limit of Insurance.

3. "Identity Theft Administrative Services" is provided up to 12 consecutive months after service begins.

4. "Identity Theft Administrative Services" do not reduce the "Identity Theft Expense" Limit.

This "Identity Theft Administrative Service" and "Identity Theft Expense" Coverage are additional insurance.

## EXCLUSIONS

The following additional exclusions apply to this coverage.

We do not provide "Identity Theft Administrative Services" or cover "Identity Theft Expenses":

1. Incurred as the result of "identity theft" due to any fraudulent, dishonest, or criminal act by you, your partners, employees, members, "executive officers", managers, directors, or trustees or by any authorized representative of yours, whether acting alone or in collusion with others.

© 2013 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

In the event of any such act, no "identity theft insured" is entitled to "Identity Theft Expenses", even an "identity theft insured" who did not commit or conspire to commit the act causing the "identity theft".

2.  Arising out of "identity theft" committed by or with knowledge of any relative or former relative of the "identity theft insured".

3.  Arising out of an "identity theft" first discovered by the "identity theft insured" prior to the policy period or after the policy period, even if the "identity theft" began or continued during the policy period.

4.  Arising out of an "identity theft" that is not reported to us within 60 days after it is first discovered by the "identity theft insured".

## DEDUCTIBLE

1.  There is no deductible applicable to the "Identity Theft Administrative Services".

2.  We will not pay for "Identity Theft Expenses" resulting from an "identity theft" unless the amount exceeds $250. We will then pay the amount of "Identity Theft Expense" in excess of the Deductible Amount, up to the Limit of Insurance. Each "identity theft insured" shall be subject to only one deductible during any one policy period.

## CONDITIONS

The following additional conditions are added for "Identity Theft Administrative Services" and "Identity Theft Expenses" Coverage:

1.  The coverage provided under this endorsement will be excess over any other insurance covering the same loss or damage, whether you can collect on it or not. But we will not pay any more than the Identity Theft Expense Limits of Insurance applicable to this coverage.

2.  Reimbursement for "Identity Theft Expenses" will be made to the "identity theft insured."

3.  "Identity Theft Administrative Services" will provide instructions on:

    a.  How to respond to a potential "identity theft";

    b.  How to submit a request for "Identity Theft Administrative Services"; and

    c.  Information needed for reimbursement of "Identity Theft Expenses".

    We may provide "Identity Theft Administrative Services" prior to a final determination of "identity theft." However, if we determine there was not an "identity theft" these services will end and we will not have a right or duty to continue these services. Offering "Identity Theft Administrative Service" does not indicate an admission of liability under this policy.

4.  Identify Theft Administrative Services. The following apply with respect to "Identity Theft Administrative Services":

    a.  Services will depend on the cooperation, permissions, and assistance provided by the "identity theft insured";

    b.  There is no warranty or guarantee that "identity theft" issues will end and it will not prevent future "identity theft" incidences; and

    c.  All services may not be offered or applicable to all "identity theft insureds." For example, minors may not have credit reports available to be monitored.

## DEFINITIONS

With respect to the provisions of this endorsement only, the following definitions are added:

1.  "Coverage Territory" means:

    a.  The United States of America (including its territories and possessions);

    b.  Puerto Rico; and

    c.  Canada.

2.  "Executive officers" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

© 2013 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

BP 88 77 07 13    **Page 2 of 3**

3. "Identity theft" means the act of knowingly transferring or using, without lawful authority, a means of identification of an "identity theft insured" with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law. "Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

4. "Identity Theft Expenses" means the following reasonable and necessary items incurred as a result of "identity theft":

   a. Costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies.

   b. Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors.

   c. Costs for obtaining credit reports.

   d. Charges incurred for long distance telephone calls to merchants, vendors, suppliers, customers, law enforcement agencies, financial institutions or similar credit grantors, or credit agencies to report or discuss an actual "identity theft".

   e. Application fees for re-applying for a loan, or loans when the original application is rejected solely because the lender received incorrect credit information as a result of a covered "identity theft."

   f. Lost income resulting from time taken off from work to complete fraud affidavits, meet with or talk to law enforcement agencies, credit agencies and/or legal counsel, up to a maximum of $250 per day. Total payment for loss of income is not to exceed $5,000 per "identity theft insured" and is included within the "Identity Theft Expenses" and aggregate limits.

   g. Attorney fees to:

      i. Defend lawsuits brought against an "identity theft insured" by merchants, vendors, suppliers, financial institutions, or their collection agencies.

      ii. Remove any criminal or civil judgments wrongly entered against an "identity theft insured"; and

      iii. Challenge the accuracy or completeness of any information in a consumer credit report.

   h. Advertising expenses to restore the reputation of your business after an "identity theft insured" has been the victim of "identity theft". Total payment for advertising expenses is not to exceed $5,000 per "identity theft insured" and is included within the "Identity Theft Expenses" and aggregate limits.

5. "Identity Theft Administrative Services" means one or more individuals assigned by us to the "identity theft insured" to assist with the communication needed to re-establish the integrity of the "identity theft insured's" identity, including with the "identity theft insured's" permission and cooperation, written and telephone communication with law enforcement authorities, government agencies, credit agencies, and individual creditors and businesses.

6. "Identity theft insured" means the following if you are designated in the Declarations as:

   a. An individual or sole proprietorship, you and your spouse are insureds.

   b. A partnership or joint venture, your members, your partners, and their spouses are insured's.

   c. A limited liability company, your members are insured's.

   d. An organization other than a partnership, joint venture, or limited liability company, your "executive officers" and directors are insureds. Your stockholders are not "identity theft insureds."

© 2013 Liberty Mutual Insurance. All rights reserved.

BUSINESSOWNERS
BP 88 78 07 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BUSINESS PERSONAL PROPERTY LIMIT - AUTOMATIC INCREASE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following is added to Part **C. Limits of Insurance** of **Section I - Property,** of the Businessowners Coverage Form:

6.  **Business Personal Property Limit - Automatic Increase**

    a.  In accordance with Paragraph C.6.b., the Limit of Insurance for Business Personal Property will automatically increase by 2%, unless a different percentage of annual increase applicable to Business Personal Property is shown in the Declarations.

    b.  The amount of increase is calculated as follows:

        (1) Multiply the Business Personal Property limit that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Business Personal Property limit by:

            (a) the percentage of annual increase applicable to Business Personal Property shown in the Declarations, expressed as a decimal (example: 2% is .02); or

            (b) .02, if no applicable percentage of annual increase is shown in the Declarations; and

        (2) Multiply the number calculated in accordance with b.(1) by the number of days since the beginning of the current policy year, or the effective date of the most recent policy change amending the Business Personal Property limit, divided by 365.

    Example:

    If:

    The applicable Business Personal Property limit is $100,000.

    The Automatic Increase Business Personal Property is 2%. The number of days since the beginning of the policy year (or last policy change) is 146.

    The amount of increase is

    $100,000 x .02 x 146 ÷ 365 = $800.

© 2013 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

BP 88 78 07 13

Page 1 of 1



**BUSINESSOWNERS
BP 89 38 07 19**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NON-CUMULATION OF LIABILITY LIMITS
# (SAME OCCURRENCE)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following is added to Section **D. Liability And Medical Expenses Limits Of Insurance** under **Section II – Liability**:

Non-Cumulation of Liability - Same Occurrence - If one "occurrence" causes "bodily injury" or "property damage" during the policy period and during the policy period of one or more prior, or subsequent, policies providing liability insurance issued to you by us, then this policy's Liability and Medical Expenses – Occurrence limit will be reduced by the amount of each payment made by us under such other policies because of the "occurrence".

For purposes of this endorsement, the term "us"  includes any Liberty Mutual Group underwriting company.

**BP 89 38 07 19**                         © 2019 Liberty Mutual Insurance                         **Page 1 of 1**
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**BUSINESSOWNERS**
**BP 90 38 01 21**



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CYBER INCIDENT EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**A.** The exclusion set forth in Paragraph **B.** below applies to all coverage under **Section I – Property** in all forms and endorsements that comprise this Businessowners Policy, except as provided in Paragraph **C. Exceptions And Limitations** below. This includes but is not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused directly or indirectly by the following:

**Cyber Incident**, meaning:

1. Unauthorized access to or use of any computer system or computer software (including electronic data).

2. Malicious code, virus or any other harmful code that is directed at, enacted upon or introduced into any computer system or computer software (including electronic data) and is designed to access, alter, corrupt, damage, delete, destroy, disrupt, encrypt, exploit, use or prevent or restrict access to or the use of any part of any computer system or computer software (including electronic data) or otherwise disrupt their normal functioning or operation.

3. Denial of service attack which disrupts, prevents or restricts access to or use of any computer system or computer software (including electronic data), or otherwise disrupts their normal functioning or operation.

Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**C. Exceptions And Limitations**

1. **Fire Or Explosion**

   If a cyber incident as described in Paragraphs **B.1.** through **B.3.** of this exclusion results in fire or explosion, we will pay for the direct physical loss or damage caused by that fire or explosion.

2. **Additional Coverage**

   The exclusion in Paragraph **B.** does not apply to the extent that coverage is provided in the:

   **a.** Additional Coverage – Electronic Data; or

   **b.** Additional Coverage – Interruption Of Computer Operations.

3. **Computer Fraud And Funds Transfer Fraud Endorsement**

   The exclusion in Paragraph **B.** does not apply to the Computer Fraud And Funds Transfer Fraud endorsement when attached to your policy.

4.  **Electronic Commerce Endorsement**

    The exclusion in Paragraph **B.** does not apply to the Electronic Commerce (E-Commerce) endorsement when attached to your policy.

5.  **Data Compromise Coverage**

    The exclusion in Paragraph **B.** does not apply to the Data Compromise Coverage endorsement when attached to your policy.

6.  **CyberOne Coverage**

    The exclusion in Paragraph **B.** does not apply to the CyberOne Coverage endorsement when attached to your policy.

7.  **Cyber Suite Coverage Endorsement**

    The exclusion in Paragraph **B.** does not apply to the Cyber Suite Coverage Endorsement when attached to your policy.

D.  **Vandalism**

    The following is added to Vandalism:

    Vandalism does not include a cyber incident as described in Paragraph **B.**

E.  The terms of this exclusion or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Businessowners Policy.



BUSINESSOWNERS
BP 90 41 04 24

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CYBER SUITE COVERAGE ENDORSEMENT

### THIS CONTAINS CLAIMS MADE COVERAGE

Throughout this Coverage Endorsement (hereinafter referred to as "Cyber Coverage"), the words "you" and "your" refer to the Named Insured(s) shown in the Declarations of this Cyber Coverage and any other person(s) or organization(s) qualifying as a Named Insured under this Cyber Coverage. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotations have special meaning. Refer to Paragraph **F. Definitions**.

The terms and conditions of any cancellation and/or nonrenewal provisions in the policy and any amendment to such terms incorporated by endorsement are hereby incorporated herein and shall apply to coverage as is afforded by this Cyber Coverage, unless specifically stated otherwise in an endorsement(s) attached hereto.

## A. Coverage

This section lists the coverages that apply if indicated in the Declarations.

### 1. Data Compromise Response Expenses

a. Data Compromise Response Expenses applies only if all of the following conditions are met:

(1) There has been a "personal data compromise"; and

(2) Such "personal data compromise" took place in the "coverage territory"; and

(3) Such "personal data compromise" is first discovered by you during the "policy period"; and

(4) Such "personal data compromise" is reported to us as soon as practicable, but in no event more than sixty (60) days after the date it is first discovered by you.

b. If the conditions listed in Paragraph **a.** above have been met, then we will provide coverage for the following expenses when they arise directly from such "personal data compromise" and are necessary and reasonable. Paragraphs **(4)** and **(5)** below apply only if there has been a notification of the "personal data compromise" to "affected individuals" as covered under Paragraph **(3)** below.

**(1) Forensic IT Review**

We will pay for a professional information technologies review if needed to determine, within the constraints of what is possible and reasonable, the nature and extent of the "personal data compromise" and the number and identities of the "affected individuals". This includes, when necessary, the cost of a qualified Payment Card Forensic Investigator.

This does not, however, include any costs to analyze, research or determine any of the following:

(a) Vulnerabilities in systems, procedures or physical security; or

(b) The nature or extent of "loss" or damage to data that is not "personally identifying information" or "personally sensitive information".

BP 90 41 04 24
© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

If there is reasonable cause to suspect that a covered "personal data compromise" may have occurred, we will pay for the necessary and reasonable costs covered under this Forensic IT Review, even if it is eventually determined that there was no covered "personal data compromise". However, once it is determined that there was no covered "personal data compromise", we will not pay for any further costs incurred from the date of such determination.

**(2) Legal Review**

We will pay for a professional legal counsel to review the "personal data compromise" and how you should best respond to it.

If there is reasonable cause to suspect that a covered "personal data compromise" may have occurred, we will pay for the necessary and reasonable costs covered under this Legal Review, even if it is eventually determined that there was no covered "personal data compromise". However, once it is determined that there was no covered "personal data compromise", we will not pay for any further costs incurred from the date of such determination.

**(3) Notification to Affected Individuals**

We will pay your necessary and reasonable costs to provide notification of the "personal data compromise" to "affected individuals".

**(4) Services to Affected Individuals**

We will pay your necessary and reasonable costs to provide the following services identified below to "affected individuals". Services in Paragraphs **(c)** and **(d)** below apply only to "affected individuals" from "personal data compromise" events involving "personally identifying information".

**(a) Informational Materials**

A packet of loss prevention and customer support information.

**(b) Help Line**

A toll-free telephone line for "affected individuals" with questions about the "personal data compromise". Where applicable, the line can also be used to request additional services as listed in Paragraphs **(c)** and **(d)** below.

**(c) Credit Report and Monitoring**

A credit report and an electronic service automatically monitoring for activities affecting an individual's credit records. This service is subject to the "affected individual" enrolling for this service with the designated service provider.

**(d) Identity Restoration Case Management**

As respects any "affected individual" who is or appears to be a victim of "identity theft" that may reasonably have arisen from the "personal data compromise", the services of an identity restoration professional who will assist that "affected individual" through the process of correcting credit and other records and, within the constraints of what is possible and reasonable, restoring control over his or her personal identity.

**Page 2 of 28**                                                           **BP 90 41 04 24**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

**(5) Public Relations**

We will pay for a professional public relations firm review of, and response to, the potential impact of the "personal data compromise" on your business relationships.

This includes necessary and reasonable costs to implement public relations recommendations of such firm. This may include advertising and special promotions designed to retain your relationship with "affected individuals". However, we will not pay for:

**(a)** Promotions provided to any of your directors or employees; or

**(b)** Promotion costs exceeding $25 per "affected individual".

**(6) Regulatory Fines and Penalties**

We will pay for any fine or penalty imposed by law, to the extent such fine or penalty is legally insurable under the law of the applicable jurisdiction. This includes, but is not limited to, fines and penalties imposed for the violation of the European Union General Data Protection Regulation, the California Consumer Privacy Act and similar laws.

**(7) Payment Card Industry (PCI) Assessments, Fines and Penalties**

We will pay for any PCI assessments, fines and penalties imposed on you under a contract to which you are a party.

This does not include any:

**(a)** Increased transaction costs;

**(b)** Any assessments, fines and penalties not arising from a covered "personal data compromise";

**(c)** Interchange fees;

**(d)** Chargebacks;

**(e)** Subsequent assessments, fines and penalties imposed due to continued PCI non-compliance; or

**(f)** Any portion of such amount that has been or can reasonably be expected to be reimbursed by a third party, such as a financial institution.

**(8) Reputational Harm**

**(a)** This Reputational Harm coverage applies only if there has been a "personal data compromise" for which you provided notifications and services to "affected individuals" in consultation with us pursuant to Paragraphs **A.1.b.(3)** and **A.1.b.(4)** above.

**(b)** If the conditions listed in Paragraph **(a)** above have been met, then we will pay your necessary and reasonable "reputational harm costs" incurred during the "period of indemnification" and arising directly from the "personal data compromise".

**(9) Reward Payments**

We will pay for any necessary and reasonable "reward payments" offered and made by you in response to a "personal data compromise".

**BP 90 41 04 24**                                                                                      **Page 3 of 28**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

2. **Computer Attack**

a. Computer Attack applies only if all of the following conditions are met:

   (1) There has been a "computer attack"; and

   (2) Such "computer attack" occurred in the "coverage territory"; and

   (3) Such "computer attack" is first discovered by you during the "policy period"; and

   (4) Such "computer attack" is reported to us as soon as practicable, but in no event more than sixty (60) days after the date it is first discovered by you.

b. If the conditions listed in Paragraph **a.** above have been met, then we will provide you the following coverages for "loss" directly arising from such "computer attack".

   **(1) Data Restoration**

   We will pay your necessary and reasonable "data restoration costs".

   **(2) Data Re-creation**

   We will pay your necessary and reasonable "data re-creation costs".

   **(3) System Restoration**

   We will pay your necessary and reasonable "system restoration costs".

   **(4) Loss of Business**

   We will pay your actual "business income and extra expense loss" incurred during the "period of restoration". This includes your actual "business income and extra expense loss" caused by a voluntary shutdown of your "computer system" in connection with your reasonable efforts to stop, mitigate the effects of, or recover from, such a "computer attack".

   **(5) Extended Income Recovery**

   If you suffer a covered "business income and extra expense loss" resulting from a "computer attack" on a "computer system" owned or leased by you and operated under your control, we will pay your actual "extended income loss".

   **(6) Public Relations**

   If you suffer a covered "business income and extra expense loss", we will pay for the services of a professional public relations firm to assist you in communicating your response to the "computer attack" to the media, the public and your customers, clients or members.

   **(7) Future Loss Avoidance**

   If you received a loss payment from us under Paragraph **A.2. Computer Attack**, we will pay your necessary and reasonable "future loss avoidance costs".

   **(8) Reward Payments**

   We will pay for any necessary and reasonable "reward payments" offered and made by you in response to a "computer attack".

**Page 4 of 28**                                                                  **BP 90 41 04 24**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

3. **Cyber Extortion**

   a. Cyber Extortion applies only if all of the following conditions are met:

   (1) There has been a "cyber extortion threat"; and

   (2) Such "cyber extortion threat" is first made against you during the "policy period"; and

   (3) Such "cyber extortion threat" is reported to us as soon as practicable, but in no event more than 60 days after the date it is first made against you.

   b. If the conditions listed in Paragraph **a.** above have been met, then we will pay for your necessary and reasonable "cyber extortion expenses" arising directly from such "cyber extortion threat" and any necessary and reasonable "reward payments" offered and made by you in response to a "cyber extortion threat". The payment of any "cyber extortion expenses" must be approved in advance by us. We will not pay for any "cyber extortion expenses" that have not been approved in advance by us, which such approval will not be unreasonably withheld.

   c. You must make every reasonable effort not to divulge the existence of this Cyber Extortion coverage.

4. **Misdirected Payment Fraud**

   a. Misdirected Payment Fraud applies only if all of the following conditions are met:

   (1) There has been a "wrongful transfer event" against you; and

   (2) Such "wrongful transfer event" took place in the "coverage territory"; and

   (3) Such "wrongful transfer event" is first discovered by you during the "policy period"; and

   (4) Such "wrongful transfer event" is reported to us as soon as practicable, but in no event more than 60 days after the date it is first discovered by you; and

   (5) Such "wrongful transfer event" is reported in writing by you to the police.

   b. If the conditions listed in Paragraph **a.** above have been met, then we will pay your necessary and reasonable "wrongful transfer costs" arising directly from the "wrongful transfer event" and any necessary and reasonable "reward payments" offered and made by you in response to a "wrongful transfer event".

5. **Computer Fraud**

   a. Computer Fraud applies only if all of the following conditions are met:

   (1) There has been a "computer fraud event" against you; and

   (2) Such "computer fraud event" took place in the "coverage territory"; and

   (3) Such "computer fraud event" is first discovered by you during the "policy period"; and

   (4) Such "computer fraud event" is reported to us within 60 days after the date it is first discovered by you; and

   (5) Such "computer fraud event" is reported in writing by you to the police.

   b. If the conditions listed in Paragraph **a.** above have been met, then we will pay your necessary and reasonable "computer fraud costs" arising directly from the "computer fraud event" and any necessary and reasonable "reward payments" offered and made by you in response to a "computer fraud event."

**BP 90 41 04 24**                                                                                      **Page 5 of 28**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

**6. Telecommunications Fraud**

    **a.** Telecommunications Fraud applies only if all of the following conditions are met:

        **(1)** There has been a "computer attack" on a "telecommunications system" that is owned or leased by you and operated under your control; and

        **(2)** Such "computer attack" took place in the "coverage territory"; and

        **(3)** Such "computer attack" is first discovered by you during the "policy period"; and

        **(4)** Such "computer attack" is reported to us within sixty (60) days after the date it is first discovered by you; and

        **(5)** Such "computer attack" is reported in writing by you to the police; and

        **(6)** As a result of such "computer attack", there have been "telecommunications fraud costs".

    **b.** If the conditions listed in Paragraph **a.** above have been met, then we will pay your necessary and reasonable "telecommunications fraud costs" arising directly from the "computer attack".

**7. Privacy Incident Liability**

    **a.** Privacy Incident Liability applies only if all of the following conditions are met:

        **(1)** During the "policy period" or any applicable Extended Reporting Period, you first receive notice of one of the following:

            **(a)** A "claim"; or

            **(b)** A "regulatory proceeding".

        **(2)** Such "claim" or "regulatory proceeding" must arise from a "privacy incident" that:

            **(a)** Took place during the "coverage term"; and

            **(b)** Took place in the "coverage territory"; and

            **(c)** Was submitted to us and insured under Data Compromise Response Expenses.

        **(3)** Such "claim" or "regulatory proceeding" is reported to us as soon as practicable, but in no event more than sixty (60) days after the date it is first received by you.

    **b.** If the conditions listed in Paragraph **a.** above have been met, then we will pay on your behalf any covered:

        **(1)** "Loss" directly arising from the "claim"; or

        **(2)** "Defense costs" directly arising from a "regulatory proceeding".

    **c.** All "claims" and "regulatory proceedings" arising from a single "privacy incident" or interrelated "privacy incidents" will be deemed to have been made at the time that notice of the first of those "claims" or "regulatory proceedings" is received by you.

           **BP 90 41 04 24**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

8.  **Network Security Liability**

    a.  Network Security Liability applies only if all of the following conditions are met:

        (1) During the "policy period" or any applicable Extended Reporting Period, you first receive notice of a "claim" which arises from a "network security incident" that:

            (a) Took place during the "coverage term"; and

            (b) Took place in the "coverage territory"; and

        (2) Such "claim" is reported to us as soon as practicable, but in no event more than sixty (60) days after the date it is first received by you.

    b.  If the conditions listed in Paragraph **a.** above have been met, then we will pay on your behalf any covered "loss" directly arising from the "claim".

    c.  All "claims" arising from a single "network security incident" or interrelated "network security incidents" will be deemed to have been made at the time that notice of the first of those "claims" is received by you.

9.  **Electronic Media Liability**

    a.  Electronic Media Liability applies only if all of the following conditions are met:

        (1) During the "policy period" or any applicable Extended Reporting Period, you first receive notice of a "claim" which arises from an "electronic media incident" that:

            (a) Took place during the "coverage term"; and

            (b) Took place in the "coverage territory"; and

        (2) Such "claim" is reported to us as soon as practicable, but in no event more than sixty (60) days after the date it is first received by you.

    b.  If the conditions listed in Paragraph **a.** above have been met, then we will pay on your behalf any covered "loss" directly arising from the "claim".

    c.  All "claims" arising from a single "electronic media incident" or interrelated "electronic media incidents" will be deemed to have been made at the time that notice of the first of those "claims" is received by you.

**B.  Exclusions**

If any cyber incident exclusion is made a part of this policy, such exclusion will not apply to the coverage afforded by this Cyber Coverage.

The following additional exclusions apply to this coverage:

We will not pay for the costs or "loss" arising from the following:

1.  Nuclear reaction or radiation or radioactive contamination, however caused.

2.  War and hostile action, including any of the following and any consequence of any of the following:

    a.  Cyber warfare, whether or not occurring in combination with physical combat;

    b.  Undeclared war;

**BP 90 41 04 24**                                                                                      **Page 7 of 28**
© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

c.  Civil war;

d.  Hostile action by military force or cyber measures, including action in hindering or defending against an actual or expected attack, by any Combatant; or

e.  Insurrection, rebellion, revolution, usurped power, political violence or action taken by governmental authority in hindering or defending against any of these, including cyber action in connection with any of the foregoing.

For purposes of this exclusion, cyber warfare, cyber measures and cyber action include, but are not limited to, the use of disruptive digital activities against a computer network or system with the intention to cause harm in order to further political or similar objectives, or to intimidate any person(s) in furtherance of such objectives, committed by a Combatant.

The attribution of an action to a Combatant will be determined by relying on reasonable evidence such as:

a.  Statements by an impacted government, sovereign or other authority;

b.  Statements by widely recognized international bodies (such as the United Nations) or alliances (such as the North Atlantic Treaty Organization); or

c.  Consensus opinion within relevant expert communities such as the cyber security industry.

Decisions about the presence or absence of war, hostile action, and other terms used in this exclusion will take into consideration the full range of available tactics, weapons and technologies at the time of the event giving rise to the "loss".

Combatant means, for purposes of this exclusion, a government, sovereign or other authority, or agents acting on their behalf.

3.  Total or partial failure or interruption of, reduction in performance of, or damage to, any electrical power supply network or telecommunications network not owned and operated by you including, but not limited to, satellites, the internet, internet service providers, Domain Name System (DNS) service providers, cable and wireless providers, internet exchange providers, search engine providers, internet protocol networks (and similar networks that may have different designations) and other providers of telecommunications or internet infrastructure.

4.  Any attack on, incident involving, or "loss" to any computer or system of computers that is not a "computer system".

5.  Costs to research or correct any deficiency.

6.  Any fines or penalties other than those explicitly covered under Data Compromise Response Expenses.

7.  Any criminal investigations or proceedings.

8.  Your intentional or willful complicity in a covered "loss" event.

9.  Your reckless disregard for the security of your "computer system" or data, including confidential or sensitive information of others in your care, custody or control.

10. Any criminal, fraudulent or dishonest act, error or omission, or any intentional or knowing violation of the law by you.

11. Any "personal data compromise", "computer attack", "cyber extortion threat", "wrongful transfer event", "computer fraud event" or "wrongful act" occurring before the "coverage term".

12. That part of any "claim" seeking any non-monetary relief. However, this exclusion does not apply to "defense costs" arising from an otherwise insured "wrongful act".

**Page 8 of 28**                                                                                 **BP 90 41 04 24**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

13. The propagation or forwarding of malware, including viruses, worms, Trojans, spyware and keyloggers in connection with hardware or software created, produced or modified by you for sale, lease or license to third parties.

14. Any "claim" or "loss" alleging, arising out of, based upon or attributable to, or brought by or on behalf of any federal, state, or legal government agency or professional or trade licensing organizations or the enforcement of any governmental law, ordinance, regulation or rule; however, this exclusion shall not apply to:

   a. Actions or proceedings brought by a governmental authority or regulatory agency acting solely in its capacity as your customer;

   b. "Regulatory proceedings" insured under Paragraph **A.7. Privacy Incident Liability**; or

   c. Any fine or penalty imposed by law which arises from a covered "personal data compromise".

15. Any "loss" or liability arising out of "pollutants or contaminants" or the presence of or the actual, alleged or threatened discharge, dispersal, release or escape of "pollutants or contaminants", or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize "pollutants or contaminants", or in any way respond to or assess the effects of "pollutants or contaminants".

16. Any oral or written publication of material, if done by you or at your direction with knowledge of its falsity.

17. "Property damage" or "bodily injury" other than mental anguish or mental injury alleged in a "claim" covered under Privacy Incident Liability, Network Security Liability or Electronic Media Liability.

18. This insurance does not apply to:

   a. Any "future loss avoidance costs" incurred after this policy has been cancelled or non-renewed by either you or us.

   b. The salaries or wages of your "employees" or "executives", or your loss of earnings.

19. Any amount not insurable under applicable law.

20. Any provision of coverage under this Cyber Coverage to the extent that such provision would expose us or you to a violation of economic or trade sanctions, laws or regulations of the United States of America or any other jurisdiction with whose laws we are legally obligated to comply.

## C. Limits Of Insurance

### 1. Aggregate Limits

Except for post-judgment interest, the Cyber Suite Annual Aggregate Limit shown in the Declarations is the most we will pay for all "loss" under all applicable coverage sections in any one "policy period" or any applicable Extended Reporting Period. The Cyber Suite Annual Aggregate Limit shown in the Declarations applies regardless of the number of insured events first discovered or "claims" or "regulatory proceedings" first received during the "policy period" or any applicable Extended Reporting Period.

### 2. Coverage Sublimits

#### a. Data Compromise Sublimits

The most we will pay under Data Compromise Response Expenses for Public Relations and Reputational Harm coverages for "loss" arising from any one "personal data compromise" is the applicable sublimit for each of those coverages shown in the Declarations.

**BP 90 41 04 24**                                                                     **Page 9 of 28**
© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

These sublimits are part of, and not in addition to, the Cyber Suite Annual Aggregate Limit shown in the Declarations. Public Relations coverage is also subject to a limit per "affected individual" as described in Paragraph **A.1.b.(5)**.

b. **Computer Attack Sublimit**

The most we will pay under Computer Attack for Public Relations coverage for "loss" arising from any one "computer attack" is the applicable Public Relations sublimit shown in the Declarations. This sublimit is part of, and not in addition to, the Cyber Suite Annual Aggregate Limit shown in the Declarations.

c. **Cyber Extortion Sublimit**

The most we will pay under Cyber Extortion coverage for "loss" arising from one "cyber extortion threat" is the applicable sublimit shown in the Declarations. This sublimit is part of, and not in addition to, the Cyber Suite Annual Aggregate Limit shown in the Declarations.

d. **Misdirected Payment Fraud Sublimit**

The most we will pay under Misdirected Payment Fraud coverage for "loss" arising from one "wrongful transfer event" is the applicable sublimit shown in the Declarations. This sublimit is part of, and not in addition to, the Cyber Suite Annual Aggregate Limit shown in the Declarations.

e. **Computer Fraud Sublimit**

The most we will pay under Computer Fraud coverage for "loss" arising from one "computer fraud event" is the applicable sublimit shown in the Declarations. This sublimit is part of, and not in addition to, the Cyber Suite Annual Aggregate Limit shown in the Declarations.

f. **Telecommunications Fraud Sublimit**

The most we will pay under Telecommunications Fraud coverage for "loss" arising from one "computer attack" on a "telecommunications system" is the applicable limit shown in the Declarations. This sublimit is part of, and not in addition to, the Cyber Suite Annual Aggregate Limit shown in the Declarations.

g. **Reward Payments Sublimit**

The Reward Payment sublimit shown in the Declarations is the most we will pay for all "reward payments" resulting from a "personal data compromise", "computer attack", "cyber extortion threat", "wrongful transfer event" or "computer fraud event" in any one "policy period". This sublimit is a part of, and not in addition to, the Cyber Suite Annual Aggregate Limit shown in the Declarations.

3. **Application of Limits**

a. A "computer attack", "cyber extortion threat", "personal data compromise", "wrongful transfer event" or "computer fraud event" may be first discovered by you in one "policy period" but it may cause insured "loss" in one or more subsequent "policy periods". If so, all insured "loss" arising from such "computer attack", "cyber extortion threat", "personal data compromise", "wrongful transfer event" or "computer fraud event" will be subject to the limit of insurance applicable to the "policy period" when the "computer attack", "cyber extortion threat", "personal data compromise", "wrongful transfer event" or "computer fraud event" was first discovered by you.

b. You may first receive notice of a "claim" or "regulatory proceeding" in one "policy period" but it may cause insured "loss" in one or more subsequent "policy periods". If so, all insured "loss" arising from such "claim" or "regulatory proceeding" will be subject to the limit of insurance applicable to the "policy period" when notice of the "claim" or "regulatory proceeding" was first received by you.

c. The limit of insurance for any Extended Reporting Periods (if applicable) will be part of, and not in addition to, the limit of insurance for the immediately preceding "policy period".

**Page 10 of 28**                                          **BP 90 41 04 24**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

d.  Coverage for Services to Affected Individuals under Data Compromise Response Expenses is limited to costs to provide such services for a period of up to one year from the date of the notification to the "affected individuals". Notwithstanding, coverage for Identity Restoration Case Management services initiated within such one year period may continue for a period of up to one year from the date such Identity Restoration Case Management services are initiated.

## D.  Deductibles

1.  We will not pay for "loss" until the amount of the insured "loss" exceeds the deductible amount shown in the Declarations. We will then pay the amount of "loss" in excess of the applicable deductible amount, subject to the applicable limits shown in the Declarations. You will be responsible for the applicable deductible amount.

2.  The deductible will apply to all:

    a.  "Loss" arising from the same insured event or interrelated insured events under Data Compromise Response Expenses, Computer Attack, Cyber Extortion, Misdirected Payment Fraud, Computer Fraud or Telecommunications Fraud coverage.

    b.  "Loss" resulting from the same "wrongful act" or interrelated "wrongful acts" insured under Privacy Incident Liability, Network Security Liability or Electronic Media Liability.

3.  In the event that "loss" is insured under more than one coverage section, only the single highest deductible applies.

## E.  Additional Conditions

The following conditions apply in addition to the Common Policy Conditions:

### 1.  Additional Policy Protection

We may, from time to time, offer or arrange to provide benefits specific to one of our risk management benefits which include, but are not limited to devices, equipment, services or benefits provided by either us or a third-party vendor selected by us. These services or products are designed to mitigate loss, provide loss control, assess risk, identify sources of risk, or develop strategies for eliminating or reducing risk. The benefits are intended to enhance the safety, value, usability, life or protection of you or your insurable assets. Such products or services must be provided by us or by a third-party vendor that has an agreement or contract with us. We do not warrant the merchantability, fitness, or quality of any product or service offered or provided by that organization.

### 2.  Bankruptcy

The bankruptcy or insolvency of you or your estate, will not relieve you or us of any obligation under this Cyber Coverage.

### 3.  Defense And Settlement

    a.  We shall have the right and the duty to assume the defense of any applicable "claim" or "regulatory proceeding" against you. You shall give us such information and cooperation as we may reasonably require.

    b.  You shall not admit liability for or settle any "claim" or "regulatory proceeding" or incur any defense costs without our prior written consent.

    c.  At the time a "claim" or "regulatory proceeding" is first reported to us, you may request that we appoint a defense attorney of your choice. We will give full consideration to any such request.

    d.  We will not be obligated to pay any "loss" or "defense costs", or to defend or continue to defend any "claim" or "regulatory proceeding" after the applicable limit of insurance has been exhausted.

**BP 90 41 04 24**                                                                          **Page 11 of 28**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

e.   We will pay all interest on that amount of any judgment within the applicable limit of insurance which accrues:

   **(1)** After entry of judgment; and

   **(2)** Before we pay, offer to pay or deposit in court that part of the judgment within the applicable limit of insurance or, in any case, before we pay or offer to pay the entire applicable limit of insurance.

   These interest payments will be in addition to and not part of the applicable limit of insurance.

f.   We may, with your written consent, make any settlement of a "claim" or "regulatory proceeding" which we deem reasonable. If you refuse to consent to any settlement recommended by us and acceptable to the claimant or plaintiff, our liability for all "settlement costs" and "defense costs" resulting from such "claim" or "regulatory proceeding" will not exceed the following:

   **(1)** The amount for which we could have settled such "claim" or "regulatory proceeding" plus "defense costs" incurred as of the date we proposed such settlement in writing to you; and

   **(2)** 80% of any "settlement costs" and "defense costs" incurred after the date of such proposed settlement;

   subject to the applicable limits.

## 4.  Due Diligence

You agree to use due diligence to prevent and mitigate "loss" insured under this Cyber Coverage. This includes, but is not limited to, complying with, and requiring your vendors to comply with, reasonable and industry-accepted protocols for:

a.   Providing and maintaining appropriate physical security for your premises, "computer systems" and hard copy files;

b.   Providing and maintaining appropriate computer and Internet security;

c.   Maintaining and updating at appropriate intervals backups of computer data;

d.   Protecting transactions, such as processing credit card, debit card and check payments; and

e.   Appropriate disposal of files containing "personally identifying information", "personally sensitive information" or "third party corporate data", including shredding hard copy files and destroying physical media used to store electronic data.

## 5.  Duties in the Event of a Claim, Regulatory Proceeding or Loss

a.   If, during the "policy period", incidents or events occur which you reasonably believe may give rise to a "claim" or "regulatory proceeding" for which coverage may be provided hereunder, such belief being based upon either written notice from the potential claimant or the potential claimant's representative; or notice of a complaint filed with a federal, state or local agency; or upon an oral "claim", allegation or threat, you shall give written notice to us as soon as practicable and either:

   **(1)** Anytime during the "policy period"; or

   **(2)** Anytime during the Extended Reporting Periods (if applicable).

b.   If a "claim" or "regulatory proceeding" is brought against you, you must:

   **(1)** Immediately document the specifics of the "claim" or "regulatory proceeding" and the date received;

**Page 12 of 28**                                                         **BP 90 41 04 24**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

(2) Provide us with written notice, as soon as practicable, but in no event more than sixty (60) days after the date the "claim" or "regulatory proceeding" is first received by you;

(3) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "regulatory proceeding";

(4) Authorize us to obtain records and other information;

(5) Cooperate with us in the investigation, settlement or defense of the "claim" or "regulatory proceeding";

(6) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to you because of "loss" or "defense costs" to which this insurance may also apply; and

(7) Not take any action, or fail to take any required action, that prejudices your rights or our rights with respect to such "claim" or "regulatory proceeding".

c. In the event of a "personal data compromise", "computer attack", "cyber extortion threat", "wrongful transfer event" or "computer fraud event" insured under this Cyber Coverage, you must see that the following are done:

(1) Notify the police, or any other appropriate law enforcement agency, if you have reasonable belief that a law may have been broken.

(2) Notify us as soon as practicable, but in no event more than sixty (60) days after the "personal data compromise", "computer attack", "cyber extortion threat", "wrongful transfer event", or "computer fraud event". Include a description of any property involved.

(3) As soon as possible, give us a description of how, when and where the "personal data compromise", "computer attack", "cyber extortion threat", "wrongful transfer event" or "computer fraud event" occurred.

(4) As often as may be reasonably required, permit us to:

(a) Inspect the property proving the "personal data compromise", "computer attack", "cyber extortion threat", "wrongful transfer event" or "computer fraud event";

(b) Examine your books, records, electronic media and records and hardware;

(c) Take samples of damaged and undamaged property for inspection, testing and analysis; and

(d) Make copies from your books, records, electronic media and records and hardware.

(5) Send us signed, sworn proof of "loss" containing the information we request to investigate the "personal data compromise", "computer attack", "cyber extortion threat", "wrongful transfer event" or "computer fraud event". You must do this within sixty (60) days after our request. We will supply you with the necessary forms.

(6) Cooperate with us in the investigation or settlement of the "personal data compromise", "computer attack", "cyber extortion threat", "wrongful transfer event" or "computer fraud event".

(7) If you intend to continue your business, you must resume all or part of your operations as quickly as possible.

(8) Make no statement that will assume any obligation or admit any liability, for any "loss" for which we may be liable, without our prior written consent.

(9) Promptly send us any legal papers or notices received concerning the "loss".

**BP 90 41 04 24**                                                                     **Page 13 of 28**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

**d.** We may examine you under oath at such times as may be reasonably required, about any matter relating to this insurance or the "claim", "regulatory proceeding" or "loss", including your books and records. In the event of an examination, your answers must be signed.

**e.** You may not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our prior written consent.

6. **Extended Reporting Periods**

**a.** You will have the right to the Extended Reporting Periods described in this section, in the event of a "termination of coverage".

**b.** If a "termination of coverage" has occurred, you will have the right to the following:

**(1)** At no additional premium, an Automatic Extended Reporting Period of thirty (30) days immediately following the effective date of the "termination of coverage" during which you may first receive notice of a "claim" or "regulatory proceeding" arising directly from a "wrongful act" occurring before the end of the "policy period" and which is otherwise insured by this Cyber Coverage; and

**(2)** Upon payment of the additional premium of 100% of the full annual premium associated with the relevant coverage, a Supplemental Extended Reporting Period of one year immediately following the effective date of the "termination of coverage" during which you may first receive notice of a "claim" or "regulatory proceeding" arising directly from a "wrongful act" occurring before the end of the "policy period" and which is otherwise insured by this Cyber Coverage.
To obtain the Supplemental Extended Reporting Period, you must request it in writing and pay the additional premium due, within thirty (30) days after the effective date of "termination of coverage". The additional premium for the Supplemental Extended Reporting Period will be fully earned at the inception of the Supplemental Extended Reporting Period. If we do not receive the written request as required, you may not exercise this right at a later date.

This insurance, provided during the Supplemental Extended Reporting Period, is excess over any other valid and collectible insurance that begins or continues in effect after the Supplemental Extended Reporting Period becomes effective, whether the other insurance applies on a primary, excess, contingent, or any other basis.

7. **Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

**a.** There has been full compliance with all of the terms of this insurance; and

**b.** The action is brought within two (2) years after the date the "loss" is first discovered by you, or the date on which you first receive notice of a "claim" or "regulatory proceeding".

8. **Legal Advice**

We are not your legal advisor. Our determination of what is or is not insured under this Cyber Coverage does not represent advice or counsel from us about what you should or should not do.

9. **Other Insurance**

If there is other insurance that applies to the same "loss", this Cyber Coverage shall apply only as excess insurance after all other applicable insurance has been exhausted.

**Page 14 of 28**                                                                                                          **BP 90 41 04 24**
© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

## 10. Pre-Notification Consultation

You agree to consult with us prior to the issuance of any notification to "affected individuals". We assume no responsibility under Data Compromise Response Expenses for any services promised to "affected individuals" without our prior agreement. If possible, this pre-notification consultation will also include the designated service provider(s) as agreed to under the Service Providers condition below. You must provide the following at our pre-notification consultation with you:

a. The exact list of "affected individuals" to be notified, including contact information.

b. Information about the "personal data compromise" that may appropriately be communicated with "affected individuals".

c. The scope of services that you desire for the "affected individuals". For example, coverage may be structured to provide fewer services in order to make those services available to more "affected individuals" without exceeding the available Data Compromise Response Expenses limit of insurance.

## 11. Service Providers

a. We will only pay under this Cyber Coverage for services that are provided by service providers approved by us. You must obtain our prior approval for any service provider whose expenses you want covered under this Cyber Coverage, and such approval will not be unreasonably withheld.

b. Prior to the Pre-Notification Consultation described in the Pre-Notification Consultation Condition above, you must come to agreement with us regarding the service provider(s) to be used for the Notification to Affected Individuals and Services to Affected Individuals. We will suggest a service provider. If you prefer to use an alternate service provider, our coverage is subject to the following limitations:

    (1) Such alternate service provider must be approved by us;

    (2) Such alternate service provider must provide services that are reasonably equivalent or superior in both kind and quality to the services that would have been provided by the service provider we had suggested; and

    (3) Our payment for services provided by any alternate service provider will not exceed the amount that we would have paid using the service provider we had suggested.

## 12. Services

The following conditions apply as respects any services provided to you or any "affected individual" by us, our designees or any service firm paid for in whole or in part under this Cyber Coverage:

a. The effectiveness of such services depends on the cooperation and assistance of you or any "affected individuals".

b. All services may not be available or applicable to all individuals. For example, "affected individuals" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions.

c. We do not warrant or guarantee that the services will end or eliminate all problems associated with the covered events.

d. You will have a direct relationship with the professional service firms paid for in whole or in part under this Cyber Coverage. Those firms work for you.

BP 90 41 04 24                                                         **Page 15 of 28**
© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

**13. Valuation**

We will determine the value of "money", "securities", cryptocurrency and tangible property as follows:

a.  Our payment for loss of "money" or loss payable in "money" will be, at your option, in the "money" of the country in which the "computer fraud event", "cyber extortion threat", "reward payments", or "wrongful transfer event" took place or in the United States of America dollar equivalent thereof determined at the rate of exchange published by the Wall Street Journal at the time of payment of such "loss".

b.  Our payment for loss of "securities" will be their value at the close of business on the day the "computer fraud event" or the "wrongful transfer event" was discovered, or the day the "securities" were transferred by you in response to the "cyber extortion threat". At our option, we may:

   (1) Pay the value of such "securities" to you or replace them in kind, in which event you must assign to us all of your rights, title and interest in those "securities"; or

   (2) Pay the cost of any lost securities bond required in connection with issuing duplicates of the "securities"; provided that we will be liable only for the cost of the lost securities bond as would be charged for a bond having a penalty not exceeding the lesser of the value of the "securities" at the close of business on the day the "computer fraud event", "cyber extortion threat" or "wrongful transfer event" was discovered.

c.  Our payment of cryptocurrency will be its market value at the close of business on the day the cryptocurrency was transferred by you in response to the covered "cyber extortion threat".

d.  Our payment for the loss of tangible property will be the smallest of:

   (1) The cost to replace the tangible property; or

   (2) The amount you actually spend that is necessary to replace the tangible property.

   We will not pay you on a replacement costs basis for any loss of tangible property until such property is actually replaced and unless the replacement is made as soon as reasonably possible after the "loss". If the lost property is not replaced as soon as reasonably possible after the "loss", we will pay you the actual cash value of the tangible property on the day the "computer fraud event", "cyber extortion threat" or "wrongful transfer event" was discovered.

## F.  Definitions

1.  "Affected individual" means any person whose "personally identifying information" or "personally sensitive information" is lost, stolen, accidentally released or accidentally published by a "personal data compromise" covered under this Cyber Coverage. This definition is subject to the following provisions:

   a.  "Affected individual" does not include any business or organization. Only an individual person may be an "affected individual".

   b.  An "affected individual" may reside anywhere in the world.

2.  "Authorized third party user" means a party who is not an employee or a director of you who is authorized by contract or other agreement to access the "computer system" for the receipt or delivery of services.

3.  "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4.  "Business income and extra expense loss" means loss of Business Income and Extra Expense

   a.  As used in this definition, Business Income means the sum of:

**Page 16 of 28**                                                                          **BP 90 41 04 24**
© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

(1) Net income (net profit or loss before income taxes) that would have been earned or incurred; and

(2) Continuing normal and necessary operating expenses incurred, including employee and director payroll.

b. As used in this definition, Extra Expense means the additional cost you incur to operate your business over and above the cost that you normally would have incurred to operate your business during the same period had no "computer attack" occurred.

5. **"Claim"**

a. "Claim" means:

(1) A written demand for monetary damages or non-monetary relief, including injunctive relief;

(2) A civil proceeding commenced by the filing of a complaint;

(3) An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent;

(4) Any other alternative dispute resolution proceeding in which such damages are claimed and to which you must submit or to which we agree you should submit to;

arising from a "wrongful act" or a series of interrelated "wrongful acts" including any resulting appeal covered under this Cyber Coverage.

b. "Claim" does not mean or include:

(1) Any demand or action brought by or on behalf of someone who is:

(a) Your director;

(b) Your owner or part-owner; or

(c) A holder of your securities;

in their capacity as such, whether directly, derivatively, or by class action. "Claim", however, will include proceedings brought by such individuals in their capacity as "affected individuals", but only to the extent that the damages claimed are the same as would apply to any other "affected individual"; or

(2) A "regulatory proceeding".

c. "Claim" also includes a demand or proceeding arising from a "wrongful act" that is a "personal data compromise" only when the "personal data compromise" giving rise to the proceeding was covered under the Data Compromise Response Expenses section of this Cyber Coverage, and you submitted a "claim" to us and provided notifications and services to "affected individuals" in consultation with us pursuant to Data Compromise Response Expenses in connection with such "personal data compromise".

6. **"Computer Attack"**

a. "Computer attack" means one of the following involving the "computer system":

(1) An "unauthorized access incident";

(2) A "malware attack"; or

(3) A "denial of service attack" against a "computer system".

BP 90 41 04 24                                                          **Page 17 of 28**
© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

   **b.** A "computer attack" ends at the earlier of:

      **(1)** The time that the active attacking behavior ceases, the time that you have regained control over the "computer system" or the time that all unauthorized creation, destruction or movement of data associated with the "computer attack" has ceased, whichever happens latest; or

      **(2)** Thirty (30) days after your discovery of the "computer attack".

**7.** "Computer fraud costs" means:

   **a.** The amount of "money" fraudulently obtained from you from a "computer fraud event". "Computer fraud costs" only include the direct financial loss to you.

   **b.** "Computer fraud costs" do not include any of the following:

      **(1)** Other expenses that arise from the "computer fraud event";

      **(2)** Indirect loss, such as "bodily injury", lost time, lost wages, "identity recovery expenses" or damaged reputation;

      **(3)** Any interest, time value or potential investment gain on the amount of financial loss; or

      **(4)** Any portion of such amount that has been or can reasonably be expected to be reimbursed by a third party, such as a financial institution.

**8.** "Computer fraud event" means:

   **a.** An "unauthorized access incident" that leads to the intentional, unauthorized and fraudulent entry of or change to data or instructions within a "computer system" owned or leased by you and operated under your control. Such fraudulent entry or change must be conducted by a person who is not an "employee", "executive" or "independent contractor". Such fraudulent entry or change must cause "money" to be sent or diverted. The fraudulent entry or change must result in direct financial loss to you.

   **b.** "Computer fraud event" does not mean or include any occurrence:

      **(1)** In which you are threatened or coerced to send money or divert a payment; or

      **(2)** Arising from a dispute or a disagreement over the completeness, authenticity or value of a product, a service or a financial instrument.

**9.** "Computer system" means a computer or other electronic hardware that:

   **a.** Is owned or leased by you and operated under your control; or

   **b.** Is operated by a third party service provider used for the purpose of providing hosted computer application services to you or for processing, maintaining, hosting or storing your electronic data, pursuant to a written contract with you for such services. However, such computer or other electronic hardware operated by such third party shall only be considered to be a "computer system" with respect to the specific services provided by such third party to you under such contract.

**10.** "Coverage term" means the increment of time:

   **a.** Commencing on the earlier of the first inception date of this Cyber Coverage or the first inception date of any coverage substantially similar to that described in this Cyber Coverage and held immediately prior to this Cyber Coverage; and

   **b.** Ending upon the "termination of coverage".

**Page 18 of 28**                                **BP 90 41 04 24**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

11. "Coverage territory" means:

    **a.** With respect to Data Compromise Response Expenses, Computer Attack, Cyber Extortion, Misdirected Payment Fraud, Computer Fraud and Telecommunications Fraud, "coverage territory" means anywhere in the world.

    **b.** With respect to Privacy Incident Liability, Network Security Liability and Electronic Media Liability, "coverage territory" means anywhere in the world, however "claims" must be brought within the United States (including its territories and possessions) or Puerto Rico.

12. "Cyber extortion expenses" means:

    **a.** The cost of a negotiator or investigator retained by you in connection with a "cyber extortion threat"; and

    **b.** Any amount paid by you in response to a "cyber extortion threat" to the party that made the "cyber extortion threat" for the purposes of eliminating the "cyber extortion threat" when such expenses are necessary and reasonable and arise directly from a "cyber extortion threat". This includes any payment made in the form of "money", "securities", cryptocurrency (including, but not limited to, Bitcoin, Ethereum and other forms of digital, virtual or electronic currency) or tangible goods. The payment of "cyber extortion expenses" must be approved in advance by us, where such approval will not be unreasonably withheld. However we may pay for "cyber extortion expenses" that were not approved in advance by us if we determine the following:

        **(1)** It was not practical for you to obtain our prior approval; and

        **(2)** If consulted at the time, we would have approved the payment.

At our sole discretion, we may choose to pay "cyber extortion expenses" in excess of the limit shown in the Declarations if doing so reduces the total amount of "loss" payable under this Cyber Risk Coverage.

13. **"Cyber Extortion Threat"**

    **a.** "Cyber extortion threat" means a demand for money from you based on a credible threat, or series of related credible threats, to:

        **(1)** Launch a "denial of service attack" against the "computer system" for the purpose of denying "authorized third party users" access to your services provided through the "computer system" via the Internet;

        **(2)** Gain access to a "computer system" and use that access to steal, release or publish "personally identifying information", "personally sensitive information" or "third party corporate data";

        **(3)** Alter, damage or destroy electronic data or software while such electronic data or software is stored within a "computer system";

        **(4)** Launch a "computer attack" against a "computer system" in order to alter, damage or destroy electronic data or software while such electronic data or software is stored within a "computer system"; or

        **(5)** Transfer, pay or deliver any funds or property using a "computer system" without your authorization.

    **b.** "Cyber extortion threat" does not mean or include any threat made in connection with a legitimate commercial dispute.

**BP 90 41 04 24**                                                                                  **Page 19 of 28**
© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

**14. "Data Re-creation Costs"**

a. "Data re-creation costs" means the costs of an outside professional firm hired by you to research, re-create and replace data that has been lost or corrupted and for which there is no electronic source available or where the electronic source does not have the same or similar functionality to the data that has been lost or corrupted.

b. "Data re-creation costs" does not mean or include costs to research, re-create or replace:

(1) Software programs or operating systems that are not commercially available; or

(2) Data that is obsolete, unnecessary or useless to you.

**15. "Data Restoration Costs"**

a. "Data restoration costs" means the costs of an outside professional firm hired by you to replace electronic data that has been lost or corrupted. In order to be considered "data restoration costs", such replacement must be from one or more electronic sources with the same or similar functionality to the data that has been lost or corrupted.

b. "Data restoration costs" does not mean or include costs to research, re-create or replace:

(1) Software programs or operating systems that are not commercially available; or

(2) Data that is obsolete, unnecessary or useless to you.

**16. "Defense Costs"**

a. "Defense costs" means reasonable and necessary expenses consented to by us resulting solely from the investigation, defense and appeal of any "claim" or "regulatory proceeding" against you. Such expenses may include premiums for any appeal bond, attachment bond or similar bond. However, we have no obligation to apply for or furnish such bond.

b. "Defense costs" does not mean or include the salaries or wages of your employees or directors, or your loss of earnings.

17. "Denial of service attack" means an intentional attack against a target computer or network of computers designed to overwhelm the capacity of the target computer or network in order to deny or impede authorized users from gaining access to the target computer or network through the Internet.

18. "Electronic media incident" means an allegation that the display of information in electronic form by you on a website resulted in:

a. Infringement of another's copyright, title, slogan, trademark, trade name, trade dress, service mark or service name;

b. Defamation against a person or organization that is unintended; or

c. A violation of a person's right of privacy, including false light and public disclosure of private facts.

19. "Employee" means any natural person, other than an "executive", who was, now is or will be:

a. Employed on a full-time or part-time basis by you;

b. Furnished temporarily to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions;

**BP 90 41 04 24**
© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

   c.  Leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **b.** above;

   d.  Your volunteer worker, which includes unpaid interns; or

   e.  An "independent contractor".

20.  "Executive" means any natural person who was, now is or will be:

   a.  The owner of your sole proprietorship; or

   b.  A duly elected or appointed:

       (1)  Director;

       (2)  Officer;

       (3)  Managing Partner;

       (4)  General Partner;

       (5)  Member (if a limited liability company);

       (6)  Manager (if a limited liability company); or

       (7)  Trustee;

       of your business.

21.  "Extended income loss" means your actual "business income and extra expense loss" incurred during the "extended recovery period".

22.  "Extended recovery period" means a fixed period of 180 days immediately following the end of the "period of restoration".

23.  **"Future Loss Avoidance Costs"**

   a.  "Future loss avoidance costs" means the amount you spend to make improvements to a "computer system" owned or leased by you and operated under your control, provided:

       (1)  Such "future loss avoidance costs" are incurred within thirty (30) days after your discovery of the "computer attack"; and

       (2)  We agree in writing that improvements to which "future loss avoidance costs" relate would reasonably reduce the likelihood of a future "computer attack" similar to the one for which you have received payment under **Computer Attack** coverage Paragraphs **A.2.b.(1)** through **A.2.b.(4)**. We will not unreasonably withhold such agreement; and

       (3)  We receive your invoices for the "future loss avoidance costs" no later than sixty (60) days after the date you received the payment for the loss under **Computer Attack** coverage Paragraphs **A.2.b.(1)** through **A.2.b.(4)**.

   b.  The most we will pay for all "future loss avoidance costs" with respect to any one "computer attack" is 10% of our Eligible Payment to you prior to any payment under this Future Loss Avoidance coverage.

       Any portion of the payment made for hardware replacement or hardware upgrades reduces the amount we will pay.

**BP 90 41 04 24**                                                                                      **Page 21 of 28**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

c.  The improvements described in Paragraph **a.(2)** above may include, but are not limited to, hardware and software upgrades. Improvements involving services subject to lease, license or subscription may have costs that are ongoing. In such case, the most we will pay are costs associated with the first 12 months of any such service, subject to the amount described in Paragraph **b.** above.

d.  As used in this coverage, Eligible Payment means our total payment to you under **Computer Attack** coverage Paragraphs **A.2.b.(1)** through **A.2.b.(4)**, not including any deductible amount.

## 24. "Identity Theft"

a.  "Identity theft" means the fraudulent use of "personally identifying information". This includes fraudulently using such information to establish credit accounts, secure loans, enter into contracts or commit crimes.

b.  "Identity theft" does not mean or include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

## 25. "Independent contractor" means a natural person that provides goods or services to you under terms specified in a written contract, but only while acting on behalf of, at the direction of, and under the supervision of you.

## 26. "Loss"

a.  With respect to Data Compromise Response Expenses, "loss" means those expenses enumerated in Paragraph **A.1.b. Data Compromise Response Expenses** above.

b.  With respect to Computer Attack, "loss" means those expenses enumerated in Paragraph **A.2.b. Computer Attack** above.

c.  With respect to Cyber Extortion, "loss" means "cyber extortion expenses".

d.  With respect to Misdirected Payment Fraud, "loss" means "wrongful transfer costs".

e.  With respect to Computer Fraud, "loss" means "computer fraud costs".

f.  With respect to Telecommunications Fraud, "loss" means "telecommunications fraud costs".

g.  With respect to Privacy Incident Liability, Network Security Liability and Electronic Media Liability, "loss" means "defense costs" and "settlement costs".

## 27. "Malware Attack"

a.  "Malware attack" means an attack that damages a "computer system" or data contained therein arising from malicious code, including viruses, worms, Trojans, spyware and keyloggers.

b.  "Malware attack" does not mean or include damage from shortcomings or mistakes in legitimate electronic code or damage from code installed on your "computer system" during the manufacturing process or normal maintenance.

## 28. "Money"

a.  "Money" means a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including currency, coins, banknotes, bullion, travelers' checks, registered checks and money orders held for sale to the public.

b.  "Money" does not mean or include any cryptocurrency, whether or not authorized or adopted by a domestic or foreign government. Cryptocurrency includes, but is not limited to, Bitcoin, Ethereum and other forms of digital, virtual or electronic currency.

**Page 22 of 28**                                                        **BP 90 41 04 24**
© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

29. "Network security incident" means a negligent security failure or weakness with respect to a "computer system" which allowed one or more of the following to happen:

    a. The unintended propagation or forwarding of malware, including viruses, worms, Trojans, spyware and keyloggers. Malware does not include shortcomings or mistakes in legitimate electronic code;

    b. The unintended abetting of a "denial of service attack" against one or more other systems; or

    c. The unintended loss, release or disclosure of "third party corporate data".

30. "Period of indemnification" means the period of time that begins on the date you first provided notification to "affected individuals" pursuant to Paragraph **A.1. Data Compromise Response Expenses** and ends after 30 days.

31. "Period of restoration" means the period of time that begins 8 hours after the time that a "computer attack" is discovered by you and continues until the earliest of:

    a. The date that all data restoration, data re-creation and system restoration directly related to the "computer attack" has been completed;

    b. The date on which such data restoration, data re-creation and system restoration could have been completed with the exercise of due diligence and dispatch;

    c. If no data restoration, data re-creation or system restoration is required, the end of the "computer attack"; or

    d. 180 days after the "computer attack" is discovered by you.

32. "Personal data compromise" means the loss, theft, accidental release or accidental publication of "personally identifying information" or "personally sensitive information" as respects one or more "affected individuals". If the loss, theft, accidental release or accidental publication involves "personally identifying information", such loss, theft, accidental release or accidental publication must result in or have the reasonable possibility of resulting in the fraudulent use of such information. This definition is subject to the following provisions:

    a. At the time of the loss, theft, accidental release or accidental publication, the "personally identifying information" or "personally sensitive information" need not be at the insured premises but must be in the direct care, custody or control of:

        (1) You; or

        (2) A professional entity with which you have a direct relationship and to which you (or an "affected individual" at your direction) have turned over (directly or via a professional transmission or transportation provider) such information for storage, processing, transmission or transportation of such information.

    b. "Personal data compromise" includes disposal or abandonment of "personally identifying information" or "personally sensitive information" without appropriate safeguards such as shredding or destruction, provided that the failure to use appropriate safeguards was accidental and not reckless or deliberate.

    c. "Personal data compromise" includes situations where there is a reasonable cause to suspect that such "personally identifying information" or "personally sensitive information" has been lost, stolen, accidentally released or accidentally published, even if there is no firm proof.

    d. All incidents of "personal data compromise" that are discovered at the same time or arise from the same cause will be considered one "personal data compromise".

BP 90 41 04 24                                         **Page 23 of 28**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

**33. "Personally Identifying Information"**

a. "Personally identifying information" means information, including health information, that could be used to commit fraud or other illegal activity involving the credit, access to health care or identity of an "affected individual". This includes, but is not limited to, Social Security numbers or account numbers.

b. "Personally identifying information" does not mean or include information that is otherwise available to the public, such as names and addresses.

**34. "Personally Sensitive Information"**

a. "Personally sensitive information" means private information specific to an individual the release of which requires notification of "affected individuals" under any applicable law.

b. "Personally sensitive information" does not mean or include "personally identifying information".

**35.** "Policy period" means the period commencing on the effective date shown in the Declarations. The "policy period" ends on the expiration date or the cancellation date of this Cyber Coverage, whichever comes first.

**36.** "Pollutants or contaminants" include, but are not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, bacterium, microorganism, virus or other pathogen, diseases, germs, soot, fumes, asbestos, acids, alkalis, chemicals, and waste. Waste includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

**37.** "Privacy incident" means:

a. A "personal data compromise";

b. Your failure to comply with a Privacy Policy;

c. Your unauthorized, unlawful (including, but not limited to, in violation of the European Union General Data Protection Regulation, the California Consumer Privacy Act or similar laws) or wrongful collection of "personally identifying information"; or

d. Your unlawful (including, but not limited to, in violation of the European Union General Data Protection Regulation, the California Consumer Privacy Act or similar laws) or wrongful failure to amend, correct or delete "personally identifying information".

For the purpose of this definition, Privacy Policy means a publicly available written policy formally adopted by you which addresses the collection, handling and management of "personally identifying information".

**38.** "Property damage" means:

a. Physical injury to or destruction of tangible property including all resulting loss of use; or

b. Loss of use of tangible property that is not physically injured.

**39.** "Regulatory proceeding" means an investigation, demand or proceeding alleging a violation of law or regulation arising from a "personal data compromise" brought by, or on behalf of, the Federal Trade Commission, Federal Communications Commission or other administrative or regulatory agency, or any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity.

**40. "Reputational Harm Costs"**

a. "Reputational harm costs" means the loss of Business Income during the "period of indemnification" arising directly from damage to your reputation caused by a "personal data compromise".

Page 24 of 28                                                                                          BP 90 41 04 24

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

As used in this definition, Business Income means the sum of:

**(1)** Net income (net profit or loss before income taxes) that would have been earned or incurred; and

**(2)** Continuing normal and necessary operating expenses incurred, including "employee" and "executive" payroll.

**b.** "Reputational harm costs" does not mean or include Business Income you lose due to:

**(1)** Unfavorable or deteriorated business conditions;

**(2)** Decreased market share;

**(3)** Any other consequential damages or losses;

**(4)** Legal costs or expenses;

**(5)** Investment income;

**(6)** Bank interest;

**(7)** Seasonal fluctuations;

**(8)** Additional costs you incur to operate your business over and above the costs that you normally would have incurred to operate your business during the same period had no "personal data compromise" occurred.

41. "Reward payments" means:

An amount of "money" paid by you to any individual(s) for information leading to the arrest and conviction of any perpetrator(s) of a "personal data compromise", "computer attack", "cyber extortion threat", "wrongful transfer event", or "computer fraud event" that:

**a.** We agree to in writing prior to the "reward payments" being offered or paid; and

**b.** Are offered and paid prior to the earlier of:

**(1)** Six months after the "personal data compromise", "computer attack", "cyber extortion threat", "wrongful transfer event", or "computer fraud event". Or

**(2)** Expiration of the policy term.

Such individual may not be:

**(1)** You;

**(2)** Your employee;

**(3)** Anyone hired by you to investigate a "personal data compromise", "computer attack", "cyber extortion threat", "wrongful transfer event", or "computer fraud event". or

**(4)** A member of law enforcement.

42. **"Securities"**

**a.** "Securities" means:

**(1)** Written negotiable and non-negotiable instruments or contracts representing "money" or tangible property; or

BP 90 41 04 24                                                                                      **Page 25 of 28**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

(2) Uncertified securities.

b.  "Securities" does not mean or include "money".

## 43. "Settlement Costs"

a.  "Settlement costs" means the following, when they arise from a "claim":

(1) Damages, judgments or settlements; and

(2) Attorney's fees and other litigation costs added to that part of any judgment paid by us, when such fees and costs are awarded by law or court order; and

(3) Pre-judgment interest on that part of any judgment paid by us.

b.  "Settlement costs" does not mean or include:

(1) Civil or criminal fines or penalties imposed by law, except for civil fines and penalties expressly covered under Data Compromise Response Expenses;

(2) Punitive and exemplary damages;

(3) The multiple portion of any multiplied damages;

(4) Taxes; or

(5) Matters which may be deemed uninsurable under the applicable law.

c.  With respect to fines and penalties, the law of the jurisdiction most favorable to the insurability of those fines, or penalties will control for the purpose of resolving any dispute between us and you regarding whether the fines, or penalties specified in this definition above are insurable under this Cyber Coverage, provided that such jurisdiction:

(1) Is where those fines, or penalties were awarded or imposed;

(2) Is where any "wrongful act" took place for which such fines, or penalties were awarded or imposed;

(3) Is where you are incorporated or you have your principal place of business; or

(4) Is where we are incorporated or have our principal place of business.

## 44. "System Restoration Costs"

a.  "System restoration costs" means the costs of an outside professional firm hired by you to do any of the following in order to restore your "computer system" to its pre-"computer attack" level of functionality:

(1) Replace or reinstall computer software programs;

(2) Remove any malicious code; and

(3) Configure or correct the configuration of your "computer system".

b.  "System restoration costs" does not mean or include:

(1) Costs to increase the speed, capacity or utility of a "computer system" beyond what existed immediately prior to the "computer attack";

(2) Labor costs of your employees or directors;

Page 26 of 28                                                                 BP 90 41 04 24
© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

(3) Any costs in excess of the actual cash value of your "computer system"; or

(4) Costs to repair or replace hardware. However, at our sole discretion, we may choose to pay to repair or replace hardware if doing so reduces the amount of "loss" payable under this Cyber Coverage.

45. "Telecommunications fraud costs" means any payment that you are responsible for making to your Telephone Service Provider as a result of a "computer attack" on a "telecommunications system" that is owned or leased by you and operated under your control. As used in this definition, Telephone Service Provider means a business with which you have a written contract to provide you with telephone services.

46. "Telecommunications system" means any telephone or fax system including but not limited to, Voice over Internet Protocol (VoIP) or other internet based telephone system that is owned or leased by you and operated under your control.

47. "Termination of coverage" means:

a. You or we cancel this coverage;

b. You or we refuse to renew this coverage; or

c. We renew this coverage on an other than claims-made basis or with a retroactive date later than the date of the first inception of this coverage or any coverage substantially similar to that described in this Cyber Coverage.

48. **"Third Party Corporate Data"**

a. "Third party corporate data" means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of information of a third party not an insured under this Cyber Coverage which is not available to the general public and is provided to you subject to a mutually executed written confidentiality agreement or which you are legally required to maintain in confidence.

b. "Third party corporate data" does not mean or include "personally identifying information" or "personally sensitive information".

49. "Unauthorized access incident" means the gaining of access to a "computer system" by:

a. An unauthorized person or persons; or

b. An authorized person or persons for unauthorized purposes.

50. **"Wrongful Act"**

a. With respect to Privacy Incident Liability, "wrongful act" means a "privacy incident".

b. With respect to Network Security Liability, "wrongful act" means a "network security incident".

c. With respect to Electronic Media Liability, "wrongful act" means an "electronic media incident".

51. "Wrongful transfer costs" means the amount of "money" fraudulently obtained from you. "Wrongful transfer costs" include the direct financial loss only. "Wrongful transfer costs" do not include any of the following:

a. Other expenses that arise from the "wrongful transfer event";

b. Indirect loss, such as "bodily injury", lost time, lost wages, identity recovery expenses or damaged reputation;

BP 90 41 04 24                                                                                     **Page 27 of 28**

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

c.  Any interest, time value or potential investment gain on the amount of financial loss; or

d.  Any portion of such amount that has been or can reasonably be expected to be reimbursed by a third party, such as a financial institution.

**52. "Wrongful Transfer Event"**

a.  "Wrongful transfer event" means an intentional and criminal deception of you or a financial institution with which you have an account. The deception must be perpetrated by a person who is not an "employee", "executive" or "independent contractor" using email, facsimile or telephone communications to induce you or the financial institution to send or divert "money", "securities" or tangible property. The deception must result in direct financial loss to you.

b.  "Wrongful transfer event" does not mean or include any occurrence:

    **(1)**  In which you are threatened or coerced to send money or divert a payment; or

    **(2)**  Arising from a dispute or disagreement over the completeness, authenticity or value of a product, a service or a financial instrument.

ALL OTHER PROVISIONS OF THIS POLICY APPLY.

© 2023, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

BUSINESSOWNERS
BP 90 73 08 21



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# VIRGINIA CHANGES AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

CYBER SUITE COVERAGE ENDORSEMENT

**A.** Paragraph **c.** of **C. Limits Of Insurance, 3. Application of Limits** is deleted and replaced with the following:

    **c.** Notwithstanding the foregoing, in the event that you purchase the Supplemental Extended Reporting Period pursuant to the terms of Paragraph **b.(2)** of **E. Additional Conditions, 6. Extended Reporting Periods** the limit of liability for the Supplemental Extended Reporting Period (if applicable) shall be equal to the applicable liability limit. The limit of liability for the Supplemental Extended Reporting Period, if purchased, shall be solely for any "claim" or "regulatory proceeding" of which you first receive notice during said Supplemental Extended Reporting Period for any "wrongful acts" occurring before the end of the coverage period for this Cyber Coverage and which is otherwise covered by this Cyber Coverage and shall be in addition to, and not part of, the applicable liability limit for the preceding coverage period.

**B.** The following is added to **E. Additional Conditions, 2. Bankruptcy**:

Any party who has obtained a judgment against you, which is returned unsatisfied, may bring an action against us to recover damages insured by this Cyber Coverage.

**C.** Paragraph **b.(2)** of **E. Additional Conditions, 5. Duties in the Event of a Claim, Regulatory Proceeding or Loss** is deleted and replaced with the following:

    **(2)** Provide us with written notice, as soon as practicable, but in no event more than sixty (60) days after the date the "claim" or "regulatory proceeding" is first received by you. Failure to give notice within the prescribed time shall not invalidate any claim if it shall be shown not to have been reasonably possible to give such notice within the prescribed time frame, that notice was given as soon as reasonably possible and that the insurer was not prejudiced by the failure to give notice within the prescribed time frame;

**D.** Paragraph **c.(2)** of **E. Additional Conditions, 5. Duties in the Event of a Claim, Regulatory Proceeding or Loss** is deleted and replaced with the following:

    **(2)** Notify us as soon as practicable, but in no event more than sixty (60) days after the "personal data compromise", "computer attack", "cyber extortion threat", "wrongful transfer event" or "computer fraud event". Include a description of any property involved. Failure to give notice within the prescribed time shall not invalidate any claim if it shall be shown not to have been reasonably possible to give such notice within the prescribed time frame, that notice was given as soon as reasonably possible and that the insurer was not prejudiced by the failure to give notice within the prescribed time frame.

**E.** Paragraph **a.** of **E. Additional Conditions, 6. Extended Reporting Periods** is deleted and replaced with the following:

    **a.** You shall have the right to the Extended Reporting Periods described in this section, in the event of a "termination of coverage".

    The limit of liability for the Supplemental Extended Reporting Period shall be as set forth in Paragraph **c.** of **C. Limits Of Insurance, 3. Application of Limits** of this Cyber Coverage (as modified in Paragraph **A.** above in this amendatory endorsement).

**BP 90 73 08 21**                                                      **Page 1 of 2**

© 2020, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

**F.** The following is added to Paragraph **b.** of **E. Additional Conditions, 6. Extended Reporting Periods**:

    **(3)** We must advise you in writing of the Automatic Extended Reporting Period and the availability of, the premium for, and the importance of purchasing the Supplemental Extended Reporting Period. This advice must be sent no earlier than the date of notification of "termination of coverage" and not later than fifteen (15) days after "termination of coverage".

    The Supplemental Extended Reporting Period is available for purchase at any time during the coverage period for this Cyber Coverage and for at least thirty (30) days following "termination of coverage".

**G.** The following is added to **E. Additional Conditions**:

**Loss Information**

We must provide you with loss information upon "termination of coverage" or within fifteen (15) calendar days of your request. The loss information shall include:

**a.** Aggregate information in total for closed claims;

**b.** Aggregate information in total for open claims; and

**c.** Information on notice of any occurrence;

For the period to which the aggregate limit applies.

**H.** Paragraph **47.** of **F. Definitions** is deleted and replaced with the following:

**47.** "Termination of coverage"

    **a.** "Termination of coverage" means:

        **(1)** You or we cancel this coverage;

        **(2)** You or we refuse to renew this coverage; or

        **(3)** We renew this coverage on an other than claims-made basis or with a retroactive date later than the date of the first inception of this coverage or any coverage substantially similar to that described in this Cyber Coverage.

    **b.** "Termination of coverage" does not mean or include:

        **(1)** Cancellation or nonrenewal due to nonpayment of premium;

        **(2)** Failure to comply with terms and conditions; or

        **(3)** Fraud.

Page 2 of 2                                                **BP 90 73 08 21**

© 2020, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.



**BUSINESSOWNERS**
**BP 90 99 03 22**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – PFC/PFAS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**Section II – Liability** is amended as follows:

A.  **B. Exclusions** is amended by added the following:
    **Perfluorinated Compounds Or Per- And Polyfluoroalkyl**

    **Substances** This insurance does not apply to:

    a.  "Bodily injury", "property damage", or "personal and advertising injury" arising out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of "PFC/PFAS"; or

    b.  Any loss, cost, or expense arising out of any:

        (1) Request, demand, order, or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate, dispose of, or in any way respond to or assess the effects of "PFC/PFAS" by any insured or on behalf of any person, entity, or governmental authority.

        (2) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, remediating, disposing of, or in any way assessing the effects of "PFC/PFAS".

    This exclusion applies whether the substances listed above are alone or combined with any other substances or factors, whether included as a component part of a product or otherwise.

    This exclusion applies regardless whether such exposure occurs within or outside a building.

B.  The following definition is added to **F. Liability And Medical Expenses Definitions**:

    "PFC/PFAS" means Perfluorinated compounds (PFC) or per- and polyfluoroalkyl substances (PFAS) including, but not limited to, perfluorooctanoic acid (PFOA), perfluorooctane sulfonic acid (PFOS), perfluorononanoic acid (PFNA), perfluorobutyric acid (PFBA), perfluorobutane sulfonic acid (PFBS), perfluoropentanoic acid (PFPeA), perfluorohexane sulfonic acid (PFHxS), GenX, C8 (perfluorinated carboxylic acid), ADONA, perfluorohexanoic acid (PFHxA),perfluoroheptanoic acid (PFHpA), perfluorooctane sulfonamide (PFSOA), perfluorodecanoic acid, (PFDA), perfluorodecane sulfonate (PFDS), perfluoroundecanoic acid (PFUnA), perfluorododecanoic acid (PFDoA), perfluorotridecanoic acid (PFTrDA), perfluorotetradecanoic acid (PFTeDA), or 6:2 fluorotelomer sulfonate (6:2 FTS) or any associated salts, acids, alcohols, precursor chemicals or related higher homologue chemicals.

The addition of this endorsement does not imply that other policy provisions, including but not limited to any pollution exclusion, do not exclude coverage for PFC-related or PFAS-related damages, expense, loss, demand, claim, liability or legal obligation.

All other terms and conditions of the policy remain unchanged.



BUSINESSOWNERS
BP 91 00 10 22



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – BIOMETRIC INFORMATION PRIVACY CLAIM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**Section II – Liability** is amended as follows:

A.  The following exclusion is added to Paragraph **B. Exclusions**:

**Biometric Information Privacy Claim**

This insurance does not apply to:

"Bodily injury", "property damage", or "personal advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate any federal, state, local, province, Native American tribe or tribal nation law, or other governmental division or subdivision law that regulates or restricts the collection, storage, use, conversion, retention, sharing and/or publication in any manner, and/or disposal of "biometric information", including, but not limited to, violations of any notifications, disclosures, sale, or authorizations related to such "biometric information".

B.  The following definition is added to Paragraph **F. Liability And Medical Expenses Definitions**:

"Biometric information" means any:

1.  Biometric identifier including, but not limited to, a retina or iris scan, fingerprint, handprint, voiceprint, scan of hand, finger, ear, or face geometry, eye or finger vein verification, handwriting or signature, deoxyribonucleic acid (DNA), or any other personally identifiable measurable biological, physiological, behavioral, or immutable characteristic of an individual or individuals; or

2.  Biometric information, including any information, regardless of how captured, converted, stored or shared, which is based on biometric identifiers used to identify an individual.

BP 91 00 10 22                © 2022 Liberty Mutual Insurance                **Page 1 of 1**
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

BUSINESSOWNERS
BP 91 08 09 23



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF CONCEALMENT, MISREPRESENTATION OR FRAUD CONDITION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The **Concealment, Misrepresentation Or Fraud** Condition is replaced by the following:

**Concealment, Misrepresentation Or Fraud**

We may void this policy and/or deny a claim if, before or after a loss, you or any insured:

1.  Concealed or misrepresented any material fact or circumstance; or

2.  Made incorrect statements or representations with regard to any material fact or circumstance; or

3.  Engaged in any fraudulent conduct;

at the time of application, or any time during the policy period.

# EXHIBIT 1A



**Liberty Mutual**
INSURANCE

Liberty Mutual Insurance
P.O. Box 5014
Scranton, PA 18505-5014

Date: 4/3/2025

Goodman-Gable-Gould/Adjusters International
Attn: Andy C. Macleay
10110 Molecular Drive - Suite 300
Rockville, MD 20850

Mr. Alan Golden
Oro Master Sub 2, LLC
7814 Stable Way
Potomac, MD 20854

| RE: | | |
|---|---|---|
| | Insured: | ORO MASTER SUB 2, LLC |
| | Loss Location: | 238 Potomac Ave, Quantico,Quantico, VA 22134 |
| | Loss Location State: | VA |
| | Date of Loss: | 1/23/2025 |
| | Policy Number: | BZS640984094 |
| | Policy Effective Dates: | 11/16/2024 To 11/16/2025 |
| | Claim Number: | 24244628 |
| | Underwriting Company: | Ohio Security Insurance Company |

Dear Mr. Golden:

This letter is to inform you that we have conducted an investigation of your claim for water damage at the above-referenced location. We have completed our review of the information provided by you or on your behalf. The following is a summary of our findings and position on coverage for the claim asserted.

The insurance policy issued to ORO MASTER SUB 2, LLC provides coverage subject to the policy terms and conditions. Based on our investigation and review of the policy, there is no coverage available for your loss as outlined below.

**THE CLAIM**

Our first notice of loss was on 1/23/2025. It was reported that there was water damage potentially due to a sprinkler line issue.

Our investigation of your claim revealed the following relevant information:

Our onsite inspection was completed on or about January 28, 2025 by Frank Schmidt of Liberty Mutual Insurance. While onsite, Mr. Schmidt observed the building is listed for sale by Trust Properties Inc. Their sign is located at the front of the building.

Inspection of the interior revealed the building is 100% unoccupied and had suffered water damage to the interior by various frozen pipes and locations inside the building. While onsite, Mr. Schmidt made contact with the insured, Mr. Golden. Mr. Golden stated the building has been unoccupied and not used for its intended purpose for approximately 3 years and his last visit to the location was sometime in October of 2024.

The water meter was found to be disconnected with the water supply from the city directly connected to the building. This was stated by the insured as an arrangement with the city's Mayor to keep water service to the building for the purpose of keeping the fire suppression system charged in the event of a fire. The city Mayor discovered the loss and reported to the insured that there was water coming from the back door of the building.

Plumbing repairs were completed by the insured's plumber (My Plumbing Heros) on January 24, 2025. Based on their invoice, they repaired or capped three leaks within the building and requested a fire suppression company make the needed repairs to the sprinkler system. Damaged components were photographed and discarded by others.

We retained the services of Jeffrey Bradley, P.E., CFEI, CVFI Forensic Engineer from Donan Engineering. Jeffrey Bradley inspected the utility bills and other relevant information provided by the insured starting on or about 3/19/2025. A copy of their report is enclosed for your review.

A summary of Mr. Bradley's findings are as follows in part:
On or around January 23, 2025, two fire-protection water supply lines and two interior water lines failed, resulting in a water loss. The building is approximately 7,000 square feet and was reportedly vacant and for sale the prior three years. The water meter was removed from the building before the water loss, and the city water was connected directly to the building.

Inspection photos include a fire protection system with a wet-type valve. An area beneath a cabinet has plumbing lines that a plumber reportedly capped after the water loss. The ceiling tiles are missing or stained in two other areas. Fiberglass insulation is above the drop-in ceiling tiles and neither domestic plumbing nor fire sprinkler piping can be seen. Sinks and other plumbing components are removed from another section of the building, and it is a second suspected water loss location.

Based on historical weather data, only during the span between January 20, 2025, and January 23, 2025, did temperature never rise above freezing and thus this is the most plausible time frame for a pipe freezing event. No photographs of the failed plumbing or sprinkler system were provided. The placement of the ceiling insulation above or below the plumbing is inconclusive in the photographs.

No information was provided on the type of heat used in the building. Based on the increased usage of natural gas during the heating season and the lack of gas usage during the warm seasons, the building is heated with natural gas. Natural gas usage increases similar to the HDD during the 2023/2024 and 2024/2025 seasons, consistent with an attempt to heat the property. The electrical usage remained steady

2

throughout the prior year, indicating electrical service has been maintained in the building. Based on the information provided, an attempt was made to maintain heat in the building.

Although the exact cause of the water losses could not be determined with the provided information, freezing in multiple areas of the building is consistent with inadequate heat inside the building. A power interruption, natural gas interruption, or furnace thermostat setting that is too low could contribute to the loss.

## THE POLICY

With regard to your Policy, we refer you to the following relevant provisions contained in the **BP 00 03 07 13 Businessowners Coverage Form** which states in part:

## SECTION I – PROPERTY
### A. Coverage
We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

#### 1. Covered Property
Covered Property includes Buildings as described under Paragraph a. below, Business Personal Property as described under Paragraph b. below, or both, depending on whether a Limit Of Insurance is shown in the Declarations for that type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described under Paragraph 2. Property Not Covered.

    **a. Buildings**, meaning the buildings and structures at the premises described in the Declarations, including:

      **(1)** Completed additions;

      **(2)** Fixtures, including outdoor fixtures;

***

### B. Exclusions
**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

***

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

***

#### e. Frozen Plumbing
Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

    **(1)** You do your best to maintain heat in the building or structure; or

    **(2)** You drain the equipment and shut off the supply if the heat is not maintained.

3

\*\*\*

**p. Continuous Or Repeated Seepage Or Leakage Of Water**

Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

\*\*\*

**3.** We will not pay for loss or damage caused by or resulting from any of the following Paragraphs **a.** through **c.** But if an excluded cause of loss that is listed in Paragraphs **a.** through **c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

\*\*\*

**c. Negligent Work**

Faulty, inadequate or defective:

\*\*\*

**(2)** Design, specifications, workmanship, repair, construction,renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction,renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.


We also refer you to the following relevant provisions contained in the **BP 00 03 07 13 Businessowners Coverage Form:**

Your policy states the following in part:

**E. Property Loss Conditions**

**\*\*\***

**8. Vacancy**

**a. Description Of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs **(a)** and **(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**\*\*\***

**(ii)** Used by the building owner to conduct customary operations.


**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

**\*\*\***

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

4

## APPLICATION OF POLICY

In an effort to alert you to the basis of the denial of coverage, we list below the grounds under which all aspects of the claim are not covered under the policy. It is our intent to incorporate by reference all of the terms of the policy through this denial of coverage letter. Based upon the information available to date, the grounds for the denial of coverage under the policy, or under applicable law, with respect to the claim, include, but are not limited to, the following:

Vacancy of the entire building for more than 60 consecutive days, at least 31% of the building was not occupied or being utilized for customary operations, the long term and repeated seepage we observed and the inadequate measure of heat in the building to protect the fire suppression system and plumbing components from freezing.

Based on the above we find no coverage under the terms and conditions of your policy for the costs claimed in connection with your asserted claim and therefore deny your claim. In view of the absence of coverage, we make no comment relative to the amount of loss or damage but include those issues within the rights reserved.

If you have any questions about the content of this letter or the terms and provisions of your policy of insurance, please do not hesitate to call me.

**Liberty Mutual's (Ohio Security Insurance Company) position is based upon facts as they are currently known. If you have other facts which you would like us to consider now, or as they may be presented later, we encourage you to submit them to us for our review.**

The foregoing is not intended to waive any defenses which are now, or which may hereafter become available to us.

The foregoing does not constitute a waiver of any term, condition, or exclusion of the insurance policy or any rights and defenses under the policy, and we hereby expressly reserve all of our rights and defenses thereunder.

We also refer you to the following relevant provisions contained in the **BP 00 03 07 13 Businessowners Coverage Form**

### 4. Legal Action Against Us
No one may bring a legal action against us under this insurance unless:
  **a.** There has been full compliance with all of the terms of this insurance; and
  **b.** The action is brought within two years after the date on which the direct physical loss or damage occurred.

5

If you have any questions regarding your claim, please feel free to contact me at 304-533-7462

Sincerely,

Douglas Hunt
General Adjuster / Large Loss Property


cc: RK Tongue Company Inc. (Agent)
    4940 Campbell Blvd. Suite 200
    Nottingham, MD 21236

6

# EXHIBIT 2



# GOODMAN-GABLE-GOULD/ADJUSTERS INTERNATIONAL

RICHMOND

9011 ARBORETUM PARKWAY SUITE 302
RICHMOND, VA 23236
800-601-9999
804-897-8626

May 1, 2025

Douglas Hunt
General Adjuster/Large Loss Property
Liberty Mutual Insurance
PO Box 5014
Scranton, PA  18505

**RE: Insured:**        **ORO MASTER SUB 2, LLC**
     **Location:**        **238 Potomac Avenue, Quantico, VA  22134**
     **State :**        **Virginia**
     **Date of Loss :**        **1/23/2025**
     **Policy Number :**        **BZS640984094**
     **Claim Number :**        **24244628**

Dear Mr. Hunt,

My name is Anthony D'Amico. I have been asked by Andy Macleay to review the facts and circumstances of the subject loss and render my opinion as to the veracity of Liberty's coverage disclaimer. Accordingly, I reviewed the policy, the investigative report prepared by Jeffrey Bradley, P.E. Forensic Engineer from Donan Engineering, as well as your denial letter dated April 3, 2025.

On the basis of my knowledge and forty-eight years of industry experience in adjusting complex property claims, I will offer the following comments:

In the first instance, I will remind you that where a policy which provides coverages for all causes of loss, except for those specifically excluded, (aka an All-Risk policy), the insurer has the absolute burden of proving the applicability of an exclusion which would defeat coverage for a given loss. The insurer is required to prove with a high degree of certainty the exact cause of the loss. Speculation, or assumptions as to the cause do not create compliance with the requirement and cannot be relied upon for a denial of coverage. If the insurer cannot unequivocally meet this burden, it must afford coverage for the loss.

This having been said, whether Liberty has met its burden in this case may not be germane at this time. Arguably, Liberty has not. In any event, I mention this so as to reserve the insured's right to reintroduce this argument in the event it should become necessary. To further explain, I say the argument may not be germane because based on the facts as known and presented, your application of the Freezing and Continuous Seepage Exclusion is seriously flawed as is your reliance on the Vacancy Provision. This alone warrants a rescission of your coverage denial. Allow me to explain.

The following is an excerpt from your letter which illustrates the policy exclusions upon which you are relying:

*2. We will not pay for loss or damage caused by or resulting from any of the following:*
  *\**
*e. Frozen Plumbing*
*Water, other liquids, powder, or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:*
*(1) You do your best to maintain heat in the building or structure; or*



**GOODMAN-GABLE-GOULD/ADJUSTERS INTERNATIONAL**

*(2) You drain the equipment and shut off the supply if the heat is not maintained.*
\*\*\*
**p. Continuous Or Repeated Seepage Or Leakage Of Water**
*Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture, or vapor, that occurs over a period of 14 days or more.*

The Frozen Plumbing Exclusion clearly has no relevance and is inapplicable to this claim as fire protective systems are clearly excepted from the Exclusion. Since you did not allude to Exclusion 2.e. per se, I trust you would agree with the inapplicability of the exclusion due to the exception. However, I mentioned this here as in your letter, you reserved the right to add additional coverage defenses.

Moreover, you cite the Continuous Or Repeated Seepage Or Leakage Of Water exclusion as a basis for a denial of coverage. I disagree with this coverage analysis. The proximate cause of this loss was the breakage or cracking of fire protection system piping due to a freezing condition. The clear and widely accepted meaning and intent of this exclusion, 2. p., is to preclude coverage for long-term water leakage or seepage due to maintenance issues or similar conditions. As you know, the water leakage in the instant matter was the result of a sudden and accidental, fortuitous event. As such, the Seepage or Leakage exclusion would not be applicable.

Furthermore, even if there was some merit to your characterization of this loss as a Seepage or Leakage event, the entire ensuing water damage loss would not be excluded. It is a well-established interpretation of this exclusion that by the inclusion of the 14-day period language into this exclusion, the intent is to exclude only that damage which occurred after day 14. The damage which occurred during the first 14-day period would not be excluded thus providing coverage for the damage sustained during the first 14-day period. Under these circumstances, it would be the burden of the insurer to prove the scope of excluded damage which occurred past the 14-day period. I do not believe that under the circumstances it would be possible to bifurcate the damage with any degree of accuracy.

Lastly, you cited the following provision from the policy:

**Vacancy Provisions**
*If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:*
*(1) We will not pay for any loss or damage*
*caused by any of the following even if*
*they are Covered Causes of Loss:*
*(a) Vandalism;*
*(b) Sprinkler leakage, unless you have protected the system against freezing;*

Given the language of this Provision or Condition, damage resulting from sprinkler leakage in a vacant building would not be covered if and only if the insured did NOT take measures to protect the system from freezing. In this situation, the only means of protecting against a freeze event is to provide heat to the building. Draining the fire protection lines is NOT an option as 1) the city requirement for maintaining a fire suppression system and more so 2) the policy contains a Protective Safe Guards endorsement which reads in part as follows:

*The following is added to the **Property General Conditions in Section I - Property: Protective Safeguards***
*1. As a condition of this insurance you are*
*required to maintain the protective devices or services listed in the Schedule*
*above.*
*The protective safeguards to which this*
*endorsement applies are identified by the*
*following symbols:*
*a. "P-1" Automatic Sprinkler System,*

2



**GOODMAN-GABLE-GOULD/ADJUSTERS INTERNATIONAL**

*including related supervisory services.*
*Automatic Sprinkler System means:*

In view of this Policy Condition, had the insured drained the lines and did not maintain an operational fire suppression system, this would void coverage under the policy. Therefore, the insured's only option so as to comply with the policy conditions is to provide heat to the building, which by your own acknowledgment the insured did.  I direct your attention to an excerpt from Mr. Bradley's report. It reads as follows:

*No information was provided on the type of heat used in the building. Based on the increased usage of natural gas during the heating season and the lack of gas usage during the warm seasons, the building is heated with natural gas. Natural gas usage increases similar to the HDD during the 2023/2024 and 2024/2025 seasons, consistent with an attempt to heat the property. The electrical usage remained steady throughout the prior year, indicating electrical service has been maintained in the building. Based on the information provided, an attempt was made to maintain heat in the building. Although the exact cause of the water losses could not be determined with the provided information, freezing in multiple areas of the building is consistent with inadequate heat inside the building. A power interruption, natural gas interruption, or furnace thermostat setting that is too low could contribute to the loss.*

On the basis of the investigative report generated by your retained consultant, it is indisputable that the insured complied with its obligation under the policy to take measures to protect the system from freezing. Given this fact, the insured was in compliance with the requirement.  Accordingly, Liberty's denial is not warranted, and coverage must be afforded for the loss.

Furthermore, your speculative theories that the insured did not maintain adequate heat, or there was a power interruption or some other unidentified issue with the heating system are totally without merit and indefensible. . Here, it is an indisputable fact that the insured complied with the letter of the requirements of the Vacancy Provision. By taking the position that you did, you are not only speculating as to potential conditions outside of the control of the insured, but more so, are expanding the scope of the Exclusion by including language which does not exist in the policy in an effort to defeat coverage for this loss.

In my opinion, this is an egregiously wrongful denial which should be immediately rescinded, coverage afforded, and the claim paid.

Should you have any questions or wish to discuss this matter directly, please advise. Otherwise, I will look forward to your response.

Respectfully,

**Anthony J. D'Amico SPPA**
Senior Vice President
CA License #2M08746
**Goodman Gable Gould/Adjusters International**
CA Corporate License #2L93134
9011 Arboretum Parkway, Suite 302 | Richmond, Virginia 23236
O: 804.897.8626 | Cell: 804.677.4933
tdamico@gggco.com
www.ggg-ai.com

c:    Dr. Alan Golden, ahgolden@aol.com (sent via email)
      Andy Macleay, amacleay@gggco.com (sent via email)

3

# EXHIBIT 3

**From: Schmidt, Frank** frank.schmidt01@libertymutual.com
**Subject:** RE: Re: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC
**Date:** August 19, 2025 at 7:56 PM
**To:** tom@virginia-lawyers.net



Douglas Hunt was the adjuster for this claim.
Douglas.Hunt@libertymutual.com
304-533-7462

**From:** tom@virginia-lawyers.net <tom@virginia-lawyers.net>
**Sent:** Tuesday, August 19, 2025 4:16 PM
**To:** Schmidt, Frank <frank.schmidt01@libertymutual.com>
**Cc:** Christine Langenberg <christine@virginia-lawyers.net>; Mr. Tony D'Amico
<tdamico@gggai.com>; Alan Golden <ahgolden@aol.com>
**Subject:** {EXTERNAL} Re: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC

I assume from your email that you still work with Liberty Mutual and that you were involved with the adjustment of the case. Can you tell me who is the adjuster and what is his or her email?

*C. Thomas Brown, Esquire.*
Va. State Bar No.: 23743
Member of Maryland Bar
**Law Offices of Silver & Brown**
A Professional Corporation
Red Maple Court
10621 Jones Street
Suite 101 Fairfax,
Virginia 22030
Telephone    (703) 591-6666
Facsimile    (703) 591-5618

-------------------

The information contained in this e-mail message is ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION intended ONLY for the use of the individual or entity named herein. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone at (703) 591-6666, return the original message by reply e-mail, and then delete it from your system. Thank you for your anticipated cooperation.

On Aug 19, 2025, at 3:58 PM, Schmidt, Frank <frank.schmidt01@libertymutual.com> wrote:

I am not the adjuster for this claim.

**From:** tom@virginia-lawyers.net <tom@virginia-lawyers.net>
**Sent:** Tuesday, August 19, 2025 2:52 PM
**To:** Schmidt, Frank <frank.schmidt01@libertymutual.com>; Senn, Becky <becky.senn@libertymutual.com>
**Cc:** Christine Langenberg <christine@virginia-lawyers.net>; Tony D'Amaico <tdamico@gggai.com>; Alan Golden <ahgolden@aol.com>
**Subject:** {EXTERNAL} Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC

Dear Mr. Schmidt and Ms. Senn

Enclosed is a letter requesting the insurer to withdraw its denial. Should the insurer refuse suit will be filed seeking imposition of attorneys fees under Va. Code § 38.2-209. I remain available to speak with you about this. At this point the Insured has incurred costs with various plumbers and a water restoration company. In addition I have attached the rebuild and restoration estimate. At this point the amount of the loss is currently $839,554.90 at Replacement Cost. The claim at ACV is $779,994.02 with a recoverable depreciation of $59,560.88.

In addition the claim against Liberty Mutual will include carrying costs for the property since the failure of the insurer to pay the claim has precluded the sale of the property.

A written response substantively responding to the letter is demanded.

# EXHIBIT 4



**From:** tom@virginia-lawyers.net 📎
**Subject:** Fwd: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC
**Date:** August 20, 2025 at 8:18 AM
**To:** Douglas.Hunt@libertymutual.com
**Cc:** Christine Langenberg christine@virginia-lawyers.net, C. Thomas Brown tom@virginia-lawyers.net, Schmidt, Frank frank.schmidt01@libertymutual.com, becky.senn@libertymutual.com
**Bcc:** Mr. Tony D'Amico tdamico@gggai.com, Alan Golden ahgolden@aol.com

Mr. Hunt below is an email sent to Liberty Mutual. That email states as follows and a timely response is demanded. As you can see from the letter the claim at this point is $7790,994.02 ACV with a recoverable depreciation of $59,560.88. If Liberty Mutual seeks a proof of loss please send the forms, otherwise we will look for the insurer to reopen and pay this claim.

Enclosed is a letter requesting the insurer to withdraw its denial. Should the insurer refuse suit will be filed seeking imposition of attorneys fees under Va. Code § 38.2-209. I remain available to speak with you about this. At this point the Insured has incurred costs with various plumbers and a water restoration company. In addition I have attached the rebuild and restoration estimate. At this point the amount of the loss is currently $839,554.90 at Replacement Cost. The claim at ACV is $779,994.02 with a recoverable depreciation of $59,560.88.

In addition the claim against Liberty Mutual will include carrying costs for the property since the failure of the insurer to pay the claim has precluded the sale of the property.

A written response substantively responding to the letter is demanded.

**1. Plumbing Heroes EMERGENCY WATER LEAK FLOODING ...**
149 KB


**2. Fire Sprinkler Repair Invoice copy.pdf**


**3. Invoice_1710250023MIT_from_...**
20 KB


**4. DR ALLEN GOLDEN_R1 4-16-25 copy.pdf**
2.4 MB


**6. Damages.pdf**


**Semper Dry Water Removal**
497 Lendall Ln #105
Fredericksburg, VA 22405
+15406422446
office@semperdrywr.com

# Invoice 1710-25-0023-MIT



**BILL TO**
Alan Golden
Oro Master Sub 2 LLC



| DATE | SERVICE | AMOUNT |
|---|---|---|
| 02/03/2025 | **Water Mitigation** | 224,378.07 |

Please pay via link provided.
We have sent your claim to your insurance but have
not received payment or a response. If you have
been paid please make payment ASAP. Thank you.

| TOTAL DUE | $224,378.07 |
|---|---|

THANK YOU.

YOU MAY PAY YOUR INVOICE VIA THE PAYMENT LINK PROVIDED TO YOU THRU EMAIL.
Please feel free to contact us if you did not receive the link.
Thank you for trusting Semper Dry Water Removal!!!

**8.19.25 TB to Liberty Mutual.pdf**
326 KB

*C. Thomas Brown, Esquire*
Va. State Bar No.: 23743
Member of Maryland Bar
*Law Offices of Silver & Brown*
A Professional Corporation
Red Maple Court
10621 Jones Street
Suite 101 Fairfax,
Virginia 22030
Telephone   (703) 591-6666
Facsimile    (703) 591-5618

Facsimile    (703) 591-6616

--------------------

The information contained in this e-mail message is ATTORNEY PRIVILEGED AND
CONFIDENTIAL INFORMATION intended ONLY for the use of the individual or
entity named herein. If you are not the intended recipient or the employee
or agent responsible for delivering it to the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this
communication in error, please immediately notify the sender by telephone at
(703) 591-6666, return the original message by reply e-mail, and then delete
it from your system. Thank you for your anticipated cooperation.

Begin forwarded message:

**From:** "tom@virginia-lawyers.net" <tom@virginia-lawyers.net>
**Subject: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC**
**Date:** August 19, 2025 at 2:51:39 PM EDT
**To:** frank.schmidt01@libertymutual.com, becky.senn@libertymutual.com
**Cc:** Christine Langenberg <christine@virginia-lawyers.net>, Tony D'Amaico <tdamico@gggai.com>, Alan Golden <ahgolden@aol.com>

Dear Mr. Schmidt and Ms. Senn

Enclosed is a letter requesting the insurer to withdraw its denial. Should the insurer refuse suit will be filed seeking imposition of attorneys fees under Va. Code § 38.2-209. I remain available to speak with you about this. At this point the Insured has incurred costs with various plumbers and a water restoration company. In addition I have attached the rebuild and restoration estimate. At this point the amount of the loss is currently $839,554.90 at Replacement Cost. The claim at ACV is $779,994.02 with a recoverable depreciation of $59,560.88.

In addition the claim against Liberty Mutual will include carrying costs for the property since the failure of the insurer to pay the claim has precluded the sale of the property.

A written response substantively responding to the letter is demanded.

**8.19.25 TB to Liberty Mutual.pdf**

**1. Plumbing Heroes EMERGENCY
WATER LEAK FLOODING ...**

Builders Fire Solutions LLC                                    **Invoice**

# EXHIBIT 5

**From: Hunt, Douglas** Douglas.Hunt@libertymutual.com
**Subject:** RE: Fwd: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC
**Date:** August 22, 2025 at 2:04 PM
**To:** tom@virginia-lawyers.net
**Cc:** Christine Langenberg christine@virginia-lawyers.net, Schmidt, Frank Frank.Schmidt01@libertymutual.com, Senn, Becky Becky.Senn@libertymutual.com

Good afternoon,
We have reviewed the information contained in your email and acknowledged the letter of representation. We maintain our coverage position and have attached a copy of the original coverage position letter your file.

Respectfully,

Douglas Hunt
General Adjuster, Large Loss Property Claims

State Auto Insurance / Liberty Mutual Insurance
PO Box 182822, Columbus, OH 43218-2822
Cell: 304-533-7462
FL Lic.#W313967
douglas.hunt@stateauto.com / douglas.hunt@libertymutual.com

> **From:** tom@virginia-lawyers.net <tom@virginia-lawyers.net>
> **Sent:** Wednesday, August 20, 2025 8:19 AM
> **To:** Hunt, Douglas <Douglas.Hunt@libertymutual.com>
> **Cc:** Christine Langenberg <christine@virginia-lawyers.net>; C. Thomas Brown <tom@virginia-lawyers.net>; Schmidt, Frank <frank.schmidt01@libertymutual.com>; Senn, Becky <becky.senn@libertymutual.com>
> **Subject:** {EXTERNAL} Fwd: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC
>
> Mr. Hunt below is an email sent to Liberty Mutual. That email states as follows and a timely response is demanded. As you can see from the letter the claim at this point is $7790,994.02 ACV with a recoverable depreciation of $59,560.88. If Liberty Mutual seeks a proof of loss please send the forms, otherwise we will look for the insurer to reopen and pay this claim.
>
>> Enclosed is a letter requesting the insurer to withdraw its denial. Should the insurer refuse suit will be filed seeking imposition of attorneys fees under Va. Code § 38.2-209. I remain available to speak with you about this. At this point the Insured has incurred costs with various plumbers and a water restoration company. In addition I have attached the rebuild and restoration estimate. At this point the amount of the loss is currently $839,554.90 at Replacement Cost. The claim at ACV is $779,994.02 with a recoverable depreciation of $59,560.88.
>>
>> In addition the claim against Liberty Mutual will include carrying costs for the property since the failure of the insurer to pay the claim has precluded the sale of the property.

A written response substantively responding to the letter is demanded.

**ORO MASTER SUB 2,**
**LLC_Coverage Position Letter.pdf**

# EXHIBIT 6

LAW OFFICES
OF
# SILVER & BROWN
A PROFESSIONAL CORPORATION
RED MAPLE COURT
10621 JONES ST., SUITE 101
FAIRFAX, VIRGINIA 22030

C. THOMAS BROWN†
GLENN H. SILVER*
ERIK B. LAWSON^
CAITLIN B. ONG°
  † (VA, MD)
  * (VA, DC, NY)
  ^ (VA, DC, MD)
  ° (VA, DC)

Telephone  (703) 591-6666
Facsimile   (703) 591-5618

Writers Email:
tom@virginia-lawyers.net

August 28, 2025

Mr. Doulgas Hunt
General Adjuster / Large Loss Property
Liberty Mutual Insurance
P.O. Box 5014
Scranton, PA 18505-5014

> **RE:**    **Insured: ORO MASTER SUB 2, LLC**
> **Loss Location: 238 Potomac Ave, Quantico, VA 22134**
> **Date of Loss: 1/23/2025**
> **Policy Number: BZS640984094**
> **Claim Number: 24244628**

Dear Mr. Hunt,

I am in receipt of your email which states as follows:

> We have reviewed the information contained in your email and
> acknowledged the letter of representation. We maintain our coverage
> position and have attached a copy of the original coverage position letter
> your file.

With all due deference, Liberty Mutual's denial is based upon facts manufactured by
Liberty Mutual and which facts do not exist. This loss was limited to 2 frozen sprinkler
pipes, which sprinkler pipes are part of the fire suppression system. The domestic water
was turned off. The repair invoice for the broken pipes leading to this loss
reflects repairs to sprinkler pipes. A denial cannot under this policy be predicated on
frozen sprinkler lines.

August 28, 2025
Page 2 of 3

DESPITE THIS, Liberty Mutual created facts which do not exist. Liberty Mutual acknowledged that the sprinkler pipes froze but then Liberty Mutual FALSELY STATED THAT 2 DOEMESTIC WATER LINES ALSO FROZE. Liberty Mutual was given an opportunity to address this misrepresentation in my last letter, but for some in explicable reason has chosen not to do so. The representation by Liberty Mutual is demonstrably false.

First, there were no broken lines other than the sprinkler lines which lead to this loss. Liberty Mutual's claim that there were 2 broken water supply lines is a fabrication by Liberty Mutual. If Liberty Mutual stands behind its fraudulently based denial, it is required under Virginia Settlement Practices Act to provide to its insured facts to support this denial.
- Provide photos of the non-sprinkler lines which Liberty Mutual claims froze.
- Provide the location of the lines.
- Provide some evidence that these lines froze.
- Provide some explanation for how non sprinkler water lines not connected to a water supply source could cause water damage

Second, the building had been winterized (see invoice attached), and no water was supplied to the domestic water system. Water supply was limited to the sprinkler systems. Accordingly, the domestic water lines had no water in them and could not have frozen. The domestic water lines had no water supplied to them, so no water could discharge from them even if they did break.

Here, Liberty Mutual denied the claim based on FALSE facts which Liberty Mutual manufactured. It was based on these falsified facts that Liberty Mutual denied the claim. This is insurance fraud, plain and simple.

After we pointed this out in the letter, your email states, "We maintain our coverage position and have attached a copy of the original coverage position letter your file." This position is absurd. It fails to provide any support for the factual basis upon which Liberty Mutual predicates its denial. By your silence, I take it that Liberty Mutual concedes that it in fact did manufacture fraudulent facts to support a claim denial. Your refusal to address these facts is a tacit admission of Liberty Mutual's insurance fraud. In the 41 years of handling first-party claims, I have never had a case in which an insurance company fabricated facts, denied the claim based on the false facts it created, and then when shown that the facts did not exist, doubled down.

Liberty Mutual is given one final opportunity to withdraw its denial and pay this claim. Failure to do so will result in both a suit and a letter directed to the Virginia Attorney General's office asking for an investigation into this insurance fraud and requesting the Bureau of Insurance to withdraw Liberty Mutual's ability to write insurance in this state.

August 28, 2025
Page 3 of 3

A written response which substantively addresses the issues in my letter of 8-19-2025 is demanded.

Very truly yours,

C. Thomas Brown

C. Thomas Brown

CTB:jcl

Enclosure

# EXHIBIT 7

**From:** tom@virginia-lawyers.net
**Subject:** Re: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC
**Date:** August 28, 2025 at 11:45 AM
**To:** Hunt, Douglas Douglas.Hunt@libertymutual.com
**Cc:** Christine Langenberg christine@virginia-lawyers.net
**Bcc:** Mr. Tony D'Amico tdamico@gggai.com, Deanna Friedel DFriedel@gggco.com, Andy Macleay amacleay@gggco.com

Mr. Hunt,

Enclosed is a letter to which a substantive response is demanded. This letter addresses the fraudulent facts that Liberty Mutual has manufactured in an attempt to deny this claim. Your attention to this matter is advised.

**8.28.25 TB to Daniel Hunt.pdf**
202 KB



**invoice.pdf**
15 KB



*C. Thomas Brown, Esquire*
Va. State Bar No.: 23743
Member of Maryland Bar
**Law Offices of Silver & Brown**
A Professional Corporation
Red Maple Court
10621 Jones Street
Suite 101 Fairfax,
Virginia 22030
Telephone   (703) 591-6666
Facsimile   (703) 591-5618

--------------------
The information contained in this e-mail message is ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION intended ONLY for the use of the individual or entity named herein. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone at (703) 591-6666, return the original message by reply e-mail, and then delete it from your system. Thank you for your anticipated cooperation.

On Aug 22, 2025, at 2:04 PM, Hunt, Douglas <Douglas.Hunt@libertymutual.com> wrote:

Good afternoon,
We have reviewed the information contained in your email and acknowledged the letter of representation. We maintain our coverage position and have attached a copy of the original coverage position letter your file.

Respectfully,

Douglas Hunt
General Adjuster, Large Loss Property Claims

State Auto Insurance / Liberty Mutual Insurance
PO Box 182822, Columbus, OH 43218-2822
Cell: 304-533-7462
FL Lic.#W313967
douglas.hunt@stateauto.com / douglas.hunt@libertymutual.com

**From:** tom@virginia-lawyers.net <tom@virginia-lawyers.net>
**Sent:** Wednesday, August 20, 2025 8:19 AM
**To:** Hunt, Douglas <Douglas.Hunt@libertymutual.com>
**Cc:** Christine Langenberg <christine@virginia-lawyers.net>; C. Thomas Brown
<tom@virginia-lawyers.net>; Schmidt, Frank <frank.schmidt01@libertymutual.com>;
Senn, Becky <becky.senn@libertymutual.com>
**Subject:** {EXTERNAL} Fwd: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC

Mr. Hunt below is an email sent to Liberty Mutual.  That email states as
follows and a timely response is demanded.  As you can see from the letter
the claim at this point is $7790,994.02 ACV with a recoverable depreciation
of $59,560.88.  If Liberty Mutual seeks a proof of loss please send the
forms, otherwise we will look for the insurer to reopen and pay this claim.

> Enclosed is a letter requesting the insurer to withdraw its denial.
> Should the insurer refuse suit will be filed seeking imposition of
> attorneys fees under Va. Code § 38.2-209.  I remain available to
> speak with you about this.  At this point the Insured has incurred
> costs with various plumbers and a water restoration company.
> In addition I have attached the rebuild and restoration estimate.
> At this point the amount of the loss is currently $839,554.90 at
> Replacement Cost.  The claim at ACV is $779,994.02 with a
> recoverable depreciation of $59,560.88.
>
> In addition the claim against Liberty Mutual will include carrying
> costs for the property since the failure of the insurer to pay the
> claim has precluded the sale of the property.
>
> A written response substantively responding to the letter is
> demanded.

ORO MASTER SUB 2,
LLC_Coverage Position Letter.pdf
317 KB



# EXHIBIT 8

**From:** tom@virginia-lawyers.net
**Subject:** Re: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC
**Date:** September 3, 2025 at 12:36 PM
**To:** Hunt, Douglas Douglas.Hunt@libertymutual.com
**Cc:** Christine Langenberg christine@virginia-lawyers.net
**Bcc:** Mr. Tony D'Amico tdamico@gggai.com, Deanna Friedel DFriedel@gggco.com, Andy Macleay amacleay@gggco.com

Mr. Hunt

I would like a timely response to my letter of 8.28.25.  Thanks.

*C. Thomas Brown, Esquire*
Va. State Bar No.: 23743
Member of Maryland Bar
**Law Offices of Silver & Brown**
A Professional Corporation
Red Maple Court
10621 Jones Street
Suite 101 Fairfax,
Virginia 22030
Telephone   (703) 591-6666
Facsimile   (703) 591-5618

--------------------
The information contained in this e-mail message is ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION intended ONLY for the use of the individual or entity named herein.  If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify the sender by telephone at (703) 591-6666, return the original message by reply e-mail, and then delete it from your system.  Thank you for your anticipated cooperation.

On Aug 28, 2025, at 11:45 AM, tom@virginia-lawyers.net wrote:

Mr. Hunt,

Enclosed is a letter to which a substantive response is demanded.  This letter addresses the fraudulent facts that Liberty Mutual has manufactured in an attempt to deny this claim.  Your attention to this matter is advised.

<8.28.25  TB to Daniel Hunt.pdf>
<invoice.pdf>

*C. Thomas Brown, Esquire*
Va. State Bar No.: 23743
Member of Maryland Bar
**Law Offices of Silver & Brown**
A Professional Corporation
Red Maple Court
10621 Jones Street
Suite 101 Fairfax,
Virginia 22030
Telephone   (703) 591-6666
Facsimile   (703) 591-5618

-------------------
The information contained in this e-mail message is ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION intended ONLY for the use of the individual or entity named herein. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone at (703) 591-6666, return the original message by reply e-mail, and then delete it from your system. Thank you for your anticipated cooperation.

On Aug 22, 2025, at 2:04 PM, Hunt, Douglas <Douglas.Hunt@libertymutual.com> wrote:

Good afternoon,
We have reviewed the information contained in your email and acknowledged the letter of representation. We maintain our coverage position and have attached a copy of the original coverage position letter your file.

Respectfully,

Douglas Hunt
General Adjuster, Large Loss Property Claims

State Auto Insurance / Liberty Mutual Insurance
PO Box 182822, Columbus, OH 43218-2822
Cell: 304-533-7462
FL Lic.#W313967
douglas.hunt@stateauto.com / douglas.hunt@libertymutual.com

**From:** tom@virginia-lawyers.net <tom@virginia-lawyers.net>
**Sent:** Wednesday, August 20, 2025 8:19 AM
**To:** Hunt, Douglas <Douglas.Hunt@libertymutual.com>
**Cc:** Christine Langenberg <christine@virginia-lawyers.net>; C. Thomas Brown <tom@virginia-lawyers.net>; Schmidt, Frank <frank.schmidt01@libertymutual.com>; Senn, Becky <becky.senn@libertymutual.com>
**Subject:** {EXTERNAL} Fwd: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC

Mr. Hunt below is an email sent to Liberty Mutual. That email states as follows and a timely response is demanded. As you can see from the letter the claim at this point is $7790,994.02 ACV with a recoverable depreciation of $59,560.88. If Liberty Mutual seeks a proof of loss please send the forms, otherwise we will look for the insurer to reopen and pay this claim.

Enclosed is a letter requesting the insurer to withdraw its denial. Should the insurer refuse suit will be filed seeking imposition of attorneys fees under Va. Code § 38.2-209. I remain available to speak with you about this. At this point the Insured has incurred costs with various plumbers and a water

restoration company. In addition I have attached the rebuild and restoration estimate. At this point the amount of the loss is currently $839,554.90 at Replacement Cost. The claim at ACV is $779,994.02 with a recoverable depreciation of $59,560.88.

In addition the claim against Liberty Mutual will include carrying costs for the property since the failure of the insurer to pay the claim has precluded the sale of the property.

A written response substantively responding to the letter is demanded.

<ORO MASTER SUB 2, LLC_Coverage Position Letter.pdf>

# EXHIBIT 9

**From: Hunt, Douglas** Douglas.Hunt@libertymutual.com
**Subject:** Automatic reply: Re: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC
**Date:** September 3, 2025 at 12:37 PM
**To:** tom@virginia-lawyers.net



Hello, and thank you for your email. I will be out of the office with limited access to email and voicemail from August 29,2025. I will return to the office on Monday, September 8,2025 @ 8am EST and will respond to your email at my first opportunity.   I appreciate your understanding.   If this an urgent matter, please contact Missy Midlik @ 931-374-6884 or melissa.midlik@libertymutual.com

# EXHIBIT 10



**From: Hunt, Douglas** Douglas.Hunt@libertymutual.com
**Subject:** RE: Re: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC
**Date:** September 8, 2025 at 1:40 PM
**To:** tom@virginia-lawyers.net, ahgolden@aol.com
**Cc:** Christine Langenberg christine@virginia-lawyers.net

Mr. Brown,

As you may know, I was out of the office last week. However, we have received and reviewed your email from 8/28/25 containing an invoice for winterization work dated 11/22/21. Our coverage position remains the same and another copy of our original coverage position letter dated 4/3/2025 has been attached herein.

Respectfully,

Douglas Hunt
General Adjuster, Large Loss Property Claims

State Auto Insurance / Liberty Mutual Insurance
PO Box 182822, Columbus, OH 43218-2822
Cell: 304-533-7462
FL Lic.#W313967
douglas.hunt@stateauto.com / douglas.hunt@libertymutual.com

> **From:** tom@virginia-lawyers.net <tom@virginia-lawyers.net>
> **Sent:** Wednesday, September 3, 2025 12:37 PM
> **To:** Hunt, Douglas <Douglas.Hunt@libertymutual.com>
> **Cc:** Christine Langenberg <christine@virginia-lawyers.net>
> **Subject:** {EXTERNAL} Re: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC
>
> Mr. Hunt
>
> I would like a timely response to my letter of 8.28.25.  Thanks.
>
> *C. Thomas Brown, Esquire*
> Va. State Bar No.: 23743
> Member of Maryland Bar
> **Law Offices of Silver & Brown**
> A Professional Corporation
> Red Maple Court
> 10621 Jones Street
> Suite 101 Fairfax,
> Virginia 22030
> Telephone   (703) 591-6666
> Facsimile    (703) 591-5618
>
>
> --------------------
> The information contained in this e-mail message is ATTORNEY PRIVILEGED AND
> CONFIDENTIAL INFORMATION intended ONLY for the use of the individual or
> entity named herein. If you are not the intended recipient or the employee

entity named herein. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone at (703) 591-6666, return the original message by reply e-mail, and then delete it from your system. Thank you for your anticipated cooperation.

On Aug 28, 2025, at 11:45 AM, tom@virginia-lawyers.net wrote:

Mr. Hunt,

Enclosed is a letter to which a substantive response is demanded. This letter addresses the fraudulent facts that Liberty Mutual has manufactured in an attempt to deny this claim. Your attention to this matter is advised.

<8.28.25 TB to Daniel Hunt.pdf>
<invoice.pdf>

*C. Thomas Brown, Esquire*
Va. State Bar No.: 23743
Member of Maryland Bar
**Law Offices of Silver & Brown**
A Professional Corporation
Red Maple Court
10621 Jones Street
Suite 101 Fairfax,
Virginia 22030
Telephone  (703) 591-6666
Facsimile  (703) 591-5618

-------------------
The information contained in this e-mail message is ATTORNEY PRIVILEGED AND
CONFIDENTIAL INFORMATION intended ONLY for the use of the individual or
entity named herein. If you are not the intended recipient or the employee
or agent responsible for delivering it to the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this
communication in error, please immediately notify the sender by telephone at
(703) 591-6666, return the original message by reply e-mail, and then delete
it from your system. Thank you for your anticipated
cooperation.

cooperation.

On Aug 22, 2025, at 2:04 PM, Hunt, Douglas
<Douglas.Hunt@libertymutual.com> wrote:

Good afternoon,
We have reviewed the information contained in your email
and acknowledged the letter of representation. We
maintain our coverage position and have attached a copy
of the original coverage position letter your file.

Respectfully,

Douglas Hunt
General Adjuster, Large Loss Property Claims

State Auto Insurance / Liberty Mutual Insurance
PO Box 182822, Columbus, OH 43218-2822
Cell: 304-533-7462
FL Lic.#W313967
douglas.hunt@stateauto.com / douglas.hunt@libertymutual
.com

**From:** tom@virginia-lawyers.net <tom@virginia-lawyers.net>
**Sent:** Wednesday, August 20, 2025 8:19 AM
**To:** Hunt, Douglas <Douglas.Hunt@libertymutual.com>
**Cc:** Christine Langenberg <christine@virginia-lawyers.net>; C. Thomas Brown <tom@virginia-lawyers.net>; Schmidt, Frank <frank.schmidt01@libertymutual.com>; Senn, Becky <becky.senn@libertymutual.com>
**Subject:** {EXTERNAL} Fwd: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC

Mr. Hunt below is an email sent to Liberty
Mutual.  That email states as follows and a
timely response is demanded.  As you can see
from the letter the claim at this point is
$7790,994.02 ACV with a recoverable
depreciation of $59,560.88.  If Liberty Mutual
seeks a proof of loss please send the forms,
otherwise we will look for the insurer to reopen
and pay this claim.

Enclosed is a letter requesting the
insurer to withdraw its denial.
Should the insurer refuse suit will

~~Should the insurer refuse suit will~~ be filed seeking imposition of attorneys fees under Va. Code § 38.2-209.  I remain available to speak with you about this.  At this point the Insured has incurred costs with various plumbers and a water restoration company.  In addition I have attached the rebuild and restoration estimate.  At this point the amount of the loss is currently $839,554.90 at Replacement Cost.  The claim at ACV is $779,994.02 with a recoverable depreciation of $59,560.88.

In addition the claim against Liberty Mutual will include carrying costs for the property since the failure of the insurer to pay the claim has precluded the sale of the property.

A written response substantively responding to the letter is demanded.

\

<ORO MASTER SUB 2, LLC_Coverage Position Letter.pdf>

**ORO MASTER SUB 2,
LLC_Coverage Position Letter.pdf**
317 KB



# EXHIBIT 11

**From:** tom@virginia-lawyers.net
**Subject:** Re: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC
**Date:** September 8, 2025 at 3:34 PM
**To:** Hunt, Douglas Douglas.Hunt@libertymutual.com
**Cc:** Alan Golden ahgolden@aol.com, Christine Langenberg christine@virginia-lawyers.net



Mr. Hunt

Please respond to the substance of my letter. Your adjuster falsely claimed that there were water leaks from the water supply lines, other than the sprinkler break. This is simply false. The only broken pipes in this case occurred to sprinkler lines. MOREOVER THE ENTIRE BASIS OF THE DENIAL WAS BASED ON THESE WATER SUPPLY LEAKS WHICH DID NOT OCCUR AND COULD NOT HAVE OCCURRED. Please let me know whether you claim there were leaks other than to the sprinkler lines. Your failures to respond will be the basis of not only a suit, but a request to the State Corporation Commission Bureau of Insurance requesting that the ability of Liberty Mutual be suspended.

Please respond to this letter providing a substantive response.

*C. Thomas Brown, Esquire*
Va. State Bar No.: 23743
Member of Maryland Bar
*Law Offices of Silver & Brown*
A Professional Corporation
Red Maple Court
10621 Jones Street
Suite 101 Fairfax,
Virginia 22030
Telephone   (703) 591-6666
Facsimile   (703) 591-5618

--------------------

The information contained in this e-mail message is ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION intended ONLY for the use of the individual or entity named herein. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone at (703) 591-6666, return the original message by reply e-mail, and then delete it from your system. Thank you for your anticipated cooperation.

On Sep 8, 2025, at 1:40 PM, Hunt, Douglas <Douglas.Hunt@libertymutual.com> wrote:

Mr. Brown,
As you may know, I was out of the office last week. However, we have received and reviewed your email from 8/28/25 containing an invoice for winterization work dated 11/22/21. Our coverage position remains the same and another copy of our original coverage position letter dated 4/3/2025 has been attached herein.

Respectfully,

Douglas Hunt
General Adjuster, Large Loss Property Claims

State Auto Insurance / Liberty Mutual Insurance
PO Box 182822, Columbus, OH 43218-2822
Cell: 304-533-7462
FL Lic.#W313967
douglas.hunt@stateauto.com / douglas.hunt@libertymutual.com

**From:** tom@virginia-lawyers.net <tom@virginia-lawyers.net>
**Sent:** Wednesday, September 3, 2025 12:37 PM
**To:** Hunt, Douglas <Douglas.Hunt@libertymutual.com>
**Cc:** Christine Langenberg <christine@virginia-lawyers.net>
**Subject:** {EXTERNAL} Re: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC

Mr. Hunt

I would like a timely response to my letter of 8.28.25.  Thanks.

*C. Thomas Brown, Esquire*
Va. State Bar No.: 23743
Member of Maryland Bar
**Law Offices of Silver & Brown**
A Professional Corporation
Red Maple Court
10621 Jones Street
Suite 101 Fairfax,
Virginia 22030
Telephone   (703) 591-6666
Facsimile   (703) 591-5618

--------------------
The information contained in this e-mail message is ATTORNEY
PRIVILEGED AND
CONFIDENTIAL INFORMATION intended ONLY for the use of the
individual or
entity named herein.  If you are not the intended recipient or the employee
or agent responsible for delivering it to the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
communication is strictly prohibited.  If you have received this
communication in error, please immediately notify the sender by telephone
at
(703) 591-6666, return the original message by reply e-mail, and then delete
it from your system.  Thank you for your anticipated cooperation.

On Aug 28, 2025, at 11:45 AM, tom@virginia-lawyers.net wrote:

Mr. Hunt,

Enclosed is a letter to which a substantive response is demanded.  This
letter addresses the fraudulent facts that Liberty Mutual has
manufactured in an attempt to deny this claim.  Your attention to this
matter is advised.

<8.28.25. TB to Daniel Hunt.pdf>

<8.28.25 TB to Daniel Hunt.pdf>
<invoice.pdf>


*C. Thomas Brown, Esquire*
Va. State Bar No.: 23743
Member of Maryland Bar
*Law Offices of Silver & Brown*
A Professional Corporation
Red Maple Court
10621 Jones Street
Suite 101 Fairfax,
Virginia 22030
Telephone    (703) 591-6666
Facsimile     (703) 591-5618


--------------------
The information contained in this e-mail message is
ATTORNEY PRIVILEGED AND
CONFIDENTIAL INFORMATION intended ONLY for the use
of the individual or
entity named herein.  If you are not the intended recipient or
the employee
or agent responsible for delivering it to the intended recipient,
you are
hereby notified that any dissemination, distribution or copying
of this
communication is strictly prohibited.  If you have received this
communication in error, please immediately notify the sender
by telephone at
(703) 591-6666, return the original message by reply e-mail, and
then delete
it from your system.  Thank you for your anticipated
cooperation.


On Aug 22, 2025, at 2:04 PM, Hunt, Douglas
<Douglas.Hunt@libertymutual.com> wrote:

Good afternoon,
We have reviewed the information contained in your
email and acknowledged the letter of representation. We
maintain our coverage position and have attached a copy
of the original coverage position letter your file.

Respectfully,

Douglas Hunt
General Adjuster, Large Loss Property Claims

State Auto Insurance / Liberty Mutual Insurance

PO Box 182822, Columbus, OH 43218-2822
Cell: 304-533-7462
FL Lic.#W313967
douglas.hunt@stateauto.com /
douglas.hunt@libertymutual.com

---

**From:** tom@virginia-lawyers.net <tom@virginia-lawyers.net>
**Sent:** Wednesday, August 20, 2025 8:19 AM
**To:** Hunt, Douglas <Douglas.Hunt@libertymutual.com>
**Cc:** Christine Langenberg <christine@virginia-lawyers.net>; C. Thomas Brown <tom@virginia-lawyers.net>; Schmidt, Frank <frank.schmidt01@libertymutual.com>; Senn, Becky <becky.senn@libertymutual.com>
**Subject:** {EXTERNAL} Fwd: Claim Number: 24244628 - Insured: ORO MASTER SUB 2, LLC

Mr. Hunt below is an email sent to Liberty Mutual. That email states as follows and a timely response is demanded. As you can see from the letter the claim at this point is $7790,994.02 ACV with a recoverable depreciation of $59,560.88. If Liberty Mutual seeks a proof of loss please send the forms, otherwise we will look for the insurer to reopen and pay this claim.

> Enclosed is a letter requesting the insurer to withdraw its denial. Should the insurer refuse suit will be filed seeking imposition of attorneys fees under Va. Code § 38.2-209. I remain available to speak with you about this. At this point the Insured has incurred costs with various plumbers and a water restoration company. In addition I have attached the rebuild and restoration estimate. At this point the amount of the loss is currently $839,554.90 at Replacement Cost. The claim at ACV is $779,994.02 with a recoverable depreciation of $59,560.88.
>
> In addition the claim against

Liberty Mutual will include carrying costs for the property since the failure of the insurer to pay the claim has precluded the sale of the property.

A written response substantively responding to the letter is demanded.

<ORO MASTER SUB 2, LLC_Coverage Position Letter.pdf>

<ORO MASTER SUB 2, LLC_Coverage Position Letter.pdf>

# EXHIBIT 12

LAW OFFICES
OF

# SILVER & BROWN

A PROFESSIONAL CORPORATION
RED MAPLE COURT
10621 JONES ST., SUITE 101
FAIRFAX, VIRGINIA 22030

C. THOMAS BROWN†
GLENN H. SILVER*
ERIK B. LAWSON^
CAITLIN B. ONG°
 † (VA, MD)
 * (VA, DC, NY)
 ^ (VA, DC, MD)
 ° (VA, DC)

Telephone  (703) 591-6666
Facsimile  (703) 591-5618

Writers Email:
tom@virginia-lawyers.net

September 24, 2025

**VIA EMAIL estephens@cblaw.com**

E. Ford Stephens, Esquire
Christian & Barton, LLP
901 East Cary Street
Suite 1800
Richmond, Virginia 23219-4037

> **Re:     Insured: ORO MASTER SUB 2, LLC**
> **Loss Location: 238 Potomac Ave, Quantico, VA 22134**
> **Date of Loss: 1/23/2025**
> **Policy Number: BZS640984094**
> **Claim Number: 24244628**

Dear Ford:

Thank you for your letter dated September 22, 2025. I am glad that you are involved in the case; however, from the correspondence and email traffic it is clear that:

1. This claim was denied based upon Liberty Mutual's false claim that damage occurred from 2 domestic water pipes, and ignoring the fact that the only water supply to the building was to the sprinkler pipes, which froze and resulted in the water damage claim; and

2. Liberty Mutuals continued refusal to address the factual predicate to its wrongful denial-which refusal remains to date.

E. Ford Stephens, Esquire
Christian & Barton, LLP
September 24, 2025
Page 2 of 3

While you have supplied a letter and requested documents having nothing to do with the claim,[1] you letter fails to address the basis of the denial of this claim which has been pending for approximately 9 months. I would note that despite requesting a substantive response from the insurer for months, neither your letter nor any communication with Liberty Mutual has provided a substantive response to my prior letters and emails dated as follows:

- 8-19-25 to Frank Schmidt, and an email from him providing no substantive response but indicating that the case has been sent to Daniel Hunt.

- 8.20.25 email sending the above letter to Mr. Daniel Hunt requesting a substantive response.

- 8.22.25 email from Hunt providing no substantive response but indicating only that "we maintain our coverage position….".

- 8.28.25 letter to Daniel Hunt again requesting a substantive response.

- 9.3.25 email to Daniel Hunt requesting a substantive response.

- 9.8.25 email from Daniel Hunt again failing to supply a substantive response, stating only that "our coverage position remains the same."

- 9.8.25 letter to Daniel Hunt again asking for a substantive response.

- 9.22.25 letter from you again, not providing any substantive response by making an unreasonable request for records having nothing to do with this claim.

The above series of communications follows a letter dated May 1, 2025, from Tony D'Amico, which was also ignored by the insurer.

Given Liberty Mutual's absolute failures above, a lawsuit has already been prepared and is in the process of being filed. I will send you a courtesy copy upon filing. That suit requests attorney's fees under Va. Code section 38.2-209 given the repeated failures of Liberty Mutual to provide responses to its insured in this matter, its failure to provide any support for its denial, and its failure to adjust and pay this claim, which bad faith continues through today's date. While Liberty Mutual has now withdrawn its denial (presumably because it was denied without any grounds at all), the insurer has still not substantively responded to any of the communications referred to above, and has failed to provide any payment to the insured.

I look forward to receiving a substantive response to the multiple communications above. In addition, please contact your clients and let them know that we will be seeking to take

---

[1] If Liberty Mutual maintains that its document request is reasonable, please provide us with some explanation as to why the records are sought.

E. Ford Stephens, Esquire
Christian & Barton, LLP
September 24, 2025
Page 3 of 3

the depositions of Daniel Hunt and Frank Schmidt as soon as service of the suit has occurred.

Very truly yours,

C. Thomas Brown

CTB:jcl

cc:    Tony D'Amico
       Alan Golden

# EXHIBIT 13

LAW OFFICES
OF

# SILVER & BROWN

A PROFESSIONAL CORPORATION
RED MAPLE COURT
10621 JONES ST., SUITE 101
FAIRFAX, VIRGINIA 22030

---

C. THOMAS BROWN†
GLENN H. SILVER*
ERIK B. LAWSON^
CAITLIN B. ONG°
  † (VA, MD)
  * (VA, DC, NY)
  ^ (VA, DC, MD)
  ° (VA, DC)

Telephone  (703) 591-6666
Facsimile  (703) 591-5618

Writers Email:
tom@virginia-lawyers.net

October 7, 2025

**VIA EMAIL estephens@cblaw.com**

E. Ford Stephens, Esquire
Christian & Barton, LLP
901 East Cary Street
Suite 1800
Richmond, Virginia 23219-4037

> **Re:    Insured: ORO MASTER SUB 2, LLC**
> **Loss Location: 238 Potomac Ave, Quantico, VA 22134**
> **Date of Loss: 1/23/2025**
> **Policy Number: BZS640984094**
> **Claim Number: 24244628**

Dear Ford:

Thank you for your letter dated September 26, 2025. Just to be clear, the fact that Ohio Security Insurance Company (the "Insurer" or "Liberty Mutual") is reassessing its prior denial does not allow the insurer to ignore its denial and attempt to create duties on the insured. Of course, should Liberty Mutual withdraw its denial, which it should do since it is based upon fraudulent representations by its adjuster, we will certainly work with Liberty Mutual to have this claim adjusted and paid. I would note that Liberty Mutual has ignored five requests for a substantive response, which, of course, is violative of the Insurance Regulations.

THE ALLEGED BROKEN PIPES: As you know, this claim involved breaks to sprinkler pipes which, per the policy requirements, were fully functional and supplied with water. Those breaks caused extreme damage to the building, which Liberty Mutual has ignored.

E. Ford Stephens, Esquire
Christian & Barton, LLP
October 7, 2025
Page 2 of 6

As noted, those sprinklers were connected to the city water supply through a standpipe system.

However, Liberty Mutual's Frank Schmidt falsely claimed that another domestic water pipe or pipes also broke, causing damage. According to your letter, Mr. Schmidt attributes that to a statement made by Dr. Golden on January 28, 2025. This is false, and Dr. Golden made no such statement to Mr. Schidt. Instead, what Mr. Schmidt was told was that while the sprinklers were connected to the city water supply, that the remaining water pipes in the building had been turned off and drained. You reference your engineering report. I would note that your engineer concedes that he never inspected the building but instead performed a "desk review" which apparently included reviewing the false background information presented to him by Frank Schmidt. In this regard, he apparently was told by Mr. Schmidt that there was "an area beneath a cabinet has plumbing lines that a plumber reportedly capped after the water loss." The statement is untrue. Moreover, a simple review of that photograph demonstrates that the pipes, which were capped off, did not contain water but instead contained "nitrous oxide" and "oxygen." The pipes are clearly marked as such. The water pipe is a small-diameter water pipe that exhibits no freeze damage and that was subject to a separate valve.



OVERVIEW DAMAGES PIPES WERE RECENTLY CAPPED BY PLUMBER. ORIGIN AREA.
TWO SECTIONS OF INTERIOR PIPES ALSO BROKE / FROZE CAUSING WATER DAMAGE...

This photograph does not show any water pipes which are capped, nor does it show any water pipe, let alone two sections of interior pipes, which "broke/froze causing water damage." Indeed, it is hard to understand how lines carrying "nitrous oxide" and "oxygen" froze or caused water damage.

E. Ford Stephens, Esquire
Christian & Barton, LLP
October 7, 2025
Page 3 of 6

As Liberty Mutual has been informed on many occasions, the water supply to the building had been turned off, and the water pipes had been drained. Indeed, the engineers' report notes that "the water meter was removed from the building before the water loss, and the city water was connected directly to the building." The direct connection of the city water was to the sprinkler system. However the water supply to the building had been turned off and the pipes drained. Accordingly, even if a pipe (other than a sprinkler) had broken, it would not have resulted in a water loss. I would note the fact that Liberty Mutual refused to state why it claimed water pipes other than the sprinkler line has broken for months points to the fact that the insurer was aware that no such pipes had broken.[1] Moreover the fact that Liberty Mutual failed to take any photos of the pipe breaks, or if it did, failed to supply such photos to the engineer is indicative of the fact that the insurer was aware that only the sprinkler lines had failed and was attempting to secure a report based on false statements made to its engineer.[2] What is not disputed is that the only pipes which were repaired were sprinkler lines. Moreover, since the supply to the other pipes had been shut off there is no way any other pipe break contributed in any way to this loss. To reiterate, it is clear that:

1. This claim was denied based upon Liberty Mutual's false claim that damage occurred from 2 domestic water pipes, and ignoring the fact that the only water supply to the building was to the sprinkler pipes, which froze and resulted in the water damage claim; and

2. Liberty Mutual has no less than 5 occasions refused to address the factual predicate to its wrongful denial. It is now clear that factual predicate was false.

While you have supplied a letter and requested documents having nothing to do with the claim,[3] you letter fails to address the basis of the denial of this claim which has been pending for approximately 9 months. Does the insurer maintain that this loss was caused by broken pipes OTHER THAN the sprinkler lines? Given that we have been requesting this information for months, I believe the insurer has a duty to provide a response.

I would note that despite requesting a substantive response from the insurer for months, neither your letter nor any communication with Liberty Mutual has provided a substantive response to my prior letters and emails dated as follows:

- 8-19-25 letter to Frank Schmidt, and an email from him providing no substantive response but indicating that the case has been sent to Daniel Hunt.

---

[1] The engineer's speculation that "sinks and other plumbing components are removed from another section of the building, and it is a second suspected water loss location" is not supported by any facts. Indeed those photos show the water supply lines in areas not affected by the water and which exhibit no damage.

[2] The engineer confirmed that "no photographs of the failed plumbing or sprinkler system were provided."

[3] If Liberty Mutual maintains that its document request is reasonable, please provide us with some explanation as to why the records are sought.

E. Ford Stephens, Esquire
Christian & Barton, LLP
October 7, 2025
Page 4 of 6

- 8.20.25 email sending the above letter to Mr. Daniel Hunt requesting a substantive response.

- 8.22.25 email from Hunt providing no substantive response but indicating only that "we maintain our coverage position….".

- 8.28.25 letter to Daniel Hunt again requesting a substantive response.

- 9.3.25 email to Daniel Hunt requesting a substantive response.

- 9.8.25 email from Daniel Hunt again failing to supply a substantive response, stating only that "our coverage position remains the same."

- 9.8.25 letter to Daniel Hunt again asking for a substantive response.

- 9.22.25 letter from you again, not providing any substantive response by making an unreasonable request for records having nothing to do with this claim.

- 9.26.25 letter from you again, not providing any substantive response as to the non-sprinkler frozen pipes other than to say that Frank Schmidt was told this, which is denied, and a photograph showing gas pipes being capped which could not lead to a water loss.

The above series of communications follows a letter dated May 1, 2025, from Tony D'Amico, which was also ignored by the insurer.

**Coverage for the broken Sprinkler Lines**: Given that the loss relates solely to broken sprinkler lines, the denial is clearly wrongful. The following is an excerpt from your letter that illustrates the policy exclusions upon which you are relying. As to each such exclusion, Liberty Mutual must establish that it clearly applies and that it unambiguously defeats coverage. You initially cite the antic concurrent causation ("ACC") language of the policy as follows:

*B. Exclusions*

*1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.*

While Liberty Mutual cites this provision, NONE OF THE EXCLUSIONS WHICH LIBERTY MUTUAL RELIES UPON FALL UNDER THE ACC LEAD IN LANGUAGE.

E. Ford Stephens, Esquire
Christian & Barton, LLP
October 7, 2025
Page 5 of 6

Liberty Mutual goes on to cite from the following exclusions, which are not subject to the ACC Clause.

> 2. *We will not pay for loss or damage caused by or resulting from any of the following:*
>
> ***
>
> **e. Frozen Plumbing**
>
> *Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (**except fire protective systems**) caused by or resulting from freezing, unless:*
>
> > *(1) You do your best to maintain heat in the building or structure; or*
> >
> > *(2) You drain the equipment and shut off the supply if the heat is not maintained.*

This section does not apply for various reasons. First, the loss is related to freeze damage to the sprinkler system. By its very terms, the above exclusion does not apply to "fire protective systems." Indeed, under the policy's protective safeguard, the insured had a duty to maintain the sprinkler systems in working order, which it did. Second, even though this does not apply to sprinkler pipes, the insured undertook its *best to maintain heat in the building or structure*. Indeed, this is confirmed by your own engineer, who performed a desk review and stated that "based on the information provided, an attempt was made to maintain heat in the building." Third, even though this does not apply to sprinkler pipes, the insured drained the pipes and shut off the supply to all but the sprinkler pipes. The fact that your own engineer states that the "water meter was removed from the building before the water loss" confirms that the supply was shut off to the non-sprinkler water lines.

**Request for Documents**:  As you know, the insured has already made the building available for inspection, has supplied utility records and has cooperated with Liberty Mutual. In addition, I have attached to multiple letters the documents showing the costs incurred by the Insured related to the water loss. While there is no duty to cooperate with the insurer once it has denied the claim, the insured will continue to do so. In this regard, be advised as follows. You have requested "the following records from [the Insured] regarding the Building's HVAC system:

a.    Request:  Maintenance Records for the last 5 years.
       Response:  the insured has requested copies of these records from the HVAC company it has utilized.

b.    Request Inspection reports and dates for the last 5 years
       Response:  the insured has requested copies of these records from the HVAC company it has utilized.

E. Ford Stephens, Esquire
Christian & Barton, LLP
October 7, 2025
Page 6 of 6

  c.  <u>Request</u> diagnostic test results done in the last 5 years
     <u>Response</u>:  the insured has requested copies of these records from the HVAC company it has utilized.

  d.  <u>Request</u> costs for repairs done in the last 5 years.
     <u>Response</u>:  the insured has requested copies of these records from the HVAC company it has utilized.

This is despite the fact that the Insurer continues to act in bad faith, the Insurer has continued its refusal to respond to multiple communications, the Insurer has refused to justify its misrepresentation as to a non-sprinkler frozen pipe causing water damage, and the Insurer has refused to withdraw its denial despite it being clear that the denial is based upon a misrepresentation made by the initial adjuster.  The insured is doing its best to ascertain if the additional documents requested are available and will supply the same if they are.  In addition, given the past misrepresentations by the Insurer at its first inspection of the property we will allow a further inspection of the property, but will record the same by cell phone video.  Please confirm that you will agree to such a recording.

**Reservation of Rights**:  Plaintiff will cooperate in this matter, but will do so under a full reservation of rights.  Neither this letter nor my clients continued is an admission or denial of coverage, and they do not waive any rights or duties of either party under any policy issued by Ohio Security. Anything done or to be done by the Insured or on the Insured's behalf in connection with the Claim shall not waive, invalidate, forfeit, or modify any of its rights and defenses under the policies it has issued, at law, in equity or otherwise.  this expressly includes the right to file a complaint with the Bureau of Insurance, to file suit, to preserve all claims against both Liberty Mutual and claims against its adjuster whose misrepresentation has led to the need to retain counsel and incur attorney's fees.  The Insured also reserves all rights under Va. Code § 38.2-209, and under Md. Insurance Art. § 27-1001, given the repeated failures of Liberty Mutual to provide responses to its insured in this matter, its failure to provide any support for its denial, its failure to adjust and pay this claim, its failure to act in good faith, and its ongoing bad faith which bad faith continues through today's date.

I look forward to receiving a substantive response to the multiple communications above.

       Very truly yours,

       C. Thomas Brown

CTB:jcl

cc:  Tony D'Amico
   Alan Golden

# EXHIBIT 14

LAW OFFICES
OF

# SILVER & BROWN

A PROFESSIONAL CORPORATION
RED MAPLE COURT
10621 JONES ST., SUITE 101
FAIRFAX, VIRGINIA 22030

---

C. THOMAS BROWN†
GLENN H. SILVER*
ERIK B. LAWSON^
CAITLIN B. ONG°
  † (VA, MD)
  * (VA, DC, NY)
  ^ (VA, DC, MD)
  ° (VA, DC)

Telephone  (703) 591-6666
Facsimile   (703) 591-5618

Writers Email:
tom@virginia-lawyers.net

October 28, 2025

**VIA EMAIL estephens@cblaw.com**

E. Ford Stephens, Esquire
Christian & Barton, LLP
901 East Cary Street
Suite 1800
Richmond, Virginia 23219-4037

      **Re:    Insured: ORO MASTER SUB 2, LLC**
              **Loss Location: 238 Potomac Ave, Quantico, VA 22134**
              **Date of Loss: 1/23/2025**
              **Policy Number: BZS640984094**
              **Claim Number: 24244628**

Dear Ford:

    First, I find it a bit inconsistent that Ohio Security, in essence asserts that it will not participate in appraisal because it has denied the claim and therefore does not have to comply with the appraisal requirements, but at the same time takes the position that even in light of the denial that the insured must comply with the policy requirements. We believe that this double standard further evidence that the insurer's actions continue to be undertaken in bad faith, and are certainly not taken in good faith. This is especially in light of the fact that although the insurer has re-opened the claim, that the insurer still stands on, what we believe is a bad faith denial.[1] The bad faith denial is based upon Ohio Security's

---

[1] You ask why Md. Insur. Art. 27-1001 may be applicable. This is because the policy was delivered to the insured in Maryland. We reserve our right to seek damages due to the lack of good faith of the insurer under that code section, and as to the insurer's bad faith under Va. Code § 38.2-209.

E. Ford Stephens, Esquire
Christian & Barton, LLP
October 28, 2025
Page 2 of 5

position that 2 phantom non sprinkler water supply lines (which it failed to identify despite many requests) broke which somehow created this water loss when (1) the water supply was shut off; (2) the pipes that the insurer points to as the "broken water supply lines" are pipes carrying not water but are lines which had supplied oxygen and nitrous oxide, and (3) the only evidence of any water discharge came from sprinkler lines which remained connected to the fire hydrant system, which supplied water only to sprinkler lines as was required by the insurance policy.

There is no dispute that the water supply was cut off and the pipes drained years ago. Indeed, we had an engineer inspect the property and he confirmed that the water supply was shut off to the building, and the water meter was removed, which would preclude any water supply to the non-sprinkler lines in this building. Moreover, the city has provided records showing no water supply to this building during the time of the event and for a time period before. A copy of those records are provided herewith. The records supplied show that the last time there was any water consumed at this building was in August 2021. Indeed, even though thousands of gallons of water ran through this building in January of 2025 when the sprinkler pipes burst, the amount of the water bill for 1-2-2025 through October 2, 2025 (a period of 9 months) showed "0" gallons consumed in each month. Had there been a supply to the non-sprinkler water supply at this building, which broke and damaged the building in January 2025, it would have shown consumption of water in January or February 2025. Despite this, the billing showed no water use.

Given the bad faith denial, we do not believe the insurer can take inconsistent positions and demand the insured's compliance with the policy, while at the same time arguing that it does not have to comply with the policy. Despite this, the insured has agreed to cooperate without waiving any rights as to the demonstrable bad faith of the insurer. Along these lines, you asked for the following as to the HVAC systems at the insured location:

---

Ohio Security requests to examine the following records of your client:

Documentation for the Building's HVAC:

    a. Maintenance records for the last 5 years
    b. Inspection reports and dates for the last 5 years
    c. Diagnostic test results done in the last 5 years
    d. Costs for any repairs done in the last 5 years

---

The HVAC records, which exist, are attached. As to inspections, I would note that Dr. Golden inspected this building several times a year, including in or about November of 2024, before this loss occurred. While there are no records of the inspections, he will certainly testify as to the same. Indeed, Dr. Golden inspected the building in November of 2024, and for several years prior to that at the beginning of winter. In November 2024, the thermostats were working, as were the HVAC heating systems. While he did not inspect each system individually, he did note that there was adequate heat in the building. Moreover, while Dr. Golden will report that there was full heat in the building in

E. Ford Stephens, Esquire
Christian & Barton, LLP
October 28, 2025
Page 3 of 5

November, all doors were open to circulate the heat, and all parts of the building were heated. When Dr. Golden visited the property in November, he observed that the thermostats and heaters appeared to be operational, and set well above freezing. From a review of the HVAC records following the pipe break several months later it appears that the batteries to several of the thermostats may have failed after that the inspection, but that there was still heat circulating in the building. However, whether there was heat in the building is without merit since the water supply to non-sprinkler water lines was turned off and none of the domestic water pipes broke. The frozen pipe exclusion (which is not found under ACC language), which served as the basis for the denial, provides as follows:

> *2. We will not pay for loss or damage caused by or resulting from any of the following:*
>
> ***
>
> **e. Frozen Plumbing**
>
> *Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (**except fire protective systems**) caused by or resulting from freezing, unless:*
>
> > *(1) You do your best to maintain heat in the building or structure; or*
> >
> > *(2) You drain the equipment and shut off the supply if the heat is not maintained.*

This section does not apply for at least two reasons. First, the loss was caused by ruptures in the sprinkler system. By its very terms, the above exclusion does not apply to "fire protective systems." Second, even if there were damage to the non-sprinkler system, which there was not, in this case, the insured met both of the safe harbor provisions. First, he did his best to maintain heat. Second, he drained the equipment and shut off the supply. Indeed, upon doing the latter he had no obligation under the policy to maintain heat.

There is no dispute that he attempted to maintain heat in the building. From the records, it appears that some of the thermostats later failed, however, the gas usage for this building was substantial as reported by the Insurer's own engineer who reviewed the records and determined that the gas usage in December and January increased as the weather became colder. Your client's engineer included the following chart and made the following determinations:

E. Ford Stephens, Esquire
Christian & Barton, LLP
October 28, 2025
Page 4 of 5



Your engineer concluded that:

No information was provided on the type of heat used in the building. Based on the increased usage of natural gas during the heating season and the lack of gas usage during the warm seasons, the building is heated with natural gas. Natural gas usage increases similar to the HDD during the 2023/2024 and 2024/2025 seasons, consistent with an attempt to heat the property. The electrical usage remained steady throughout

It is clear that the non-sprinkler water pipes had been drained and the supply shut off. Moreover, the water authorities' removal of the water meter prevented any water supply. Indeed, the records provided make clear that there was no water used in this building for years, and certainly no water from the domestic supply was involved in the pipe break, based on the water supply records provided. Given the same frozen pipe exclusion, which does not apply to sprinkler lines, is of no movement since this loss was not caused by a domestic water line freezing and breaking.

Demand is made on the insurer to withdraw its denial and adjust this loss. If Ohio Security disputes the estimated rebuild costs, emergency services and mitigation costs incurred, we fully expect the insurer to name its appraiser. Given the clear coverage in this matter we will take as an admission the insurers failure to participate in appraisal as an agreement to my clients estimates previously supplied.

**Reservation of Rights**: Plaintiff will cooperate in this matter but will do so under a full reservation of rights. Neither this letter nor my clients continued is an admission or denial of coverage, and they do not waive any rights or duties of either party under any policy issued by Ohio Security. Anything done or to be done by the Insured or on the Insured's behalf in connection with the Claim shall not waive, invalidate, forfeit, or modify any of its rights and defenses under the policies it has issued, at law, in equity or otherwise. this expressly includes the right to file a complaint with the Bureau of Insurance, to file suit, to preserve all claims against both Liberty Mutual and claims against its adjuster whose misrepresentation has led to the need to retain counsel and incur attorney's fees. The Insured also reserves all rights under Va. Code § 38.2-209, and under Md. Insurance

E. Ford Stephens, Esquire
Christian & Barton, LLP
October 28, 2025
Page 5 of 5

Art. § 27-1001, given the repeated failures of Liberty Mutual to provide responses to its insured in this matter, its failure to provide any support for its denial, its failure to adjust and pay this claim, its failure to act in good faith, and its ongoing bad faith, which bad faith continues through today's date.

Please advise if (1) the insurer is going to continue its breach of the obligation to appraise this loss; and (2) whether it continues to stand by its wrongful and bad faith denial of this claim. A written response to this letter is requested.

Very truly yours,

C. Thomas Brown

Enclosure

cc:    Tony D'Amico
       Alan Golden

*Ex A*



K.W. Smith & Son, Inc.
9106 Industry Drive
Manassas Park, VA 20111
Phone: 571-208-0160

**BILL TO**
Embrace Family Smiles
7814 Stable Way
Potomac, MD 20854 USA

| | INVOICE | INVOICE DATE |
|---|---|---|
| ) | 0000020331 | 10/7/2020 |

**JOB ADDRESS**
Alan Golden
238 Potomac Ave.
Quantico, VA 22134 United States

**Completed Date** 10/7/2020
**Customer PO #**
**Payment Term** Due Upon Receipt
**Due Date** 10/7/2020

### DESCRIPTION OF WORK

Count and size : #1_ 18x25x1 (1) #2_ Belt_____na Count and size 1_ 2_ Operational check System type: Gas__x AC only_____ AC with other_ Heat pump___ Boiler_____ Other_____ PM &amp; FILTER CHANGE WEDNESDAY HOURS 11 AM - 7PM LUNCH FROM 3-4 (OFFICE CLOSED FOR LUNCHES) THURSDAY HOURS 8: 30 AM - 5 PM LUNCH FROM 12-2 10/6/2020 3:48 PM - ANGELA - OFFICE MANAGER ON VACATION WILL RETURN LATER THIS WEEK.... 9/28/2020 4:56:22 PM - ANGELA - *********GREGS REGISTRATION IS EXPIRED ON VAN SO HE COULDN'T GET ONTO QUANTICO******** MAKE SURE YOU HAVE YOUR ID FOR GUEST PASS, OFFICE IS OPEN 8: 30 AM TO 5 PM , CLOSED FOR LUNCH 12:30-2 PM. 9/18/2020 3:37 PM - ANGELA - 9/10/2020 11:21:46 AM - MARVETT - PULLED JOE OFF BECAUSE HE COULD NOT GET THROUGH THE GATE AT QUANTICO. WAS TOLD BY DR. GOLDEN'S OFFICE THAT WE NEED TO GO TO 27000 TELEGRAPH RD BLD #27175T STAFFORD, VA TO GET A GUESS PASS. WAS TOLD NEED TO BRING ID AND SOCIAL SECURITY CARD. NEED TO SPEAK WITH JEREMY BEFORE DISPATCHING. 8/27/2020 8:54 AM - RILEY - SCHEDULED W/ CUSTOMER FOR 1ST CALL. THEY OPEN AT 8:30 QUARTERLY PM 4-18X25X1 2-A23 EACH VISIT IS $250 Notes added by tech JOE on 10/7/2020 2:19:43 PM Gf 1 WEATHER__76 COOLING or HEATING "X" checked and good "X-+" checked with issue "NA" not applicable "UA" unavailable Visual inspection_____x Tightened Elec_____x Heat Exchanger_____x Bearings_____x Blower_____x Condensate_____ Filters_____x Count and size : #1_ 18x25x1 (1) #2_ Belt_____na Count and size 1_ 2_ Operational check System type: Gas_____x AC only_____ AC with other _____ Heat pump_____ Boiler_____ Other_____ Compressor_____RLA OD Fan_____. FLA Blower____5.3_____. FLA Draft_____1.8_____ Co_____0_____ Supply_____130_____. DEG Return_____74_____. DEG Tstat_____. DEG Issues_____ Gf 2 "X" checked and good "X-+" checked with issue "NA" not applicable "UA" unavailable Visual inspection_____x Tightened Elec._____x Heat Exchanger_____x Bearings_____x Blower_____x Condensate_____ Filters_____x Compressor_____. RLA OD Fan_____. FLA Blower____4_____. FLA Draft_____1.5_____ Co_____0_____ Supply_____130_____. DEG Return_____74_____. DEG Tstat_____. DEG Issues_____

| TASK | DESCRIPTION | QTY | PRICE | TOTAL |
|---|---|---|---|---|
| Imported Default Service | INFO: INVOICED IN QB AND EMAILED TO CUSTOMER... ANGELA 10.14.20 | 0.00 | $0.00 | $0.00 |
| Imported | 18X25X1 STD: Replaceable 18x25x1 Standard Filter | 4.00 | $0.00 | $0.00 |

| Default Service | | | | | |
|---|---|---|---|---|---|
| Imported Default Service | SA: Invoice for service agreement | | 1.00 | $0.00 | $0.00 |
| Imported Default Service | SA: Maintenance Visit | | 1.00 | $250.00 | $250.00 |

**PAYMENT**

| Paid On | Type | Memo | Amount |
|---|---|---|---|
| 10/7/2020 | Applied Payment for AR | | $250.00 |

|  |  |
|---|---|
| **SUB-TOTAL** | $250.00 |
| **MANUAL TAX 0%** | $0.00 |
| **TOTAL DUE** | $250.00 |
| **PAYMENT** | $250.00 |
| **BALANCE DUE** | $0.00 |

Thank you for choosing K.W. Smith & Son, Inc!

**CUSTOMER AUTHORIZATION**

This invoice is agreed and acknowledged. Payment is due upon receipt. A service fee will be charged for any returned checks, and a financing charge of 1.5% per month shall be applied for overdue amounts(18% Annual Percentage Rate).

Sign here                    Date
_____

**CUSTOMER ACKNOWLEDGEMENT**

I find and agree that all work performed by has been completed in a satisfactory and workmanlike manner. I have been given the opportunity to address concerns and/or discrepancies in the work provided, and I either have no such concerns or have found no discrepancies or they have been addressed to my satisfaction. My signature here signifies my full and final acceptance of all work performed by the contractor.

Sign here                    Date
_____



K.W. Smith & Son. Inc.
9106 Industry Drive
Manassas Park, VA 20111
Phone: 571-208-0160

**BILL TO**
Embrace Family Smiles
7814 Stable Way
Potomac, MD 20854 USA

| | INVOICE<br>0000021407 |  |
|---|---|---|

**JOB ADDRESS**
Alan Golden
238 Potomac Ave.
Quantico, VA 22134 United States

**Completed Date** 1/27/2021
**Customer PO #**
**Payment Term** Due Upon Receipt
**Due Date** 1/27/2021

## DESCRIPTION OF WORK

Count and size 1_ 2_ Operational check System type: Gas_____x AC only_____AC with other _____Heat pump_____

Boiler_____Other_____Compressor_____RLA OD Fan_____. FLA Blower_____5.5/9.3_____. FLA

Draft_____1.9_____Co_____0_____Supply_____135_____. DEG Return_____85_____. DEG

Tstat_____. DEG Issues_____Gf4 "X" checked and good "X-+" checked with issue "NA" not applicable "UA"

unavailable Visual inspection_____x Tightened Elec._____x Heat Exchanger_____x Bearings_____x

Blower_____x Condensate_____Filters_____x Count and size : #1_ 18x25x1 (1) #2_

Belt_____na Count and size 1_ 2_ Operational check System type: Gas__x PM &amp; FILTER CHANGE 1/26/2021

3:07:34 PM - ANGELA - HOURS OPEN AT 10 AM AND THEY TAKE LUNCH FROM 3 TO 4 PM 1/20/2021 9:15:43 AM - ANGELA

- LM QUARTERLY PM 4-18X25X1 EACH VISIT IS $250 Notes added by tech JOE on 1/27/2021 3:51:25 PM Gf1 WEATHER__46

COOLING or HEATING "X" checked and good "X-+" checked with issue "NA" not applicable "UA" unavailable Visual

inspection_____x Tightened Elec_____x Heat Exchanger_____x Bearings_____x Blower_____x

Condensate_____Filters_____x Count and size : #1_ 18x25x1 (1) #2_ Belt_____na AC

only_____AC with other_ Heat pump___ Boiler_____Other_____OD Fan_____. FLA Compressor:_____. RLA

Blower____9/9.8_____. FLA Draft_____.9_____Co_____0_____Supply_____115_____. DEG Return_____80_____.

DEG Tstat_____. DEG Issues_____Gf2 "X" checked and good "X-+" checked with issue "NA" not applicable "UA"

unavailable Visual inspection_____x Tightened Elec._____x Heat Exchanger_____x Bearings_____x

Blower_____x Condensate_____Filters_____x Count and size : #1_ 18x25x1 (1) #2_

Belt_____na Count and size

| TASK | DESCRIPTION | QTY | PRICE | TOTAL |
|---|---|---|---|---|
| Imported Default Service | 18X25X1 STD: Replaceable 18x25x1 Standard Filter | 4.00 | $0.00 | $0.00 |
| Imported Default Service | SA: Invoice for service agreement | 1.00 | $250.00 | $250.00 |
| Imported Default | INFO: ***ANGELA 2.3.21, INVOICED IN QB AND EMAILED TO CUSTOMER | 0.00 | $0.00 | $0.00 |

Service

| | | | | | |
|---|---|---|---|---|---|
| Imported Default Service | INFO: Okay MD 2-4-21 | | 0.00 | $0.00 | $0.00 |

PAYMENT

| Paid On | Type | Memo | Amount |
|---|---|---|---|
| 1/27/2021 | Applied Payment for AR | | $250.00 |

|  |  |
|---|---|
| **SUB-TOTAL** | $250.00 |
| **MANUALTAX 0%** | $0.00 |
| **TOTAL DUE** | $250.00 |
| **PAYMENT** | $250.00 |
| **BALANCE DUE** | $0.00 |

Thank you for choosing K.W. Smith & Son, Inc!

CUSTOMER AUTHORIZATION

This invoice is agreed and acknowledged. Payment is due upon receipt. A service fee will be charged for any returned checks, and a financing charge of 1.5% per month shall be applied for overdue amounts(18% Annual Percentage Rate).

Sign here                                           Date

CUSTOMER ACKNOWLEDGEMENT

I find and agree that all work performed by has been completed in a satisfactory and workmanlike manner. I have been given the opportunity to address concerns and/or discrepancies in the work provided, and I either have no such concerns or have found no discrepancies or they have been addressed to my satisfaction. My signature here signifies my full and final acceptance of all work performed by the contractor.

Sign here                                           Date



K.W. Smith & Son, Inc.
9106 Industry Drive
Manassas Park, VA 20111
Phone: 571-208-0160

**BILL TO**
Embrace Family Smiles
7814 Stable Way
Potomac, MD 20854 USA

| | INVOICE |  |
| --- | --- | --- |
| | 107701 | |

**JOB ADDRESS**
Alan Golden
238 Potomac Ave.
Quantico, VA 22134 United States

**Completed Date** 7/27/2020
**Customer PO #**
**Payment Term** Due Upon Receipt
**Due Date** 7/27/2020

DESCRIPTION OF WORK

SPRING PM WITH BELTS

4-18X25X1
2-A23

EACH VISIT IS $250

3/31/2020 3:11:48 PM - SARAH - ALL GOLDEN DENTAL LOCATIONS ARE CLOSED FOR SEVERAL WEEKS

SKIPPED PM 7/27/2020 4:41:28 PM - JEREMY -

| | |
| --- | --- |
| **SUB-TOTAL** | $0.00 |
| **MANUALTAX 0%** | $0.00 |
| **TOTAL DUE** | $0.00 |
| **PAYMENT** | $0.00 |
| **BALANCE DUE** | $0.00 |

Thank you for choosing K.W. Smith & Son, Inc!
CUSTOMER AUTHORIZATION

**This invoice is agreed and acknowledged. Payment is due upon receipt. A service fee will be charged for any returned checks, and a financing charge of 1.5% per month shall be applied for overdue amounts(18% Annual Percentage Rate).**

Sign here                                        Date

**CUSTOMER ACKNOWLEDGEMENT**

I find and agree that all work performed by has been completed in a satisfactory and workmanlike manner. I have been given the opportunity to address concerns and/or discrepancies in the work provided, and I either have no such concerns or have found no discrepancies or they have been addressed to my satisfaction. My signature here signifies my full and final acceptance of all work performed by the contractor.

Sign here                                    Date



K.W. Smith & Son. Inc.
9106 Industry Drive
Manassas Park. VA 20111
Phone: 571-208-0160

**BILL TO**
Embrace Family Smiles
7814 Stable Way
Potomac, MD 20854 USA

| INVOICE |  |
|---------|--------------|
| 112766  | 10/27/2021 |

**JOB ADDRESS**
Alan Golden
238 Potomac Ave.
Quantico, VA 22134 United States

**Completed Date** 10/27/2021
**Customer PO #**
**Payment Term** Due Upon Receipt
**Due Date** 10/27/2021

## DESCRIPTION OF WORK

QUARTERLY PM WITH BELTS

4-18X25X1
2-A23

EACH VISIT IS $250

SKIPPED PM. 10/27/2021 2:46:48 PM - JEREMY -

| | |
|---|---|
| **SUB-TOTAL** | $0.00 |
| **MANUALTAX 0%** | $0.00 |
| **TOTAL DUE** | $0.00 |
| **PAYMENT** | $0.00 |
| **BALANCE DUE** | $0.00 |

Thank you for choosing K.W. Smith & Son, Inc!
CUSTOMER AUTHORIZATION

This invoice is agreed and acknowledged. Payment is due upon receipt. A service fee will be charged for any returned checks, and a financing charge of 1.5% per month shall be applied for overdue amounts(18% Annual Percentage Rate).

Sign here                                    Date

CUSTOMER ACKNOWLEDGEMENT

I find and agree that all work performed by has been completed in a satisfactory and workmanlike manner. I have been given the opportunity to address concerns and/or discrepancies in the work provided, and I either have no such concerns or have found no discrepancies or they have been addressed to my satisfaction. My signature here signifies my full and final acceptance of all work performed by the contractor.

Sign here                                        Date



K.W. Smith & Son, Inc.
9106 Industry Drive
Manassas Park, VA 20111
Phone: 571-208-0160

**BILL TO**
Embrace Family Smiles
7814 Stable Way
Potomac, MD 20854 USA

| INVOICE | INVOICE DATE |
|---|---|
| 113802 | 10/27/2021 |



**JOB ADDRESS**
Alan Golden
238 Potomac Ave.
Quantico, VA 22134 United States

**Completed Date** 10/27/2021
**Customer PO #**
**Payment Term** Due Upon Receipt
**Due Date** 10/27/2021

### DESCRIPTION OF WORK

QUARTERLY PM

4-18X25X1

EACH VISIT IS $250

SKIPPED PM. 10/27/2021 2:46:11 PM - JEREMY -

| | |
|---|---|
| **SUB-TOTAL** | $0.00 |
| **MANUALTAX 0%** | $0.00 |
| **TOTAL DUE** | $0.00 |
| **PAYMENT** | $0.00 |
| **BALANCE DUE** | $0.00 |

Thank you for choosing K.W. Smith & Son, Inc!
CUSTOMER AUTHORIZATION

This invoice is agreed and acknowledged. Payment is due upon receipt. A service fee will be charged for any returned checks, and a financing charge of 1.5% per month shall be applied for overdue amounts(18% Annual Percentage Rate).

Sign here                                    Date

CUSTOMER ACKNOWLEDGEMENT

I find and agree that all work performed by has been completed in a satisfactory and workmanlike manner. I have been given the opportunity to address concerns and/or discrepancies in the work provided, and I either have no such concerns or have found no discrepancies or they have been addressed to my satisfaction. My signature here signifies my full and final acceptance of all work performed by the contractor.

Sign here                                    Date



K.W. Smith & Son, Inc.
9106 Industry Drive
· Manassas Park, VA 20111
Phone: 571-208-0160

**BILL TO**
Embrace Family Smiles
7814 Stable Way
Potomac, MD 20854 USA

| INVOICE | |
|---|---|
| 114621 |  |

**JOB ADDRESS**
Alan Golden
238 Potomac Ave.
Quantico, VA 22134 United States

**Completed Date** 10/27/2021
**Customer PO #**
**Payment Term** Due Upon Receipt
**Due Date** 10/27/2021

### DESCRIPTION OF WORK

QUARTERLY PM

4-18X25X1

EACH VISIT IS $250

Good Afternoon Marvett,

Just updating you and the team there at KW Smith.

The practice has vacated the Quantico facility at 238 Potomac Avenue. As such we will no longer require any servicing of the HVAC equipment at that address. Please note this in our records.

Thank You & Kind Regards,

- Roger
10/27/2021 3:01:39 PM - JEREMY -

| | |
|---|---|
| SUB-TOTAL | $0.00 |
| MANUAL TAX 0% | $0.00 |
| TOTAL DUE | $0.00 |
| PAYMENT | $0.00 |
| BALANCE DUE | $0.00 |

Thank you for choosing K.W. Smith & Son, Inc!
CUSTOMER AUTHORIZATION

**This invoice is agreed and acknowledged. Payment is due upon receipt. A service fee will be charged for any returned checks, and a financing charge of 1.5% per month shall be applied for overdue amounts(18% Annual Percentage Rate).**

Sign here                                      Date

## CUSTOMER ACKNOWLEDGEMENT

I find and agree that all work performed by has been completed in a satisfactory and workmanlike manner. I have been given the opportunity to address concerns and/or discrepancies in the work provided, and I either have no such concerns or have found no discrepancies or they have been addressed to my satisfaction. My signature here signifies my full and final acceptance of all work performed by the contractor.

Sign here                                      Date

## KW Smith & Son
### Heating & Air Conditioning
—— SINCE 1983 ——

KW Smith & Son, Inc.
9106 Industry Drive
Manassas Park, VA 20111
Website: www.kwsmith.com
Phone: 571-208-0160
Fax: 571-208-0166

**BILL TO**
Embrace Family Smiles
7814 Stable Way
Potomac, MD 20854 USA

| INVOICE | INVOICE DATE |
|---|---|
| 38583265 | 9/29/2022 |

**JOB ADDRESS**
Alan Golden
238 Potomac Ave.
Quantico, VA 22134 United States

**Completed Date** 9/29/2022
**Customer PO #**
**Payment Term** Due Upon Receipt
**Due Date** 9/29/2022

| TASK | DESCRIPTION | QTY | PRICE | TOTAL |
|---|---|---|---|---|
| Service Call | • 3 of 4 stats were blank , replaced batts in each and set at 50 deg Perm Hold and heat mode with fan AUTO. Fourth stat , up front , was showing date , waiting for it to be set , as I tried , screen went blank . Batteries are new , played with how they are held in stat but screen goes in and out like it has a loose connection inside ! For now it's on but I can't say it may not stay. In attic , found the farthest furnace with blower running . IGN control flashing TEMP LIMIT OPEN. Checked all three temp devices , high limit , roll out and draft ( blocked vent ) all were good . Reset and unit cleared and heat works when jumped out Tested the other units , replacing filters , The next unit didn't ignite , found HSI broken Left unit open with power off Next two worked fine , no issues Rechecked stats stayed as I set them and they did , even the front stat was still on. | 2.00 | $120.00 | $240.00 |
| TRIP CHARGE 1 | Trip Charge | 1.00 | $45.00 | $45.00 |

| MATERIAL | DESCRIPTION | QUANTITY | PRICE | TOTAL |
|---|---|---|---|---|
| 18X25X1 | 18x25x1 Filter | 2.00 | $26.00 | $52.00 |
| Batteries | Batteries | 1.00 | $33.00 | $33.00 |

**PAYMENT**

| Paid On | Type | Memo | Amount |
|---------|------|------|--------|
| 10/27/2022 | Check | | $370.00 |

| | | |
|---|---|---|
| **SUB-TOTAL** | | $370.00 |
| **TAX 0%** | | $0.00 |
| **TOTAL DUE** | | $370.00 |
| **PAYMENT** | | $370.00 |
| **BALANCE DUE** | | $0.00 |

Thank you for choosing KW Smith & Son, Incl



**KW Smith & Son**
Heating & Air Conditioning
—— SINCE 1938 ——

KW Smith & Son, Inc.
9106 Industry Drive
Manassas Park, VA 20111
Website: www.kwsmith.com
Phone: 571-208-0160
Fax: 571-208-0166

**BILL TO**
ALAN GOLDEN
7814 Stable Way
Potomac , MD 20854 United States

| INVOICE | INVOICE DATE |
|---|---|
| 57088865 | 3/10/2025 |

**JOB ADDRESS**
Alan Golden
238 Potomac Ave.
Quantico, VA 22134 United States

**Completed Date** 3/10/2025
**Customer PO #**
**Payment Term** Due Upon Receipt
**Due Date** 3/10/2025

| TASK | DESCRIPTION | QTY | PRICE | TOTAL |
|---|---|---|---|---|
| Service Call | System stat #2 | 4.75 | $145.00 | $688.75 |

Removed old base and attached new base. Programmed new stat for equip. type.
Hooked up a Common wire for stat , so batteries are not essential. Tested stat and
unit once other repair was complete.
In other units , tried to also use a common wire for stat.

Tested operation , stat now has power without batteries, furnace runs. Let it run to
check. Found furnace would trip off during long cycles , from limit. Limit rated 190 and
it trips around 180. Filter good , blower good , measured temp near limit to diagnose
properly.

Limit is weak , trips early, below its design of 190 deg.

System 3# found a common Blue wire to use for stat and connected it at both ends.
Checked stat had power and furnace runs properly.
It does.

System #1 repeated above, both are good.

System #4 repeated same, filter was dirty , replaced it. This one also tripped off from
safety.

Lowered gas pressure to keep it running, suspect a dirty evaporation coil at this point.
Everything else ok.

| | | | | |
|---|---|---|---|---|
| TRIP CHARGE 1 | Trip Charge | 1.00 | $45.00 | $45.00 |

| MATERIAL DESCRIPTION | | QUANTITY | PRICE | TOTAL |
|---|---|---|---|---|
| HSI | HSI | 1.00 | $136.00 | $136.00 |
| tstat | tstat | 1.00 | $254.00 | $254.00 |

| air filter 1 | Air filter | | 1.00 | $20.00 | $20.00 |

**PAYMENT**

| Paid On | Type | Memo | | Amount |
|---|---|---|---|---|
| 4/3/2025 | Check | | | $1,143.75 |

| | | | SUB-TOTAL | $1,143.75 |
|---|---|---|---|---|
| | | | TAX 0% | $0.00 |
| | | | TOTAL DUE | $1,143.75 |
| | | | PAYMENT | $1,143.75 |
| | | | BALANCE DUE | $0.00 |

Thank you for choosing KW Smith & Son, Inc!



**KW Smith & Son**
Heating & Air Conditioning
──── SINCE 1988 ────

KW Smith & Son, Inc.
9106 Industry Drive
Manassas Park, VA 20111
Website: www.kwsmith.com
Phone: 571-208-0160
Fax: 571-208-0166

**BILL TO**
Embrace Family Smiles
7814 Stable Way
Potomac, MD 20854 USA

| INVOICE | INVOICE DATE |
|---|---|
| 57151585 | 3/10/2025 |

**JOB ADDRESS**
Alan Golden
238 Potomac Ave.
Quantico, VA 22134 United States

**Completed Date** 3/10/2025
**Customer PO #**
**Payment Term** Due Upon Receipt
**Due Date** 3/10/2025

| | |
|---|---|
| SUB-TOTAL | $0.00 |
| TAX 0% | $0.00 |
| TOTAL DUE | $0.00 |
| PAYMENT | $0.00 |
| BALANCE DUE | $0.00 |

Thank you for choosing KW Smith & Son, Inc!



**KW Smith & Son**
Heating & Air Conditioning
——— SINCE 1983 ———

KW Smith & Son, Inc.
9106 Industry Drive
Manassas Park, VA 20111
Website: www.kwsmith.com
Phone: 571-208-0160
Fax: 571-208-0166

**BILL TO**
ALAN GOLDEN
7814 Stable Way
Potomac , MD 20854 United States

| | INVOICE | INVOICE DATE |
|---|---|---|
| | 52698324 | 1/24/2025 |

**JOB ADDRESS**
DR ALAN GOLDEN DDS
ORTHODONTIC 238 POTOMAC AVE
QUANTICO , VA 22134

**Completed Date** 1/24/2025
**Customer PO #**
**Payment Term** Due Upon Receipt
**Due Date** 1/24/2025

| TASK | DESCRIPTION | QTY | PRICE | TOTAL |
|---|---|---|---|---|
| Service Call | 4- stats , one on , 3 blank<br>Upstairs at furnaces<br>System 1 running in heat<br>#4 has power but no operation cause stat is blank<br>#2 has panels removed, power switch off and gas valve turned off with not stating it is off!<br>#3. Powered but no operation<br><br>Tstats , batteries are dead, stats don't have common to power stat , must have batteries.<br><br>Replaced batteries in the 3 blank stats , two came on pulling over, the third acted like it has a loose connection internally, won't stay on if bumped. Put this stat by #2's wall on a counter marking stat as bad.<br>Other two , put them on for units #4 & #3. Then verified furnaces were working.<br><br>Also checked filters. #3 was very dirty , replaced it with one I found in attic<br><br>Three of four units are working now ,in attic the furnaces run from the door to right -1-4-2-3 with #2 being down<br>Inside stats are front , left , rear , right ( as viewed from the rear forward )<br>The right stat marked as #2 is the one not working. All working stats are set to 50 deg permanent hold Heat mode. | 1.50 | $145.00 | $217.50 |
| TRIP CHARGE 1 | Trip Charge | 1.00 | $45.00 | $45.00 |

| MATERIAL | DESCRIPTION | QUANTITY | PRICE | TOTAL |
|---|---|---|---|---|
| Batteries | No charge Tech provided | 1.00 | $0.00 | $0.00 |

**PAYMENT**

| Paid On | Type | Memo | Amount |
|---------|------|------|--------|
| 2/24/2025 | Check | | $262.50 |

|  | |
|--|--|
| **SUB-TOTAL** | $262.50 |
| **TAX 0%** | $0.00 |
| **TOTAL DUE** | $262.50 |
| **PAYMENT** | $262.50 |
| **BALANCE DUE** | $0.00 |

Thank you for choosing KW Smith & Son, Inc!

10/8/2025 9:54:14 AM

Customer Consumption History List

C/O DR. ALAN GOLDEN  Acct:  45

*Ex B*

| TransDate | ReadDate | Meter Type | Current | Previous | Consumption |
|-----------|----------|------------|---------|----------|-------------|
| 08/01/2022 | 07/03/2022 | Combined | 2673400 | 2673400 | 0 |
| 07/01/2022 | 05/29/2022 | Combined | 2673400 | 2673400 | 0 |
| 06/01/2022 | 05/01/2022 | Combined | 2673400 | 2673400 | 0 |
| 05/02/2022 | 04/03/2022 | Combined | 2673400 | 2673400 | 0 |
| 04/01/2022 | 02/27/2022 | Combined | 2673400 | 2673400 | 0 |
| 03/01/2022 | 01/30/2022 | Combined | 2673400 | 2673400 | 0 |
| 02/01/2022 | 12/31/2021 | Combined | 2673400 | 2673400 | 0 |
| 01/06/2022 | 11/28/2021 | Combined | 2673400 | 2673400 | 0 |
| 12/01/2021 | 10/30/2021 | Combined | 2673400 | 2673400 | 0 |
| 11/01/2021 | 10/03/2021 | Combined | 2673400 | 2673400 | 0 |
| 10/01/2021 | 08/28/2021 | Combined | 2673400 | 2672800 | 600 |
| 09/01/2021 | 07/31/2021 | Combined | 2672800 | 2672400 | 400 |
| 08/02/2021 | 07/03/2021 | Combined | 2672400 | 2670800 | 1600 |
| 07/01/2021 | 05/31/2021 | Combined | 2670800 | 2669100 | 1700 |
| 06/01/2021 | 05/02/2021 | Combined | 2669100 | 2667300 | 1800 |
| 05/03/2021 | 04/04/2021 | Combined | 2667300 | 2665100 | 2200 |
| 04/01/2021 | 02/27/2021 | Combined | 2665100 | 2664000 | 1100 |
| 03/01/2021 | 01/30/2021 | Combined | 2664000 | 2662100 | 1900 |

| Account Num | Trans Type | Description | Original Amt | Curr Bill Bal | Running Bal | Bill Date | Due Date | Void Date | Void Note |
|---|---|---|---|---|---|---|---|---|---|
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $25.66 | $25.66 | 10/2/2025 | 10/31/2025 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 9/1/2025 | 9/30/2025 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 8/1/2025 | 8/29/2025 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 7/1/2025 | 7/31/2025 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 6/1/2025 | 6/30/2025 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 5/1/2025 | 5/30/2025 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 4/1/2025 | 4/30/2025 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 3/1/2025 | 3/31/2025 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 2/3/2025 | 2/3/2025 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 1/2/2025 | 1/31/2025 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 12/2/2024 | 12/31/2024 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 11/1/2024 | 11/27/2024 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 10/1/2024 | 10/31/2024 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 8/30/2024 | 9/30/2024 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 8/1/2024 | 8/30/2024 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 7/1/2024 | 7/31/2024 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 6/1/2024 | 6/28/2024 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 5/1/2024 | 5/31/2024 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 4/1/2024 | 4/30/2024 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 3/1/2024 | 3/29/2024 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 1/31/2024 | 1/31/2024 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 12/29/2023 | 1/31/2024 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 12/1/2023 | 12/29/2023 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 11/1/2023 | 11/30/2023 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 10/2/2023 | 10/31/2023 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 9/1/2023 | 9/29/2023 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 8/1/2023 | 8/31/2023 | | |

Southern Software FMS UB Transaction History

Date: 10/8/2025 9:50 AM



| Account Num | Trans Type | Description | Original Amt | Curr Bill Bal | Running Bal | Bill Date | Due Date | Void Date | Void Note |
|---|---|---|---|---|---|---|---|---|---|
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 7/1/2023 | 7/31/2023 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 6/1/2023 | 6/30/2023 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 5/1/2023 | 5/31/2023 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 4/1/2023 | 4/28/2023 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 3/1/2023 | 3/1/2023 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 2/1/2023 | 2/28/2023 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 1/1/2023 | 1/31/2023 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 12/1/2022 | 12/29/2022 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 11/1/2022 | 11/30/2022 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 10/1/2022 | 10/31/2022 | | |
| 001-0000490-1 | Bill | UB Bill Transacti | $25.66 | $0.00 | $0.00 | 9/1/2022 | 9/30/2022 | | |
| 001-0000490-1 | Manual Bill | Converted Manu | $25.66 | $0.00 | $0.00 | 8/11/2022 | | | |

Account Consumption History



| Meter ID | Trans Typ | Trans Cod | Trans Not | ccount Nu | Full Nam | ervice Ad | Curr Rea | Prev Rea | Calc Usag | vg Use Ar | Was Bille | Bill Date | Entry Dat | Serial No | Mtr Multi | Tran MtI | Trans Note1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Meter ID: 17** | | | | | | | | | | | | | | | | | |
| 17 | Manual | Manual | | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 0 | N | | 10/2/20 | 3195488 | 1 | | |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5687 | Y | 10/2/20 | 9/1/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5709 | Y | 9/1/202 | 7/13/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5731 | Y | 8/1/202 | 7/13/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5754 | Y | 7/1/202 | 6/14/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5777 | Y | 6/1/202 | 5/10/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5800 | Y | 5/1/202 | 4/6/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5823 | Y | 4/1/202 | 3/2/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5846 | Y | 3/1/202 | 2/4/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5869 | Y | 2/3/202 | 1/2/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5893 | Y | 1/2/202 | 12/8/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5917 | Y | 12/2/20 | 11/3/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5941 | Y | 11/1/20 | 10/6/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5965 | Y | 10/1/20 | 9/1/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 5989 | Y | 8/30/20 | 8/4/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6014 | Y | 8/1/202 | 7/7/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6039 | Y | 7/1/202 | 6/2/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6064 | Y | 6/1/202 | 5/5/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6089 | Y | 5/1/202 | 4/1/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6114 | Y | 4/1/202 | 3/3/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6140 | Y | 3/1/202 | 1/28/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6166 | Y | 1/31/20 | 12/28/2 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6192 | Y | 12/29/2 | 12/3/20 | 3195488 | 1 | | Transaction |
| 17 | HandHel | | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6218 | Y | 12/1/20 | 10/29/2 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6244 | Y | 11/1/20 | 10/1/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6271 | Y | 10/2/20 | 9/3/202 | 3195488 | 1 | | Transaction |



| Meter ID | Trans Typ | Trans Cod | Trans Not | Account Nu | Full Name | Service Ad | Curr Read | Prev Read | Calc Usag | Avg Use Ar | Was Billed | Bill Date | Entry Dat | Serial No | Mtr Multi | Tran Mit I | Trans Note1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | HandHel | | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6298 | Y | 9/1/202 | 7/30/20 | 3195488 | 1 | | Transaction |
| 17 | HandHel | | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6325 | Y | 8/1/202 | 6/25/20 | 3195488 | 1 | | Transaction |
| 17 | HandHel | | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6352 | Y | 7/1/202 | 5/28/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6380 | Y | 6/1/202 | 5/7/202 | 3195488 | 1 | | Transaction |
| 17 | HandHel | | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6408 | Y | 5/1/202 | 4/4/202 | 3195488 | 1 | | Transaction |
| 17 | HandHel | | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6436 | Y | 4/1/202 | 3/5/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6464 | Y | 3/1/202 | 2/5/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6492 | Y | 2/1/202 | 1/1/202 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6521 | Y | 1/1/202 | 12/4/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6550 | Y | 12/1/20 | 10/30/2 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | DR. ALA | 238 POT | 2673400 | 2673400 | 0 | 6579 | Y | 11/1/20 | 10/9/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | C/O DR. | 238 POT | 2673400 | 2673400 | 0 | 6608 | Y | 9/1/202 | 8/28/20 | 3195488 | 1 | | Transaction |
| 17 | Manual | Manual | Transact | 001-000 | C/O DR. | 238 POT | 2673400 | 2673400 | 0 | 6638 | Y | 10/1/20 | 8/15/20 | 3195488 | 1 | | Transaction |

# EXHIBIT 15

LAW OFFICES
OF

# SILVER & BROWN

A PROFESSIONAL CORPORATION
RED MAPLE COURT
10621 JONES ST., SUITE 101
FAIRFAX, VIRGINIA 22030

C. THOMAS BROWN†
GLENN H. SILVER*
ERIK B. LAWSON^
CAITLIN B. ONG°
  † (VA, MD)
  * (VA, DC, NY)
  ^ (VA, DC, MD)
  ° (VA, DC)

Telephone  (703) 591-6666
Facsimile  (703) 591-5618

Writers Email:
tom@virginia-lawyers.net

January 9, 2026

**VIA EMAIL estephens@cblaw.com**

E. Ford Stephens, Esquire
Christian & Barton, LLP
901 East Cary Street
Suite 1800
Richmond, Virginia 23219-4037

> **Re:**  **Insured: ORO MASTER SUB 2, LLC**
> **Insurer:  Ohio Security Insurance Company**
> **Loss Location: 238 Potomac Ave, Quantico, VA 22134**
> **Date of Loss: 1/23/2025**
> **Policy Number: BZS640984094**
> **Claim Number: 24244628**

Dear Ford:

It has been over a month since the inspection by your client and its engineer. In addition we are now approaching the one year anniversary from the date of loss. Can you please advise as to how the insurer wishes to proceed. Given the history of this case in which my client was ignored by the insurer for the better part of a year during which time the insurer failed to provide any substantive response to the questions posed, the insured is understandably frustrated. In the absence of notice that the insurer is withdrawing its unsubstantiated denial, I have been instructed to file suit given the history of delay but wanted to the insurer a final opportunity to pay this claim. Please let me know as soon as possible.

**Reservation of Rights**: Plaintiff will cooperate in this matter but will do so under a full reservation of rights. Neither this letter nor my clients continued cooperation with the

E. Ford Stephens, Esquire
Christian & Barton, LLP
January 9, 2026
Page 2 of 2 _____

insurers demands waives any rights against the insurer, including the right to assert claims for breach of contract, fraud, bad faith and lack of good faith. My client resaves all rights against Ohio Security. Anything done or to be done by the Insured or on the Insured's behalf in connection with the Claim shall not waive, invalidate, forfeit, or modify any of its rights under the policy or related to the manner in which the insurer has acted in connection with this matter. This expressly includes the right to file a complaint with the Bureau of Insurance and/or the Maryland Insurance Administration, to file suit, to preserve all claims against both Liberty Mutual and claims against its adjusters. The Insured also reserves all rights under Va. Code § 38.2-209, and under Md. Insurance Art. § 27-1001, given the repeated failures of Liberty Mutual to provide responses to its insured in this matter, its failure to provide any support for its denial, its failure to adjust and pay this claim, its failure to act in good faith, its various misrepresentations made in its attempt to deny this claim, and its ongoing bad faith which bad faith continues through today's date.

I look forward to receiving a substantive response to the multiple communications above.

Very truly yours,

*C. Thomas Brown*

C. Thomas Brown


CTB:jcl

cc:    Tony D'Amico
       Andy Macleay
       Dr. Alan Golden

# EXHIBIT 16



Liberty
Mutual.
INSURANCE

Liberty Mutual Insurance
Business Lines Property Claims
PO Box 5014
Scranton, PA 18505-5014

January 27, 2026

Dr. Alan Golden
Oro Master Sub 2, LLC
c/o Mr. C. Thomas Brown
Silver & Brown
A Professional Corporation
Red Maple Court
10621 Jones St., Suite 101
Fairfax, Virginia 22030
tom@virginia-lawyers.net

| RE: | Insured: | ORO MASTER SUB 2, LLC |
|---|---|---|
| | Loss Location: | 238 Potomac Ave, Quantico, Quantico, VA 22134 |
| | Loss Location State: | VA |
| | Date of Loss: | 1/23/2025 |
| | Policy Number: | BZS640984094 |
| | Policy Effective Dates: | 11/16/2024 To 11/16/2025 |
| | Claim Number: | 24244628 |
| | Underwriting Company: | Ohio Security Insurance Company |

Dear Dr. Golden:

This letter is to inform you that we have conducted a further investigation of your claim for water damage at the above-referenced location after receiving your lawyer's response to the coverage position set forth our April 3, 2025 letter to you. We have completed our review of the information provided by you or on your behalf, and a report on an inspection of the building. We have reassessed our previous coverage position. The following is a summary of our findings and our revised position on coverage for the claim asserted.

The insurance policy issued to ORO MASTER SUB 2, LLC provides coverage subject to the policy terms and conditions. Based on our investigation and review of the policy, there is no coverage available for your loss, as outlined below.

THE CLAIM

Our first notice of loss was on January 23, 2025. It was reported that there was water damage potentially due to a sprinkler line issue. We understand that your claim is limited to the loss to the building and does not include any business personal property. Please let us know if this is incorrect.

Our investigation of your claim revealed the following relevant information:

An onsite inspection was completed on or about January 28, 2025 by Frank Schmidt of Liberty Mutual Insurance. While onsite, Mr. Schmidt observed the building was listed for sale by Trust Properties Inc. Their sign was located at the front of the building.

Inspection of the interior revealed the building is 100% unoccupied and had suffered water damage to the interior by various frozen pipes and locations inside the building. While onsite, Mr. Schmidt made contact with you. You stated the building had been unoccupied and not used for its intended purpose for approximately 3 years and your last visit to the location was sometime in October of 2024.

The water meter was found to be disconnected with the water supply from the city directly connected to the building. This was stated by you as an arrangement with the city's Mayor to keep water service to the building for the purpose of keeping the fire suppression system charged in the event of a fire. The city Mayor discovered the loss and reported to you that there was water coming from the back door of the building.

Plumbing repairs were completed by your plumber (My Plumbing Heroes) on January 24, 2025. Based on their invoice, they repaired two leaks within the building. The invoice indicated that both water leaks were from frozen pipes, that they repaired 3/4th or 1" copper pipes with new copper pipes and fittings, and that they requested a fire suppression company make the needed repairs to the sprinkler system. The cost of these repairs was $2,678.00. Damaged components were photographed and discarded by others.

We received a copy of an invoice dated February 5, 2025 from Builders Fire Solutions LLC for fire sprinkler repairs at the building. It states, "Based on initial inspection, we replaced 3 identifiable sprinkler heads that were broken due to freezing temperatures. We proceeded to test the pipe under pressure… One additional leak was identified in this process and replaced. We have left street pressure on the system but we did leave the incoming valve in the 'off' position at this time. This is due to the fact the fire alarm panel is not operational at this time." The cost of these repairs was $1,680.00.

We retained the services of Jeffrey Bradley, P.E., CFEI, CVFI Forensic Engineer from Donan Engineering. Mr. Bradley inspected the utility bills and other relevant information provided by you. He did not inspect the building in person.

Mr. Bradley prepared a report dated March 21, 2025. His findings included in part:

> The building is approximately 7,000 square feet and was reportedly vacant and for sale the prior three years. The water meter was removed from the building before the water loss, and the city water was connected directly to the building.
>
> Inspection photos include a fire protection system with a wet-type valve….
>
> Based on historical weather data, only during the span between January 20, 2025, and January 23, 2025, did temperatures never rise above freezing and thus this is the most plausible time frame for a pipe freezing event….

No information was provided on the type of heat used in the building. Based on the increased usage of natural gas during the heating season and the lack of gas usage during the warm seasons, the building is heated with natural gas. Natural gas usage increases similar to the HDD during the 2023/2024 and 2024/2025 seasons, consistent with an attempt to heat the property. The electrical usage remained steady throughout the prior year, indicating electrical service has been maintained in the building. Based on the information provided, an attempt was made to maintain heat in the building.

Although the exact cause of the water losses could not be determined with the provided information, freezing in multiple areas of the building is consistent with inadequate heat inside the building. A power interruption, natural gas interruption, or furnace thermostat setting that is too low could contribute to the loss.

A copy of the March 21, 2025 report with appendices is attached.

In an April 3, 2025 letter to you, we informed you that based on our investigation and review of the policy, there was no coverage available for your loss.

We received letters and emails from your lawyer dated August 19, 2025 and August 28, 2025 contesting our April 3, 2025 coverage position. He sent us copies of documents relating the amount of loss or damage that you are claiming. Your lawyer has maintained that the water supply to the domestic lines in the building had been cut off and the water drained before the loss. He also sent us a copy of a 2021 invoice from K&B Plumbing & Heating, Inc. to "WINTERIZE DENTAL OFFICE."

In his August 18, 2025 letter to us, your lawyer asserted that "the heating system was operational but due to events beyond the insureds control a freeze occurred when some part of the heating system failed." This sentence was followed by a footnote that asserted, in part: "The heating system could have failed by … the failure of the furnace in operation."

In response, we reopened our investigation of the claim to reassess our previous coverage position. On September 22, 2025, we requested documentation for the building's HVAC and an opportunity to inspect the building. We did so under a reservation of our rights.

While reserving your rights, your lawyer provided documents from KW Smith & Son, Inc. and a Customer Consumption History List with his October 28, 2025 letter, and an inspection of the building took place on December 2, 2025. You, Andrew Macleay, a public adjuster, Robert Hester, an engineer, and Mr. Bradley were present at the inspection.

Mr. Bradley provided a report dated December 9, 2025. A summary of Mr. Bradley's findings is as follows in part:

Andrew Macleay pointed out two areas inside the building where the sprinkler heads had been replaced after a water loss: the doctor's office in the southeast portion of the building and the bathroom in the northeast corner. After the fire protection system was restored, another area leaked in the front lobby area of the building from an unknown location....

The building is heated by four Trane-brand furnaces in the attic area of the building. The units are labeled one, four, two, and three (east to west)... The burners ignite, and the blower motors energize on all four units when heat is called for by the thermostats....

A metered 6-inch water line feeds into the southwest corner of the building and supplies a wet-type fire protection system (Photograph 19). The system is pressurized to approximately 65 pounds per square inch (psi). The domestic water meter box is along the sidewalk in front of the building. No meter or bypass is installed on the municipal water line (Photograph 20). The 2-inch copper domestic water enters from the floor near the south wall of the mechanical room.

The report then notes the areas where the sprinkler heads reportedly failed – the doctor's office in the southeast portion of the building; the northeast bathroom; and front hallway area in the west portion of the building – and includes a layout of the building showing the locations of the sprinkler heads.

Mr. Bradley reviewed the HVAC records:

A total of 19 pages of HVAC records from KW Smith & Son, Incorporated, were reviewed. Invoices of completed dates October 7, 2020, July 27, 2020, January 27, 2021, and October 27, 2021, reference air filter and/or belt replacements as a part of quarterly maintenance. A note on an October 27, 2021, invoice states, "The practice has vacated the Quantico facility at 238 Potomac Avenue. As such, we will no longer require any servicing of the HVAC equipment at that address. Please note this in our records."

The next invoice, dated September 29, 2022, states, "3 of 4 stats were blank, replaced batts in each set at 50 deg perm hold and heat mode with fan AUTO." Also, "in attic, found the farthest furnace with blower running. IGN control flashing TEMP LIMIT OPEN. Checked all three temp devices, high limit, roll out and draft (blocked vent) all were good. Reset and unit cleared and heat works when jumped out". Additionally, "the next unit didn't ignite, found HIS broken. Left unit open with power off. Next two worked fine, no issues."

The next invoice dated January 24, 2025, states, "4 stats, one on, 3 blank. System 1 running in heat. #4 has power but no operation cause stat is blank. #2 has panels removed, power switch off and gas valve turned off with not stating it is off! #3 powered but no operation. Tstats, batteries are dead, stats don't have

common to power stat, must have batteries. Replaced batteries in the 3 blank stats, two came on pulling over, the third acted like it has a loose connection internally, won't stay on if bumped. Put this stat by #2's wall on a counter marking stat as bad. Other two, put them on for units #4 & #3. Then verified furnaces were working." Also, "three of four units are working now, in attic the furnaces run from the door to right – 1-4-2-3 with #2 being down. The right stat marked #2 is the one not working. All working stats are set to 50 deg permanent hold heat mode".

An invoice dated March 10, 2025, states that the thermostat of system #2 was replaced and hooked up a common wire for the thermostat. The limit switch also trips early, below its design of 190 degrees. A common wire was connected to the thermostat of systems 1, 3, and 4. System 4 was tripped off from safety.

Mr. Bradley reviewed the plumbing repair records:

An invoice dated January 24, 2025, from My Plumbing Heroes was reviewed. The invoice states, "My plumbing heroes located two leaks at two different areas in building. My plumbing heroes located 6 inch fire main and was able to shut down water in order to locate the exact leak. Both water leaks were from frozen pipes. Repaired one leak at the rear east part of the building. Repaired second leak in private administrative office."

An invoice dated February 5, 2025, from Builders Fire Solutions was reviewed. The invoice states, "Based on initial inspection, we replaced three identifiable sprinkler heads that were broken due to freezing temperatures. We proceeded to test the pipe under pressure… one additional leak was identified in this process and replaced. We have left street pressure on the system but we did leave the incoming valve in the "off" position at this time. This is due to the fact the fire alarm panel is not operational at this time."

Mr. Bradley's report then describes plumbing freeze failures in general, and freeze protection for plumbing components, as provided in the International Plumbing Code, and that the National Fire Sprinkler Association summarizes NFPA 13, 13R, and 13D's requirements regarding freeze protection for a fire suppression system in section five of "Insulation for Fire Sprinklers Guide." The report includes provisions from NFPA 13R about methods to protect sprinkler systems from freezing.

The report's conclusions are:

Based on the HVAC records, three of the four furnaces were not in operation on January 24, 2025. This corresponds to a time after a span between January 20 and January 23, 2025, where temperatures did not rise above freezing. On furnace two, the gas valve was shut off, the panels removed, and the thermostat was inoperable. The thermostats for furnaces three and four were blank and were

fixed by replacing the dead batteries. The only furnace in operation was unit one, which serves the south portion of the building.

The multiple fire protection and plumbing leaks occurred in sections of the building with the inoperable furnaces. The doctor's office in the southeast portion of the building was more vulnerable due to an exterior wall and window. The supply air diffuser in the ceiling is near the failed sprinkler head, supporting that no heat was on in this section of the building. The northeast bathroom was more vulnerable to freezing due to two exterior walls and no supply air diffuser inside the room. The bathroom is heated from a hallway supply air diffuser outside the door. The furnace for this section of the building and hallway was also inoperable. The exact sprinkler head that failed above the west portion of the building's hallway could not be determined; however, the furnace for this section was also inoperable. All of the above-referenced sprinkler system failures occurred below the insulation beneath the roof sheathing, indicating that inadequate heat was provided inside the building to prevent the fire protection system from freezing.

The plumber's invoice indicates that two domestic water lines also froze and were repaired. Although the exact pipes could not be identified during the study, the areas "private administrative office" and "rear east part of the building" are the same areas as the failed sprinkler heads. These areas are in the areas of the building with inoperable furnaces.

The inspection photographs from March 1, 2025, from Liberty Mutual Insurance have a "for sale" sign on the front of the building. No furniture is in the building, and no dental chairs or equipment are in the rooms. The last HVAC invoice before the water loss for HVAC service was on September 29, 2022. During the service, the batteries in three of the thermostats were dead and replaced. In addition, the furnace next to the last (furnace two), was left with the panel off and the power off. Furnace two was found in a similar condition during the January 24, 2025, HVAC invoice. On January 24, 2025, three of the thermostats were found blank again with depleted batteries. Based on the information provided, the HVAC system was not serviced for over two years before the water loss. During this time span, the batteries in three of the thermostats failed, and furnace two was left inoperable. The absence of heat in the building that caused the freezing was due to inadequate maintenance of the HVAC equipment.

The original Donan desk review concluded that natural gas and electricity were provided to the building. With the electrical and gas usage, an attempt was made to maintain heat in the building. These findings remain unchanged. The gas meter's actual reading was on January 31, 2025. Three of the four furnaces were up and running after the January 24, 2025, repair for at least seven days during this gas usage cycle. The exact gas usage before and after the water loss could not be determined.



Mr. Bradley's summary of conclusions, based on what is known at this time, is that he is of the opinion that:

- Inadequate heat was maintained inside the building to prevent the fire protection and plumbing system from freezing.

- The absence of heat in the building that caused the freezing was due to inadequate maintenance of the HVAC equipment.

A copy of Mr. Bradley's full report, with appendices, is attached for your review.

## THE POLICY

The Common Policy Declarations to Policy No. BZS (25) 64 09 84 09 indicate that the policy was issued to ORO MASTER SUB 2, LLC, which is the owner of the building at 238 Potomac Ave, Quantico, VA 22134-3459, and the named insured's business is listed as "Dental Office." The building coverage has a $5,000 deductible.

The policy includes a Businessowners Coverage Form (Form BP 00 03 07 13) which states in part:

### BUSINESSOWNERS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Form, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance....

Other words and phrases that appear in quotation marks have special meaning. Refer to Paragraph H. Property Definitions in Section I - Property and Paragraph F. Liability And Medical Expenses Definitions in Section II - Liability.

### SECTION I – PROPERTY

#### A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

#### 1. Covered Property

Covered Property includes Buildings as described under Paragraph **a.** below, Business Personal Property as described under Paragraph **b.** below, or both, depending on whether a Limit Of Insurance is shown in the Declarations for that type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described under Paragraph 2. Property Not Covered.

    **a.** Buildings, meaning the buildings and structures at the premises described in the Declarations, including:

        **(1)** Completed additions;

        **(2)** Fixtures, including outdoor fixtures;...

**3. Covered Causes Of Loss**

Direct physical loss unless the loss is excluded or limited under Section I - Property....

**B. Exclusions ...**

    **3.** We will not pay for loss or damage caused by or resulting from any of the following Paragraphs **a.** through **c.** But if an excluded cause of loss that is listed in Paragraphs **a.** through **c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss....

        **c. Negligent Work**

        Faulty, inadequate or defective:...

        **(4)** Maintenance;

        of part or all of any property on or off the described premises....

**E. Property Loss Conditions ...**

    **8. Vacancy**

        **a. Description Of Terms**

        **(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs **(a)** and **(b)** below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31 % of its total square footage is:

(i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:...

(b) Sprinkler leakage, unless you have protected the system against freezing;...

(2) With respect to Covered Causes of Loss other than those listed in Paragraphs (1)(a) through (1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%....

An effort has been made to recite accurately the terms of the policy in this letter. However, to the extent that the terms recited in this letter differ from the terms of the policy, the policy would control.

## APPLICATION OF POLICY

In an effort to alert you to the basis of the denial of coverage, listed below are the grounds under which all aspects of the claim are not covered under the policy and on which we are reserving our rights. It is Ohio Security's intent to incorporate by reference all of the terms of the policy through this letter. Based upon the information available to date, the grounds for the denial of coverage and our reservation of rights under the policy, or under applicable law, with respect to the claim, include, but are not limited to, the following:

### The Vacancy Provisions

Under the Vacancy Provision, the term building and the term vacant have certain meanings, including that when the policy is issued to the owner or general lessee of a building, building means the entire building; and such building is vacant unless at least 31% of its total square footage is: (i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or (ii) Used by the building owner to conduct customary operations.

The policy was issued to ORO MASTER SUB 2, LLC, which is the owner of the building. You stated the building had been unoccupied and not used for its intended purpose for approximately three years and your last visit to the location was sometime in October of 2024. As a result, at the time of the loss, the building was vacant, because at least 31% of its total square footage was neither (i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; nor (ii) Used by ORO MASTER SUB 2, LLC to conduct customary operations.

In addition, when the building where loss or damage occurred has been vacant for more than 60 consecutive days before that loss or damage occurred, we will not pay for any loss or damage caused by the following even if they are Covered Causes of Loss: sprinkler leakage, unless you have protected the system against freezing.

Here, the building had been vacant for more than 60 consecutive days before that loss or damage occurred; you have claimed that the loss or damage to the building was caused by sprinkler leakage; and you did not protect the system from freezing, as described in Mr. Bradley's reports.

As a result, there is no coverage under the policy for your claim for the loss or damage to the building caused by the sprinkler leakage.

### The Exclusion for Negligent Work

Under this exclusion, we will not pay for loss or damage caused by or resulting from any of the following Paragraphs a. through c. But if an excluded cause of loss that is listed in Paragraphs a. through c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss. Paragraph c. includes Negligent Work, which is described in part as faulty, inadequate or defective maintenance.

The damage to the building that the plumbers repaired was caused by or was resulting from inadequate maintenance of the HVAC equipment. As a result, there is no coverage under the policy for the damage that the plumbers repaired. Alternatively, even if such damage were covered, the cost of the repairs would be within the policy's deductible of $5,000.

**The Amount of the Loss or Damage**

Ohio Security finds no coverage under the terms and conditions of the Policy for the costs claimed in connection with your claim, and therefore respectfully denies claim. In view of the absence of coverage, Ohio Security makes no comment relative to the amount of loss or damage but includes those issues within the rights that Ohio Security is reserving.

If you have any questions about the content of this letter or the terms and provisions of your policy of insurance, please do not hesitate to us.

**Ohio Security's position is based upon facts as they are currently known. If you have other facts which you would like us to consider now, or as they may be presented later, we encourage you to submit them to us for our review.**

The foregoing is not intended to waive any defenses which are now, or which may hereafter become available to us. The foregoing does not constitute a waiver of any term, condition, or exclusion of the insurance policy or any rights and defenses under the policy, and we hereby expressly reserve all of our rights and defenses.

Finally, we refer you to the following relevant provisions contained in the Businessowners Coverage Form:

    **E. Property Loss Conditions ...**

        4. **Legal Action Against Us**

        No one may bring a legal action against us under this insurance unless:

        a. There has been full compliance with all of the terms of this insurance; and

        b. The action is brought within two years after the date on which the direct physical loss or damage occurred....

If you have any questions regarding your claim, please feel free to contact us.

Sincerely,

Douglas Hunt
General Adjuster / Large Loss Property


cc: RK Tongue Company Inc. (Agent)
    4940 Campbell Blvd. Suite 200
    Nottingham, MD 21236

# COVER SHEET FOR FILING CIVIL ACTIONS

COMMONWEALTH OF VIRGINIA

Case No. .............................................................
(CLERK'S OFFICE USE ONLY)

PRINCE WILLIAM COUNTY .................................................................. Circuit Court

ORO MASTER SUB 2, LLC .................................................................. v./In re: LIBERTY MUTUAL INSURANCE COMPANY ..................
PLAINTIFF(S)                                                      DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

**GENERAL CIVIL**

**Subsequent Actions**
[ ] Claim Impleading Third Party Defendant
  [ ] Monetary Damages
  [ ] No Monetary Damages
[ ] Counterclaim
  [ ] Monetary Damages
  [ ] No Monetary Damages
[ ] Cross Claim
[ ] Interpleader
[ ] Reinstatement (other than divorce or driving privileges)
[ ] Removal of Case to Federal Court

**Business & Contract**
[ ] Attachment
[ ] Confessed Judgment
[X] Contract Action
[ ] Contract Specific Performance
[ ] Detinue
[ ] Garnishment

**Property**
[ ] Annexation
[ ] Condemnation
[ ] Ejectment
[ ] Encumber/Sell Real Estate
[ ] Enforce Vendor's Lien
[ ] Escheatment
[ ] Establish Boundaries
[ ] Landlord/Tenant
  [ ] Unlawful Detainer
[ ] Mechanics Lien
[ ] Partition
[ ] Quiet Title
[ ] Termination of Mineral Rights

**Tort**
[ ] Asbestos Litigation
[ ] Compromise Settlement
[ ] Intentional Tort
[ ] Medical Malpractice
[ ] Motor Vehicle Tort
[ ] Product Liability
[ ] Wrongful Death
[ ] Other General Tort Liability

**ADMINISTRATIVE LAW**
[ ] Appeal/Judicial Review of Decision of (select one)
  [ ] ABC Board
  [ ] Board of Zoning
  [ ] Compensation Board
  [ ] DMV License Suspension
  [ ] Employee Grievance Decision
  [ ] Employment Commission
  [ ] Local Government
  [ ] Marine Resources Commission
  [ ] School Board
  [ ] Voter Registration
  [ ] Other Administrative Appeal

**DOMESTIC/FAMILY**
[ ] Adoption
  [ ] Adoption – Foreign
[ ] Adult Protection
[ ] Annulment
  [ ] Annulment – Counterclaim/Responsive Pleading
[ ] Child Abuse and Neglect – Unfounded Complaint
[ ] Civil Contempt
[ ] Divorce (select one)
  [ ] Complaint – Contested*
  [ ] Complaint – Uncontested*
  [ ] Counterclaim/Responsive Pleading
  [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
[ ] Separate Maintenance
  [ ] Separate Maintenance Counterclaim

**WRITS**
[ ] Certiorari
[ ] Habeas Corpus
[ ] Mandamus
[ ] Prohibition
[ ] Quo Warranto

**PROBATE/WILLS AND TRUSTS**
[ ] Accounting
[ ] Aid and Guidance
[ ] Appointment (select one)
  [ ] Guardian/Conservator
  [ ] Standby Guardian/Conservator
  [ ] Custodian/Successor Custodian (UTMA)
[ ] Trust (select one)
  [ ] Impress/Declare/Create
  [ ] Reformation
[ ] Will (select one)
  [ ] Construe
  [ ] Contested

**MISCELLANEOUS**
[ ] Amend Birth/Death Certificate
[ ] Appointment (select one)
  [ ] Church Trustee
  [ ] Conservator of Peace
  [ ] Marriage Celebrant
[ ] Approval of Transfer of Structured Settlement
[ ] Bond Forfeiture Appeal
[ ] Declaratory Judgment
[ ] Declare Death
[ ] Driving Privileges (select one)
  [ ] Reinstatement pursuant to § 46.2-427
  [ ] Restoration – Habitual Offender or 3rd Offense
[ ] Expungement
[ ] Firearms Rights – Restoration
[ ] Forfeiture of Property or Money
[ ] Freedom of Information
[ ] Injunction
[ ] Interdiction
[ ] Interrogatory
[ ] Judgment Lien-Bill to Enforce
[ ] Law Enforcement/Public Official Petition
[ ] Name Change
[ ] Referendum Elections
[ ] Sever Order
[ ] Taxes (select one)
  [ ] Correct Erroneous State/Local
  [ ] Delinquent
[ ] Vehicle Confiscation
[ ] Voting Rights – Restoration
[ ] Other (please specify)

[X] Damages in the amount of $ 1,250,000.00 ........................................ are claimed.

4/6/2026
DATE

[ ] PLAINTIFF  [ ] DEFENDANT  [X] ATTORNEY FOR  [X] PLAINTIFF
                                                 [ ] DEFENDANT

C. Thomas Brown, Esquire/ Silver & Brown, P.C.
PRINT NAME

10621 Jones Street, Suite 101, Fairfax, VA 22030
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

(703) 591-6666

tom@virginia-lawyers.net
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 02/23

## Civil Action Type Codes
### (Clerk's Office Use Only)

Accounting ................................................................ ACCT
Adoption .................................................................. ADOP
Adoption – Foreign ................................................... FORA
Adult Protection ....................................................... PROT
Aid and Guidance ...................................................... AID
Amend Birth/Death Certificate ................................... AVR
Annexation ............................................................... ANEX
Annulment ............................................................... ANUL
Annulment – Counterclaim/Responsive Pleading .. ACRP
Appeal/Judicial Review
    ABC Board ......................................................... ABC
    Board of Zoning ................................................ ZONE
    Compensation Board ......................................... ACOM
    DMV License Suspension ...................................... JR
    Employment Commission ................................... EMP
    Employment Grievance Decision ........................ GRV
    Local Government ............................................. GOVT
    Marine Resources ............................................. MAR
    School Board ....................................................... JR
    Voter Registration ........................................... AVOT
    Other Administrative Appeal ............................ AAPL
Appointment
    Conservator of Peace ......................................... COP
    Church Trustee ................................................ AOCT
    Custodian/Successor Custodian (UTMA) ...... UTMA
    Guardian/Conservator ....................................... APPT
    Marriage Celebrant ......................................... ROMC
Approval of Transfer of Structured Settlement ............. SS
Asbestos Litigation ....................................................... AL
Attachment ................................................................. ATT
Bond Forfeiture Appeal ............................................... BFA
Child Abuse and Neglect – Unfounded Complaint .. CAN
Civil Contempt ......................................................... CCON
Claim Impleading Third Party Defendant –
    Monetary Damages/No Monetary Damages .......... CTP
Complaint – (Miscellaneous) ...................................... COM
Compromise Settlement ............................................ COMP
Condemnation .......................................................... COND
Confessed Judgment ...................................................... CJ
Contract Action ........................................................ CNTR
Contract Specific Performance .................................. PERF
Counterclaim – Monetary Damages/No Monetary
    Damages ................................................................ CC
Cross Claim ............................................................. CROS
Declaratory Judgment ............................................... DECL
Declare Death ........................................................... DDTH
Detinue ....................................................................... DET
Divorce
    Complaint – Contested/Uncontested ................... DIV
    Counterclaim/Responsive Pleading ................. DCRP
    Reinstatement – Custody/Visitation/Support/
        Equitable Distribution ................................... CVS
Driving Privileges
    Reinstatement pursuant to § 46.2-427 ............. DRIV
    Restoration – 3rd Offense ..................................... REST

Ejectment ................................................................. EJET
Encumber/Sell Real Estate ............................................ RE
Enforce Vendor's Lien .............................................. VEND
Escheatment ............................................................... ESC
Establish Boundaries ................................................. ESTB
Expungement ........................................................... XPUN
Forfeiture of Property or Money ............................. FORF
Freedom of Information ............................................... FOI
Garnishment ............................................................ GARN
Injunction ................................................................... INJ
Intentional Tort ........................................................ ITOR
Interdiction ............................................................... INTD
Interpleader .............................................................. INTP
Interrogatory ............................................................ INTR
Judgment Lien – Bill to Enforce .............................. LIEN
Landlord/Tenant ............................................................ LT
Law Enforcement/Public Official Petition .............. LEP
Mechanics Lien ....................................................... MECH
Medical Malpractice ................................................. MED
Motor Vehicle Tort ..................................................... MV
Name Change .............................................................. NC
Other General Tort Liability .................................... GTOR
Partition .................................................................. PART
Permit, Unconstitutional Grant/Denial by Locality LUC
Petition – (Miscellaneous) ........................................ PET
Product Liability ...................................................... PROD
Quiet Title ................................................................... QT
Referendum Elections .............................................. ELEC
Reinstatement (Other than divorce or driving
    privileges) ........................................................ REIN
Removal of Case to Federal Court ............................ REM
Restore Firearms Rights – Felony ........................... RFRF
Restore Firearms Rights – Review ........................... RFRR
Separate Maintenance ................................................ SEP
Separate Maintenance – Counterclaim/Responsive
    Pleading ............................................................ SCRP
Sever Order ............................................................. SEVR
Sex Change ................................................................ COS
Taxes
    Correct Erroneous State/Local ....................... CTAX
    Delinquent ....................................................... DTAX
Termination of Mineral Rights .................................. MIN
Trust – Impress/Declare/Create ................................ TRST
Trust – Reformation .................................................. REFT
Uniform Foreign Country Money Judgments ....... RFCJ
Unlawful Detainer ....................................................... UD
Vehicle Confiscation ................................................. VEH
Violation – Election Law ............................................ VEL
Voting Rights – Restoration .................................... VOTE
Will Construction ..................................................... CNST
Will Contested ......................................................... WILL
Writs
    Certiorari ........................................................... WC
    Habeas Corpus ................................................. WHC
    Mandamus ......................................................... WM
    Prohibition ......................................................... WP
    Quo Warranto ................................................. WQW
Wrongful Death .......................................................... WD